1  COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
2  BONNY E. SWEENEY (176174)
   PHONG L. TRAN (204961)
3  655 West Broadway, Suite 1900
   San Diego, CA  92101
4  Telephone:  619/231-1058
   619/231-7423 (fax)
5  bonnys@csgrr.com
   ptran@csgrr.com
6      – and –
   DAVID J. GEORGE
7  STUART A. DAVIDSON
   JAMES L. DAVIDSON
8  MARY CLARK
9  120 E. Palmetto Park Road, Suite 500
   Boca Raton, FL  33432-4809
10 Telephone:  561/750-3000
   561/750-3364 (fax)
11 dgeorge@csgrr.com
   sdavidson@csgrr.com
12 jdavidson@csgrr.com
13 mclark@csgrr.com

14 Attorneys for Plaintiffs

15 [Additional counsel appear on signature page.]

16              UNITED STATES DISTRICT COURT

17             NORTHERN DISTRICT OF CALIFORNIA

18                  SAN JOSE DIVISION

19 ECLECTIC PROPERTIES EAST, LLC, a
   California Limited Liability Company,      No.
20 RISOLA FAMILY LP II, a Florida Limited
   Partnership, CECA 3000, LP, a Nevada       COMPLAINT FOR:
21 Limited Partnership, CHEATHAM
   PROPERTIES, LLC, a California Limited       1.  Violations of the Racketeer Influenced and
22 Liability Company, successor in the interest of  Corrupt Organizations Act, 18 U.S.C.
   John and Mary Cheatham, VAS                §1962(c)-(d);
23 ENTERPRISES I LLC,                         2.  Negligent Misrepresentation;
                                              3.  Fraudulent Concealment, Cal. Civ. Code
24 ─────────────────────────────────          §1710, et seq.;
                                              4.  Unjust Enrichment and Imposition of a
25 [Caption continued on following page.]      Constructive Trust;
                                              5.  Money Had and Received;
26                                            6.  Violation of California Business &
                                              Professions Code §17200, et seq.; and
27                                            7.  Violation of California Business &
                                              Professions Code §17500, et seq.
28
                                              DEMAND FOR JURY TRIAL

**ORIGINAL FILED**

FEB – 4 2009

Richard W. Wieking
Clerk, U.   . District Court
Northern District of California
San Jose

C09  00511

RMW

RS

1 | a California Limited Liability Company, )
AMNON DANUS and RIVKA DANUS, )
2 | FRED ENGELBERG, LINDA FARRELL, )
JOSEPH W. AMIRKHAS, JOSEPH W. )
3 | AMIRKHAS, as Trustee under The Amirkhas )
Trust, dated January 14, 2000, JUSTUS L. )
4 | AHREND and SUSAN W. AHREND, )
Trustees of The Justus and Susan Ahrend )
5 | Trust, dated December 6, 1990, KEVORK )
BELIKIAN and SYLVIA S. BELIKIAN, )
6 | Trustees under The Kevork Belikian and Sylvia)
S. Belikian Living Trust, dated July 10, 2000, )
7 | MANI ETEMAD and SUSAN )
KHOSHNOOD, Trustees of the Mani Etemad )
8 | and Susan Khoshnood 2001 Revocable Trust, )
EUGENIA GAGNON, Trustee of the Genie )
9 | Debs Revocable Trust, dated October 10, 1995,)
THOMAS H. LINDEN and SYLVIA E. )
10 | LINDEN, Trustees of The Thomas H. Linden )
and Sylvia E. Linden Family Trust, dated )
11 | September 19, 2000, JOHANNES )
MODERBACHER and EILEEN STARR )
12 | MODERBACHER, as Trustees of The )
Moderbacher Family Trust, Established by )
13 | Declaration of Trust, dated February 1, 2006, )
RICHARD W. SIEBERT and DEBRA M. )
14 | SIEBERT, Trustees of The Siebert Family )
Trust U/D/T, dated January 13, 2003, ALLEN )
15 | ERNEST HOM, Trustee for The Allen Ernest )
Hom Trust, dated August 19, 1992, and )
16 | LINDA J. CALL, Trustee for The Linda )
Jeanne Call Family Trust, dated September 12, )
17 | 2002, )
| )
18 | Plaintiffs, )
| )
19 | vs. )
| )
20 | THE MARCUS & MILLICHAP COMPANY, )
a California corporation, MARCUS & )
21 | MILLICHAP REAL ESTATE INVESTMENT )
SERVICES INC., a California corporation, )
22 | MARCUS & MILLICHAP REAL ESTATE )
INVESTMENT BROKERAGE COMPANY, a )
23 | California corporation, SOVEREIGN )
INVESTMENT COMPANY, a California )
24 | corporation, SOVEREIGN SCRANTON LLC, )
a Delaware Limited Liability Company, )
25 | SOVEREIGN CC, LLC, a Delaware Limited )
Liability Company, SOVEREIGN JF, LLC, )
26 | )

27 | [Caption continued on following page.]

28

1   a California Limited Liability Company, PAUL)
    A. MORABITO, individually and as the alter- )
2   ego of Eureka Petroleum Inc., a New York     )
    corporation, Tibarom Inc., a Delaware        )
3   corporation, Tibarom NY LLC, a Nevada        )
    Limited Liability Company, Tibarom PA LLC, )
4   a Nevada Limited Liability Company, Scranton)
    Lube, LLC, a Delaware Limited Liability      )
5   Company, NY Seven Lube, LLC, a Delaware )
    Limited Liability, New York Lube Number 3, )
6   LLC, a Delaware Limited Liability Company, )
    Rochester Lube, LLC, a Delaware Limited      )
7   Liability Company, Baruk Management, Inc., a )
    California corporation, EUREKA               )
8   PETROLEUM INC., a New York corporation, )
    TIBAROM INC., a Delaware corporation,        )
9   TIBAROM NY LLC, a Nevada Limited            )
    Liability Company, TIBAROM PA LLC, a         )
10  Nevada Limited Liability Company,            )
    SCRANTON LUBE, LLC, a Delaware Limited)
11  Liability Company, NY SEVEN LUBE, LLC, )
    a Delaware Limited Liability, NEW YORK      )
12  LUBE NUMBER 3, LLC, a Delaware Limited )
    Liability Company, ROCHESTER LUBE,          )
13  LLC, a Delaware Limited Liability Company, )
    BARUK MANAGEMENT, INC., a California )
14  corporation, JACK WAELTI, individually and)
    as the alter-ego of The QSR Group One, LLC, )
15  a Florida Limited Liability Company, The QSR)
    Group, LLC, a Florida Limited Liability      )
16  Company, and The QSR Group II, LLC, a       )
    Florida Limited Liability Company a/k/a The )
17  QSR Group Two, LLC, THE QSR GROUP       )
    ONE, LLC, a Florida Limited Liability        )
18  Company, THE QSR GROUP, LLC, a Florida )
    Limited Liability Company, and THE QSR      )
19  GROUP II, LLC, a Florida Limited Liability   )
    Company a/k/a THE QSR GROUP TWO,            )
20  LLC, PGP VALUATION, INC., an Oregon         )
    corporation, GLEN D. KUNOFSKY,              )
21  MARCUS MUIRHEAD, ALEXANDER                )
    MICKLE, SEAN PERKIN, DONALD EMAS, )
22  ANDREW LESHER, STEWART WESTON,          )
    BRICE HEAD, DAIZY GOMEZ, and BRET        )
23  KING,                                        )
                                                 )
24                          Defendants.          )
                                                 )
25  ─────────────────────────────────────────)

26

27

28

# TABLE OF CONTENTS

Page

I.     INTRODUCTION ...................................................................................................2

II.    JURISDICTION AND VENUE ...........................................................................4

III.   INTRADISTRICT ASSIGNMENT.......................................................................5

IV.    PARTIES ...............................................................................................................5

V.     GENERAL ALLEGATIONS ...............................................................................13

VI.    THE SET-UP .......................................................................................................13

VII.   THE BAIT IS CAST – THE MISREPRESENTATIONS.....................................15

VIII.  THE PAYOFF – THE SCAM WORKS ..............................................................17

IX.    THE PARTICULARS OF DEFENDANTS' FRAUDULENT SCHEME ...........19

       A.    How Mani Etemad Got Scammed ............................................................19

       B.    How Michael and Sally Wiley Got Scammed ..........................................28

       C.    How Eileen and Johannes Moderbacher Got Scammed ...........................34

       D.    How Thomas Linden Got Scammed..........................................................41

       E.    How Sylvia and Kevork Belikian Got Scammed .....................................47

       F.    How Sam and Arleen Risola Got Scammed .............................................55

       G.    How Justus and Susan Ahrend Got Scammed...........................................60

       H.    How Gary Reid Got Scammed..................................................................67

       I.    How Eugenia Gagnon Got Scammed .......................................................76

       J.    How Joseph Amirkhas Got Scammed ......................................................92

       K.    How Allen Hom Got Scammed ................................................................106

       L.    How Mary Cheatham Got Scammed .........................................................116

       M.    How Amnon and Rivka Danus Got Scammed ..........................................123

       N.    How Richard and Debra Siebert Got Scammed ........................................128

       O.    How Linda Farrell and Fred Engelberg Got Scammed ............................135

       P.    How Victoria Armenta Got Scammed ......................................................143

       Q.    How Linda Call Got Scammed ..................................................................150

**Page**

X.      RICO ALLEGATIONS ........................................................................................159

    A.      The M&M Enterprise..........................................................................159

    B.      Pattern of Racketeering Activity.........................................................162

    C.      Predicate Act Violations of 18 U.S.C. §§1341 and 1343 ....................163

    D.      RICO Violations ..................................................................................165

    E.      RICO Conspiracy.................................................................................165

XI.     FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ...........................166

XII.    CAUSES OF ACTION.....................................................................................167

COUNT I Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)-(d) .................................................................................167

COUNT II Negligent Misrepresentation ....................................................................168

COUNT III Fraudulent Concealment, Cal. Civ. Code §1710, *et seq.* .............................169

COUNT IV Unjust Enrichment and Imposition of a Constructive Trust ........................170

COUNT V Money Had and Received ..........................................................................171

COUNT VI Violation of California Business & Professions Code §17500, *et seq.* .......172

COUNT VII Violation of California Business & Professions Code §17200, *et seq.* .......172

PRAYER FOR RELIEF ..............................................................................................174

JURY DEMAND........................................................................................................174

CERTIFICATION OF INTERESTED ENTITIES OR PERSONS ...........................................176

COMPLAINT

1     Plaintiffs Eclectic Properties East, LLC, Risola Family Limited Partnership II, CECA 3000,

2  LP, Cheatham Properties, LLC, VAS Enterprises I LLC, Amnon Danus and Rivka Danus, Fred

3  Engelberg, Linda Farrell, Joseph W. Amirkhas, Joseph W. Amirkhas, as Trustee under The

4  Amirkhas Trust, dated January 14, 2000, Justus L. Ahrend and Susan W. Ahrend, Trustees of The

5  Justus and Susan Ahrend Trust, dated December 6, 1990, Kevork Belikian and Sylvia S. Belikian,

6  Trustees under The Kevork Belikian and Sylvia S. Belikian Living Trust, dated July 10, 2000, Mani

7  Etemad and Susan Khoshnood, Trustees of the Mani Etemad and Susan Khoshnood 2001 Revocable

8  Trust, Eugenia Gagnon, Trustee of The Genie Debs Revocable Trust, dated October 10, 1995,

9  Thomas H. Linden and Sylvia E. Linden, Trustees of The Thomas H. Linden and Sylvia E. Linden

10  Family Trust, dated September 19, 2000, Johannes Moderbacher and Eileen Starr Moderbacher, as

11  Trustees of The Moderbacher Family Trust, Established by Declaration of Trust, dated February 1,

12  2006, Richard W. Siebert and Debra M. Siebert, Trustees of The Siebert Family Trust U/D/T, dated

13  January 13, 2003, Allen Ernest Hom, Trustee for The Allen Ernest Hom Trust, dated August 19,

14  1992, and Linda J. Call, Trustee for The Linda Jeanne Call Family Trust, dated September 12, 2002

15  (collectively "Plaintiffs"), by and through their attorneys, bring this action against Defendants The

16  Marcus & Millichap Company, Marcus & Millichap Real Estate Investment Services Inc., Marcus &

17  Millichap Real Estate Investment Brokerage Company, Sovereign Investment Company, Sovereign

18  Scranton LLC, Sovereign CC, LLC, Sovereign JF, LLC, Paul A. Morabito (individually and as the

19  alter-ego of Eureka Petroleum Inc., Tibarom Inc., Tibarom NY LLC, Tibarom PA LLC, Scranton

20  Lube LLC, NY Seven Lube LLC), Eureka Petroleum Inc., Tibarom Inc., Tibarom NY LLC, Tibarom

21  PA LLC, Scranton Lube LLC, NY Seven Lube LLC, LLC, New York Lube Number 3, LLC,

22  Rochester Lube, LLC, Baruk Management, Inc., Jack Waelti (individually and as the alter-ego of

23  The QSR Group, LLC, The QSR Group One, LLC, The QSR Group II, LLC a/k/a The QSR Group

24  Two, LLC), The QSR Group, LLC, The QSR Group One, LLC, The QSR Group II, LLC a/k/a The

25  QSR Group Two, LLC, PGP Valuation, Inc., Glen D. Kunofsky, Marcus Muirhead, Alexander

26  Mickle, Sean Perkin, Donald Emas, Andrew Lesher, Stewart Weston, Brice Head, Daizy Gomez and

27  Bret King (collectively "Defendants"), and allege as follows:

28

COMPLAINT                                                                                      - 1 -

# I.   INTRODUCTION

1.      Plaintiffs are victims of a far-reaching real estate scam, perpetrated by Defendants, through the implementation of a uniform and well-executed conspiracy over several years and involving at least 22 commercial properties in four states.  A complete list of the locations of the properties purchased by Plaintiffs as a result of Defendants' fraudulent scheme (referenced herein individually as a "Property" or collectively as the "Properties") is attached hereto and made a part hereof as Exhibit "A."

2.      Using a carefully orchestrated plan in which certain of the individual and corporate Defendants acted as shills or dummy corporations to hide the true nature of the transactions, Defendants artificially inflated the value of the properties they marketed and sold to Plaintiffs as safe, fairly-valued, income-producing investments.  In order to artificially inflate the value of the properties – as much as doubling their actual value in many instances – Defendants entered into sham leases with shill tenants (at rental rates that were, unbeknownst to Plaintiffs, significantly higher then the legitimate rental rates that real tenants would pay in arm's-length transactions), generated and disseminated false and misleading marketing materials, financial information and projections, and, in some instances, caused the creation and use of fraudulent appraisals.

3.      After artificially inflating the values of the properties, Defendants convinced Plaintiffs to invest tens of millions of dollars (including, in some instances, their entire retirement savings) to purchase the properties, each of which was accompanied by a lease with a tenant installed by Defendants.  Invariably, sometime after Plaintiffs completed their purchases of the fraudulently-valued properties, the shill "tenants" abandoned the properties and disappeared. Thereafter, Plaintiffs – who subsequently attempted to sell or re-lease the properties – gradually learned that they had been defrauded into purchasing properties at artificially inflated prices.

4.      Through this fraudulent scheme, Defendants swindled Plaintiffs out of tens of millions of dollars.  When the shill tenants abandoned Plaintiffs' properties, not only were the fair market values of Plaintiffs' properties instantly devalued, but Plaintiffs were also deprived of 15 to 25 year income streams of present and future lease payments that Plaintiffs were relying on to sustain their retirement dreams.

1        5.    To implement this elaborate shell game, Defendants first approached owners of

2    commercial rental properties containing franchises such as Jiffy Lube or Church's Chicken and

3    offered to purchase their properties and franchises. Defendants then conspired to artificially inflate

4    the purported fair market values of those commercial rental properties by entering into sham leases

5    with dummy corporations that Defendants controlled.

6        6.    On paper, these leases guaranteed investors 15 to 25 years of consistent rental income

7    at, unbeknownst to Plaintiffs, approximately twice the rent that had been previously paid in

8    connection with each property. Because commercial rental property is appraised using the value of

9    any long-term leases on the property, the sham leases had the direct and intended effect of doubling

10   the apparent values of the commercial rental properties to twice the legitimate fair market values of

11   those properties (*i.e.,* a commercial rental property that was actually worth $1,000,000.00 had its

12   "paper" fair market value artificially inflated to $2,000,000.00).

13       7.    Defendants never disclosed to Plaintiffs that the fair market rent for each property

14   was significantly less then the rent reflected in the sham leases, or that the apparent fair market

15   values of the properties that Plaintiffs were being asked to purchase had been artificially inflated. To

16   the contrary, Defendants marketed these properties to Plaintiffs as excellent investments by touting

17   their (artificially inflated) fair market values, their (sham) long-term leases, and, as described more

18   particularly below, the purported successes and "business" acumen of defendants Paul Morabito and

19   Jack Waelti, whom supposedly would be the long-term "tenants" on Plaintiffs' properties.

20       8.    Defendants The Marcus & Millichap Company, Marcus & Millichap Real Estate

21   Investment Services Inc., Marcus & Millichap Real Estate Investment Brokerage Company, and

22   their agents, Marcus Muirhead, Alexander Mickle, Sean Perkin, Donald Emas, Andrew Lesher,

23   Stewart Weston, Brice Head, Daizy Gomez, Glen Kunofsky and Bret King acted as the real estate

24   brokers on these transactions and convinced Plaintiffs that they were representing Plaintiffs and were

25   protecting their interests. Reasonably relying on Defendants' promises of financial stability,

26   conservative risks and secure retirement income, Plaintiffs took Defendants' bait, hook, line, and

27   sinker.

28

COMPLAINT                                                - 3 -

9.      Unfortunately for Plaintiffs, once Defendants reeled them in and took all of their money, Defendants had no use for Plaintiffs anymore.  In each instance, shortly after the purchase by, and transfer of, a particular property to one of the Plaintiffs, Defendants, their shill tenants, and dummy corporations, simply stopped paying rent and walked away from the property, leaving Plaintiffs with tenantless, income-less, de-valued rental properties.

10.      Stunned and financially decimated, Plaintiffs finally learned the truth – *the investment properties that Defendants had promised would sustain their retirements were worth up to 50% less then what Defendants represented to Plaintiffs that the properties were worth.* Plaintiffs also realized that the "tenants" that were supposed to be providing Plaintiffs with decades of rental income were ghosts of Defendants' creation, and replacement tenants (at least at the promised rental rates the shill tenants agreed to pay) were nowhere to be found.  Even when new, legitimate tenants could be found, they – not surprisingly – were only willing to pay a substantially lower amount of rent then the shill tenants had promised to pay.

11.      As described in greater detail below, Defendants manipulated the fair-market values of at least 22 commercial rental properties, and ensnared dozens of unwitting investors, pocketing tens of millions of dollars in the process.  The audacity of Defendants' scheme is demonstrated by the mathematical precision with which the scheme was implemented, and the uniformity of its success.

12.      Plaintiffs bring this case to seek recovery of the investment monies and lost rental income that was stolen from them by Defendants.  Collectively, those damages exceed $50 million.

## II.      JURISDICTION AND VENUE

13.      This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1961-68, the Racketeer Influenced and Corrupt Organizations Act (RICO), which confers primary jurisdiction on the district courts of the United States, and under 28 U.S.C. §§1331, 1332 and 1341(b).

14.      The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.  The amount in controversy exceeds $75,000 for each Plaintiff, exclusive of costs and interest.

1     15.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b)

2   and (d).  This Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P.

3   (4)(k)(1)(A) and Cal. Code of Civ. Proc. §410.10.

4     16.     Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b), because a

5   substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial

6   district.  Venue is also proper under 18 U.S.C. §1965(a) because Defendants transact substantial

7   business in this District.

8                           **III.     INTRADISTRICT ASSIGNMENT**

9     17.     A substantial part of the events or omissions which give rise to the claims in this

10  action occurred in the county of Santa Clara, and as such this action is properly assigned to the San

11  Jose division of this Court.

12                                  **IV.     PARTIES**

13  **Plaintiffs**

14    18.     Eclectic Properties East, LLC is a California Limited Liability Company with its

15  principal place of business located in San Bernardino County, California.

16    19.     Risola Family LP II is a Florida Limited Partnership with its principal place of

17  business located in Pinellas County, Florida.

18    20.     CECA 3000, LP is a Nevada Domestic Limited Partnership with its principal place of

19  business located in Clark County, Nevada.

20    21.     Cheatham Properties, LLC is a California Limited Liability Company with its

21  principal place of business located in Orange County, California.

22    22.     VAS Enterprises I LLC is a California Limited Liability Company with its principal

23  place of business located in Los Angeles County, California.

24    23.     Amnon Danus is an individual who resides in Santa Barbara County, California.

25    24.     Rivka Danus is an individual who resides in Santa Barbara County, California.

26    25.     Fred Engelberg is an individual who resides in San Diego County, California.

27    26.     Linda Farrell is an individual who resides in San Diego County, California.

28

COMPLAINT                                                                              - 5 -

1    27.    Joseph W. Amirkhas is an individual who resides in San Francisco County,

2 California.

3    28.    Justus L. Ahrend is an individual who resides in Los Angeles County, California.

4    29.    Susan W. Ahrend is an individual who resides in Los Angeles County, California.

5    30.    Kevork Belikian is an individual who resides in Los Angels County, California.

6    31.    Sylvia S. Belikian is and individual who resides in Los Angeles County, California.

7    32.    Mani Etemad is an individual who resides in Santa Clara County, California.

8    33.    Susan Khoshnood is an individual who resides in Santa Clara County, California.

9    34.    Eugenia Gagnon is an individual who resides in Charlotte County, Florida.

10    35.    Thomas H. Linden is an individual who resides in Lee County, Florida.

11    36.    Sylvia E. Linden is an individual who resides in Lee County, Florida.

12    37.    Johannes Moderbacher is an individual who resides in Alameda County, California.

13    38.    Eileen Starr Moderbacher is an individual who resides in Alameda County,

14 California.

15    39.    Richard W. Siebert is an individual who resides in Sonoma County, California.

16    40.    Debra M. Siebert is an individual who resides in Sonoma County, California.

17    41.    Allen Ernest Hom is an individual who resides in Orange County, California.

18    42.    Linda J. Call is an individual who resides in Riverside County, California.

19 **Defendants**

20    43.    The Marcus & Millichap Company ("M&M") is a California corporation with its

21 principal place of business located at 777 California Avenue, Palo Alto, California 94304.  M&M

22 holds itself out to the public as "the premier provider of investment real estate brokerage services,"

23 noting that "[o]ur 37-year history of maintaining investor relationships in local markets enables us to

24 be the best information source and transaction service provider nationally."  M&M also represents to

25 the public that "our investment professionals are able to provide clients with an unparalleled

26 perspective on the investment real estate market locally, regionally and nationally."  M&M is the

27 parent company of defendant Sovereign Investment Company and a co-conspirator in Defendants'

28 scheme.  M&M, among other things, provided false information to investors and marketed the

COMPLAINT                                                                                              - 6 -

commercial real properties despite its knowledge that their fair market values were artificially inflated and that the rental rates reflected in their leases were significantly higher than the fair market rental rates and were not sustainable.

44. Marcus & Millichap Real Estate Investment Services Inc. ("M&M Investment") is a California corporation with its principal place of business located at 777 California Avenue, Palo Alto, California 94304. M&M Investment is a wholly owned subsidiary of M&M. M&M Investment was a co-conspirator in Defendants' scheme by, among other things, providing false information to investors and marketing the commercial real properties despite its knowledge that their fair market values were artificially inflated and that the rental rates reflected in their leases were significantly higher then the fair market rental rates and were not sustainable.

45. Marcus & Millichap Real Estate Investment Brokerage Company ("M&M Real Estate") is a California corporation with its principal place of business located at 777 California Avenue, Palo Alto, California 94304. M&M Real Estate is a subsidiary of M&M Investment. M&M Real Estate was a co-conspirator in Defendants' scheme by, among other things, providing false information to investors and marketing the commercial real properties despite its knowledge that their fair market values were artificially inflated and that the rental rates reflected in their leases were significantly higher then the fair market rental rates and were not sustainable.

46. Sovereign Investment Company ("Sovereign Investment") is a California corporation with its principal place of business located at 777 California Avenue, Palo Alto, California 94304. Sovereign Investment was formed by M&M in May 2003 as a private capital acquirer of net lease properties. Sovereign Investment is one of the principal investing platforms and a wholly owned subsidiary of M&M. Sovereign Investment holds itself out to the public as "a private principal equity investment firm focused on unlocking the value of real estate through net lease portfolio transactions," noting that Sovereign Investment "leverages the experience of a 30-year investment history, investing its own capital to offer a variety of terms and structures, providing unparalleled service, pricing and execution for our transaction partners." Sovereign Investment took title to one or more of the commercial rental properties and entered into fraudulent long-term leases with one or

1   more of the other Defendants, before those properties were sold to unwitting investors, including

2   Plaintiffs.

3        47.    Sovereign Scranton, LLC ("Sovereign Scranton") is a Delaware Limited Liability

4   Company with its principal place of business located at 777 California Avenue, Palo Alto, California

5   94304. Upon information and belief, Sovereign Scranton is a subsidiary of Sovereign Investment.

6   Sovereign Scranton took title to one or more of the commercial rental properties, including the bogus

7   leases for each, before they were sold to unwitting investors, including Plaintiffs.

8        48.    Sovereign CC, LLC ("Sovereign CC") is a Delaware Limited Liability Company with

9   its principal place of business located at 777 California Avenue, Palo Alto, California 94304. Upon

10   information and belief, Sovereign CC is a subsidiary of Sovereign Investment. Sovereign CC took

11   title to one or more of the commercial rental properties, including the bogus leases for each, before

12   they were sold to unwitting investors, including Plaintiffs.

13        49.    Sovereign JF, LLC ("Sovereign JF") is a California Limited Liability Company with

14   its principal place of business located at 777 California Avenue, Palo Alto, California 94304. Upon

15   information and belief, Sovereign JF is a subsidiary of Sovereign Investment. Sovereign JF took

16   title to one or more of the commercial rental properties, including the bogus leases for each, before

17   they were sold to unwitting investors, including Plaintiffs.

18        50.    Defendants Sovereign Investment, Sovereign Scranton, Sovereign CC, and

19   Sovereign JF are sometimes hereinafter referred to collectively as the "Sovereign Entities."

20        51.    M&M is the ultimate parent company and owner of 100% of the company stock of

21   both M&M Investment and Sovereign Investment. Indeed, George Marcus and William Millichap,

22   the founders and co-chairmen of M&M, are the registered principals of M&M Investment and

23   Sovereign Investment. M&M, M&M Investment and Sovereign Investment occupied the same

24   corporate headquarters, share many of the same employees and agents, and share the same corporate

25   philosophy and operating principles. M&M exercises dominion and control over the affairs and

26   actions of M&M Investment and Sovereign Investment, and there existed a unity of interest and

27   ownership between all of these companies.

28

COMPLAINT                                       - 8 -

1    52.    M&M Investment and Sovereign Investment, as well as their other sister subsidiary

2    corporations, were formed by M&M to service specific segments of the real estate industry.

3    M&M Investment was formed as a real estate sales and services arm of M&M, and it purportedly

4    provides investment sales, financing and research and advisory services.  Similarly, Sovereign

5    Investment was formed as a real estate investment arm of M&M, and it purportedly provides

6    investment services concerning long-term, net-leased retail, restaurant, office and industrial assets,

7    including services related to sale/leaseback transactions.  Under these circumstances, M&M

8    Investment and Sovereign Investment are, and at all times herein mentioned, were the

9    instrumentalities, conduits and agents through which M&M carried on its real estate and investment

10   business throughout the United States.

11    53.    At all times alleged herein, M&M owned, managed, maintained, and controlled the

12   activities of its agents M&M Investment and Sovereign Investment, as well as those entities'

13   subsidiaries and affiliates.  Therefore, the activities, acts, and omissions of M&M Investment and

14   Sovereign Investment were and are, in reality, the activities, acts, and omissions of M&M.

15   Accordingly, M&M is fully responsible and liable for the wrongdoing of its agents as alleged in this

16   Complaint.

17    54.    Paul A. Morabito ("Morabito") is an individual residing in Reno, Nevada.  Upon

18   information and belief, at all times material to this litigation, Morabito was the Chief Executive

19   Officer of Eureka Petroleum Inc. and President, Secretary and Treasurer of Tibarom, Inc.  Morabito

20   is a former Member of Tibarom PA, LLC, Tibarom NY, LLC, Scranton Lube, LLC, NY Seven Lube

21   LLC, New York Lube Number 3, LLC, Rochester Lube LLC and Baruk Management, Inc.

22   Morabito was a co-conspirator in connection with Defendants' fraudulent scheme and controlled

23   various bogus tenants on Plaintiffs' investment properties, which tenants walked away from and

24   abandoned Plaintiffs' investment properties, wiping out the income streams they had been promised

25   by Defendants.

26    55.    Eureka Petroleum Inc. ("Eureka") is a New York corporation with its principal place

27   of business located at 318 Barkley Circle, Hanover, Pennsylvania 17331. Eureka was, at all relevant

28   times, controlled by, and the alter-ego of, Morabito.

COMPLAINT                                                                                                    - 9 -

1    56.    Tibarom Inc. ("Tibarom") is a Delaware corporation with its principal place of

2  business located at 668 North Coast Highway, Suite 517, Laguna Beach, CA 92651. Tibarom was at

3  all relevant times, controlled by, and the alter-ego of, Morabito.

4    57.    Tibarom NY LLC ("Tibarom NY") is a Nevada Limited Liability Company with its

5  principal place of business located at 668 North Coast Highway, Suite 517, Laguna Beach, CA

6  92651. Tibarom NY was, at all relevant times, controlled by, and the alter-ego of, Morabito.

7    58.    Tibarom PA LLC ("Tibarom PA") is a Nevada Limited Liability Company with its

8  principal place of business located at 668 North Coast Highway, Suite 517, Laguna Beach, CA

9  92651. Tibarom PA was, at all relevant times, controlled by, and the alter-ego of, Morabito.

10    59.    Scranton Lube LLC ("Scranton Lube") is a Delaware Limited Liability Company

11  with its registered agent located at 615 S. Dupont Highway, Dover, Delaware 19901. Scranton Lube

12  was, at all relevant times, controlled by, and the alter-ego of, Morabito.

13    60.    NY Seven Lube LLC ("NY Seven Lube") is a Delaware Limited Liability Company

14  with its registered agent located at 615 S. Dupont Highway, Dover, Delaware 19901. NY Seven

15  Lube was, at all relevant times, controlled by, and the alter-ego of, Morabito.

16    61.    New York Lube Number 3, LLC ("New York Lube 3") is a Delaware Limited

17  Liability Company with its registered agent located at 615 S. Dupont Highway, Dover, Delaware

18  19901. New York Lube 3 was, at all relevant times, controlled by, and the alter-ego of, Morabito.

19    62.    Rochester Lube, LLC ("Rochester Lube") is a Delaware Limited Liability Company

20  with its principal place of business located at 668 North Coastal Highway, Suite 517, Laguna Beach,

21  CA 92651. Rochester Lube was at all relevant times, controlled by, and the alter-ego of, Morabito.

22    63.    Baruk Management, Inc. ("BMI") is a California corporation with its principal place

23  of business located at 668 North Coastal Highway, Suite 517, Laguna Beach, CA 92651. BMI was

24  at all relevant times, controlled by, and the alter-ego of, Morabito.

25    64.    At all relevant times, Morabito controlled and dominated the affairs of Eureka,

26  Tibarom, Tibarom PA, Tibarom NY, Scranton Lube, NY Seven Lube, New York Lube 3, Rochester

27  Lube and BMI, directed the business and financial activities of those entities, used assets of the

28  corporate entities for his personal use, and caused assets of those entities to be transferred to him

COMPLAINT                                                                                    - 10 -

1   personally without adequate consideration as well as to other business entities which he controlled.

2   At all relevant times, each of those entities was a mere shell, instrumentality and conduit through

3   which Morabito carried on his business, including their participation as co-conspirators in

4   Defendants' scheme.

5         65.     Jack Waelti ("Waelti") is an individual residing in Clay County, Florida.  Upon

6   information and belief, at all times material to this litigation, Waelti was the Chief Executive Officer

7   and sole Member of The QSR Group, LLC, The QSR Group One, LLC and The QSR Group II,

8   LLC. Waelti was a co-conspirator in connection with Defendants' fraudulent scheme and controlled

9   various bogus tenants on Plaintiffs' investment properties, which tenants walked away from and

10  abandoned Plaintiffs' investment properties, wiping out the income streams they had been promised

11  by Defendants.

12        66.     The QSR Group, LLC ("QSR") is a Florida Limited Liability Company with its

13  principal place of business located at 1542 Kingsley Avenue, Suite 132, Orange Park, Florida 32073.

14  QSR was, at all relevant times, controlled by, and the alter-ego of, Waelti.

15        67.     The QSR Group One, LLC ("QSR One") is a Florida Limited Liability Company

16  with its principal place of business located at 1542 Kingsley Avenue, Suite 132, Orange Park,

17  Florida 32073. QSR One was, at all relevant times, controlled by, and the alter-ego of, Waelti.

18        68.     The QSR Group II, LLC a/k/a The QSR Group Two, LLC ("QSR II") is a Florida

19  Limited Liability Company with its principal place of business located at 1542 Kingsley Avenue,

20  Suite 131, Orange Park, Florida 32073.  QSR II was, at all relevant times, controlled by, and the

21  alter-ego of, Waelti.

22        69.     At all relevant times, Waelti controlled and dominated the affairs of QSR, QSR One,

23  and QSR II, directed the business and financial activities of those entities, used assets of the

24  corporate entities for his personal use, and caused assets of those entities to be transferred to him

25  personally without adequate consideration as well as to other business entities which he controlled.

26  At all relevant times, each of those entities were a mere shell, instrumentality and conduit through

27  which Waelti carried on his business, including his participation as a co-conspirator in Defendants'

28  scheme.

1    70.    PGP Valuation, Inc. ("PGP") is an Oregon corporation with its principal place of

2    business located at 110 SW Yamhill Street, Suite 200, Portland, Oregon 97204. PGP is a co-

3    conspirator in connection with Defendants' fraudulent scheme and prepared appraisals of various

4    investment properties purchased by the Plaintiffs, which appraisals improperly reflected the

5    artificially inflated fair market values manipulated by Defendants.

6    71.    Glen D. Kunofsky ("Kunofsky") is an individual residing in New York County, New

7    York. Kunofsky is a First Vice President of Investments and Senior Director of the Net Leased

8    Properties Group of M&M Real Estate. M&M Real Estate held Kunofsky out as "one of the most

9    knowledgeable investment specialists in the nation," "an authority in the field of net lease and sale-

10   leaseback transactions," "a consummate professional" and indicated that Kunofsky's "focus on client

11   services has earned him a high degree of loyalty and respect from investors as well as his peers."

12   72.    Marcus Muirhead ("Muirhead") is an individual residing in Maricopa County,

13   Arizona. At all times relevant to this litigation, Muirhead was a senior associate at M&M Real

14   Estate.

15   73.    Alexander Mickle ("Mickle") is an individual residing in San Diego County,

16   California. At all times relevant to this litigation, Mickle was an investment associate at M&M Real

17   Estate.

18   74.    Sean Perkin ("Perkin") is an individual residing in San Bernardino, California. At all

19   times relevant to this litigation, Perkin was a Senior Associate at M&M Real Estate.

20   75.    Donald Emas ("Emas") is an individual residing in San Bernardino, California. At all

21   times relevant to this litigation, Emas was a First Vice President of Investments, a Senior Director on

22   the Net Leased Properties Group, and a Director of the National Retail Group of M&M Real Estate.

23   76.    Andrew Lesher ("Lesher") is an individual residing in Mariposa County, California.

24   At all times relevant to this litigation, Lesher was a Senior Associate at M&M Real Estate.

25   77.    Stewart Weston ("Weston") is an individual residing in Los Angeles County,

26   California. At all times relevant to this litigation, Weston was a Vice President of Investments and

27   Senior Director of the National Multi-Housing Group of M&M Real Estate.

28   78.    Brice Head ("Head") is an individual residing in Los Angeles County, California.

1    79.    Daizy Gomez ("Gomez") is an individual residing in New York County, New York.

2  At all times relevant to this litigation, Gomez was a Marketing and Transactions Coordinator at

3  M&M Real Estate.

4    80.    Bret King ("King") is an individual residing in Los Angeles County, California.

5    81.    Defendants M&M Investment, M&M Real Estate, Kunofsky, Muirhead, Mickle,

6  Perkin, Emas, Lesher, Weston, Head, Gomez, and King are sometimes hereinafter referred to

7  collectively as the "M&M Brokers."

8                  **V.    GENERAL ALLEGATIONS**

9    82.    As set forth above, this case stems from Defendants' fraudulent scheme to induce

10  Plaintiffs to purchase the Properties holding certain franchises, including Jiffy Lube and Church's

11  Chicken (collectively the "Franchises"), at artificially inflated prices.

12    83.    The Defendants, acting in concert, undertook a deceitful course of conduct through

13  the use of shell companies, fraudulent sale/leaseback agreements, and sham leases, which conduct

14  was intended to, and did, bilk the Plaintiffs – purchasers of the Properties – out of tens of millions of

15  dollars, both in investment monies and in lost present and future rental streams.

16    84.    Due to Defendants' outrageous, coordinated conduct, Plaintiffs were defrauded into

17  purchasing commercial properties that were worth only a fraction of what Plaintiffs paid for them.

18                  **VI.    THE SET-UP**

19    85.    Defendants devoted considerable time and resources into defrauding Plaintiffs, and

20  used both mail and wire to perpetrate the fraud.  The core scheme involved the existing Franchises,

21  Morabito and Waelti,  Morabito and Waelti's respective alter-ego shell companies, the Sovereign

22  Defendants, M&M, the M&M Brokers, PGP, bogus alter-ego tenants controlled by Morabito and

23  Waelti (in various combinations), and the Plaintiffs.

24    86.    At the outset of the scheme, one of the Defendants would approach a non-party owner

25  of one or more operating franchises and offer to purchase one or more of the franchises, properties

26  and improvements.  The purchase by this Defendant was usually made through one of Morabito or

27  Waelti's alter-ego shell companies, with the intention of quickly re-selling each property to one of

28

1   the Sovereign Entities. The ultimate goal was to artificially inflate the values of the Properties and

2   then quickly flip the Properties to unwitting investors, such as Plaintiffs.

3      87.   Prior to or shortly after the consummation of each purchase by one of Morabito or

4   Waelti's alter-ego shell companies, that entity would enter into a sale/leaseback agreement with one

5   of the other Defendants at a rental rate that was significantly higher then the reasonable, fair market,

6   arms-length rental rate previously in place. A sale/leaseback agreement is an agreement whereby an

7   owner of property on which a building is located sells the real estate to an outside purchaser who

8   then leases it back to the original owner.[1]

9      88.   There are two important financial considerations in a sale/leaseback agreement:

10  (1) the sale price of the property, and (2) the rental rate and term of the lease. These considerations

11  are the key negotiating factors in a sale/leaseback transaction. The typical guide with respect to sale

12  price is the market value of the property. In typical circumstances, the seller will have the property

13  valued by an independent professional appraiser. The appraiser will consider recent sales of similar

14  properties (as well as the reasonable rental rates of those properties) within a market area as a guide

15  to market value. The lease rate, which represents the amount of rent the seller/tenant will pay, is

16  largely dependent on the financial strength or credit of the tenant, the type of business the tenant is

17  involved in, where the property is located, and the general financial markets. Other factors affecting

18  this rate are the buyer/lessor's cost of funds, estimated residual value of the property at the end of the

19  lease, and the tax benefits that the lessor receives.

20     89.   In Defendants' scheme, the sale/leaseback would include a bogus lease *with a rental*

21  *rate that was significantly higher then the arm's-length market lease rate for the particular*

22  *property*. The property would then be marketed by M&M, the M&M Brokers, Morabito and/or

23

24

---

25  [1]    When utilized in a non-fraudulent manner, a sale/leaseback transaction has obvious, and

26  subtle, implications for business owners. First, it frees up capital for expansion and other purposes.
    Second, a sale/leaseback transaction, if properly structured, can improve a company's debt-to-equity

27  ratio and reduce interest and depreciation expense. Finally, the sale/leaseback transaction allows the
    owner to concentrate its resources as opposed to having its funds tied-up in a non-liquid asset.

28

COMPLAINT                                                                    - 14 -

1   Waelti to unsuspecting investors, including Plaintiffs, at the artificially inflated prices and including

2   the bogus leases.

3       90.    In many instances, Defendants, aided and abetted by PGP and/or other entities acting

4   as appraisers, would cause an appraisal to be created to bolster the credibility of the scam.  The

5   property would be appraised based upon, "the as-is market value of the leased fee interest . . . ."  In

6   other words, the property would be appraised based upon the inflated lease rate set forth in the sham

7   long-term lease, and using comparables provided by Defendants of other properties with artificially-

8   inflated values – causing the appraised value of the property at issue to be artificially inflated.

9       **VII.    THE BAIT IS CAST – THE MISREPRESENTATIONS**

10       91.    Immediately after the purchase of each property by Morabito and Waelti's alter-ego

11   shell companies, M&M, the M&M Brokers and/or one of the Sovereign Entities, with the assistance,

12   in some instances, of one or more of the other Defendants, would promptly begin marketing the

13   property to 1031 investors, like Plaintiffs.[2]  In each case, the investment was presented to potential

14   investors as a triple-net lease – a long-term lease of 15 to 25 years, the terms of which required the

15   tenant to pay all expenses of the property, including maintenance, building insurance, and property

16   taxes (*i.e.,* the three "nets").  Thus, in connection with the marketing and sales of the Properties,

17   Defendants explicitly, and uniformly, represented to Plaintiffs that "Tenants Pay All Expenses," that

18   there were "No Landlord Responsibilities," and that an investment in one of the Properties was

19   "extremely safe and secure."

20       92.    Defendants also represented that the Properties would generate a Capitalization Rate

21   ("cap rate") of between 7.75% and 9.00%, indicating a solid enough return on net operating income

22

23

24   _____

25   [2]    Section 1031 of the Internal Revenue Code provides that no gain or loss shall be recognized
on the exchange of property held for productive use in a trade or business, or for investment.  A tax-

26   deferred exchange is a method by which a property owner trades one or more relinquished properties
for one or more replacement properties of "like-kind," while deferring the payment of federal

27   income taxes and some state taxes on the transaction.  To avoid taxation, the 1031 investor must
reinvest the proceeds of the initial sale within six months.

28

COMPLAINT                                  - 15 -

1   relative to the property price to make it an attractive investment.[3]   Further, M&M, the M&M

2   Brokers, the Sovereign Entities and/or in some instances, one or more of the other Defendants, made

3   both oral and written misrepresentations – over the telephone, through e-mail, through the U.S. mail,

4   and in person – to the Plaintiffs regarding the value, income, income stream, and stability of each

5   property, together with other information material to Plaintiffs' decisions whether or not to invest.

6       93.   For example, with regard to the Jiffy Lube franchises, Defendants made material

7   misrepresentations concerning, among other things, the fact that the rental income for each property

8   was supported by the revenue generated by the franchise on each property, that the properties had

9   high cap rates compared to the market, existing sales on the Properties, number of cars serviced per

10   day, rent, quicklube sales, cost of goods, labor, square footage, general and administrative fees,

11   royalties and advertising fees. These representations were made orally and in writing, over the

12   phone, in person, using e-mail and the U.S. mail, and are more particularly set forth below.

13       94.   With regard to the Church's Chicken franchises, Defendants made material

14   misrepresentations concerning, among other things, the fact that the rental income on each property

15   was supported by the revenue generated by the franchises, that the properties had high cap rates

16   compared to the market, the extent of renovations to be made on the Properties, liens on the

17   Properties, traffic in the stores, the proper rent/sales ratio of the franchises, the tenants' history as

18   franchisees on the Properties, and the financial stability of the tenants.  These representations were

19   made orally and in writing, over the phone, in person, using e-mail and the U.S. mail, and are more

20   fully set forth below.

21       95.   At all times relevant to this litigation, the representations made by Defendants with

22   respect to the present and/or future anticipated income generated by the Properties and the leases

23   associated therewith, the financial stability of the tenants, the existing sales on the Properties, and the

24   cap rates, among other representations, were known or should have been known by Defendants to be

25

---

26
27   [3]   Cap rates are a measure of the ratio between the cash flow produced by an asset (usually real estate) and its capital cost (the original price paid to buy the asset) or alternatively its current market value. Cap rates are an indirect measure of how fast an investment will pay for itself in net cash flows; each year, the percentage amount of the cap rates will be repaid.

28

1    false, with the true facts being that the actual fair market rent reasonably expected from the

2    Properties multiplied by the cap rates would have justified purchase prices significantly less than

3    what Plaintiffs were fraudulently induced to pay.

4          96.    M&M, the M&M Brokers, and in some instances, one or more of the other

5    Defendants, held themselves out to the public in general and the Plaintiffs specifically as having

6    particular knowledge and expertise with respect to triple net leases, including those included with the

7    Franchises located on the Properties, as well as with regard to the values of the Properties and the

8    underlying leases.[4]  At no time did Defendants disclose to Plaintiffs that they were using shell

9    companies, shill tenants, bogus leases and artificially inflated appraisals to dupe Plaintiffs out of tens

10   of millions of dollars.

11         97.    Through the fraudulent scheme described above, Defendants were able to sell

12   unwitting 1031 investors dozens of commercial properties at grossly inflated prices.  Plaintiffs alone

13   purchased 22 of the artificially inflated Properties.  In many instances, M&M and the M&M Brokers

14   acted as the broker for the purchases by Morabito and Waelti's alter-ego companies, and as broker

15   for both the buyer and the seller in the sales by the Defendants to Plaintiffs – assuring Plaintiffs in

16   most cases that there was no conflict of interest with M&M and the M&M Brokers representing

17   parties on all sides of the transactions.  Indeed, Plaintiffs were led to believe that M&M and the

18   M&M Brokers were representing them and would look out for their best interests.  Plaintiffs

19   reasonably relied on M&M and the M&M Brokers to insure that their investments were safe and

20   secure.

21                    **VIII.   THE PAYOFF – THE SCAM WORKS**

22         98.    Once the sales were completed and Defendants had Plaintiffs' monies in hand, all

23   Defendants had to do to accomplish their goal of defrauding Plaintiffs was to walk away.  Thus, in

24   furtherance of the conspiracy, following the sale of the one of the Properties to one of the Plaintiffs,

25   the shill tenant would operate the franchise for anywhere from a few months to over a year, paying

26   _____

27   [4]    *See, e.g.,* Exhibit "B."

28

the double rental rate used to induce Plaintiffs to invest.  Thereafter, Morabito (or one of his alter-ego shell companies), Waelti (or one of his alter-ego shell companies), or in some cases, a purported assignee who was also in on the fraudulent scheme, would call the Plaintiff that owned that particular Property and ask for either a reduction in rent or offer to buy the Property for a price significantly less than the price that was paid for the property by the Plaintiff.

99.    In instances in which the Plaintiff was unwilling to reduce the rental rate, or to sell the property for significantly less than what the Plaintiff paid for it just a short time earlier, Morabito (or one of his alter-ego shell companies), Waelti (or one of his alter-ego shell companies), or the purported assignee, would continue to operate the business for a short period of time and then abandon the property (sometimes even stripping the building of trade fixtures) – leaving the Plaintiff with no tenant, no income stream and a vastly devalued piece of property.

100.    Even in instances where Morabito (or one of his alter-ego shell companies), Waelti (or one of his alter-ego shell companies), or a purported assignee did not seek reduced rent or a discounted sale, they would still abandon the property, leaving the plaintiff with no tenant, no income stream and a devalued piece of property.

101.    In every single one of the 22 transactions referenced in this Complaint, Morabito, Waelti and the purported assignees failed to honor the original, inflated lease terms put in place by Defendants as part of the scam to steal Plaintiffs' investment monies and thereafter, abandoned the Properties.  Notwithstanding this fact, M&M, the M&M Brokers, and the Sovereign Entities continued to market certain of the Properties and other triple-net properties with fraudulent leases, thereafter, with specific knowledge that Morabito, Waelti and the purported assignees had and would continue to walk away.

1    IX.    THE PARTICULARS OF DEFENDANTS' FRAUDULENT SCHEME

2    A.    How Mani Etemad Got Scammed[5]

3         1.    M&M Real Estate and Muirhead Cast the Bait

4         102.    Mani Etemad ("Etemad") had never before invested in a triple-net lease property.

5    Indeed, Etemad first learned of the concept from Muirhead at M&M Real Estate in July 2005 when

6    he was first introduced to Muirhead by Etemad's former real estate partners, Joseph Amirkhas

7    ("Amirkhas") and Eileen and Johannes Moderbacher (the "Moderbachers").

8         103.    Muirhead, as an agent of M&M Real Estate, explained to Etemad the basics of triple-

9    net lease investing.  Muirhead told Etemad that triple-net lease investments have less risk when the

10   operators on the properties operate a large number of franchises.  Muirhead also recommended that

11   Etemad purchase a property with a long-term lease in place, noting that leases that had annual rent

12   increases were even better investments.  Muirhead further counseled Etemad on the cap rates he

13   should be looking for when he evaluated a potential triple-net property.

14        104.    Etemad was initially concerned about buying a property in a state other than

15   California, where Etemad and his wife lived.  In order to allay Etemad's concerns, Muirhead advised

16   Etemad that triple-net lease investments did not have to be local because they had long-term leases

17   and the tenants paid all the maintenance and other expenses.  As Muirhead described them to

18   Etemad, triple-net lease investments sounded extremely secure.

19        105.    Thereafter, Muirhead began suggesting specific potential triple-net investments to

20   Etemad.  Etemad questioned Muirhead about the investment opportunities, and relied on Muirhead's

21   answers, believing that Muirhead and M&M Real Estate were acting in Etemad's best interests.

22        106.    Several of the properties that Muirhead presented to Etemad were Jiffy Lube

23   locations operated by Morabito.  Etemad became very interested in the Jiffy Lube properties as a

24   result of the significant amount of information provided by M&M Real Estate and Muirhead.  M&M

25   Real Estate and Muirhead represented to Etemad that Morabito and his entities – Eureka and

26   _____

27   [5]    Mani Etemad and his wife, Susan Khoshnood, took title to the property as Trustees of The
     Mani Etemad and Susan Khoshnood 2001 Revocable Trust.

28

1    Tibarom (which were alter-egos of Morabito) – were successful and financially sound, in part

2    because Morabito/Eureka/Tibarom was backed by Shell Oil Products US ("SOPUS").  Muirhead

3    made the Jiffy Lube investments sound so secure that Etemad believed that nothing could go wrong

4    short of a natural disaster.

5         107.    By this time, Muirhead had convinced Etemad that Muirhead was very trustworthy

6    and that M&M Real Estate was a reputable company.  When Muirhead advised Etemad how to

7    analyze the quality of a triple-net lease investment, Muirhead did not tell Etemad to look at the

8    performance of the particular store he was considering buying.  Instead, Muirhead consistently

9    directed Etemad to focus on the operator who was guaranteeing the lease, not the actual size of the

10   store or how the particular store was performing.

11        108.    Consequently, at Muirhead's urging, Etemad always focused on the fact that

12   Morabito/Eureka/Tibarom operated 56 stores and was purportedly financially sound.  Etemad was

13   led to believe that – should he purchase one of the Jiffy Lube properties – Morabito/Eureka/Tibarom

14   would continue to operate the locations and that Morabito/Eureka/Tibarom's continued involvement

15   made an investment in one of the Jiffy Lube properties even more safe and secure.

16        109.    Thereafter, around August 11, 2005, Muirhead provided Etemad with a copy of

17   M&M Real Estate's marketing brochure for a Jiffy Lube property in Kingston, Pennsylvania.

18   Sovereign Scranton was the seller, asking $2,339,879.00 for the property.  Kunofsky, of M&M Real

19   Estate's New York office, was the listing agent for the Kingston Jiffy Lube property.

20        110.    The original lease term for Morabito/Eureka/Tibarom under the lease in place on the

21   Kingston Jiffy Lube property was for 25 years with one ten-year option.  The rent was $16,086.67

22   per month with annual rent increases of 1.6%, and a cap rate of 8.25%.[6]  The M&M Real Estate

23   marketing materials noted that "Tibarom, Inc. is the fastest growing franchisee in Shell Oil

24

_____

25   [6]    M&M Real Estate and Muirhead consistently steered Etemad towards the Jiffy Lube

26   properties.  Towards that end, M&M Real Estate represented to Etemad that these properties had just
     come on the market, leading him to believe that he and his investment partners (Amirkhas, and the

27   Moderbachers) were privileged to have the properties available to purchase.  Muirhead told them
     that they had to move quickly because the investments were hot and would sell fast.

28

1  Companies' store Jiffy Lube International, Inc. subsidiary." The marketing materials further noted

2  that "Tibarom operates 56 stores throughout the United States." Muirhead and M&M Real Estate

3  also represented to Etemad that Morabito not only had a fast growing stable of properties with 56

4  stores, but planned to expand his operations much further.

5       111.    To further reassure Etemad, Muirhead advised Etemad that Etemad's lender would

6  look into the quality of the investment and Muirhead concurred with Etemad's understanding that

7  the lender's examination of the investment was extra protection for Etemad. Each time Etemad had

8  questions about the Kingston Jiffy Lube property, Muirhead assured him that the investment was

9  secure, and put him at ease that the investment was a great deal and nothing could go wrong.

10  Muirhead represented that the Kingston Jiffy Lube property was a safe, low-risk investment. Based

11  on M&M Real Estate, Muirhead and Sovereign Scranton's representations, Etemad felt very

12  comfortable with the investment by the end of the process.

13      **2.**    **Etemad Takes the Bait**

14       112.    On August 30, 2005, Etemad sent a letter of intent to purchase the Kingston Jiffy

15  Lube property for $2,339,897.00. Thereafter, Etemad continued conducting due diligence by

16  reviewing information provided by M&M Real Estate, Muirhead, and Sovereign Scranton.

17       113.    On September 12, 2005, Etemad sent an e-mail to Muirhead asking questions related

18  to the financial strength of Morabito/Eureka/Tibarom.[7] Muirhead once again assured Etemad that

19  Morabito/Eureka/Tibarom was financially solid. On September 14, 2005, Muirhead wrote an e-mail

20  to Etemad, Amirkhas and the Moderbachers, noting that:

21        I will be spending the balance of the day looking at due diligence items on each of
      your deals to make sure there are no surprises. I will consult with Brandon

22        [Harrington] today and see what level of commitment the lender can give at this
      stage and by the time we are scheduled to remove our due diligence materials. Once

23        I hear something from the Listing Agent regarding the questions we covered
      yesterday I will contact you . . . the Seller said they were never late with rent,

24        Sovereign never had any issues with that.

25

26

---

27  [7]    Etemad requested Morabito/Eureka/Tibarom's tax returns but was told by Muirhead that he
could not have access to them.

28

114.    Then on September 21, 2005, Muirhead wrote in an e-mail to Etemad that "Glen [Kunofsky] is working hard to get us a response from the Seller on the Jiffy Lube in Kingston on the questions you asked."

115.    On September 22, 2005, Etemad wrote an e-mail to Muirhead indicating he had read the franchise agreement closely and wanted to confirm that the franchise agreement term matched the lease length, with options. He also wrote:

> [p]lease look at the page 41, is Paul Morabito representing many companies (one of them is Tibarom)?  There are many companies listed in the page.  What is the relationship between these companies?  If they are all related, then that means the Operator is much bigger that what we originally thought!

Muirhead wrote an e-mail back to Etemad the same day confirming Etemad's understanding of the dates and noting:

> This is one of the strongest franchises in the Jiffy Lube system and to my conversations with Glen Kunofsky one of the fastest growing franchisees. From my understanding all of the all of the [sic] LLC's listed are under the same operator. They have set up different LLC's for each market they enter into or have existing properties.  For example, I believe Eureka Petroleum, LLC handles the west coast operations and Tibarom, Inc. handles the east coast operations, yet the managing members and directors, such as Paul Morabito are the same.

116.    Thereafter, Etemad wrote to M&M Real Estate about a planned Tibarom merger with another company that Etemad had heard about. Kunofsky responded through e-mail that there was "nothing new to report on this point. This would in effect be a 'bonus' to the deal if they merge with this other company. Tibarom is a very financially sound company."

117.    Muirhead, purportedly on behalf of Etemad, also asked Kunofsky about the assignment clause in the lease agreement:

> In Paragraph 10 of the leases it talks about assignment of interest in the property. How is the assignee's financial strength measured?  For example Tibarom/Eureka appear to be very financially strong at this point. Let's say their financial condition declines over the couple of years and they are in a position to assign their interest in this lease over to a new Jiffy Lube franchisee. Tibarom/Eureka's financial strength at the time of assigning to a new entity will be of a lower grade than they are today. So, the buyer's question is when is the financial condition of Tibarom/Eureka measured as a benchmark to ensure that the new Jiffy Lube franchisee is of equal or greater standing?

Kunofsky answered through e-mail that:

> This does not appear to be an issue as there is language in the lease that basically states you as landlord have the ultimate authority to approve/disapprove a new

franchisee from taking over. If you have any further questions, please contact me to discuss.

118.    Throughout the sales process, Muirhead portrayed Kunofsky as one of the most knowledgeable and powerful people at M&M Real Estate, re-confirming Etemad's belief that he was being represented by triple-net lease experts. On October 26, 2005, Muirhead advised Etemad, Amirkhas and the Moderbachers in an e-mail that Kunofsky told him that they could use the 1031 exchange funds to pay transfer taxes. Muirhead further wrote in the e-mail that he trusted "[Kunofsky's] opinion as he closed 25 Uni-Marts, earlier this year, most of which were in Pennsylvania and sells more Single Tenant NNN properties than anyone in our company."[8]

119.    During the sales process, and at the behest of M&M Real Estate, PGP prepared an appraisal of the Kingston Jiffy Lube property. The appraisal included comparables provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based on leases with inflated rents, making the appraisal wholly unreliable. Of course, none of this information was disclosed to Etemad.

120.    Etemad eventually closed on the Kingston Jiffy Lube property in mid-November 2005, at a purchase price of $2,271,058.00. Etemad, Muirhead, Kunofsky, M&M Real Estate, Sovereign Scranton and Morabito used fax, e-mail, phone, and U.S. mail by and between California and New York to negotiate the transaction.

**3.    The Jiffy Lube Sale Was a Scam**

121.    On October 13, 2006, Salvatore ("Sam") Morabito (Paul Morabito's brother) sent a letter to Etemad via certified mail notifying him that the lease on the Kingston Jiffy Lube property had been assigned to Tibarom PA, notwithstanding the fact that Etemad had not consented to this assignment. Etemad called Morabito/Eureka/Tibarom to find out why they purportedly made this assignment and was told that "it was just a technical thing to put more focus on these companies and

---

[8]    Following Kunofsky's sale of the Uni-Mart triple-net lease properties, Uni-Mart filed for Chapter 11 bankruptcy protection, leaving the purchasers without tenants on their properties.

1   make sure we address things better." After that time, Etemad began receiving rent checks from

2   Tibarom PA.

3       122.    On December 14, 2006, California Credit Union, Etemad's lender, sent Etemad a

4   copy of a physical inspection that the lender had requested on the Kingston Jiffy Lube property. The

5   report, which included photos and text information, listed the building square footage as 3,000 sq. ft.

6   The PGP appraisal and initial marketing materials from M&M both claimed that the square footage

7   on the Kingston Jiffy Lube property was 4,225 sq. ft.[9]

8       123.    On April 24, 2007, Etemad wrote to Morabito/Eureka/Tibarom because the rent check

9   for that month had bounced. Etemad was told that the check bounced due to a bank mistake.

10      124.    On November 23, 2007, Etemad wrote to Morabito/Eureka/Tibarom to complain

11  about recent rent delivery problems, and he requested a financial statement. Morabito/Eureka/

12  Tibarom promised to provide the financial statement, but never did. Thereafter, Etemad received

13  rent for December 2007 – the last rent payment that Etemad would receive from Morabito/Eureka/

14  Tibarom.

15      125.    Subsequently, on January 5, 2008, Etemad received a phone call from David Macchia

16  ("Macchia"), who identified himself as the new owner of Tibarom, and Etemad's new tenant.

17  Macchia told Etemad that he was coming to meet with Jiffy Lube owners in San Francisco on

18  January 9, 2008, and that he would like to meet with Etemad, Amirkhas and the Moderbachers.

19      126.    At the meeting, Etemad asked Macchia how and when he became the owner of

20  Tibarom as Etemad had not received any notice of such a transfer. Macchia told them that he took

21  over the operations of their Jiffy Lube locations on approximately December 22, 2007. Macchia

22  asked Etemad, Amirkhas and the Moderbachers all to take the largest rental reduction that they could

23  possibly take so that Macchia could continue to operate the properties.

24      127.    On January 10, 2008 – the day after the meeting with Macchia – Morabito called

25  Etemad to "find out how everything is going." During the call, Morabito attempted to intimidate

26

27  [9]     If the inspection report is accurate, then there is an approximate 30% discrepancy between
    claimed and actual square footage, making the price per square foot dramatically higher.

28

1  Etemad, stating that "I know a lot of powerful people, this whole thing is bullshit." Morabito also

2  stated that "I know where you live, it is Saratoga [California] right? You must have a lot of money."

3  When Etemad told Morabito that he worked at Oracle, Morabito said that he knew Oracle CEO

4  "Larry Ellison and he was a jerk." Etemad got the impression that Morabito was trying to scare him

5  and show him how well-connected Morabito was.

6      128.    Thereafter, on February 11, 2008, Tibarom employee Greg Breen ("Breen") sent

7  Etemad an e-mail stating that Tibarom did not plan to pay property taxes going forward on the

8  Kingston Jiffy Lube property. Then, on February 16, 2008, Breen sent Etemad an e-mail attaching

9  Jiffy Lube sales trend data going back to 2000 showing *serious declines in sales since*

10 *approximately 2001.*   This information was in direct conflict with representations made by

11 Muirhead, M&M Real Estate, Kunofsky, Morabito and Sovereign Scranton when they were

12 convincing Etemad to invest in the Kingston Jiffy Lube property.

13     129.    Shortly thereafter, Macchia proposed to pay rent equivalent to 50% of profits from

14 operations. Macchia proposed leasing the property on a month-to-month basis with the rent varying

15 each month based on profits to be divided after paying expenses. The proposed lease document also

16 included a very broad release of claims against Macchia, his predecessors and successors. Etemad

17 did not sign the release and did not agree to the new lease terms.

18     130.    Macchia ultimately abandoned the store at the end of April 2008. In order to mitigate

19 his damages, Etemad re-let the property to a new tenant, Snowdon, LLC d/b/a Valvoline Instant Oil

20 Change ("Snowdon"), on May 1, 2008 at $5,500.00 per month – significantly less then the

21 Morabito/Eureka/Tibarom lease. This figure is not enough to cover Etemad's monthly mortgage

22 payment of $8,819.17.

23     131.    Throughout the course of his relationship with M&M Real Estate, Muirhead,

24 Kunofsky, Sovereign Scranton, Morabito and the various other members of the M&M Enterprise,

25 Defendants made false and misleading statements and omissions regarding the fair market value,

26 future rents, business prospects, security and stability of Etemad's investment – exploiting the

27 relationship of trust that they had intentionally built with Etemad. During this time, Defendants

28 knew that the fair market value of the investment property was artificially inflated, that the purported

COMPLAINT                                                                                    - 25 -

1   long-term lease was a farce, and that the "tenant" would walk away, abandoning the property,

2   wiping out the artificial inflation in the fair market value of the property, and eviscerating the future

3   rents.

4          132.    So, like every other investor, Defendants' conspiracy to scam Etemad was a complete

5   success. With mathematical precision, Defendants artificially inflated the value of the property that

6   Etemad was induced to purchase, which value plummeted when the Defendants walked away. As a

7   result, Etemad suffered severe financial damages, including the loss of fair market value of his

8   investment, future rents and out-of-pocket damages, all of which he is entitled to recover.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Etemads' purchase of the Jiffy Lube located at 175 S. Wyoming Avenue, Kingston, Pennsylvania 18704

---

**JUNE 30, 2004**

Morabito/Scranton Lube purchased the Kingston Jiffy Lube property from Millett 21st Century Ventures, LP for **$924,000.00**

---

**JUNE 30, 2004**

Sovereign Scranton purchased the Kingston Jiffy Lube property from Morabito/Scranton Lube for **$1,960,000.00**

---

**JULY 1, 2004**

Sovereign Scranton and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$15,833.33** with a 1.60% increase per annum through June 30, 2029

---

**NOVEMBER 11, 2005**

Etemad purchased the Kingston Jiffy Lube property from Sovereign Scranton for **$2,271,058.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$15,833.33**

---

**DECEMBER 22, 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia

---

**APRIL 2008**

Macchia abandoned the property

---

**MAY 1, 2008**

Etemad mitigated his damages and signed a new lease with Snowdon for 35 months at a rental rate of **$5,500.00** per month

---

COMPLAINT

- 27 -

**B.      How Michael and Sally Wiley Got Scammed**[10]

     **1.      M&M Real Estate and Weston Cast the Bait**

     133.   In 2003, Mike and Sally Wiley (the "Wileys") agreed, at Weston's (an agent working out of M&M Real Estate's Long Beach office) solicitation and recommendation, to sell a 16-unit apartment building they owned in Long Beach, California.  Weston told the Wileys that they had gained a great deal of equity in the property since purchasing it and that equity would be put to much better use by selling the property and reinvesting in another property via a 1031 exchange.  The Wileys had a previous successful experience with Weston, who represented them in a 1031 exchange in 2000, and trusted his judgment.  Weston represented the Wileys on both the sell and buy ends of that transaction.

     134.   The Wileys eventually sold the Long Beach property in September 2003 for $1,850,000.00.  Thereafter, the Wileys again sought Weston's advice regarding the reinvestment of the proceeds.  Weston strongly recommended that the Wileys "graduate" from apartment building investing and move into a commercial triple-net property investment, where there would be minor owner responsibilities and a stable and secure income, relative to the apartment business.  Weston said that this was a common progression of investment strategy for apartment owners.

     135.   While the Wileys liked the concept of investing in a triple-net lease property, they were concerned about the risk of having a single tenant.  Weston assured the Wileys that having a single tenant was not cause for concern, noting that one of the benefits of a triple-net lease was that the single tenant would be responsible for all repairs, taxes, insurance and any other expenses on the property.  In fact, Weston told the Wileys that investors in triple-net lease properties received their rent checks "automatically" through electronic deposit.

     136.   Weston's representations were very appealing to the Wileys, as they had experienced numerous problems with past tenants of the apartment buildings that they previously owned.  Based

---

[10]    Michael and Sally Wiley took title to the property as Trustees of the Wiley/Fimiani Family Trust, dated November 18, 1998.  On August 17, 2004, they transferred the title of the property to Eclectic Properties East, LLC, a California Limited Liability Company.

1  on Weston's representations, the Wileys decided to move forward and look for a triple-net lease

2  property.

3      137.    Thereafter, Weston sent the Wileys listings of various triple-net lease opportunities,

4  including a Jiffy Lube property located in Vestal, New York. The Vestal Jiffy Lube was offered for

5  sale by Sovereign JF. Defendants never disclosed to the Wileys the extent of Sovereign JF's

6  relationship with M&M.

7      138.    Weston and M&M Real Estate led the Wileys to believe that the Vestal Jiffy Lube

8  property – listed at approximately $2,200,000.00 – was the most appealing and secure investment

9  opportunity that was available to them. Weston assured the Wileys that Morabito – the operator of

10 the property – was one of the largest and most successful Jiffy Lube franchisees in the country.

11 Weston and M&M Real Estate led the Wileys to believe that Morabito's involvement further

12 increased the security of an investment in the Vestal Jiffy Lube Property.

13     139.    Weston and M&M Real Estate provided the Wileys with a full-color sales brochure

14 which marketed the Vestal Jiffy Lube property as yielding an 8.0% cap rate. The marketing

15 materials also noted that the tenants of the Vestal Jiffy Lube property – Eureka and Tibarom (which

16 were alter-egos of Morabito) – would pay rent starting at $173,675.00 per year with 10% rental

17 increases every five years. The long-term lease on the property was for 25 years. The marketing

18 materials touted Morabito as being the highest net worth Jiffy Lube operator in the United States.

19 Reasonably relying on the M&M Real Estate marketing materials and Weston's representations, the

20 Wileys believed that Morabito/Eureka/Tibarom was financially stable and would be a safe tenant.

21     140.    The Wileys subsequently had a number of conversations with Weston, during which

22 he assured them of the accuracy of the statements in M&M Real Estate's marketing materials.

23 Weston told the Wileys that Morabito was one of Jiffy Lube's biggest franchisees and that he owned

24 approximately 24 Jiffy Lube stores around the country. Weston assured the Wileys that it was

25 highly unlikely that the Vestal Jiffy Lube would ever go out of business, but that even if the store

26 failed, Morabito had 23 other operational Jiffy Lube stores and therefore could cover any rental

27 payments.

28

### 2.      The Wileys Take the Bait

141.     Thereafter, in November 2003, in reasonable reliance on M&M Real Estate and Weston's representations, the Wileys agreed to purchase the Vestal Jiffy Lube property for $2,144,195.00, with $1,050,000.00 in financing. By that time, the Wileys were very close to the 45-day deadline to identify a property for their 1031 exchange, and felt pressure to move forward with their investment. As this was the Wiley's first commercial real estate transaction, they placed their complete trust in Weston and M&M Real Estate, whom, based upon their representations, the Wileys perceived to be experts in the field, and relied on them to protect their interests.

142.     The Wileys closed on the Vestal Jiffy Lube location in February 2004, and thereafter, received timely rental payments from Morabito/Eureka/Tibarom through October 2006. The Wileys, Weston, M&M Real Estate, Sovereign JF and Morabito used fax, e-mail, phone and U.S. mail by and between California and New York to negotiate the transaction.

### 3.      The Jiffy Lube Sale Was a Scam

143.     On October 23, 2006, the Wileys received a letter from Salvatore Morabito, Vice-President of Eureka (and brother of Morabito), advising them that the lease on the Vestal Jiffy Lube property had purportedly been assigned and transferred to Tibarom NY.  The assignment was completed without the Wiley's agreement or consent and in direct contravention of the language of the lease agreement.  The Wileys were concerned about the assignment, but felt powerless to do anything.  Thereafter, Tibarom NY paid rent on time through September 2007.

144.     From September through December 2007, Tibarom NY was late on its rent payments. As such, the Wileys contacted Breen – the general manager of the Vestal Jiffy Lube property – each month, about the late rental payments.  On a December 2007 call, Breen told the Wileys that Tibarom NY was now controlled by Macchia and that Macchia would contact them about the situation.  The Wileys never received any written notice of the transfer of the Vestal Jiffy Lube property to Macchia, nor did they ever consent to it.

145.     Soon thereafter, Macchia called Michael Wiley and told him that he was taking over Tibarom NY.  Macchia told him that the current rental rate for the lease on the Vestal Jiffy Lube property was way out of line with the actual revenues generated from store operations. Specifically,

1   Macchia told the Wileys that *the rent was nearly twice what it should be* for a lease on the property.

2   Macchia then told the Wileys that he would not be able to pay rent until February 2008, after he

3   closed poor performing stores.[11]

4       146.    In late 2007, the Wileys called Weston to inform him that they were having trouble

5   with the tenant on the Vestal Jiffy Lube property and to inquire about the possibility of selling the

6   property. After several conversations, Weston told the Wileys that he would investigate what was

7   going on with the property and tenants. From that point on, Weston did not respond to the Wiley's

8   phone calls.

9       147.    In early February 2008, Macchia called Michael Wiley and informed him that

10  Macchia would be closing all of the Jiffy Lube stores that Tibarom NY operated. Macchia told

11  Michael Wiley that he would continue operating the Vestal Jiffy Lube until the Wileys found another

12  tenant, but Macchia stated that he would not pay any rent during the time that he continued to

13  operate the property.

14      148.    Thereafter, in February 2008, Macchia abandoned the property, leaving the property

15  in very poor condition. The property had 4 feet of water in the basement, water damage, mold and

16  oil on the walls, and the trade fixtures and other items were either missing or destroyed. Thereafter,

17  in order to mitigate their damages, in March 2008, the Wileys entered into a new 10-year triple-net

18  lease with Sierra Oil Management at a monthly rent of 15% of net sales, well below the rent of

19  $14,492.92 that Morabito/Eureka/Tibarom had agreed to pay and well below the monthly mortgage

20  of $7,731.00 that the Wiley's owed on the property.

21      149.    Throughout the course of their relationship with M&M Real Estate, Weston,

22  Sovereign JF, Morabito and the various other members of the M&M Enterprise, Defendants made

23  false and misleading statements and omissions regarding the fair market value, future rents, business

24  _____

25  [11]    In a subsequent phone call, Michael Wiley asked Macchia if he thought the base rent rate was
    inflated. Macchia explained that he used to own and operate other Jiffy Lube stores and that he had

26  been approached by individuals at Sovereign about selling his Jiffy Lubes years before. *The
    individuals at Sovereign told Macchia that it did not matter what the lease rates on the properties*

27  *were as Sovereign could value the sales at much higher prices based on the other Jiffy Lubes that*
    *Sovereign had been selling.*

28

1 prospects, security and stability of the Wiley's investment – exploiting the relationship of trust that

2 they had intentionally built with the Wileys. During this time, Defendants knew that the fair market

3 value of the investment property was artificially inflated, that the purported long-term lease was a

4 farce, and that the "tenant" would walk away, abandoning the property, wiping out the artificial

5 inflation in the fair market value of the property, and eviscerating the future rents.

6      150.   So, like every other investor, Defendants' conspiracy to scam the Wileys was a

7 complete success. With mathematical precision, Defendants artificially inflated the value of the

8 property that the Wileys were induced to purchase, which value plummeted when the Defendants

9 walked away. As a result, the Wileys suffered severe financial damages, including the loss of fair

10 market value of their investment, future rents and out-of-pocket damages, all of which they are

11 entitled to recover.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3

**Chronology of the Wileys' purchase of the Jiffy Lube property located at 137 Vestal Parkway East, Vestal, New York 13850**

4
5
6

### OCTOBER 15, 2003

Morabito/Eureka purchased the Vestal Jiffy Lube property as part of a group of three properties from Net Lease Development for a combined price of **$4,085,356.00** - an average price of **$1,361,785.00** per property



7
8
9

### OCTOBER 16, 2003

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$14,472.92** per month and a 10% increase every 5 years through October 15, 2028



10
11
12

### OCTOBER 28, 2003

Sovereign JF purchased the same three properties including the Vestal Jiffy Lube property from Morabito/Eureka for a combined price of **$4,472,163.00** - an average of **$1,490,721.00** per property



13
14
15

### JANUARY 30, 2004

The Wileys purchased the Vestal Jiffy Lube property from Sovereign JF for **$2,144,135.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$14,492.92**



16
17
18

### DECEMBER 2007

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia



19
20

### FEBRUARY 2008

Macchia abandoned the property and removed the trade fixtures



21
22
23

### MARCH 17, 2008

The Wileys mitigated their damages and signed a new lease with Sierra Oil for a 10 year term at a rental rate of 15% of net sales

24
25
26
27
28

COMPLAINT

**C.  How Eileen and Johannes Moderbacher Got Scammed**[12]

    **1.  M&M Real Estate and Muirhead Cast the Bait**

151.  In August 2005, Eileen and Johannes Moderbacher (the "Moderbachers") were introduced to Muirhead and M&M Real Estate when they sold an Arizona apartment complex they owned with Amirkhas and Etemad.  In the course of Muirhead and M&M Real Estate's representation of Amirkhas in connection with the sale of the apartment complex, the Moderbachers and Etemad were advised about Amirkhas' prior investment in M&M Real Estate's 1031 exchange properties.  Having trusted and relied on M&M Real Estate previously, Amirkhas arranged a meeting at his house in San Francisco so that the Moderbachers and Etemad could meet with Muirhead.

152.  The initial meet and greet with Muirhead lasted at least two hours.  Muirhead did most of the talking and made triple-net lease investments sound like fantastic, safe and secure investments.  Muirhead, as an agent of M&M Real Estate, aggressively marketed triple-net leases as an investment for "Baby Boomers."  The Moderbachers specifically told Muirhead they were seeking steady income and an investment where the rental income was more than their monthly mortgage obligation.  They wanted a stream of income with low personal involvement and no hassle.

153.  Muirhead repeatedly represented to the Moderbachers that triple-net lease investments were ideal for people who do not want the hassles of maintenance and whose primary goal was to generate a consistent and reliable income stream.  Muirhead represented to the Moderbachers that triple-net lease properties were the best investments they could ever find, comparing them to a pension fund.  Muirhead's representations led the Moderbachers to believe that triple-net lease investments were stable and reliable retirement options for people nearing retirement age.

---

[12]    Eileen and Johannes Moderbacher took title to their property as Eileen Starr Moderbacher and Johannes Moderbacher, husband and wife. On February 1, 2006, the Moderbachers transferred title to The Moderbacher Family Trust, established by Declaration of Trust, dated February 1, 2006.

154.   Following the San Francisco meeting, the Moderbachers had numerous phone conversations with Muirhead wherein Muirhead pitched properties he said were available for a 1031 exchange.  Muirhead recommended three potential 1031 exchange options to the Moderbachers – Jiffy Lube, Uni-Mart and KFC.  Muirhead assured the Moderbachers that these were all good, safe investments, especially in light of Muirhead's specific knowledge of the Moderbachers risk tolerance and income generation goals.  Jiffy Lube was touted as being particularly attractive because it was owned by SOPUS.

155.   In September 2005, Muirhead and M&M Real Estate provided the Moderbachers with information and marketing documents relating to a Jiffy Lube in Clarks Summit, Pennsylvania.  The brochure they received from M&M Real Estate for the Clarks Summit Jiffy Lube property portrayed the location and the business opportunities as highly attractive.  M&M Real Estate and Muirhead represented that Morabito – who controlled the tenants on the Clarks Summit Jiffy Lube property, Eureka and Tibarom (which were alter-egos of Morabito) – was a highly successful Jiffy Lube operator.

156.   M&M Real Estate's glossy, full-color marketing brochure cleverly and conspicuously focused on the concept of cap rates.  The Moderbachers believed that Muirhead, as their broker, was looking out for their best interests.  Thus, when Muirhead touted the importance of capitalization rates in determining which property to purchase, the Moderbachers took his advice.  Relying on Muirhead's advice about investment criteria, the Moderbacher's main investment criteria was to invest in a location with a cap rate of 8.0% or better.

157.   Muirhead and M&M Real Estate represented to the Moderbachers that Morabito/Eureka/Tibarom was at the start of a new long-term lease on the Clarks Summit Jiffy Lube property with a monthly income stream of $11,583.33 per month and with increases of 1.6% per year.  Muirhead and M&M Real Estate convinced the Moderbachers that a 1031 investment property was more valuable if the property had a newer lease, because then the landlord would have more time with a tenant already under contract.

158.   Muirhead maintained that the Clarks Summit Jiffy Lube property would be stable, require very little oversight from the Moderbachers and be a positive investment. The Moderbachers

1   put their trust in Muirhead and in M&M Real Estate, in part because M&M Real Estate was a huge,

2   reputable firm.  Because the Moderbachers trusted Muirhead and M&M Real Estate as their broker

3   and relied on the marketing materials they were provided, the Moderbachers did not get an

4   additional property inspection, relying instead on M&M Real Estate to protect them.    The

5   Moderbachers believed that they did not need to personally undertake additional analysis because

6   Muirhead convinced them that the Clarks Summit Jiffy Lube property was a fantastic investment.

7        **2.     The Moderbachers Take the Bait**

8        159.    In addition to convincing them that he was working to protect their interests and that

9   the Clarks Summit Jiffy Lube property was a safe and secure investment, Muirhead pressured the

10  Moderbachers to move quickly.  Muirhead told the Moderbachers on several occasions that there

11  were not many properties available to them given their impending deadline to select a property under

12  the 1031 rules.  Muirhead further pressured the Moderbachers by telling them that the sellers would

13  offer a discount to them, but only if they and their partners (Amirkhas and Etemad) purchased Jiffy

14  Lube properties immediately.

15       160.    At the behest of M&M Real Estate, PGP prepared an appraisal of the Clarks Summit

16  Jiffy Lube property.  The appraisal included comparables provided by M&M Real Estate and

17  Morabito/Eureka/Tibarom which comparables were also based on leases with inflated rents, making

18  the appraisal wholly unreliable.  Of course, none of this information was disclosed to the

19  Moderbachers.

20       161.    Sovereign Scranton initially offered to sell the Clarks Summit Jiffy Lube to the

21  Moderbachers for $1,720,000.00.  The Moderbachers eventually purchased this location effective

22  September 30, 2005 (although the closing was delayed until January 16, 2006) for $1,661,458.00.

23  The Moderbachers, Muirhead, M&M Real Estate, Morabito and Sovereign Scranton used fax, e-

24  mail, phone and U.S. mail by and between California, New York, and Arizona to negotiate the

25  transaction.

26       **3.     The Jiffy Lube Sale Was a Scam**

27       162.    Subsequent to the closing, Morabito/Eureka/Tibarom initially paid rent regularly from

28  January 2006 through October 2007.  In the fall of 2007, Breen purportedly took over managing the

1   Morabito/Eureka/Tibarom offices, which had been moved by Morabito from California to Nevada

2   after the Moderbachers' closing. After Breen started working for Morabito/Eureka/Tibarom, the rent

3   started arriving on the 25th of each month – the very last day of the ten-day grace period provided

4   for in the lease.

5          163.   In November 2007, Morabito called the Moderbachers from Nevada and

6   acknowledged that there had been some problems paying rent on time. Morabito assured the

7   Moderbachers that he had a plan in place and that everything was going to be fine. Shortly

8   thereafter, and unbeknownst to the Moderbachers, Morabito purportedly transferred his shares in

9   Eureka and Tibarom to Macchia and his company D and R Lube, Inc. This transfer occurred without

10  the Moderbachers' knowledge or consent.[13]

11         164.   In early January 2008, the Moderbachers learned, for the first time, that Macchia had

12  taken over a number of Jiffy Lube stores from Morabito/Eureka/Tibarom, including the Clarks

13  Summit Jiffy Lube property. Macchia told the Moderbachers that he was coming to San Francisco

14  later that month and scheduled a meeting with them, Amirkhas and Etemad.

15         165.   During the meeting, Macchia told the Moderbachers, Amirkhas and Etemad that his

16  experience with Morabito "taught him the difference between trusting and trustworthy." Macchia

17  represented that Morabito came to Macchia and offered to pay him to acquire Eureka and Tibarom

18  because Morabito was having problems with the franchisor, JLI, and Morabito believed those

19  problems would be resolved if he no longer owned Eureka and Tibarom. In reality, Morabito was

20  just trying to dump the leases on the Jiffy Lubes, which were no longer of value to him as he had

21  monthly payment obligations coming due under the leases and had already received his split of the

22  scammed investors' monies.

23         166.   Macchia told the Moderbachers that he could not continue to pay the current rental

24  rate and asked for a new lease in which rent would be paid as a percentage of net sales. This new

25  _____

26  [13]    When they stopped receiving rent in a timely manner, the Moderbachers contacted Jiffy Lube
        International ("JLI") to see if JLI would help or find them a new operator who would pay rent. Two
27  JLI employees, Cynthia Bains ("Bains") and Susan Kane ("Kane"), told the Moderbachers there was
        nothing JLI could do unless Morabito declared bankruptcy.
28

COMPLAINT                                                                                    - 37 -

1    rent arrangement would have resulted in a significant rent reduction from the Moderbachers' original

2    lease with Morabito/Eureka/Tibarom.

3        167.    In order to attempt to mitigate their damages, the Moderbachers began talking to an

4    experienced Jiffy Lube franchisee in the area – Jim Millet ("Millet") – regarding taking over the

5    existing lease. The Moderbachers learned from Millet that he had built several Jiffy Lube stores,

6    including the Clarks Summit Jiffy Lube property that the Moderbachers had purchased through

7    M&M Real Estate. Millett sold 5 or 6 of the stores to Morabito. When Millett heard the

8    Moderbachers had paid $1,600,000.00 for the Clarks Summit Jiffy Lube property and had been led

9    to believe by M&M Real Estate and Muirhead that this was a fair price, "he was dumbfounded."

10   Millett told the Moderbachers that he would not pay more then $350,000.00 for the Clark's Summit

11   Jiffy Lube property.

12       168.    Facing mounting damages, the Moderbachers leased the property to a new tenant who

13   began operating an Valvoline Instant Oil service in May 2008. While the new tenant is paying

14   $5,500.00 in rent per month, the Moderbachers' monthly mortgage payment is close to $6,800.00,

15   requiring the Moderbachers to take a loss every month.

16       169.    Throughout the course of their relationship with M&M Real Estate, Sovereign

17   Scranton, Muirhead, Morabito and the various other members of the M&M Enterprise, Defendants

18   made false and misleading statements and omissions regarding the fair market value, future rents,

19   business prospects, security and stability of the Moderbacher's investment – exploiting the

20   relationship of trust that they had intentionally built with the Moderbachers. During this time,

21   Defendants knew that the fair market value of the investment property was artificially inflated, that

22   the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the

23   property, wiping out the artificial inflation in the fair market value of the property, and eviscerating

24   the future rents.

25       170.    So, like every other investor, Defendants' conspiracy to scam the Moderbachers was

26   a complete success. With mathematical precision, Defendants artificially inflated the value of the

27   property that the Moderbachers were induced to purchase, which value plummeted when the

28   Defendants walked away. As a result, the Moderbachers suffered severe financial damages,

1   including the loss of fair market value of their investment, future rents and out-of-pocket damages,

2   all of which they are entitled to recover.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of the Moderbachers' purchase of the Jiffy Lube property located at 150 South Abington Road, Clarks Summit, Pennsylvania 18411

**JUNE 30, 2004**

Morabito/Scranton Lube purchased the Clarks Summit Jiffy Lube property from Millet 21st Century Ventures, LP for **$1,386,000.00**



**JUNE 30, 2004**

Sovereign Scranton purchased the Clarks Summit Jiffy Lube property from Morabito/Scranton Lube for **$1,450,000.00**



**JULY 1, 2004**

Sovereign Scranton and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$11,588.33** per month with a 1.6% increase per annum through June 30, 2029



**JANUARY 12, 2006**

The Moderbachers purchased the Clarks Summit Jiffy Lube from Sovereign Scranton for **$1,661,458.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$11,588.33**



**DECEMBER 22, 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia/D&R Lube, and thereafter Macchia/D&R Lube abandoned the property



**MAY 1, 2008**

The Moderbachers mitigated their damages and signed a new lease with Snowdon for 35 months at a rental rate of **$5,500.00** per month

COMPLAINT

- 40 -

1 | **D.   How Thomas Linden Got Scammed**[14]

2 |     **1.   M&M Real Estate Casts the Bait**

3 |     171.   In late 2003 or early 2004, Thomas Linden ("Linden") sold an apartment building that

4 | he owned in Maywood, California. At the time he sold the apartment building, Linden planned to

5 | enter into a 1031 tax deferred exchange. The title company on the sale of the apartment building,

6 | First American Title Insurance Company, referred him to a subsidiary, First American Exchange

7 | Company, to perform the services as a 1031 intermediary.

8 |     172.   Julie Galvin ("Galvin"), Linden's contact at First American Exchange Company,

9 | explained to Linden – who was living in California at the time – that he needed to purchase a new

10 | investment property using the proceeds he received from the sale of the Maywood apartment

11 | building. Galvin referred Linden to M&M Real Estate's Long Beach, California office to assist in

12 | finding a new investment property.

13 |     173.   From the outset, Linden told M&M Real Estate that he wanted an investment that was

14 | less of a hassle and less hands-on than the apartment building he had owned. M&M Real Estate

15 | suggested Linden allow M&M Real Estate to search for a triple-net lease investment with an 8.0%

16 | cap rate, which Linden understood to mean that he would earn 8.0% per year on his investment.

17 | While Linden had heard of triple-net leases, he did not have more than a cursory knowledge of them.

18 | For this reason, and because he was using M&M Real Estate as his broker in the purchase of a new

19 | 1031 exchange property, he relied on M&M Real Estate to advise him regarding achieving his

20 | investment goals and protecting his interests.

21 |     174.   M&M Real Estate provided Linden with various investment options, including

22 | potential Jiffy Lube, Burger King and Church's Chicken locations. M&M Real Estate represented to

23 | Linden that it typically sold properties for franchises and companies that did not want to operate

24 | their own property. M&M Real Estate provided Linden with a spreadsheet identifying a number of

25 | Jiffy Lube locations being offered for sale. The spreadsheet purported to show operating income,

26 |

27 | [14]   Thomas Linden took title to the property, with Sylvia E. Linden, as trustees of the Thomas H. Linden and Sylvia E. Linden Family Trust, dated September 19, 2000.

28 |

1  expenses and other information for each location listed.  The tenants on most of the Jiffy Lube

2  properties were Eureka and Tibarom (which were alter-egos of Morabito).  M&M Real Estate

3  represented to Linden that Jiffy Lube was "supporting" Morabito's Eureka and Tibarom deals and

4  that they were safe and secure investments.

5      175.    The marketing materials that M&M Real Estate provided Linden for the Jiffy Lube

6  properties prominently featured the JLI logo, and Linden was led to believe by M&M Real Estate

7  that JLI was affiliated with or supported Morabito/Eureka/Tibarom – the likely tenant.  M&M Real

8  Estate also made a representation in the marketing materials that the tenant is "Eureka Petroleum,

9  Inc. (Oil agreement with Shell is a 10 year agreement which Shell only signs with Eureka.  Shell Oil

10 has a right to cure any lease default under the oil agreement.)"  Based on these representations, as

11 well as others made by M&M Real Estate, at the time he was considering his investment options,

12 Linden believed that if Morabito/Eureka/Tibarom were to default, then SOPUS would take over any

13 lease on the property.

14     176.    M&M Real Estate also used Morabito, personally, as a selling point, representing that

15 Morabito's involvement greatly increased the stability of the Jiffy Lube investments.  For example,

16 M&M Real Estate provided Linden with M&M Real Estate marketing materials indicating that

17 Morabito's franchises sold 12.0% more than the average Jiffy Lube store and had an average per

18 service revenue of $56.00 compared to just $50.00 at other franchises.  Linden relied upon the

19 totality of M&M Real Estate's representations and assurances when he chose to invest.

20     **2.    Linden Takes the Bait**

21     177.    On April 20, 2004, Linden purchased the Jiffy Lube in Rochester, NY from

22 Sovereign JF for $1,240,425.00.  Linden, M&M Real Estate, Sovereign JF and Morabito used fax, e-

23 mail, phone and U.S. mail by and between California, New York, and Florida to negotiate the

24 transaction.

25     178.    At the time of closing, Morabito/Eureka/Tibarom was Linden's tenant, and there were

26 24 years and eight-and-a-half months remaining on the long-term lease on the property.  The

27 monthly rent payment under the lease was $8,269.50, with an annual increase of 1.6% on each

28 March 5th.

COMPLAINT                                                                                    - 42 -

### 3.  The Jiffy Lube Sale was a Scam

179.  From the time of Linden's closing in 2004 until 2007, Linden received his rent from Morabito/Eureka/Tibarom without any issues.  However, in approximately the spring of 2007, Linden did not receive the monthly rent check.  Thereafter, Linden called Morabito's office in Reno, Nevada to find out why Morabito/Eureka/Tibarom had not paid the rent for that month.  At that time, he spoke with a person he believes was Brandi Sartain ("Sartain").  Linden overheard Sartain confirm with another woman in the office that his franchise had been "transferred" to DDS Management ("DDS") [which was an alter-ego of Samuel Pearson ("Pearson") and Deborah Pickett "Pickett")].  Sartain then told Linden that Morabito/Eureka/Tibarom had transferred his franchise and lease to DDS, but that DDS was keeping the Eureka name.

180.  Shortly thereafter, Linden received a letter notifying him that Morabito was purporting to "transfer" Linden's store to DDS.  The letter explained that Linden's Rochester Jiffy Lube would continue to be run by Pearson and Pickett.  The letter noted that Pearson and Pickett were experienced operators and had both previously worked for Morabito and JLI.  The letter led Linden to believe that Pearson and Pickett were well qualified to operate his Jiffy Lube property in Rochester.

181.  Subsequent to the unapproved "transfer," DDS paid the rent under the long-term lease for a few months.  Thereafter, Linden started receiving unsigned checks in the mail from DDS as well as checks drafted with the right amount but the wrong payee.  DDS did not pay any rent in September or October 2007.

182.  Remembering that M&M Real Estate represented to Linden in their marketing materials that SOPUS had the right to cure any default under the lease, Linden contacted JLI employees Paula Floeck ("Floeck") and Lenny Lestrovsky ("Lestrovsky") to see if SOPUS would cure the default and take over his store or help him identify a replacement tenant.  No one at JLI offered any assistance.

183.  In November 2007, Pearson called Linden and offered to buy the Rochester Jiffy Lube property.  Linden asked for $1,200,000.00 but Pearson declined, stating that he might pay $1,000,000.00.  Linden sent Pearson an e-mail asking him to make a written offer.  On

1    November 2, 2007, Pearson told Linden through e-mail that he was having his attorney prepare a

2    purchase contract, and Linden could expect to get a written offer.

3         184.   Then, on November 8, 2007, Pearson asked Linden through e-mail whether Linden

4    would let DDS out of the lease if Pearson did not purchase the property. Pearson provided Linden

5    with calculations indicating that, based upon the property's revenues, the rent should have been more

6    along the lines of $4,500.00 to $5,000.00 per month, not the $8,878.00 originally agreed to under the

7    long-term lease that Morabito and Sovereign JF put in place. When Linden refused to agree to a

8    modification of the existing rental rate, DDS abandoned the Rochester Jiffy Lube property. As of

9    that time, Linden was already owed approximately $40,000.00 in unpaid rent, late fees and penalties.

10        185.   When Linden made his investment, M&M Real Estate did not disclose that Sovereign

11   JF had only purchased the location a few months before it was resold to him. He only learned this

12   information much later, when he retained a local appraiser out of Rochester, New York to appraise

13   the property. The appraisal concluded that Linden's store was valued at approximately $400,000.00

14   – a far cry from the $1,200,000.00 that M&M Real Estate, Sovereign JF and Morabito had induced

15   Linden to pay.

16        186.   In December 2007, Linden received a call from Jim O'Leary ("O'Leary"), President

17   of Fast Track Oil Change. O'Leary had heard that when other local Jiffy Lubes had been

18   abandoned, the tenant came back and took all the equipment and machinery from the store. O'Leary

19   offered to lock the Rochester Jiffy Lube store for Linden to prevent it from being stripped. Linden

20   accepted this assistance. O'Leary then offered to lease the location and run it and try to make it

21   grow. In order to mitigate his damages, Linden re-let his property to O'Leary, who signed a new

22   lease with Linden on December 31, 2007 and agreed to pay Linden 12% of sales, approximately

23   $2,600.00 per month (as opposed to the $8,269.50 that Linden was supposed to be paid under the

24   lease with Morabito/Eureka/Tibarom).

25        187.   Throughout the course of his relationship with M&M Real Estate, Sovereign JF,

26   Morabito and the various other members of the M&M Enterprise, Defendants made false and

27   misleading statements and omissions regarding the fair market value, future rents, business

28   prospects, security and stability of Linden's investment – exploiting the relationship of trust that they

1   had intentionally built with the Linden.  During this time, Defendants knew that the fair market value

2   of the investment property was artificially inflated, that the purported long-term lease was a farce,

3   and that the "tenant" would walk away, abandoning the property, wiping out the artificial inflation in

4   the fair market value of the property, and eviscerating the future rents.

5           188.    So, like every other investor, Defendants' conspiracy to scam Linden was a complete

6   success.  With mathematical precision, Defendants artificially inflated the value of the property that

7   Linden was induced to purchase, which value plummeted when the Defendants walked away.  As a

8   result, Linden suffered severe financial damages, including the loss of fair market value of his

9   investment, future rents and out-of-pocket damages, all of which he is entitled to recover.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2

**Chronology of Linden's purchase of the Jiffy Lube property located at 3022 Ridge Road, West Rochester, New York 14626**

3
4
5

**MARCH 5, 2004**

Morabito/Rochester Lube purchased the Rochester Jiffy Lube property from Bruce D. Coleman for **$1,004,006.00**

6
7
8

**MARCH 5, 2004**

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$8,269.17** per month with a 1.6% increase per annum through March 4, 2029

9
10
11

**MARCH 5, 2004**

Sovereign JF purchased the Rochester Jiffy Lube property from Morabito/Rochester Lube for **$1,086,439.00**

12
13
14

**APRIL 5, 2007**

Linden purchased the Rochester Jiffy Lube property from Sovereign JF for **$1,240,425.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$8,269.17**

15
16
17

**APRIL 10, 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/DDS

18
19
20

**NOVEMBER 2007**

Pearson/Pickett/DDS abandoned the property

21
22
23

**DECEMBER 31, 2007**

Linden mitigated his damages and signed a new lease with Fast Track for a term of two years at a rental rate of 12% of net sales calculated at the end of each calendar month

24
25
26
27
28

COMPLAINT

E.    **How Sylvia and Kevork Belikian Got Scammed**[15]

    **1.    M&M Real Estate's Prior Representation of Sylvia and Kevork Belikian**

189.    In 2000, Sylvia Belikian read about M&M Real Estate's purported expertise regarding triple net-lease investments on its website, and called M&M Real Estate for further information. After being introduced to Mickle, a broker in M&M Real Estate's San Diego office, Belikian explained to Mickle that she and her husband Kevork Belikian (the "Belikians") were interested in obtaining more information regarding a triple-net lease property for a 1031 exchange. Sylvia Belikian told Mickle that it was important that any investment property be "secure" and "reputable."

190.    Mickle provided the Belikians with information regarding a medical building in Houston Texas, which, because of Sylvia Belikian's previous experience as a nurse, was of some interest to her. Relying on Mickle's advice, the Belikians ultimately purchased the medical building in 2000 for $1,700,000.00.

191.    Because Mickle acted as the Belikians' agent in connection with their purchase of the medical building, the Belikians came to accept him as a trustworthy representative. As such, when, in early 2004, the Belikians sold their commercial printing business in Pasadena, California, they contacted Mickle regarding another potential 1031 exchange.

    **2.    M&M Real Estate and Mickle Cast the Bait**

192.    The Belikians told Mickle that they wanted to reinvest the proceeds from the printing business in a secure investment and were interested in possibly purchasing an additional medical building. Mickle called the Belikians back several days later and told them that there were no other medical buildings available, but that he did know of a property that would be a safe and secure investment that would meet the Belikians' needs – a Jiffy Lube property in Brockport, New York.

193.    As the Belikians were not familiar with the oil change business, they were cautious and hesitant about investing in a property with an operating Jiffy Lube on it. In order to allay their

---

[15]    Sylvia and Kevork Belikian took title to their property as Trustees under the Kevork Belikian and Sylvia S. Belikian Living Trust, dated July 10, 2000.

COMPLAINT

1  fears, Mickle, as an agent of M&M Real Estate, repeatedly represented that an investment in the

2  Brockport Jiffy Lube would be secure and would pay a steady stream of rental income. In fact,

3  Mickle promised the Belikians that investing in the Jiffy Lube property would be "very lucrative"

4  since, among other things, it provided a cap rate 8.24%. Mickle described the Brockport Jiffy Lube

5  property as being relatively new and located in a high traffic area in Brockport, New York, near a

6  large university.

7      194.   Consistent with the ongoing scheme, M&M Real Estate used Morabito as an

8  additional inducement to convince the Belikians to invest in the Brockport Jiffy Lube property.[16]

9  Mickle told the Belikians that Morabito was the owner of 42 other Jiffy Lube franchises, and

10  represented that Morabito's other locations were doing very well. Mickle assured the Belikians that

11  the rental income from the Brockport Jiffy Lube property would be secure and steady as there were

12  21 years remaining on Morabito's 25-year lease. Mickle further represented to the Belikians that the

13  lease was "guaranteed." In addition, Mickle and M&M Real Estate represented that SOPUS – the

14  parent company of the franchisor JLI – had a 10-year oil agreement with Morabito and that SOPUS

15  had the right to cure any default under the lease agreement. Mickle and M&M Real Estate's

16  representations led the Belikians to believe that SOPUS would cover any unpaid rent if there were

17  any problem with Morabito/Eureka/Tibarom.

18      195.   Based on these and other repeated representations by Mickle and M&M Real Estate,

19  the Belikians reasonably believed that the Jiffy Lube property in Brockport was a safe, secure

20  investment that would provide a guaranteed income stream each month for the next two decades.

21  Indeed, Mickle created the illusion that even if the Brockport Jiffy Lube did not do well, Morabito

22  would offset any potential losses with the revenue generated from one of Morabito's other Jiffy Lube

23  properties – insuring that the rent on the Brockport property would continue uninterrupted.

24      196.   In furtherance of Mickle and M&M Real Estate's attempts to convince the Belikians

25  to invest in the Brockport Jiffy Lube property, Mickle provided the Belikians with an electronic

26  _____

27  [16]    Tibarom and Eureka (which were alter-egos of Morabito) were the tenants and guarantors of
the long-term lease already in place on the Brockport Jiffy Lube property.

28

1  password so that the Belikians could access M&M Real Estate's secure website.  Mickle also

2  provided the Belikians with a 35-page glossy, color brochure about the Brockport Jiffy Lube

3  property.  M&M Real Estate's website and brochure made many representations regarding the

4  Belikian's potential investment, including that:

5  • The investment is a triple-net lease for 25 years with 21 years remaining (landlord
       has "absolutely no responsibilities");

6

7  • Cap Rate of 8.24% and net operating income of $147,670.00;

8  • Rent increased by 1.6% each year;

9  • Lease is guaranteed by Eureka Petroleum;

10 • Eureka Petroleum has an oil agreement with Shell and Shell has the right to cure any
       lease default;

11 • The property is located in an "excellent" area close to SUNY Brockport;

12 • Tibarom, Inc. is a highly successful Jiffy Lube franchisee, owned and operated by
       Paul Morabito; and

13

14 • Morabito-owned Jiffy Lube franchises, on average, do 12% better than other Jiffy
       Lube franchises.

15     197.    Mickle explained to the Belikians that the reported net operating income generated by

16 the Brockport Jiffy Lube location was based on the $12,305.00 monthly rent that the Belikians, as

17 landlords, would receive.  Mickle represented that the $1,900,000.00 listing price of the property was

18 based on the rental income that would be generated from the property – not the value of the

19 underlying property itself.  In fact, on more than one occasion, Mickle told Sylvia Belikian not to

20 worry about what the building or its fixtures were actually worth because the value of the property

21 was based on the income that the property could generate from the long-term lease already in place

22 on the property between Sovereign JF, the current landlord, and Morabito/Eureka/Tibarom.

23     198.    During the time that the Belikians were evaluating the Jiffy Lube property, Mickle

24 also provided a purported balance sheet for Tibarom, prepared by BMI.  The Belikians were never

25 told that BMI was controlled by Morabito.

26     199.    The Belikians reviewed the financials and discussed them with Mickle, questioning

27 whether the financials showed sufficient net profits to support the rental rate.  Mickle represented

28 that Morabito/Eureka/Tibarom had incurred substantial expenses for renovations to its Jiffy Lube

COMPLAINT                                                                                    - 49 -

1   properties which were reflected in the balance sheet, but assured them that the property would

2   generate the rental income reflected in the materials provided to the Belikians by M&M Real Estate

3   and Mickle.

4          200.    While the Belikians dealt primarily with Mickle, on one occasion Mickle's supervisor

5   participated in a conference call wherein he reiterated many of the representations made by Mickle,

6   including that Morabito had 42 extremely successful Jiffy Lube franchises, that the rent on the

7   Brockport Jiffy Lube property was guaranteed, and that there was an agreement with SOPUS.

8          201.    After Mickle made the above representations to the Belikians, Sylvia Belikian visited

9   other Jiffy Lube properties in Pasadena and Arcadia, California and talked to the employees in those

10   shops about how the franchise operated.  Sylvia Belikian was told that to generate rental income in

11   excess of $12,000.00 a month (as advertised by Mickle and M&M Real Estate), a Jiffy Lube would

12   have to process about 60 oil changes a day.  However, she was told that the Jiffy Lubes in Pasadena

13   and Arcadia had, at best, 10-12 cars pass through a day.  Based upon this anecdotal information, the

14   Belikians became concerned about what Mickle and M&M Real Estate had represented to them

15   concerning the Brockport Jiffy Lube property.

16          202.    Thereafter, Sylvia Belikian called Mickle regarding her conversations with the Jiffy

17   Lube employees at the Pasadena and Arcadia locations and voiced her concerns about the income

18   potential.  Mickle assured Sylvia Belikian that the Brockport location would generate significantly

19   more income then the California locations, stressing that the Jiffy Lube property that he and M&M

20   Real Estate were recommending to the Belikians was located in a very busy part of New York, near

21   a big university, and close to an industrial center.  After several conversations, Mickle persuaded the

22   Belikians that the Pasadena and Arcadia Jiffy Lubes were not good comparables for the Brockport

23   Jiffy Lube.

24          203.    Relying on Mickle's representations, as well as their belief that M&M Real Estate

25   was acting to protect their interests, the Belikians decided to purchase the Brockport Jiffy Lube

26   property, offering $1,700,000.00.   The offer was submitted via facsimile from Mickle on

27   April 7, 2004 to Sovereign JF. Kunofsky of M&M's New York office was the listing/selling agent

28   on the Brockport Jiffy Lube property.

COMPLAINT                                                                                    - 50 -

204.   As the offer prepared by Mickle was sent to Kunofsky – another M&M Real Estate agent – the Belikians asked Mickle to confirm that he and M&M Real Estate represented them and were looking out for their best interests. Mickle stated that he only represented the Belikians and served their best interests. Mickle told the Belikians that Kunofsky was solely a listing agent and that there was no conflict of interest. Mickle further represented to the Belikians that he had done "a lot of other deals" with Kunofsky in the past. Mickle also reiterated that M&M Real Estate had sold a lot of Jiffy Lube properties and that all of the investors in those properties did well.

### 3.   The Belikians Take the Bait

205.   In July 2004, the Belikians received a counter-offer from Sovereign JF, through Kunofsky, of $1,737,294.00. Concerned that $1,737,294.00 was too much to pay for the property, the Belikians discussed the counter-offer with Mickle. Mickle assured the Belikians that the price was worth paying because of the stable and consistent income stream that would be generated from the property. Ultimately, reasonably relying on the myriad of representations made by Mickle, M&M Real Estate, and Morabito/Eureka/Tibarom, the Belikians accepted the counter-offer on July 21, 2004. The Belikians, Mickle, Kunofsky, M&M Real Estate, Morabito and Sovereign JF used fax, e-mail, phone and U.S. mail by and between California and New York to negotiate the transaction.

206.   Mickle and M&M Real Estate did not disclose to the Belikians the extent of Sovereign JF's relationship with M&M and the Belikians had no idea that they were buying a property from an M&M subsidiary. As the Belikians trusted Mickle and M&M Real Estate and believed that they were looking out for the Belikians' best interests, the Belikians did not have an attorney or accountant review the purchase agreement or any other document provided by M&M Real Estate.

207.   At the behest of M&M Real Estate, PGP prepared an appraisal of the Brockport Jiffy Lube property. The appraisal included comparables provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based on leases with inflated rents, making the appraisal wholly unreliable. Of course, none of this information was disclosed to the Belikians.