COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
BONNY E. SWEENEY (176174)
PHONG L. TRAN (204961)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
bonnys@csgrr.com
ptran@csgrr.com
      – and –
DAVID J. GEORGE
STUART A. DAVIDSON
JAMES L. DAVIDSON
BAILIE L HEIKKINEN
120 E. Palmetto Park Road, Suite 500
Boca Raton, FL 33432-4809
Telephone: 561/750-3000
561/750-3364 (fax)
dgeorge@csgrr.com
sdavidson@csgrr.com
jdavidson@csgrr.com
bheikkinen@csgrr.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ECLECTIC PROPERTIES EAST, LLC, a California Limited Liability Company, RISOLA FAMILY LP II, a Florida Limited Partnership, CECA 3000, LP, a Nevada Limited Partnership, CHEATHAM PROPERTIES, LLC, a California Limited Liability Company, successor in the interest of John and Mary Cheatham, VAS ENTERPRISES I LLC, a California Limited Liability Company, AMNON DANUS and RIVKA DANUS, FRED ENGELBERG, LINDA FARRELL, JOSEPH W. AMIRKHAS, JOSEPH W. AMIRKHAS, as Trustee under The Amirkhas Trust, dated January 14, 2000, JUSTUS L. AHREND and SUSAN W. AHREND, Trustees of The Justus and Susan Ahrend Trust, dated December 6, 1990, | No. 09-cv-00511-RMW(HRL) <br><br> FIRST AMENDED COMPLAINT FOR: <br><br> 1. Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)-(d); <br> 2. Negligent Misrepresentation; <br> 3. Fraudulent Concealment, California Civil Code §1710 *et seq.*; <br> 4. Unjust Enrichment and Imposition of a Constructive Trust; <br> 5. Money Had and Received; <br> 6. Violation of California Business and Professions Code §17200 *et seq.*; and <br> 7. Violation of California Business and Professions Code §17500 *et seq.* |
| [Caption continued on following page.] | DEMAND FOR JURY TRIAL |

1  KEVORK BELIKIAN and SYLVIA S.                  )
   BELIKIAN, Trustees under The Kevork            )
2  Belikian and Sylvia S. Belikian Living Trust,  )
   dated July 10, 2000, MANI ETEMAD and           )
3  SUSAN KHOSHNOOD, Trustees of the               )
   Mani Etemad and Susan Khoshnood 2001           )
4  Revocable Trust, EUGENIA GAGNON,               )
   Trustee of the Genie Debs Revocable Trust,     )
5  dated October 10, 1995, THOMAS H.              )
   LINDEN and SYLVIA E. LINDEN, Trustees          )
6  of The Thomas H. Linden and Sylvia E.          )
   Linden Family Trust, dated September 19,       )
7  2000, JOHANNES MODERBACHER and                 )
   EILEEN STARR MODERBACHER, as                   )
8  Trustees of The Moderbacher Family Trust,      )
   Established by Declaration of Trust, dated      )
9  February 1, 2006, RICHARD W. SIEBERT           )
   and DEBRA M. SIEBERT, Trustees of The          )
10 Siebert Family Trust U/D/T, dated January 13,  )
   2003, ALLEN ERNEST HOM, Trustee for            )
11 The Allen Ernest Hom Trust, dated August 19,   )
   1992, and LINDA J. CALL, Trustee for The       )
12 Linda Jeanne Call Family Trust, dated          )
   September 12, 2002,                            )
13                                                )
                                  Plaintiffs,     )
14         vs.                                    )
                                                  )
15 THE MARCUS & MILLICHAP COMPANY,                )
   a California corporation, MARCUS &             )
16 MILLICHAP REAL ESTATE INVESTMENT              )
   SERVICES INC., a California corporation,       )
17 MARCUS & MILLICHAP REAL ESTATE                 )
   INVESTMENT BROKERAGE COMPANY,                  )
18 a California corporation, SOVEREIGN            )
   INVESTMENT COMPANY, a California               )
19 corporation, SOVEREIGN SCRANTON               )
   LLC, a Delaware Limited Liability Company,     )
20 SOVEREIGN CC, LLC, a Delaware Limited          )
   Liability Company, SOVEREIGN JF, LLC, a        )
21 California Limited Liability Company,          )
   PAUL A. MORABITO, individually and as         )
22 the alter ego of Eureka Petroleum Inc., a      )
   New York corporation, Tibarom Inc., a          )
23 Delaware corporation, Tibarom NY LLC, a        )
   Nevada Limited Liability Company, Tibarom      )
24 PA LLC, a Nevada Limited Liability             )
   Company, Scranton Lube, LLC, a Delaware        )
25 Limited Liability Company, New York Seven      )
   Lube, LLC, a Delaware Limited Liability,       )
26 New York Lube Number 3, LLC, a                 )
   Delaware Limited Liability Company,            )
27 _____)

28 [Caption continued on following page.]

510939_1

1   Rochester Lube, LLC, a Delaware Limited       )
    Liability Company, Baruk Management, Inc.,     )
2   a California corporation,  EUREKA              )
    PETROLEUM INC., a New York corporation,        )
3   TIBAROM INC., a Delaware corporation,          )
    TIBAROM NY LLC, a Nevada Limited               )
4   Liability Company, TIBAROM PA LLC, a           )
    Nevada Limited Liability Company,              )
5   SCRANTON LUBE, LLC, a Delaware                 )
    Limited Liability Company, NY SEVEN            )
6   LUBE, LLC, a Delaware Limited Liability,       )
    NEW YORK LUBE NUMBER 3, LLC, a                 )
7   Delaware Limited Liability Company,            )
    ROCHESTER LUBE, LLC, a Delaware                )
8   Limited Liability Company, BARUK               )
    MANAGEMENT, INC., a California                 )
9   corporation, THE QSR GROUP ONE, LLC, a         )
    Florida Limited Liability Company, THE QSR     )
10  GROUP, LLC, a Florida Limited Liability        )
    Company, and THE QSR GROUP II, LLC, a          )
11  Florida Limited Liability Company a/k/a THE    )
    QSR GROUP TWO, LLC, PGP                        )
12  VALUATION, INC., an Oregon corporation,        )
    GLEN D. KUNOFSKY, MARCUS                       )
13  MUIRHEAD, SEAN PERKIN, DONALD                  )
    EMAS, ANDREW LESHER, STEWART                   )
14  WESTON, BRICE HEAD, DAIZY GOMEZ,               )
    and BRET KING,                                 )
15                                                 )
                          Defendants.              )
16  _____       )

17

18

19

20

21

22

23

24

25

26

27

28

510939_1

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION .......................................................................................................2

II.   JURISDICTION AND VENUE ...........................................................................13

III.   INTRADISTRICT ASSIGNMENT .....................................................................14

IV.   PARTIES .................................................................................................................14

    A.   Plaintiffs ........................................................................................................14

    B.   Defendants .....................................................................................................15

    C.   Waelti's Status and Bankruptcy Proceedings ..........................................21

    D.   Non-Defendant Co-Conspirator ................................................................21

V.   GENERAL ALLEGATIONS ...............................................................................22

X.   THE TRANSACTIONS .........................................................................................26

    A.   Mani Etemad ................................................................................................26

    B.   Michael and Sally Wiley .............................................................................39

    C.   Eileen and Johannes Moderbacher ..........................................................46

    D.   Thomas Linden .............................................................................................54

    E.   Sylvia and Kevork Belikian .......................................................................62

    F.   Sam and Arleen Risola ................................................................................72

    G.   Justus and Susan Ahrend ...........................................................................79

    H.   Gary Reid .....................................................................................................87

    I.   Eugenia Gagnon ..........................................................................................97

    J.   Joseph Amirkhas ........................................................................................114

    K.   Allen Hom ...................................................................................................130

    L.   Mary Cheatham .........................................................................................142

    M.   Amnon and Rivka Danus ..........................................................................151

    N.   Richard and Debra Siebert .......................................................................157

    O.   Linda Farrell and Fred Engelberg ..........................................................165

    P.   Victoria Armenta .......................................................................................174

|  | | Page |
|---|---|---|
| | Q. | Linda Call .................................................................................183 |
| XI. | RICO ALLEGATIONS ........................................................................192 |
| | A. | The M&M Enterprise ...................................................................192 |
| | B. | Pattern of Racketeering Activity .................................................199 |
| | C. | Predicate Act Violations of 18 U.S.C. §§1341 and 1343 ...................200 |
| | D. | RICO Violations ........................................................................211 |
| | E. | RICO Conspiracy .......................................................................211 |
| XII. | ALTER EGO ALLEGATIONS ...............................................................212 |
| | A. | Sovereign Investment and M&M Investment Are the Alter Egos of M&M .......213 |
| | B. | M&M Real Estate Is the Alter Ego of M&M Investment and M&M ...............214 |
| | C. | Sovereign Scranton, LLC, Sovereign JF, LLC and Sovereign CC, LLC Are the Alter Egos of Sovereign Investment and M&M ......................................216 |
| | D. | The Morabito Entities Are Alter Egos of Morabito ...............................217 |
| | E. | The Waelti Entities Are the Alter Ego of Waelti .................................220 |
| XIII. | FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING ...........................222 |
| XIV. | CAUSES OF ACTION .........................................................................223 |

COUNT I .................................................................................................223
Violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §1962(c)-(d)

COUNT II .................................................................................................224
Negligent Misrepresentation

COUNT III .................................................................................................225
Fraudulent Concealment, California Civil Code §1710 *et seq.*

COUNT IV .................................................................................................226
Unjust Enrichment and Imposition of a Constructive Trust

COUNT V .................................................................................................227
Money Had and Received

COUNT VI .................................................................................................227
Violation of California Business and Professions Code §17500 *et seq.*

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

**Page**

COUNT VII    ..............................................................................................228
    Violation of California Business and Professions Code §17200 *et seq.*

PRAYER FOR RELIEF ..........................................................................230

JURY DEMAND...................................................................................230

1  Plaintiffs Eclectic Properties East, LLC, Risola Family Limited Partnership II, CECA 3000,

2  LP, Cheatham Properties, LLC, VAS Enterprises I LLC, Amnon Danus and Rivka Danus, Fred

3  Engelberg, Linda Farrell, Joseph W. Amirkhas, Joseph W. Amirkhas, as Trustee under The

4  Amirkhas Trust, dated January 14, 2000, Justus L. Ahrend and Susan W. Ahrend, Trustees of The

5  Justus and Susan Ahrend Trust, dated December 6, 1990, Kevork Belikian and Sylvia S. Belikian,

6  Trustees under The Kevork Belikian and Sylvia S. Belikian Living Trust, dated July 10, 2000, Mani

7  Etemad and Susan Khoshnood, Trustees of the Mani Etemad and Susan Khoshnood 2001 Revocable

8  Trust, Eugenia Gagnon, Trustee of The Genie Debs Revocable Trust, dated October 10, 1995,

9  Thomas H. Linden and Sylvia E. Linden, Trustees of The Thomas H. Linden and Sylvia E. Linden

10  Family Trust, dated September 19, 2000, Johannes Moderbacher and Eileen Starr Moderbacher, as

11  Trustees of The Moderbacher Family Trust, Established by Declaration of Trust, dated February 1,

12  2006, Richard W. Siebert and Debra M. Siebert, Trustees of The Siebert Family Trust U/D/T, dated

13  January 13, 2003, Allen Ernest Hom, Trustee for The Allen Ernest Hom Trust, dated August 19,

14  1992, and Linda J. Call, Trustee for The Linda Jeanne Call Family Trust, dated September 12, 2002

15  (individually as "Plaintiff" and collectively as "Plaintiffs"), by and through their attorneys, bring this

16  action against Defendants The Marcus & Millichap Company, Marcus & Millichap Real Estate

17  Investment Services Inc., Marcus & Millichap Real Estate Investment Brokerage Company,

18  Sovereign Investment Company, Sovereign Scranton LLC, Sovereign CC, LLC, Sovereign JF, LLC,

19  Paul A. Morabito (individually and as the alter ego of Eureka Petroleum Inc., Tibarom Inc., Tibarom

20  NY LLC, Tibarom PA LLC, Scranton Lube LLC, New York Seven Lube LLC), Eureka Petroleum

21  Inc., Tibarom Inc., Tibarom NY LLC, Tibarom PA LLC, Scranton Lube LLC, New York Seven

22  Lube LLC, New York Lube Number 3, LLC, Rochester Lube, LLC, Baruk Management, Inc., The

23  QSR Group, LLC, The QSR Group One, LLC, The QSR Group II, LLC a/k/a The QSR Group Two,

24  LLC, PGP Valuation, Inc., Glen D. Kunofsky, Marcus Muirhead, Sean Perkin, Donald Emas,

25  Andrew Lesher, Stewart Weston, Brice Head, Daizy Gomez and Bret King (individually as

26  "Defendant" and collectively as "Defendants"), and allege as follows:

27

28

I. **INTRODUCTION**

1.     Defendants, individually and collectively, planned and implemented a far-reaching real estate scheme that was conducted over several years, ensnaring the 26 investors who are the Plaintiffs herein.  As set forth herein, each Defendant knowingly played a critical and defined role, and undertook multiple acts of racketeering activity in furtherance of this conspiracy.  Through their ongoing pattern of racketeering activity, Defendants defrauded Plaintiffs into purchasing 22 commercial properties in four states at grossly inflated prices.  A complete list of the locations of the properties purchased by Plaintiffs as a result of Defendants' fraudulent scheme (referenced herein individually as a "Property" or collectively as the "Properties") is attached hereto as Exhibit A.

2.     To implement the conspiracy, Defendants first approached non-party operators of commercial rental properties containing existing quick lube and fast food franchises and offered to purchase the real estate and the franchise businesses.  Defendants then conspired to artificially inflate the purported fair market values of those properties by entering into sham leases with dummy corporations that Defendants owned, operated and/or controlled.

3.     On paper, these sham leases supposedly guaranteed 15 to 25 years of consistent rental income at rates that, unbeknownst to Plaintiffs, were more than double the fair market lease rates for similarly situated franchises.  In other words, Defendants knowingly and intentionally agreed to "pay" significantly more than the legitimate, fair market, commercially reasonable rental rates, in order to artificially inflate the sale prices of the Properties.

4.     Because commercial rental property is appraised using the value of any long-term lease on the property, the sham leases had the direct and intended effect of inflating the apparent values of the Properties significantly higher than their legitimate fair market values (*i.e.,* plaintiff Joseph W. Amirkhas was fraudulently induced into purchasing a Property for $2,939,082.00 when that Property was only worth $630,000.00).

5.     Defendants failed to disclose to Plaintiffs that the fair market, commercially reasonable rent for each Property was no more than half of the rent reflected in the sham leases, or that the values of the Properties had been artificially inflated.  To the contrary, Defendants marketed the Properties to Plaintiffs as excellent, safe and secure investments by touting their (artificially

1    inflated) fair market values, their (sham) long-term leases, and, as described more particularly below,

2    the purported successes and "business" acumen of Paul Morabito ("Morabito") and Jack Waelti

3    ("Waelti"), who were franchisees of Jiffy Lube and Church's Chicken respectively, and supposedly

4    would be the long-term "tenants" on the Properties.

5         6.    Defendants The Marcus & Millichap Company, Marcus & Millichap Real Estate

6    Investment Services Inc., Marcus & Millichap Real Estate Investment Brokerage Company, and

7    their agents, Marcus Muirhead, Sean Perkin, Donald Emas, Andrew Lesher, Stewart Weston, Brice

8    Head, Daizy Gomez, Glen D. Kunofsky and Bret King acted as the real estate brokers on these

9    transactions and claimed that they were representing and protecting Plaintiffs' interests.  These

10   Defendants made numerous representations to Plaintiffs regarding the financial stability and

11   longevity of the tenants and the level of risk.  Reasonably relying on Defendants' promises of tenant

12   financial stability and low risk investments chosen to provide secure retirement income, Plaintiffs

13   agreed to purchase the Properties.

14        7.    Unfortunately for Plaintiffs, after they paid Defendants inflated purchase prices for

15   the Properties, Defendants defaulted on their obligations to Plaintiffs under the long-term leases.  In

16   each instance, after the purchase by, and transfer of, a particular property to one of the Plaintiffs,

17   Defendants – through their shill tenants and dummy corporations – simply stopped paying rent and

18   walked away from the property, leaving Plaintiffs with tenantless, income-less, rental properties

19   worth only a small fraction of the purported "market price" that Plaintiffs had just been induced to

20   pay.  Defendants breached each and every lease agreement, failing to make good on tens of millions

21   of dollars in future rent obligations owed to Plaintiffs.

22        8.    Stunned and financially decimated, Plaintiffs finally learned the truth – that the

23   investment properties that Defendants had claimed would sustain Plaintiffs' retirements were worth

24   significantly less than promised.  Moreover, the "tenants" that were supposed to be providing

25   Plaintiffs with decades of rental income were revealed to be nothing more than fictional shells

26   created by Defendants.  Worse yet, replacement tenants (at least at the promised rental rates the shill

27   tenants agreed to pay) were nowhere to be found.  Even when Plaintiffs could find new tenants,

28   those tenants were willing to pay only a fraction of the rent that the shill tenants had agreed to pay.

9.     Indeed, the fact that nine of the 11 "tenants" that Defendants installed on the properties (which were all corporations and LLC's controlled by Morabito or Waelti) have failed to even respond to Plaintiffs' initial complaint and have been defaulted[1] is strong and compelling evidence that such "tenants" were nothing more than shell entities and dummy corporations used to further Defendants' fraudulent scheme.

10.     Defendants also furthered their conspiracy by misrepresenting the nature of the triple net long-term leases that Morabito and Waelti had executed as tenants on the Properties.  Defendants knew that the collapse of the franchises on the Properties was imminent at the time of the sales to Plaintiffs because Morabito and Waelti were highly unstable and risky Sub-Credit Tenants (as defined below) obligated to pay artificially-inflated and commercially unreasonable rents. Defendants concealed from Plaintiffs the inevitability of the collapse, and in fact represented that the investments were safe and secure, and backed by long-term leases to creditworthy tenants.

11.     Indeed, Defendants represented to Plaintiffs that they were selling the Properties as traditional "sale-leaseback" acquisitions.  In a legitimate sale-leaseback transaction, a business operator who owns the real estate underneath the business sells the real estate at market prices, with a promise to the purchaser to pay market rent under a long-term lease.  The seller/business operator gets paid the value of the real estate which is used to invest in the business, and the purchaser gets a promise of long-term rent secured by real estate worth approximately what the purchaser paid to purchase it.  The seller/business operator has every incentive to honor the lease, or else they have to pay to relocate the business and then pay similar market rent at a new location.[2]

_____

[1]     Nine entities were defaulted by this Court on July 21, 2009, July 22, 2009, and August 27, 2009.  *See* Dkt. Nos. 127-132, 156.  Those entities are Eureka Petroleum, Inc., Tibarom Inc., Scranton Lube LLC, New York Seven Lube LLC, New York Lube Number 3, LLC, Rochester Lube, LLC (which were all alter egos of Morabito) and The QSR Group, LLC, The QSR Group One, LLC, and The QSR Group II, LLC (which were all alter egos of Waelti). Upon information and belief these entities are asset-less shells.

[2]     If Defendants sold traditional sale-leasebacks to Plaintiffs as promised, Morabito and Waelti would have been paying significantly less rent then they actually agreed to pay, making their defaults less likely.  The real estate would have been worth what the Plaintiffs paid and believed the real estate to be worth.  If and when Morabito or Waelti defaulted on their leases, Plaintiffs might

12.     Although Defendants represented to Plaintiffs that they were selling the Properties as traditional sale-leaseback acquisitions, Defendants were in fact selling far riskier and dangerous debt laden investment products known as Sub-Credit Tenant Leases ("SCTLs") to Plaintiffs.  SCTLs are akin to a bond, insofar as SCTLs, in theory, are promises to pay partially secured by the value of real estate.  The seller/business operator sells the real estate at a multiple of the actual market value and the seller/business operator usually agrees to pay an even greater multiple of market rent to compensate the purchaser for the risk that the seller/business operator will default on the SCTL.  If the seller/business operator defaults, the purchaser is typically only able to re-let the property at a small portion of what the SCTL had agreed to pay.  In SCTLs, "Sub-Credit" refers to the fact that the tenant has not been rated by a credit rating agency, and there is thus no available independent analysis of the risk of bankruptcy and default.  SCTLs are so risky (even riskier than junk bonds) that pension funds and endowments are not even permitted to purchase them.[3]

13.     There is no doubt that Defendants knew they were selling SCTLs (as opposed to traditional "sale-leasebacks") to Plaintiffs.  For example, on October 11, 2004, both Morabito and Peter Mavoides – the President of Defendant Sovereign Investment Company ("Sovereign Investment)" – attended a conference for real estate professionals and led a panel discussion titled: "*Sub-Credit Tenant Net Leases: Opportunity or Quagmire.*"  Defendant Glen D. Kunofsky and several top executives of Defendant The Marcus and Millichap Company ("M&M") and its defendant subsidiaries also attended that conference.  The description of the panel noted that "[t]he growth of market interest in CTLs has begun to spark interest in use of net leases as a means to finance sub-credit grade enterprise activity."  At that same panel discussion, another panelist pointed out that Morabito's

have suffered a month or two of vacancy, but could have found new tenants at market rent and otherwise would have suffered virtually no damages.

[3]     Unlike SCTLs, in a Credit Tenant Lease ("CTL"), the seller/business operator is rated by the major credit rating agencies, S&P, Moody's or Fitch, who perform detailed analyses and modeling to determine the likelihood the seller/business operator will declare bankruptcy and therefore default on the lease.  The institutional investor considering purchasing the CTL then performs its own detailed analysis and underwriting to determine how great the risk of tenant default is, and to calculate a sufficiently high discount rate (or cap rate) to compensate for that risk.  The process is akin to underwriting a bond issued by a credit rated company.  Unless the company offers a sufficient premium to compensate for the risk of default, an institutional investor will not purchase it.

1    balance sheets (which were later provided to Plaintiffs) were dramatically flawed because Morabito

2    failed to include as a liability his massive future lease obligations (discounted to present value) under

3    the SCTLs.

4         14.    However, Defendants actively concealed from Plaintiffs the fact that the Properties –

5    while representing an "opportunity" for Defendants – represented a potential "quagmire" for

6    Plaintiffs.  Defendants instead marketed the Properties to Plaintiffs as safe, stable, income-producing

7    investments that Plaintiffs could depend on to provide a worry-free retirement.  Had Defendants

8    revealed to Plaintiffs that they were selling complex real estate/debt hybrids in which a significant

9    portion of the value of the purchase price was secured not by real estate, but only by a promise to

10   pay from a Sub-Credit grade debtor, Plaintiffs never would have purchased the Properties.  Indeed,

11   Morabito and Waelti were so thinly capitalized that they both borrowed the money to acquire the

12   Jiffy Lube and Church's Chicken stores from co-conspirator Sovereign Investment – another in a

13   long list of key facts not disclosed to Plaintiffs.

14        15.    Morabito and Waelti never intended to, and knew they could not, perform their

15   obligations under the SCTLs.  Instead, Defendants were able to avoid the impending collapse of the

16   franchises on the Properties by getting all their profits out early, and then abandoning the Properties,

17   thereby transferring all risks to Plaintiffs.

18        16.    All of the 22 transactions are inextricably intertwined because they all were part of

19   the same overarching conspiracy by Defendants to sell artificially-inflated properties through

20   material misrepresentations and omissions, sham leases and fictional tenants.  In each transaction,

21   some combination of Defendants played the same essential role necessary to implement the

22   conspiracy.  Further, Defendants used the same means in each of the 22 transactions to defraud

23   Plaintiffs out of tens of millions of dollars, leaving them with devalued properties and no cash flow

24   or future rents.  Defendants used fraudulent misrepresentations and omissions regarding the

25   conservative nature of the investments; the value of the Properties; Defendants' relationship with one

26   another; the business acumen, experience and financial wherewithal of the tenants; and the stability

27   of the long-term leases to induce Plaintiffs to purchase overvalued properties that were backed by

28   inflated lease values.

17.   The falsity of Defendants' representations to Plaintiffs cannot be disputed.   For instance, the marketing materials that Defendants provided to Plaintiff Linda Call indicated that the property that was marketed to her (and which she ultimately purchased) was 2500 square feet and that the daily traffic count was 25,000 cars per day.   Yet, an independent appraisal prepared for the property (but not provided to Plaintiff Call until well after the closing of her transaction) indicated:

> It should be noted that the "Offering Memorandum" incorrectly identifies the rentable square feet of the subject as being 2,500 square feet. The actual square footage of the subject is 1,251 square feet. Also, the memorandum identifies a traffic count of 25,000 cars per day. According to information provided by the City of Jacksonville, the average daily traffic count in front of the subject property is approximately 7,300 vehicles (Le. between Kings Road and Golfair Boulevard).

This is just one example in a pattern of misrepresentations by Defendants about the quality and rentable square footage of the properties.

18.   While there are differences among those 22 transactions, there are common factual elements demonstrating that each individual transaction is a part of the same overarching conspiracy and comprises a single pattern of continuous and systematic racketeering activity.   For example:

- In every instance, Defendants marketed and sold triple net lease properties featuring sham sale-leasebacks;

- In every instance, Morabito or Waelti had not owned the property for an extended period of time, but instead had recently (through one of their alter ego entities) purchased the property from an existing third-party operator;

- In every instance, Sovereign Investment provided acquisition financing for Morabito's or Waelti's purchase of the property from the prior existing franchisee;

- In every instance, Defendants provided the particular plaintiff with marketing materials which falsely touted the security of the investment and the business acumen of Morabito or Waelti;

- In every instance, Defendant Glen D. Kunofsky, one of M&M Real Estate's top-selling agents, was the seller's listing agent for the property;

- In every instance, Defendants marketed the property as having a marginally higher capitalization rate than could be found for similarly situated properties, but a far lower capitalization rate than investors would have demanded if the true facts about the inflated market values of the property and the ability/capitalization of the tenant had not been concealed;

- In every instance, Defendants marketed and sold the property for significantly more than the property's fair market value and concealed this fact by failing to disclose that Morabito, Waelti, and thereafter Sovereign Investment had only recently acquired the property at a fraction of the price charged to Plaintiffs;

- • In every instance, M&M or one of its subsidiaries profited from the sale and received a sales commission;

- • In every instance, the lease entered into by Morabito or Waelti (through their alter ego entities) was for a rental rate that was substantially higher than the legitimate, fair market, commercially reasonable rental rate for a Jiffy Lube or Church's Chicken franchise on the property;

- • In every instance, the sham tenant abandoned the property without any attempt whatsoever to make good on the substantial rent still owed under the lease; and

- • In every instance, the particular plaintiff that purchased the property was only able to re-let the property, if at all, at a rental rate significantly below what the sham tenant had agreed to pay.

19.     Importantly, Sovereign Investment's own pre-litigation publications confirm that the 22 transactions were part of a single, premeditated RICO conspiracy.  On its website, Sovereign Investment announced that it was providing financing for the Jiffy Lube and Church's Chicken properties at issue and described the sale-leaseback arrangements as follows:

- • "Sovereign Investment Company has provided programmatic sale-leaseback financing to a leading Jiffy Lube franchisee [Morabito] to help execute his roll-up strategy of acquiring existing lube operations and converting them to Jiffy Lubes. As part of the financing, the franchisee purchased the businesses and Sovereign [Investment] simultaneously acquired the real property under a long-term lease. Sovereign invested in 21 assets in New York and Pennsylvania;" and

- • "Sovereign Investment Company has provided sale-leaseback financing to a new operator [Waelti] to help finance the purchase of 8 Church's Chicken restaurants in Georgia and Florida from an existing franchisee. The new franchisee is an experienced operator who plans to roll up additional locations within the chain."

As Sovereign Investment's pre-litigation announcements demonstrate, the sale-leaseback agreements were not isolated, random transactions.  Quite the contrary, the sale-leaseback agreements were executed by Defendants on a collective basis as part of the same scheme and marketed to Plaintiffs as part of the "safe and secure" investments that Defendants were peddling.

20.     The appraisals provided to Plaintiffs further confirm that Sovereign Investment and its subsidiaries purchased the Properties from Morabito and Waelti in bulk, and that Defendants' fraud was one uniform scheme.  For instance:

- • The appraisal prepared for Plaintiff Mani Etemad's Jiffy Lube purchase indicates:

    The subject is currently vested in the name of Sovereign Scranton, LLC.  The current owner purchased the subject property on July 2, 2004 for $1,950,000 per Luzerne County records. ***The subject appears to have been part of a***

*bulk transaction*; however, we were unable to determine the total number of properties included.[4]

- The appraisal prepared for Plaintiff Gary Reid's Jiffy Lube purchase indicates:

    *The subject is currently vested in the name of Sovereign Investment Company (under a separate LLC), which purchased the subject in November 2003 as part of a bulk sale for a price of $1.00.  The sale price is not the actual price paid as one bulk price was paid and the sale price was divided among the different portions of the portfolio without regard to market.  Further, the price was discounted due to the number of Jiffy Lube properties included in the sale; further, the buyer [Sovereign Investment] also negotiated the current 25-year lease.*

21.    Accordingly, Defendants' plan from the very beginning was for Sovereign Investment to provide financing for Morabito and Waelti, so that they could purchase commercial properties from third-party operators, and then for Sovereign Investment to acquire all of those properties from Morabito and Waelti using a "portfolio" approach, in the process executing bogus sale-leaseback agreements to artificially inflate the fair market value of all such properties.  Under this portfolio approach, Defendants intended to market the Properties collectively and flip them to unwitting mom and pop investors one or two at a time.

22.    A June 16, 2004 *Commercial Property News* article titled "Ironing Out the Wrinkles" further evidences the pre-existing, established relationship among Defendants and the uniformity of Defendants' overarching scheme:

    Marcus & Millichap Real Estate Investment Brokerage Co. affiliate Sovereign Investment Co. benefits from the services provided by its brokerage firm parent. But taking on an industry new to net leasing is still a challenge, especially when the seller is a franchisor that wants to dispose of its properties as it buys them.

    That was the situation Sovereign stepped into when it began working with Paul Morabito, the owner of a Jiffy Lube franchise business on an expansion tear and in need of financing.

    Morabito had been funding much of his expansion with one-off sale-leaseback transactions with Marcus & Millichap but was ready to do larger deals so he could access larger amounts of capital to expand more rapidly. "Virtually all of our deals were one-sies and two-sies," Morabito said. ***We got to a point where we needed to work with a group*.**

---

[4]    Unless otherwise noted, emphasis is added.

*Instead of approaching a traditional lender, Morabito established a relationship with Sovereign, which uses Marcus & Millichap capital to acquire portfolios ranging in value from $10 million to $250 million, or one-off transactions ranging from $1 million to $75 million.*

The investment company was able to offer Morabito a lower cost of capital to finance his expansion, according to Peter Mavoides, president & CEO of Sovereign. *It could also offer more money than a conventional lender because it was confident in an exit strategy, since the brokerage firm could sell the assets to private investors.*

23.     Indeed, Sovereign Investment was so confident in its "exit strategy" that it did not require Morabito or Waelti to execute a personal guarantee on a single one of the long-term sale-leaseback agreements, even though Sovereign Investment (through its subsidiaries) was purchasing tens of millions of dollars in property from Morabito and Waelti secured only by long-term leases executed by asset-less corporate entities that Morabito and Waelti controlled.   Of course, Defendants' collective "exit strategy" required defrauding unwitting investors into purchasing the Properties at artificially inflated prices.

24.     Importantly, the actual (fair market) rental rates that the Properties were able to support were of no consequence to Defendants, as Defendants could market the properties at much higher prices based on other properties that they had sold.  And, that is exactly what Defendants did, preparing and providing Plaintiffs with fraudulent appraisals featuring other properties (often with Morabito and/or Waelti as tenants) with artificially-inflated values as comparables.

25.     In paragraphs 97 through 110 below, Plaintiffs detail the means by which Defendants implemented a step-by-step process to acquire a portfolio of commercial properties, create sham leases (with grossly inflated, commercially unreasonable and unsustainable rental rates), using tenants that had neither the intention nor the ability to comply with those long-term agreements in order to artificially manipulate and inflate the purported fair market values of the Properties, and market and sell the Properties to unsuspecting investors (who were typically targeted because they only had a short time to identify a replacement property and complete a purchase as required by section 1031).  In paragraphs 111 through 674 below, Plaintiffs detail the specifics of each transaction, including the "who, what, when, where and how" of Defendants' conspiracy.

26.     Independent appraisals of the true fair market values of each of the 22 Properties as of the dates they were purchased by Plaintiffs demonstrate that every property was sold at a price that was at least 53.50% (and in most cases more than 100%) above fair market value.  The results of those appraisals are depicted in the following chart:

### FAIR MARKET VALUES OF PROPERTIES AT TIME OF CLOSING

| Plaintiff | Property Address | Amount of Money Plaintiff(s) Was/Were Defrauded into Paying | True Fair Market Value of Property at Time of Purchase | Amount of Artificial Inflation at Closing | % of Artificial Inflation at Closing |
|---|---|---|---|---|---|
| Justus & Susan Ahrend | 739 Oak Street, Scranton, PA 18508 | $2,668,500 | $490,000 | $2,178,500 | 444.59% |
| Joseph Amirkhas | 401 West Oglethorpe Blvd., Albany, GA 31701 | $1,088,000 | $365,000 | $723,000 | 198.08% |
| Joseph Amirkhas | 92-94 Mundy Street, Wilkes-Barre, PA 18702 | $2,939,082 | $630,000 | $2,309,082 | 366.52% |
| VAS Enterprises I LLC (Victoria Armenta) | 1926 Martin Luther King Jr. Blvd, Albany, GA, 31701 | $635,000 | $245,000 | $390,000 | 159.18% |
| Kevork & Sylvia Belikian | 1010 Transit Way, Brockport, NY 14420 | $1,744,244 | $590,000 | $1,154,244 | 195.63% |
| Linda Call | 1830 North Myrtle Ave, Jacksonville, FL 32209 | $1,100,000 | $350,000 | $750,000 | 214.29% |
| Cheatham Properties, LLC (Mary Cheatham) | 5809 North Main St., Jacksonville, FL 32208 | $1,000,000 | $470,000 | $530,000 | 112.77% |
| Amnon & Rivka Danus | 4250 Moncrief Rd., Jacksonville, FL 32209 | $896,000 | $400,000 | $496,000 | 124.00% |
| Linda Farrell & Fred Engelberg | 1060 E. 21st St., Jacksonville, FL 32206 | $957,800 | $455,000 | $502,800 | 110.51% |
| Mani Etemad | 175 S. Wyoming Ave., Kingston, PA 18704 | $2,271,058 | $580,000 | $1,691,058 | 291.56% |
| Eugenia Gagnon | 6480 Transit Road, Cheektowaga, NY 14043 | $1,250,000 | $550,000 | $700,000 | 127.27% |
| Eugenia Gagnon | 4885 Transit Road, Lancaster, NY 14086 | $1,250,000 | $630,000 | $620,000 | 98.41% |
| Allen Hom | 3007 W. Edgewood Ave, Jacksonville, FL 32209 | $1,020,000 | $400,000 | $620,000 | 155.00% |
| Allen Hom | 321 S. Hamilton St., Painted Post, NY 14870 | $1,370,964 | $320,000 | $1,050,964 | 328.43% |
| Allen Hom | 141 Seneca Street, Hornell, NY 14843 | $1,070,929 | $350,000 | $720,929 | 205.98% |
| Thomas Linden | 3022 Ridge Road, West Rochester, NY 14626 | $1,240,425 | $640,000 | $600,425 | 93.82% |
| Eileen & Johannes Moderbacher | 150 South Abington Road, Clarks Summit, PA 18411 | $1,661,458 | $410,000 | $1,251,458 | 305.23% |
| CECA 3000, LP (Gary Reid) | 234-330 Main Street, Binghamton, NY 13905 | $1,307,143 | $520,000 | $787,143 | 151.37% |
| CECA 3000, LP (Gary Reid) | 288 Hamilton Street, Geneva, NY 14456 | $951,719 | $620,000 | $331,719 | 53.50% |
| Risola Family LP II (Sam & Arleen Risola) | 2418 North Main St., Warsaw, NY 14569 | $990,000 | $610,000 | $380,000 | 62.30% |

| Plaintiff | Property Address | Amount of Money Plaintiff(s) Was/Were Defrauded into Paying | True Fair Market Value of Property at Time of Purchase | Amount of Artificial Inflation at Closing | % of Artificial Inflation at Closing |
|---|---|---|---|---|---|
| Richard & Debra Siebert | 448 East Jackson St., Thomasville, GA 31792 | $759,091 | $420,000 | $339,091 | 80.74% |
| Eclectic Properties East, LLC (Mike & Sally Wiley) | 137 Vestal Parkway East, Vestal, NY 13850 | $2,144,135 | $1,100,000 | $1,044,135 | 94.92% |
| **TOTAL** | | **$30,315,548** | **$11,145,000** | **$19,170,548** | |

27.     Further, as can be seen from the chart below, in every transaction, the amount of rents actually paid to Plaintiffs (prior to abandonment) under the long-term leases on each of the Properties was only a small fraction of the total rent that Morabito or Waelti had actually agreed to pay over the life of the long-term leases:

**ACTUAL RENT PAID VERSUS RENT DEFENDANTS AGREED TO PAY**

| Plaintiff | Address Of Property | Total Amount of Rent Morabito/ Waelti Agreed to Pay | Total Amount of Rent Actually Collected by Plaintiffs | % of Total Rent Actually Collected by Plaintiffs | Amount of Rent Owed by Morabito/Waelti From Date of Default |
|---|---|---|---|---|---|
| Justus & Susan Ahrend | 739 Oak Street, Scranton, PA | $6,689,373 | $784,999 | 11.74% | $5,904,374 |
| Joseph Amirkhas | 401 W. Oglethorpe Blvd., Albany, GA | $1,524,082 | $258,457 | 16.96% | $1,265,625 |
| Joseph Amirkhas | 92-94 Mundy Street Wilkes-Barre, PA | $7,485,887 | $856,980 | 11.45% | $6,628,907 |
| VAS Enterprises I LLC (Victoria Armenta) | 1926 Martin Luther King Jr. Albany, GA | $905,951 | $139,827 | 15.43% | $766,124 |
| Mani Etemad | 157 S. Wyoming Ave. Kingston, PA | $5,784,414 | $678,802 | 11.74% | $5,105,612 |
| Linda Farrell & Fred Engelberg | 1060 East 21st St. Jacksonville, FL | $1,301,399 | $233,915 | 17.97% | $1,067,484 |
| Eugenia Gagnon | 4885 Transit Road Lancaster NY. | $2,505,666 | $253,017 | 10.10% | $2,252,649 |
| Eugenia Gagnon | 6480 Transit Road Cheektowaga, NY | $2,505,666 | $253,017 | 10.10% | $2,252,649 |
| Thomas & Sylvia Linden | 3022 Ridge Road West Rochester, NY | $3,092,593 | $309,648 | 10.01% | $2,782,945 |
| Richard & Debra Siebert | 448 East Jackson St. Thomasville, GA | $1,063,651 | $180,376 | 16.96% | $883,275 |
| Eclectic Properties East, LLC (Mike & Sally Wiley) | 137 Vestal Parkway E. Vestal, NY | $5,667,711 | $726,540 | 12.82% | $4,941,171 |
| CECA 3000 LP (Gary Reid) | 288 Hamilton Street Geneva, NY | $2,375,900 | $340,525 | 14.33% | $2,035,375 |
| CECA 3000 LP (Gary Reid) | 234-330 Main Street Binghamton, NY | $3,342,783 | $469,353 | 14.04% | $2,873,430 |

| Plaintiff | Address Of Property | Total Amount of Rent Morabito/ Waelti Agreed to Pay | Total Amount of Rent Actually Collected by Plaintiffs | % of Total Rent Actually Collected by Plaintiffs | Amount of Rent Owed by Morabito/Waelti From Date of Default |
|---|---|---|---|---|---|
| Eileen & Johannes Moderbacher | 150 South Abington Rd. Clarks Summit, PA | $4,231,755 | $496,597 | 11.74% | $3,735,158 |
| Risola Family LP II (Sam & Arleen Risola) | 2418 North Main St. Warsaw, NY | $2,486,782 | $334,658 | 13.46% | $2,152,124 |
| Kevork & Sylvia Belikian | 1010 Transit Way Brockport, NY | $4,495,707 | $514,666 | 11.45% | $3,981,041 |
| Amnon & Rivka Danus | 4250 Moncrief Road, Jacksonville, FL | $1,217,445 | $212,641 | 17.47% | $1,004,804 |
| Allen Hom | 3007 W. Edgewood Jacksonville, FL | $1,568,055 | $273,879 | 17.47% | $1,294,176 |
| Allen Hom | 141 Seneca Street, Hornell, NY | $2,970,640 | $235,158 | 7.92% | $2,735,482 |
| Allen Hom | 321 South Hamilton St., Painted Post, NY | $3,547,734 | $254,977 | 7.19% | $3,292,757 |
| Cheatham Properties, LLC (Mary Cheatham) | 5809 N. Main St Jacksonville, FL | $1,388,462 | $242,511 | 17.47% | $1,145,951 |
| Linda Call | 1830 North Myrtle Ave. Jacksonville, FL | $1,698,444 | $142,395 | 8.38% | $1,556,049 |
| **TOTAL** | | **$67,850,100** | **$8,192,938** | **12.08%** | **$59,657,162** |

28.     As described in greater detail below, Defendants manipulated the fair market values of the 22 Properties purchased by Plaintiffs.  Plaintiffs bring this case to recover their investments, the lost rental income and other economic losses.  Collectively, Plaintiffs' damages exceed $50 million (not including treble damages permitted under the RICO statute).

## II.     JURISDICTION AND VENUE

29.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1961-68, the Racketeer Influenced and Corrupt Organizations Act (RICO), which confers primary jurisdiction on the district courts of the United States, and under 28 U.S.C. §§1331, 1332 and 1341(b).

30.     The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367.  The amount in controversy exceeds $75,000 for each Plaintiff, exclusive of costs and interest.

31.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §1965(b) and (d).  This Court also has personal jurisdiction over Defendants pursuant to Rule (4)(k)(1)(A) of the Federal Rules of Civil Procedure and California Code of Civil Procedure §410.10.

1    32.    Venue is proper in this District pursuant to 28 U.S.C. §1391(a) and (b), because a

2    substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial

3    district.  Venue is also proper under 18 U.S.C. §1965(a) because Defendants transact substantial

4    business in this District.

5    ### III.    INTRADISTRICT ASSIGNMENT

6    33.    A substantial part of the events or omissions which give rise to the claims in this

7    action occurred in the county of Santa Clara, and as such this action is properly assigned to the San

8    Jose division of this Court.

9    ### IV.    PARTIES

10   **A.    Plaintiffs**

11   34.    Eclectic Properties East, LLC is a California Limited Liability Company with its

12   principal place of business located in San Bernardino County, California.

13   35.    Risola Family LP II is a Florida Limited Partnership with its principal place of

14   business located in Pinellas County, Florida.

15   36.    CECA 3000, LP is a Nevada Domestic Limited Partnership with its principal place of

16   business located in Clark County, Nevada.

17   37.    Cheatham Properties, LLC is a California Limited Liability Company with its

18   principal place of business located in Orange County, California.

19   38.    VAS Enterprises I LLC is a California Limited Liability Company with its principal

20   place of business located in Los Angeles County, California.

21   39.    Amnon Danus is an individual who resides in Santa Barbara County, California.

22   40.    Rivka Danus is an individual who resides in Santa Barbara County, California.

23   41.    Fred Engelberg is an individual who resides in San Diego County, California.

24   42.    Linda Farrell is an individual who resides in San Diego County, California.

25   43.    Joseph W. Amirkhas is an individual who resides in San Francisco County,

26   California.

27   44.    Justus L. Ahrend is an individual who resides in Los Angeles County, California.

28   45.    Susan W. Ahrend is an individual who resides in Los Angeles County, California.

1      46.    Kevork Belikian is an individual who resides in Los Angels County, California.

2      47.    Sylvia S. Belikian is and individual who resides in Los Angeles County, California.

3      48.    Mani Etemad is an individual who resides in Santa Clara County, California.

4      49.    Susan Khoshnood is an individual who resides in Santa Clara County, California.

5      50.    Eugenia Gagnon is an individual who resides in Charlotte County, Florida.

6      51.    Thomas H. Linden is an individual who resides in Lee County, Florida.

7      52.    Sylvia E. Linden is an individual who resides in Lee County, Florida.

8      53.    Johannes Moderbacher is an individual who resides in Alameda County, California.

9      54.    Eileen Starr Moderbacher is an individual who resides in Alameda County,

10 California.

11     55.    Richard W. Siebert is an individual who resides in Sonoma County, California.

12     56.    Debra M. Siebert is an individual who resides in Sonoma County, California.

13     57.    Allen Ernest Hom is an individual who resides in Orange County, California.

14     58.    Linda J. Call is an individual who resides in Riverside County, California.

15 **B.**    **Defendants**

16     59.    M&M is a California corporation with its principal place of business located at 777

17 California Avenue, Palo Alto, California 94304. M&M holds itself out to the public as "the premier

18 provider of investment real estate brokerage services," noting that "[o]ur 37-year history of

19 maintaining investor relationships in local markets enables us to be the best information source and

20 transaction service provider nationally." M&M also represents to the public that "our investment

21 professionals are able to provide clients with an unparalleled perspective on the investment real

22 estate market locally, regionally and nationally." M&M is the parent company of Sovereign

23 Investment and a co-conspirator in Defendants' scheme. M&M, among other things, provided false

24 information to investors and marketed the commercial real properties despite its knowledge that their

25 fair market values were artificially inflated and that the rental rates reflected in their leases were

26 significantly higher than the fair market rental rates and were not sustainable.

27     60.    Marcus & Millichap Real Estate Investment Services Inc. ("M&M Investment") is a

28 California corporation with its principal place of business located at 777 California Avenue, Palo

1   Alto, California 94304.  M&M Investment is a wholly owned subsidiary of M&M.  M&M

2   Investment was a co-conspirator in Defendants' scheme by, among other things, providing false

3   information to investors and marketing the commercial real properties despite its knowledge that

4   their fair market values were artificially inflated and that the rental rates reflected in their leases were

5   significantly higher then the fair market rental rates and were not sustainable.  As set forth in ¶¶745-

6   755, M&M Investment is and was, at all relevant times, an alter ego of M&M.

7        61.     Marcus & Millichap Real Estate Investment Brokerage Company ("M&M Real

8   Estate") is a California corporation with its principal place of business located at 777 California

9   Avenue, Palo Alto, California 94304.  M&M Real Estate is a subsidiary of M&M Investment.

10  M&M Real Estate was a co-conspirator in Defendants' scheme by, among other things, providing

11  false information to investors and marketing the commercial real properties despite its knowledge

12  that their fair market values were artificially inflated and that the rental rates reflected in their leases

13  were significantly higher then the fair market rental rates and were not sustainable.  As set forth in

14  ¶¶745-755, M&M Real Estate is and was, at all relevant times, an alter ego of M&M Investment and

15  M&M.

16       62.     Sovereign Investment is a California corporation with its principal place of business

17  located at 777 California Avenue, Palo Alto, California 94304.  Sovereign Investment was formed

18  by M&M in May 2003 as a private capital acquirer of net lease properties.  Sovereign Investment is

19  one of the principal investing platforms and a wholly owned subsidiary of M&M.  Sovereign

20  Investment holds itself out to the public as "a private principal equity investment firm focused on

21  unlocking the value of real estate through net lease portfolio transactions," and indicates that it

22  "leverages the experience of a 30-year investment history, investing its own capital to offer a variety

23  of terms and structures, providing unparalleled service, pricing and execution for our transaction

24  partners."  Sovereign Investment financed Morabito and Waelti's acquisitions of the Properties, took

25  title to one or more of the commercial rental properties and entered into fraudulent long-term leases

26  with one or more of the other Defendants, before those properties were sold to unwitting investors,

27  including Plaintiffs.  As set forth in ¶¶745-750, 756-759, Sovereign Investment is and was, at all

28  relevant times, an alter ego of M&M.

63.     Sovereign Scranton, LLC ("Sovereign Scranton") is a Delaware Limited Liability Company with its principal place of business located at 777 California Avenue, Palo Alto, California 94304. Upon information and belief, Sovereign Scranton is a subsidiary of Sovereign Investment. Sovereign Scranton took title to one or more of the commercial rental properties, including the bogus leases for each, before they were sold to unwitting investors, including Plaintiffs.

64.     Sovereign CC, LLC ("Sovereign CC") is a Delaware Limited Liability Company with its principal place of business located at 777 California Avenue, Palo Alto, California 94304. Upon information and belief, Sovereign CC is a subsidiary of Sovereign Investment. Sovereign CC took title to one or more of the commercial rental properties, including the bogus leases for each, before they were sold to unwitting investors, including Plaintiffs.

65.     Sovereign JF, LLC ("Sovereign JF") is a California Limited Liability Company with its principal place of business located at 777 California Avenue, Palo Alto, California 94304. Upon information and belief, Sovereign JF is a subsidiary of Sovereign Investment. Sovereign JF took title to one or more of the commercial rental properties, including the bogus leases for each, before they were sold to unwitting investors, including Plaintiffs.

66.     Defendants Sovereign Investment, Sovereign Scranton, Sovereign CC, and Sovereign JF are sometimes hereinafter referred to collectively as the "Sovereign Entities." As set forth in ¶¶745-750, 756-759, Sovereign Scranton, Sovereign CC and Sovereign JF are all alter egos of Sovereign Investment.

67.     Morabito is an individual residing in Laguna Beach, California. Upon information and belief, at all times material to this litigation, Morabito was the Chief Executive Officer of Eureka Petroleum Inc. and President, Secretary and Treasurer of Tibarom, Inc. Morabito is a former Member of Tibarom PA, LLC, Tibarom NY, LLC, Scranton Lube, LLC, New York Seven Lube LLC, New York Lube Number 3, LLC, Rochester Lube LLC and Baruk Management, Inc. Morabito was a co-conspirator in connection with Defendants' fraudulent scheme and controlled various bogus tenants on Plaintiffs' investment properties, which tenants walked away from and abandoned Plaintiffs' investment properties, wiping out the income streams they had been promised by Defendants.

68.     Eureka Petroleum Inc. ("Eureka") is a New York corporation with its principal place of business located at 318 Barkley Circle, Hanover, Pennsylvania 17331.

69.     Tibarom Inc. ("Tibarom") is a Delaware corporation with its principal place of business located at 668 North Coast Highway, Suite 517, Laguna Beach, CA 92651.

70.     Tibarom NY LLC ("Tibarom NY") is a Nevada Limited Liability Company with its principal place of business located at 668 North Coast Highway, Suite 517, Laguna Beach, CA 92651.

71.     Tibarom PA LLC ("Tibarom PA") is a Nevada Limited Liability Company with its principal place of business located at 668 North Coast Highway, Suite 517, Laguna Beach, CA 92651.

72.     Scranton Lube LLC ("Scranton Lube") is a Delaware Limited Liability Company with its principal place of business at all times relevant to this litigation located at 668 North Coast Highway, Suite 517, Laguna Beach, CA 92651.

73.     New York Seven Lube LLC ("New York Seven Lube") is a Delaware Limited Liability Company with its principal place of business at all times relevant to this litigation located at 668 North Coast Highway, Suite 517, Laguna Beach, CA 92651.

74.     New York Lube Number 3, LLC ("New York Lube 3") is a Delaware Limited Liability Company with its principal place of business at all times relevant to this litigation located at 668 North Coast Highway, Suite 517, Laguna Beach, CA 92651.

75.     Rochester Lube, LLC ("Rochester Lube") is a Delaware Limited Liability Company with its principal place of business located at 668 North Coastal Highway, Suite 517, Laguna Beach, CA 92651.

76.     Baruk Management, Inc. ("BMI") is a California corporation with its principal place of business located at 668 North Coastal Highway, Suite 517, Laguna Beach, CA 92651.

77.     Eureka, Tibarom, Tibarom PA, Tibarom NY, Scranton Lube, New York Seven Lube, New York Lube 3, Rochester Lube and BMI are sometimes hereinafter referred to as the "Morabito Entities."  As set forth more fully at ¶¶747, 760-766, at all relevant times, Morabito controlled and dominated the affairs of Eureka, Tibarom, Tibarom PA, Tibarom NY, Scranton Lube, New York

1  Seven Lube, New York Lube 3, Rochester Lube and BMI, directed the business and financial

2  activities of those entities, used assets of the corporate entities for his personal use, and caused assets

3  of those entities to be transferred to him personally without adequate consideration as well as to

4  other business entities which he controlled.  At all relevant times, each of those entities was a mere

5  shell, instrumentality and conduit through which Morabito carried on his business, including their

6  participation as co-conspirators in Defendants' scheme.  The Morabito Entities are and were, at all

7  relevant times, alter egos of Morabito.

8      78.     The QSR Group, LLC ("QSR") is a Florida Limited Liability Company with its

9  principal place of business located at 1542 Kingsley Avenue, Suite 132, Orange Park, Florida 32073.

10     79.     The QSR Group One, LLC ("QSR One") is a Florida Limited Liability Company

11 with its principal place of business located at 1542 Kingsley Avenue, Suite 132, Orange Park,

12 Florida 32073.

13     80.     The QSR Group II, LLC a/k/a The QSR Group Two, LLC ("QSR II") is a Florida

14 Limited Liability Company with its principal place of business located at 1542 Kingsley Avenue,

15 Suite 131, Orange Park, Florida 32073.

16     81.     As set forth more fully at ¶¶747, 767-774, at all relevant times, Waelti controlled and

17 dominated the affairs of QSR, QSR One, and QSR II, directed the business and financial activities of

18 those entities, used assets of the corporate entities for his personal use, and caused assets of those

19 entities to be transferred to him personally without adequate consideration and to other business

20 entities which he controlled.  At all relevant times, each of those entities were a mere shell,

21 instrumentality and conduit through which Waelti carried on his business, including his participation

22 as a co-conspirator in Defendants' scheme.  QSR, QSR One and QSRII are and were, at all relevant

23 times, alter egos of Waelti.

24     82.     PGP Valuation, Inc. ("PGP") is an Oregon corporation with its principal place of

25 business located at 110 SW Yamhill Street, Suite 200, Portland, Oregon 97204.  PGP is a co-

26 conspirator in connection with Defendants' fraudulent scheme and knowingly prepared appraisals of

27 various investment properties purchased by the Plaintiffs using comparables provided by other of the

28

1    Defendants, which appraisals improperly reflected the artificially inflated fair market values

2    manipulated by Defendants.

3         83.    Glen D. Kunofsky ("Kunofsky") is an individual residing in New York County, New

4    York.  Kunofsky is a First Vice President of Investments and Senior Director of the Net Leased

5    Properties Group of M&M Real Estate.  M&M Real Estate held Kunofsky out as "one of the most

6    knowledgeable investment specialists in the nation," "an authority in the field of net lease and sale-

7    leaseback transactions," "a consummate professional" and indicated that Kunofsky's "focus on client

8    services has earned him a high degree of loyalty and respect from investors as well as his peers."

9         84.    Marcus Muirhead ("Muirhead") is an individual residing in Maricopa County,

10   Arizona.  At all times relevant to this litigation, Muirhead was a senior associate at M&M Real

11   Estate.

12        85.    Sean Perkin ("Perkin") is an individual residing in San Bernardino, California.  At all

13   times relevant to this litigation, Perkin was a Senior Associate at M&M Real Estate.

14        86.    Donald Emas ("Emas") is an individual residing in San Bernardino, California.  At all

15   times relevant to this litigation, Emas was a First Vice President of Investments, a Senior Director on

16   the Net Leased Properties Group, and a Director of the National Retail Group of M&M Real Estate.

17        87.    Andrew Lesher ("Lesher") is an individual residing in Mariposa County, California.

18   At all times relevant to this litigation, Lesher was a Senior Associate at M&M Real Estate.

19        88.    Stewart Weston ("Weston") is an individual residing in Los Angeles County,

20   California.  At all times relevant to this litigation, Weston was a Vice President of Investments and

21   Senior Director of the National Multi-Housing Group of M&M Real Estate.

22        89.    Brice Head ("Head") is an individual residing in Los Angeles County, California.

23        90.    Daizy Gomez ("Gomez") is an individual residing in New York County, New York.

24   At all times relevant to this litigation, Gomez was a Marketing and Transactions Coordinator at

25   M&M Real Estate.

26        91.    Bret King ("King") is an individual residing in Los Angeles County, California.

27

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                                    - 20 -

**C.     Waelti's Status and Bankruptcy Proceedings**

92.     Waelti is an individual, based on information and belief, who resides in Florida, and who previously resided in Erath County, Texas.  Waelti was previously named as a defendant in Plaintiffs' initial complaint.  However, on or about December 28, 2008, Waelti filed a voluntary petition for Chapter 7 bankruptcy in United States Bankruptcy Court for the Northern District of Texas, No. 08-46099-RFN.  Plaintiffs have filed an adversary proceeding in that Court against Waelti attempting to prevent a discharge of the debt he owes Plaintiffs as a result of the fraud alleged herein.

93.     Although Waelti was an integral actor in Defendants' fraudulent scheme and conspiracy, as a result of the automatic stay imposed by section 362 of the Bankruptcy Code, Plaintiffs cannot name Waelti as a defendant in this First Amended Complaint at this time.[5]  While Plaintiffs are not asserting claims against Waelti at this time, Plaintiffs have included allegations as to Waelti in this First Amended Complaint in order to assist the Court in understanding Defendants' scheme and the role that each individual and entity played.

94.     Upon information and belief, at all times material to this litigation, Waelti was the Chief Executive Officer and sole Member of QSR, QSR One and QSR Group II.  Waelti was a co-conspirator in connection with Defendants' fraudulent scheme and controlled various bogus tenants on Plaintiffs' investment properties, which tenants walked away from and abandoned Plaintiffs' investment properties, wiping out the income streams they had been promised by Defendants.

**D.     Non-Defendant Co-Conspirator**

95.     Alexander Mickle ("Mickle") is an individual residing in San Diego County, California.  At all times relevant to this litigation, Mickle was an investment associate at M&M Real Estate.

---

[5]     Plaintiffs are in the process of moving the Bankruptcy Court to modify the stay to allow Plaintiffs to name Waelti as a defendant in this litigation, but will not proceed further against Waelti absent a subsequent order from the Bankruptcy Court.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                    - 21 -

96.     Defendants M&M Investment, M&M Real Estate, Kunofsky, Muirhead, Perkin, Emas, Lesher, Weston, Head, Gomez, and King and non-defendant co-conspirator Mickle are sometimes hereinafter referred to collectively as the "M&M Brokers."

## V.     GENERAL ALLEGATIONS

97.     Defendants devoted considerable time and resources into defrauding Plaintiffs, and used both mail and wire to perpetrate the fraud.  The core scheme involved the existing franchises, Morabito and Waelti, bogus alter ego tenants controlled by Morabito and Waelti, the Sovereign Entities, M&M, the M&M Brokers, PGP, and the Plaintiffs.

98.     To implement the conspiracy, Defendants agreed that Sovereign Investment, using M&M capital, would finance Morabito's purchases of Jiffy Lube franchises and Waelti's purchases of Church's Chicken franchises.  Morabito and Waelti, either directly or through one of the entities they controlled, then approached non-party operators of quick lube and Church's Chicken operations, respectively, and purchased the real estate and the businesses, using the financing provided by Sovereign Investment.  Either immediately thereafter, or simultaneously, Morabito and Waelti (through one of their alter ego companies) then sold each property to one of the Sovereign Entities and immediately leased back the business at an artificially high lease rate.  The sale-leaseback agreements between the Sovereign Entities and Morabito's and Waelti's alter ego entities were, in each case, set at rental rates that were dramatically higher (usually by more than 50%) than the reasonable, fair market, arms-length rental rate.

99.     A sale-leaseback agreement is an agreement whereby an owner of property on which a building is located sells the real estate to an outside purchaser who then leases it back to the original owner.[6]  There are two important financial considerations in a sale-leaseback agreement: (1) the sale price of the property; and (2) the rental rate and term of the lease.  These considerations

---

[6]     When utilized in a non-fraudulent manner, a sale-leaseback transaction has obvious, and subtle, implications for business owners.  First, it frees up capital for expansion and other purposes. Second, a sale-leaseback transaction, if properly structured, can improve a company's debt-to-equity ratio and reduce interest and depreciation expense.  Finally, the sale-leaseback transaction allows the owner to concentrate its resources as opposed to having its funds tied-up in a non-liquid asset.

1   are the key negotiating factors in a sale-leaseback transaction. The typical guide with respect to sale

2   price is the market value of the property. Usually, the seller will have the property valued by an

3   independent professional appraiser. The appraiser will consider recent sales of similar properties (as

4   well as the reasonable rental rates of those properties) within a market area as a guide to market

5   value. The lease rate, which represents the amount of rent the seller/tenant will pay, is largely

6   dependent on the financial strength or credit of the tenant, the type of business the tenant is involved

7   in, where the property is located, and the general financial markets. Other factors affecting this rate

8   are the buyer/lessor's cost of funds, estimated residual value of the property at the end of the lease,

9   and the tax benefits that the lessor receives.

10      100.    A critical element of Defendants' conspiracy was the sale-leaseback agreement,

11   which in each of the 22 transactions at issue in this litigation included a sham lease **with a rental rate**

12   **that was dramatically higher then the arm's-length market lease rate for the particular property**.

13   Using the leases to artificially inflate the values of the Properties, the M&M Brokers, Morabito

14   and/or Waelti then marketed them to unsuspecting investors, including Plaintiffs, at the artificially

15   inflated prices and including the bogus leases.

16      101.    In many instances, after the Properties were acquired by Defendants and then

17   simultaneously flipped to Sovereign Investment, Defendants commissioned appraisals to bolster the

18   inflated values of the Properties. Indeed, Defendants were aided and abetted by PGP, which

19   appraised the Properties based upon, "the as-is market value of the leased fee interest," in other

20   words, based upon the inflated lease rate set forth in the sham long-term leases.

21      102.    Further undermining the reliability of the appraisals, PGP used comparables provided

22   by Defendants, which consisted of other properties acquired by Sovereign Investment at

23   intentionally inflated, above-market values. Use of these comparables caused the appraised value of

24   the property at issue to be artificially inflated. PGP and the other Defendants did not reveal these

25   facts to Plaintiffs, and so intentionally concealed the fact that the alleged comparables used in the

26   appraisals were of no value in determining a fair price for each of the Properties.

27      103.    Immediately after (or even, in some cases, before) Morabito, Waelti or their alter ego

28   shell companies purchased one of the Properties, M&M, the M&M Brokers and/or one of the

1    Sovereign Entities, with the assistance of one or more of the other Defendants, in some instances,

2    began marketing the Property to 1031 investors like Plaintiffs.[7]  In each case, the investment was

3    marketed as a triple net lease – a long-term lease of 15 to 25 years, the terms of which required the

4    tenant to pay all expenses of the property, including maintenance, building insurance, and property

5    taxes (*i.e.,* the three "nets").  Thus, in connection with the marketing and sales of the Properties,

6    Defendants explicitly, and uniformly, represented to Plaintiffs that "Tenants Pay All Expenses," that

7    there were "No Landlord Responsibilities," and that an investment in one of the Properties was

8    "extremely safe and secure."

9          104.    Defendants also represented that the Properties would generate a Capitalization Rate

10    ("cap rate") of between 7.75% and 9.00%, indicating a solid enough return on net operating income

11    relative to the property price to make it an attractive investment.[8]  Further, M&M, M&M Real

12    Estate, M&M Investment, the M&M Brokers, the Sovereign Entities and/or in some instances, one

13    or more of the other Defendants, made both oral and written misrepresentations – over the telephone,

14    through U.S. mail, facsimile and email, and in person – to Plaintiffs regarding the value, income,

15    income stream, and stability of each property, together with other information material to Plaintiffs'

16    decisions whether or not to invest.

17          105.    At all times relevant to this litigation, Defendants knew that their representations

18    concerning the present and/or future anticipated income generated by the Properties and the leases

19    associated therewith, the financial stability of the tenants, the existing sales on the Properties, and the

20    cap rates, among other representations, were false. The true facts known to Defendants at the time,

21

---

22    [7]    Section 1031 of the Internal Revenue Code provides that no gain or loss shall be recognized

23    on the exchange of Property held for productive use in a trade or business, or for investment.  A tax-deferred exchange is a method by which a Property owner trades one or more relinquished Properties

24    for one or more replacement Properties of "like-kind," while deferring the payment of federal income taxes and some state taxes on the transaction.  To avoid taxation, the 1031 investor must

25    reinvest the proceeds of the initial sale within six months.

26    [8]    Cap rates are a measure of the ratio between the cash flow produced by an asset (usually real estate) and its capital cost (the original price paid to buy the asset) or alternatively its current market

27    value. Cap rates are an indirect measure of how fast an investment will pay for itself in net cash flows; each year, the percentage amount of the cap rates will be repaid.

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)      - 24 -

1    but withheld from Plaintiffs, were that the actual fair market rent reasonably expected from the

2    Properties multiplied by the cap rates would have justified purchase prices significantly less than

3    what Plaintiffs were fraudulently induced to pay.

4         106.    M&M and the M&M Brokers held themselves out to Plaintiffs as having particular

5    knowledge and expertise with respect to triple net leases, including those with the franchises located

6    on the Properties, as well as with regard to the values of the Properties and the underlying leases.[9]

7    At no time did Defendants disclose to Plaintiffs that they were using shell companies, shill tenants,

8    bogus leases and artificially inflated appraisals to dupe Plaintiffs out of tens of millions of dollars.

9         107.    Through the fraudulent scheme described above, Defendants were able to sell

10    Plaintiffs 22 Properties at artificially inflated prices.  M&M and the M&M Brokers acted as the

11    broker for the purchases by Morabito and Waelti's alter ego companies, and, in many instances, as

12    broker for both the buyer and the seller in the sales by the Defendants to Plaintiffs – assuring

13    Plaintiffs in most cases that there was no conflict of interest with M&M and the M&M Brokers

14    representing parties on all sides of the transactions.  Indeed, Plaintiffs were led to believe that M&M

15    and the M&M Brokers were representing Plaintiffs and would look out for their best interests.

16    Plaintiffs reasonably relied on M&M and the M&M Brokers to insure that their investments were

17    safe and secure.

18         108.    Once the sales were completed and Defendants had Plaintiffs' monies in hand, all

19    Defendants had to do to accomplish their goal of defrauding Plaintiffs was to walk away.  Thus, in

20    furtherance of the conspiracy, following the sale of the one of the Properties to one of the Plaintiffs,

21    the shill tenant would operate the franchise for anywhere from a few months to over a year, paying

22    the artificially-inflated and unsustainably high rental rate used to induce Plaintiffs to invest.

23    Thereafter, Morabito (or one of his alter ego shell companies), Waelti (or one of his alter ego shell

24    companies), or in some cases, a purported assignee who was also in on the fraudulent scheme, would

25    call the Plaintiff that owned that particular Property and ask for either a massive reduction in rent

26    _____

27    [9]    *See*, *e.g.*, Exhibit B.

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)          - 25 -

1   (typically 50% or more) or offer to buy the Property for a price significantly less than the price that

2   was paid for the Property by the Plaintiff.

3          109.    When the Plaintiff was unwilling to accept the dramatically lower rent, or to sell the

4   Property for significantly less than what the Plaintiff paid for it just a short time earlier, Morabito (or

5   one of his alter ego shell companies), Waelti (or one of his alter ego shell companies), or the

6   purported assignee, would continue to operate the business for a short period of time and then

7   abandon the property (sometimes even stripping the building of trade fixtures) – leaving the Plaintiff

8   with no tenant, no income stream and a vastly devalued piece of property.

9          110.    In every single one of the 22 transactions referenced in this First Amended

10  Complaint, Morabito or Waelti failed to honor the original, inflated lease terms put in place by

11  Defendants as part of the scam to steal Plaintiffs' investment monies and thereafter, abandoned the

12  Properties.   Notwithstanding this fact, M&M, the M&M Brokers, and the Sovereign Entities

13  continued to market certain of the Properties and other triple net properties with fraudulent leases,

14  thereafter, with specific knowledge that Morabito, Waelti and the purported assignees had and would

15  continue to walk away.

16                          X.      THE TRANSACTIONS

17  **A.     Mani Etemad[10]**

18  **The Sale of the Kingston Jiffy Lube to Etemad**

19         111.    Mani Etemad ("Etemad") had never before invested in a triple net lease property.

20  Indeed, Etemad first learned of the concept from Muirhead at M&M Real Estate in July 2005 when

21  he was first introduced to Muirhead by Etemad's former real estate partners, Joseph Amirkhas

22  ("Amirkhas") and Eileen and Johannes Moderbacher (the "Moderbachers").

23         112.    Muirhead, as an agent of M&M Real Estate, explained to Etemad the basics of triple

24  net lease investing.  Muirhead told Etemad that triple net lease investments have less risk when the

25  operators on the properties operate a large number of franchises.  Muirhead also recommended that

26

27  [10]    Mani Etemad and his wife, Susan Khoshnood, took title to the property as Trustees of The
Mani Etemad and Susan Khoshnood 2001 Revocable Trust.

28

1   Etemad purchase a property with a long-term lease in place, noting that leases that had annual rent

2   increases were even better investments.  Muirhead further counseled Etemad on the cap rates he

3   should be looking for when he evaluated a potential triple net property.  Muirhead made these

4   representations to Etemad in person and by phone.

5        113.   Etemad was initially concerned about buying a property in a state other than

6   California, where Etemad and his wife lived.  In order to allay Etemad's concerns, Muirhead advised

7   Etemad over the phone that triple net lease investments did not have to be local because they had

8   long-term leases and the tenants paid all the maintenance and other expenses.  As Muirhead

9   described them to Etemad, triple net lease investments sounded extremely secure.

10        114.   Thereafter, Muirhead began suggesting specific potential triple net investments to

11   Etemad.  Etemad questioned Muirhead about the investment opportunities, and relied on Muirhead's

12   answers, believing that Muirhead and M&M Real Estate were acting in Etemad's best interests.

13        115.   Several of the properties that Muirhead presented to Etemad were Jiffy Lube

14   locations operated by Morabito.  Etemad became very interested in the Jiffy Lube properties as a

15   result of the significant amount of information provided by M&M Real Estate and Muirhead.  M&M

16   Real Estate and Muirhead represented to Etemad that Morabito and his entities – Eureka and

17   Tibarom (which were alter egos of Morabito) – were successful and financially sound, in part

18   because Morabito/Eureka/Tibarom was backed by Shell Oil Products US ("SOPUS").  On phone

19   calls to Etemad, Muirhead made the Jiffy Lube investments sound so secure that Etemad believed

20   that nothing could go wrong short of a natural disaster.

21        116.   By this time, Muirhead had convinced Etemad that Muirhead was very trustworthy

22   and that M&M Real Estate was a reputable company.  When Muirhead advised Etemad how to

23   analyze the quality of a triple net lease investment, Muirhead did not tell Etemad to look at the

24   performance of the particular store he was considering buying.  Instead, Muirhead consistently

25   directed Etemad to focus on the operator who was guaranteeing the lease, not the actual size of the

26   store or how the particular store was performing.

27        117.   Consequently, at Muirhead's urging, Etemad always focused on the fact that

28   Morabito/Eureka/Tibarom operated 56 stores and was purportedly financially sound.  Etemad was

1    led to believe that – should he purchase one of the Jiffy Lube properties – Morabito/Eureka/Tibarom

2    would continue to operate the locations and that Morabito/Eureka/Tibarom's continued involvement

3    made an investment in one of the Jiffy Lube properties even more safe and secure.

4         118.    Thereafter, around August 11, 2005, Muirhead sent Etemad a copy of M&M Real

5    Estate's marketing brochure for a Jiffy Lube property in Kingston, Pennsylvania.   Sovereign

6    Scranton was the seller, asking $2,339,879.00 for the property.   Kunofsky, of M&M Real Estate's

7    New York office, was the listing agent for the Kingston Jiffy Lube property.

8         119.    The original lease term for Morabito/Eureka/Tibarom under the lease in place on the

9    Kingston Jiffy Lube property was for 25 years with one ten-year option.   The rent was $16,086.67

10   per month with annual rent increases of 1.6%, and a cap rate of 8.25%.[11]   The M&M Real Estate

11   marketing materials noted that "Tibarom, Inc. is the fastest growing franchisee in Shell Oil

12   Companies' store Jiffy Lube International, Inc. subsidiary."   The marketing materials further noted

13   that "Tibarom operates 56 stores throughout the United States."   Also, during his phone calls to

14   Etemad, Muirhead, in his capacity as an M&M Real Estate agent, claimed that Morabito not only

15   had a fast growing stable of properties with 56 stores, but planned to expand his operations much

16   further.

17        120.    To further reassure Etemad, Muirhead advised Etemad that Etemad's lender would

18   look into the quality of the investment and Muirhead concurred with Etemad's understanding that

19   the lender's examination of the investment was extra protection for Etemad.   Each time Etemad had

20   questions about the Kingston Jiffy Lube property, Muirhead assured him that the investment was

21   secure, and put him at ease that the investment was a great deal and nothing could go wrong.

22   Muirhead represented that the Kingston Jiffy Lube property was a safe, low-risk investment.   Based

23

24   _____

25   [11]    M&M Real Estate and Muirhead consistently steered Etemad towards the Jiffy Lube
26   properties.   Towards that end, M&M Real Estate represented to Etemad that these properties had just
     come on the market, leading him to believe that he and his investment partners (Amirkhas, and the
27   Moderbachers) were privileged to have the properties available to purchase.   Muirhead told them
     that they had to move quickly because the investments were hot and would sell fast.

28

1   on M&M Real Estate, Muirhead and Sovereign Scranton's representations, Etemad felt very

2   comfortable with the investment by the end of the process.

3          121.    On August 30, 2005, Etemad sent a letter of intent to purchase the Kingston Jiffy

4   Lube property for $2,339,897.00.   Thereafter, Etemad continued conducting due diligence by

5   reviewing information provided by M&M Real Estate, Muirhead, and Sovereign Scranton.  This

6   information was transmitted to Etemad by U.S. mail, facsimile, and e-mail.

7          122.    On September 12, 2005, Etemad sent an e-mail to Muirhead asking questions related

8   to the financial strength of Morabito/Eureka/Tibarom.  Muirhead once again assured Etemad that

9   Morabito/Eureka/Tibarom was financially solid.  On September 14, 2005, Muirhead wrote an e-mail

10  to Etemad, Amirkhas and the Moderbachers, noting that:

11          *I will be spending the balance of the day looking at due diligence items on each of*
            *your deals to make sure there are no surprises.*  I will consult with Brandon
12          [Harrington] today and see what level of commitment the lender can give at this
            stage and by the time we are scheduled to remove our due diligence materials.  Once
13          I hear something from the Listing Agent regarding the questions we covered
            yesterday I will contact you . . . *the Seller said they were never late with rent,*
14          *Sovereign never had any issues with that.*

15          123.    Then on September 21, 2005, Muirhead wrote in an e-mail to Etemad that "Glen

16  [Kunofsky] is working hard to get us a response from the Seller on the Jiffy Lube in Kingston on the

17  questions you asked."

18          124.    On September 22, 2005, Etemad wrote an e-mail to Muirhead indicating he had read

19  the franchise agreement closely and wanted to confirm that the franchise agreement term matched

20  the lease length, with options.  He also wrote:

21          [p]lease look at the page 41, is Paul Morabito representing many companies (one of
            them is Tibarom)?  There are many companies listed in the page.  What is the
22          relationship between these companies?  If they are all related, then that means the
            Operator is much bigger that what we originally thought!
23
    Muirhead wrote an e-mail back to Etemad the same day confirming Etemad's understanding of the
24
    dates and noting:
25
            *This is one of the strongest franchises in the Jiffy Lube system and to my*
26          *conversations with Glen Kunofsky one of the fastest growing franchisees.*  From
            my understanding all of the all of the [sic] LLC's listed are under the same operator.
27          They have set up different LLC's for each market they enter into or have existing
            properties.  For example, I believe Eureka Petroleum, LLC handles the west coast
28

operations and Tibarom, Inc. handles the east coast operations, yet the managing members and directors, such as Paul Morabito are the same.

125.   Thereafter, Etemad wrote to Muirhead about a planned Tibarom merger with another company that Etemad had heard about.  Kunofsky responded through e-mail that there was "nothing new to report on this point.  This would in effect be a 'bonus' to the deal if they merge with this other company.  Tibarom is a very financially sound company."

126.   Muirhead, purportedly on behalf of Etemad, also asked Kunofsky about the assignment clause in the lease agreement:

> In Paragraph 10 of the leases it talks about assignment of interest in the property. How is the assignee's financial strength measured?  For example Tibarom/Eureka appear to be very financially strong at this point.  Let's say their financial condition declines over the couple of years and they are in a position to assign their interest in this lease over to a new Jiffy Lube franchisee. Tibarom/Eureka's financial strength at the time of assigning to a new entity will be of a lower grade than they are today. So, the buyer's question is when is the financial condition of Tibarom/Eureka measured as a benchmark to ensure that the new Jiffy Lube franchisee is of equal or greater standing?

Kunofsky answered through e-mail that:

> ***This does not appear to be an issue as there is language in the lease that basically states you as landlord have the ultimate authority to approve/disapprove a new franchisee from taking over.  If you have any further questions, please contact me to discuss.***

127.   Throughout the sales process, Muirhead portrayed Kunofsky as one of the most knowledgeable and powerful people at M&M Real Estate, re-confirming Etemad's belief that he was being represented by triple net lease experts.  On October 26, 2005, Muirhead advised Etemad, Amirkhas and the Moderbachers in an e-mail that Kunofsky told him that they could use the 1031 exchange funds to pay transfer taxes.  Muirhead further wrote in the e-mail that he trusted "[Kunofsky's] opinion as he closed 25 Uni-Marts, earlier this year, most of which were in Pennsylvania and sells more Single Tenant NNN properties than anyone in our company."[12]

---

[12]   Following Kunofsky's sale of the Uni-Mart triple net lease properties, Uni-Mart filed for bankruptcy, which is yet another material fact that Defendants failed to disclose to Etemad and the other Plaintiffs.

128.    During the sales process, and at the behest of M&M Real Estate, PGP prepared an appraisal of the Kingston Jiffy Lube property.  Unbeknownst to Etemad, the appraisal included comparables provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based on leases with inflated rents, making the appraisal wholly unreliable.  The PGP Appraisal was transmitted by U.S. mail to Etemad's lender during the course of the sale and closing.

129.    Etemad eventually closed on the Kingston Jiffy Lube property in mid-November 2005, at a purchase price of $2,271,058.00.  Etemad, Muirhead, Kunofsky, M&M Real Estate, Sovereign Scranton, Sovereign Investment and Morabito used facsimile, e-mail, phone, and U.S. mail by and between California and New York to negotiate the transaction.

**The Fraudulent Sale-Leaseback on the Property**

130.    Little did Etemad know at the time of the closing that he had been defrauded into purchasing a commercial property at a price that had been grossly inflated due to the existence of a sham lease crafted by Defendants.  Indeed, Sovereign Scranton, as the alter ego and wholly-owned subsidiary of Sovereign Investment, had previously purchased the Kingston Jiffy Lube from Morabito on or around July 30, 2004 (the very same day Morabito had purchased the property from a third-party).  Sovereign Scranton simultaneously executed a fraudulent sale-leaseback agreement with Morabito, which had the intended effect of artificially increasing the price of the property to well beyond its fair market value.

131.    Defendants intended from the very beginning to flip the overpriced property to an unwitting investor like Etemad.  Accordingly, to conceal the fraudulent nature of the sale-leaseback agreement, Sovereign Scranton and Sovereign Investment turned to their sister company and co-conspirator, M&M Real Estate, and its agents Muirhead and Kunofsky, to list, market and sell the property.  M&M Real Estate, Muirhead and Kunofsky, as the alter egos of M&M, misrepresented and concealed material facts concerning the fair market value, future rents, business prospects, security and stability of the investment.

132.    As discussed below, Morabito (and his shell companies) never had the intention of occupying the property and operating the Jiffy Lube franchise through the full term of the lease,

1   despite the numerous misrepresentations concerning his financial stability and the strength of his

2   business operation.

3   **Morabito Abandons the Kingston Jiffy Lube**

4          133.    On October 13, 2006, Salvatore ("Sam") Morabito (Paul Morabito's brother) sent a

5   letter to Etemad via certified mail notifying him that the lease on the Kingston Jiffy Lube property

6   had been assigned to Tibarom PA, notwithstanding the fact that Etemad had not consented to this

7   assignment.  Etemad called Morabito/Eureka/Tibarom to find out why they purportedly made this

8   assignment and was told that "it was just a technical thing to put more focus on these companies and

9   make sure we address things better."  After that time, Etemad began receiving rent checks from

10  Tibarom PA.

11         134.    On December 14, 2006, California Credit Union, Etemad's lender, sent Etemad a

12  copy of a physical inspection that the lender had requested on the Kingston Jiffy Lube property.  The

13  report, which included photos and text information, listed the building square footage as 3,000

14  square feet.  The PGP appraisal and initial marketing materials from M&M both claimed that the

15  square footage on the Kingston Jiffy Lube property was 4,225 square feet.

16         135.    On April 24, 2007, Etemad wrote to Morabito/Eureka/Tibarom because the rent check

17  for that month had bounced.  Etemad was told that the check bounced due to a bank mistake.

18         136.    On November 23, 2007, Etemad wrote to Morabito/Eureka/Tibarom to complain

19  about recent rent delivery problems, and he requested a financial statement.  Morabito/Eureka/

20  Tibarom promised to provide the financial statement, but never did.  Thereafter, Etemad received

21  rent for December 2007 – the last rent payment that Etemad would receive from Morabito/Eureka/

22  Tibarom.

23         137.    Subsequently, on January 5, 2008, Etemad received a phone call from David Macchia

24  ("Macchia"), who identified himself as the new owner of Tibarom, and Etemad's new tenant.

25  Macchia told Etemad that he was coming to meet with Jiffy Lube owners in San Francisco on

26  January 9, 2008, and that he would like to meet with Etemad, Amirkhas and the Moderbachers.

27         138.    At the meeting, Etemad asked Macchia how and when he became the owner of

28  Tibarom as Etemad had not received any notice of such a transfer.  Macchia told them that he took

1    over the operations of their Jiffy Lube locations on approximately December 22, 2007.  Macchia

2    asked Etemad, Amirkhas and the Moderbachers all to take the largest rental reduction that they could

3    possibly take so that Macchia could continue to operate the properties.

4         139.    On January 10, 2008 – the day after the meeting with Macchia – Morabito called

5    Etemad to "find out how everything is going."  During the call, Morabito attempted to intimidate

6    Etemad, stating that "I know a lot of powerful people, this whole thing is bullshit."  Morabito also

7    stated that "I know where you live, it is Saratoga [California] right?  You must have a lot of money."

8    When Etemad told Morabito that he worked at Oracle, Morabito said that he knew Oracle CEO

9    "Larry Ellison and he was a jerk."  Etemad got the impression that Morabito was trying to scare him

10   and show him how well-connected Morabito was.

11        140.    Thereafter, on February 11, 2008, Tibarom employee Greg Breen ("Breen") sent

12   Etemad an e-mail stating that Tibarom did not plan to pay property taxes going forward on the

13   Kingston Jiffy Lube property.  Then, on February 16, 2008, Breen sent Etemad an e-mail attaching

14   Jiffy Lube sales trend data going back to 2000 showing serious declines in sales since approximately

15   2001.  This information was in direct conflict with representations made by Muirhead, M&M Real

16   Estate, Kunofsky, Morabito, Sovereign Investment and Sovereign Scranton when they were

17   convincing Etemad to invest in the Kingston Jiffy Lube property.

18        141.    Shortly thereafter, Macchia proposed to pay rent equivalent to 50% of profits from

19   operations.  Macchia proposed leasing the property on a month-to-month basis with the rent varying

20   each month based on profits to be divided after paying expenses.  The proposed lease document also

21   included a very broad release of claims against Macchia, his predecessors and successors.  Etemad

22   did not sign the release and did not agree to the new lease terms.

23        142.    Macchia ultimately abandoned the store at the end of April 2008.  In order to mitigate

24   his damages, Etemad re-let the property to a new tenant, Snowdon, LLC d/b/a Valvoline Instant Oil

25   Change ("Snowdon"), on May 1, 2008 at $5,500.00 per month – significantly less then the

26   Morabito/Eureka/Tibarom lease.  This figure is not enough to cover Etemad's monthly mortgage

27   payment of $8,819.17.

28

143.   Throughout the course of Etemad's his relationship with M&M Real Estate, Muirhead, Kunofsky, Sovereign Scranton, Morabito and the various other members of the M&M Enterprise, Defendants made false and misleading statements and omissions regarding the fair market value, future rents, business prospects, security and stability of Etemad's investment – exploiting the relationship of trust that they had intentionally built with Etemad.  These false and misleading statements were communicated to Etemad via U.S. mail, e-mail, facsimile and over the phone.  During this time, Defendants knew that the fair market value of the investment property was artificially inflated, that the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the property, wiping out the artificial inflation in the fair market value of the property, and eviscerating the future rents.

144.   So, as was the case with every other investor, Defendants' conspiracy to scam Etemad was a complete success.  Defendants artificially inflated the value of the property that Etemad was induced to purchase, which value plummeted when the Defendants walked away.  As a result, Etemad suffered severe financial damages, including the loss of fair market value of his investment, future rents and out-of-pocket damages, all of which he is entitled to recover.

145.   M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign Scranton, Sovereign Investment, PGP, Morabito, and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity as they used U.S. mail and wire to orchestrate and carry out the sale of the Kingston Jiffy Lube to Etemad.

146.   M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign Scranton, Sovereign Investment, PGP, Morabito, and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused Etemad to purchase a Jiffy Lube property at a grossly and artificially inflated price.  The value of the property plummeted when Morabito and his shell companies abandoned it.

147.   As demonstrated through their ongoing conduct, M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign Scranton, Sovereign Investment, Morabito, and the various other members of the M&M Enterprise shared the common purpose of luring investors like Etemad into purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

148.    The fraudulent sale of the Kingston Jiffy Lube property to Etemad was by no means a random, isolated transaction, but part of a single, coordinated scheme devised by Defendants to sell triple net properties using bogus sale-leaseback agreements.   Indeed, the Kingston Jiffy Lube property was one of multiple "portfolio" properties that Sovereign Investment had previously agreed to purchase from Morabito.  From the outset, Sovereign Investment had planned to purchase these portfolio properties "in bulk" with the intention of re-selling them to unwitting investors at drastically inflated prices.  The sale to Etemad was consummated exactly as it had been planned and conceived by Defendants.

149.    In addition, the statements made by Defendants to Etemad and referenced herein were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.   The true facts, which were known to or recklessly disregarded by each of the Defendants, were:

- Morabito and his alter egos were not backed by SOPUS.  At the time of the transaction, Morabito and SOPUS merely had an existing oil supply agreement for SOPUS to provide, and Morabito to purchase and re-sell, Quaker State oil products.  In fact, this supply agreement actually required Morabito to exclusively buy more expensive oil supplies through SOPUS affiliates, and this higher cost of goods made Morabito's business even less sustainable, exactly the opposite of the impression Defendants worked to create with Etemad.

- The Jiffy Lube investments were not safe and secure as Morabito (through his alter egos Eureka and Tibarom) had entered into long-term leases the obligations of which Morabito never intended to fulfill.  Indeed, at the time that Morabito entered into the sham leases, the rental rates that Morabito agreed to pay were significantly more than the fair and customary market value rents for quick lube businesses on the Properties, and were not supported by the revenues being generated by the Properties.  The actual rental rates that the Jiffy Lube properties were able to support were of no consequence to Sovereign Investment as Sovereign Investment could value the Properties at much higher prices based on other Jiffy Lubes that Sovereign Investment had sold.

- Defendants knew that the collapse of the franchises on the Properties was inevitable, and that such collapse was imminent at the time of the sales to Plaintiffs, because Morabito was a Sub-Credit Tenant obligated to pay artificially-inflated and commercially unreasonable rents for many years.  Indeed, on October 11, 2004, Kunofsky, Morabito, Peter Mavoides (President of Sovereign Investment), Bernard Haddigan (Managing Director and Senior Vice President of M&M), Mitchell LeBar (Managing Director and Senior Vice President of M&M), Salvatore Morabito and Jeffrey Langan (General Counsel for Eureka and Tibarom) attended the 2004 Real Share Net Lease conference at the Marquis Hotel in New York City.  At that event, Mavoides and Morabito sat on a panel together that discussed the potential for "sub-

credit tenant net leases" to be a "quagmire." The presence of Morabito and Mavoides on the above referenced panel discussion indicates that Sovereign Investment and Morabito knew that they were selling SCTLs, and knew the risks involved. Defendants concealed and misrepresented these risks and the high probability of collapse of the franchises on the Properties from Plaintiffs by, among other things, assuring Plaintiffs that the leases on the properties were traditional triple net leases and highly safe and secure.

- The M&M Brokers knew the structure of these investments and the risks involved as well, through many sources, including from the listing agent Kunofsky, who attended the 2004 conference where Morabito discussed his methods. Other Sovereign Investment executives also knew about the serious risks and need for extra careful underwriting for SCTL investments. Jeffrey Hoppen (former Chief Investment Officer of M&M and the Chief Investment Officer of Sovereign Investment) gave a presentation at RealShare Conference West on November 11, 2004 at the Omni Hotel in Los Angeles describing how to analyze "Credit Tenants" and protect yourself when dealing with sub-investment grade tenants. Morabito served on the advisory board of that event on behalf of Tibarom and Bernard Haddigan (Managing Director and Senior Vice President of M&M) served on the Advisory Board as well.

- While the long-term leases did require landlord consent prior to assignments of the lease obligations by Morabito, at the times of the sales of the Properties, Defendants knew this language to be illusory because Morabito planned to divest himself of any interest in the alter ego entities who were the parties interest to the long-term lease agreements, leaving those companies asset-less and uncollectible.

- Tibarom and Eureka were not financially stable, but were, in fact, saddled with debt and on the verge of collapse. By no later than October 2004, Morabito was publicly told (while sitting on the panel with Sovereign Investment President Peter Mavoides at the Real Share Net Lease Conference) that Tibarom and Eureka's balance sheets were flawed. Indeed, Morabito and BMI had manipulated Tibarom and Eureka's balance sheets such that the balance sheets failed to reflect the present value of the substantial future lease obligations that Tibarom and Eureka had been incurring under the long-term leases that Morabito had entered into with Sovereign JF, Sovereign Scranton and others. Through these actions, Defendants were able to hide tens of millions of dollars in liabilities that Tibarom and Eureka had accrued until after they had completed their fraud and Morabito had purportedly divested himself of his interest in Tibarom and Eureka.

- The Jiffy Lube properties that Defendants sold to Plaintiffs were bleeding with financial losses every month due to the exorbitant rents that Morabito had "agreed" to pay. Multiple sources have confirmed that the typical Jiffy Lube store could afford to pay no more than 8%-12% in rent, through Defendants' scheme, Morabito (through his alter ego entities) had "agreed" to pay 30%-40% of gross sales in rent (approximately 3-4 times greater rent than sales would support) – a percentage that Defendants knew to be completely unsustainable. Though Defendants marketed the Properties as safe, stable income producing investments, in reality, due to the sham leases entered into by Morabito and the Sovereign Entities, the Jiffy Lube stores were completely overleveraged and had no possible way of producing enough income to support the monthly rental obligations that Defendants had agreed to. Further, Morabito's Jiffy Lube properties had experienced serious declines in sales since 2001.

- Though Defendants marketed Morabito as a Jiffy Lube "superstar," in reality, Morabito did not have any operating experience in running the day-to-day operations

of a Jiffy Lube, and was not interested in the long-term viability of any of the Jiffy Lube properties. Indeed, many of the Jiffy Lube properties that Defendants induced Plaintiffs into purchasing had actually been losing money since the time Morabito first acquired them and were never profitable thereafter. Morabito knew this because he received detailed monthly store sales reports showing the revenue and profit and loss figures for each store that he owned. Morabito and the other Defendants never intended to make the stores profitable, but rather dump the stores off on unwitting investors and then abandon the properties, making off with millions of dollars.

- The appraisals and land comparisons prepared by PGP included comparables provided by M&M Real Estate and Morabito which were also based on leases (on properties being operated by Morabito) with inflated rents, making the appraisals and land comparisons wholly unreliable. Further, the appraisals, and the marketing materials prepared by M&M Real Estate and M&M Investment, misrepresented the square footage of the Properties.

- Sovereign Investment was a subsidiary of M&M.

## Chronology of Etemad's purchase of the Jiffy Lube property located at 175 S. Wyoming Avenue, Kingston, Pennsylvania 18704

**JUNE 30, 2004**

Morabito/Scranton Lube purchased the Kingston Jiffy Lube property from a third-party for **$924,000.00**\*\*



**JUNE 30, 2004**

Sovereign Scranton purchased the Kingston Jiffy Lube property from Morabito/Scranton Lube for **$1,960,000.00**



**JULY 1, 2004**

Sovereign Scranton and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$15,833.33** with a 1.60% increase per annum through June 30, 2029

**NOVEMBER 11, 2005**

Etemad purchased the Kingston Jiffy Lube property from Sovereign Scranton for **$2,271,058.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$15,833.33**



**DECEMBER 22, 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia



**APRIL 2008**

Macchia abandoned the property



**MAY 1, 2008**

Etemad mitigated his damages and signed a new lease with Snowdon for 35 months at a rental rate of **$5,500.00** per month



**Damages as a Result of Defendants' Fraud**

**$6,796,670.00**: **$1,691,058.00** as of closing plus **$5,105,612.00** in future rent, plus misc. out-of-pocket expenses

\*\*Morabito/Scranton Lube purchased the Kingston Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/Scranton Lube attributed to the Kingston Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Etemad.

**B.      Michael and Sally Wiley**[13]

**The Sale of the Vestal Jiffy Lube to the Wileys**

150.     In 2003, Mike and Sally Wiley (the "Wileys") agreed, at Weston's (an agent working out of M&M Real Estate's Long Beach office) solicitation and recommendation, to sell a 16-unit apartment building they owned in Long Beach, California.  Weston told the Wileys that they had gained a great deal of equity in the property since purchasing it and that equity would be put to much better use by selling the property and reinvesting in another property via a 1031 exchange.  The Wileys had a previous successful experience with Weston, who represented them in a 1031 exchange in 2000, and trusted his judgment.  Weston represented the Wileys on both the sell and buy ends of that transaction.

151.     The Wileys eventually sold the Long Beach property in September 2003 for $1,850,000.00.  Thereafter, the Wileys again sought Weston's advice regarding the reinvestment of the proceeds.  Weston strongly recommended that the Wileys "graduate" from apartment building investing and move into a commercial triple net property investment, where there would be minor owner responsibilities and a stable and secure income, relative to the apartment business.  Weston said that this was a common progression of investment strategy for apartment owners.

152.     While the Wileys liked the concept of investing in a triple net lease property, they were concerned about the risk of having a single tenant.  Weston assured the Wileys that having a single tenant was not cause for concern, noting that one of the benefits of a triple net lease was that the single tenant would be responsible for all repairs, taxes, insurance and any other expenses on the property.  In fact, Weston told the Wileys that investors in triple net lease properties received their rent checks "automatically" through electronic deposit.  Weston made these representations to the Wileys in person and by phone.

_____

[13]     The Wileys took title to the property as Trustees of the Wiley/Fimiani Family Trust, dated November 18, 1998.  On August 17, 2004, they transferred the title of the property to Eclectic Properties East, LLC, a California Limited Liability Company, of which they are the Managing Members.

153.     Weston's representations were very appealing to the Wileys, as they had experienced numerous problems with past tenants of the apartment buildings that they previously owned. Based on Weston's representations, the Wileys decided to move forward and look for a triple net lease property.

154.     Thereafter, Weston sent the Wileys via U.S. mail listings of various triple net lease opportunities, including a Jiffy Lube property located in Vestal, New York. The Vestal Jiffy Lube was offered for sale by Sovereign JF. Defendants never disclosed to the Wileys the extent of Sovereign JF's relationship with M&M and M&M Real Estate – Weston's employer .

155.     Weston and M&M Real Estate led the Wileys to believe that the Vestal Jiffy Lube property – listed at approximately $2,200,000.00 – was the most appealing and secure investment opportunity that was available to them. Weston assured the Wileys that Morabito – the operator of the property – was one of the largest and most successful Jiffy Lube franchisees in the country. Weston and M&M Real Estate led the Wileys to believe that Morabito's involvement further increased the security of an investment in the Vestal Jiffy Lube property.

156.     Weston and M&M Real Estate provided the Wileys via U.S. mail a full-color sales brochure which marketed the Vestal Jiffy Lube property as yielding an 8.0% cap rate. The marketing materials also noted that the tenants of the Vestal Jiffy Lube property – Eureka and Tibaram (which were alter egos of Morabito) – would pay rent starting at $173,675.00 per year with 10% rental increases every five years. The long-term lease on the property was for 25 years. The marketing materials touted Morabito as being the highest net worth Jiffy Lube operator in the United States. Reasonably relying on the M&M Real Estate marketing materials and Weston's representations, the Wileys believed that Morabito/Eureka/Tibarom was financially stable and would be a safe tenant.

157.     The Wileys subsequently had a number of conversations with Weston, during which he assured them of the accuracy of the statements in M&M Real Estate's marketing materials. Weston told the Wileys that Morabito was one of Jiffy Lube's biggest franchisees and that he owned approximately 24 Jiffy Lube stores around the country. Weston assured the Wileys that it was highly unlikely that the Vestal Jiffy Lube would ever go out of business, but that even if the store

1    failed, Morabito had 23 other operational Jiffy Lube stores and therefore could cover any rental

2    payments.

3        158.    During the sales process, and at the behest of M&M Real Estate, PGP prepared a

4    land comparison of the Vestal Jiffy Lube property. The land comparison included comparables

5    provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based

6    on leases with inflated rents, making the land comparison wholly unreliable.

7        159.    Thereafter, in November 2003, in reasonable reliance on M&M Real Estate and

8    Weston's representations, the Wileys agreed to purchase the Vestal Jiffy Lube property for

9    $2,144,195.00, with $1,050,000.00 in financing. By that time, the Wileys were very close to the 45-

10   day deadline to identify a property for their 1031 exchange, and felt pressure to move forward with

11   their investment. As this was the Wiley's first commercial real estate transaction, they placed their

12   complete trust in Weston and M&M Real Estate, whom, based upon their representations, the Wileys

13   perceived to be experts in the field, and relied on them to protect their interests.

14       160.    The Wileys closed on the Vestal Jiffy Lube location in February 2004, and thereafter,

15   received timely rental payments from Morabito/Eureka/Tibarom through October 2006. The Wileys,

16   Weston, M&M Real Estate, Sovereign JF and Morabito used facsimile, e-mail, phone and U.S. mail

17   by and between California and New York to negotiate the transaction.

18   **The Fraudulent Sale-Leaseback on the Property**

19       161.    Little did the Wileys know at the time of the closing that they had been defrauded into

20   purchasing a commercial property at a price that had been grossly inflated due to the existence of a

21   sham lease crafted by Defendants. Indeed, Sovereign JF, as the alter ego and wholly-owned

22   subsidiary of Sovereign Investment, had previously purchased the Vestal Jiffy Lube from Morabito

23   on or around October, 2003 (just a day after Morabito/Eureka had purchased the property from a

24   third-party). Sovereign JF executed a fraudulent sale-leaseback agreement with

25   Morabito/Eureka/Tibarom, which had the intended effect of artificially increasing the price of the

26   property to well beyond its fair market value.

27       162.    Defendants intended from the very beginning to flip the overpriced property to

28   unwitting investors like the Wileys. Accordingly, to conceal the fraudulent nature of the sale-

1   leaseback agreement, Sovereign JF and Sovereign Investment turned to their sister company and co-

2   conspirator M&M Real Estate and its agents Weston and Kunofsky to list, market and sell the

3   property.  M&M Real Estate, Weston and Kunofsky, as alter egos of M&M, misrepresented and

4   concealed material facts about the property's true market value, future rents, security and stability.

5           163.    As discussed below, Morabito never had the intention of occupying the property and

6   operating the Jiffy Lube franchise through the full term of the lease, despite the numerous

7   misrepresentations concerning his financial stability and the strength of his business operation.

8   **Morabito Abandons the Vestal Jiffy Lube**

9           164.    On October 23, 2006, the Wileys received a letter via U.S. mail from Salvatore

10  Morabito, Vice-President of Eureka (and brother of Morabito), advising them that the lease on the

11  Vestal Jiffy Lube property had purportedly been assigned and transferred to Tibarom NY.  The

12  assignment was completed without the Wiley's agreement or consent and in direct contravention of

13  the language of the lease agreement.  The Wileys were concerned about the assignment, but felt

14  powerless to do anything.  Thereafter, Tibarom NY paid rent on time through September 2007.

15          165.    From September through December 2007, Tibarom NY was late on its rent payments.

16  As such, the Wileys contacted Breen – the general manager of the Vestal Jiffy Lube property and

17  agent of Tibarom NY – each month, about the late rental payments.  On a December 2007 phone

18  call, Breen told the Wileys that Tibarom NY was now controlled by Macchia and that Macchia

19  would contact them about the situation.  The Wileys never received any written notice of the transfer

20  of the Vestal Jiffy Lube property to Macchia, nor did they ever consent to it.

21          166.    Soon thereafter, Macchia called Michael Wiley and told him that he was taking over

22  Tibarom NY.  Macchia told him that the current rental rate for the lease on the Vestal Jiffy Lube

23  property was way out of line with the actual revenues generated from store operations.  Specifically,

24  Macchia told the Wileys that the rent was nearly twice what it should be for a lease on the property.

25  Macchia then told the Wileys that he would not be able to pay rent until February 2008, after he

26  closed poor performing stores.

27          167.    In late 2007, the Wileys called Weston to inform him that they were having trouble

28  with the tenant on the Vestal Jiffy Lube property and to inquire about the possibility of selling the

1   property.  After several conversations, Weston told the Wileys that he would investigate what was

2   going on with the property and tenants.  From that point on, Weston did not respond to the Wiley's

3   phone calls.

4        168.    In early February 2008, Macchia called Michael Wiley and informed him that

5   Macchia would be closing all of the Jiffy Lube stores that Tibarom NY operated.  Macchia told

6   Michael Wiley that he would continue operating the Vestal Jiffy Lube until the Wileys found another

7   tenant, but Macchia stated that he would not pay any rent during the time that he continued to

8   operate the property.

9        169.    Thereafter, in February 2008, Macchia abandoned the property, leaving the property

10  in very poor condition.  The property had four feet of water in the basement, water damage, mold

11  and oil on the walls, and the trade fixtures and other items were either missing or destroyed.

12  Thereafter, in order to mitigate their damages, in March 2008, the Wileys entered into a new 10-year

13  triple net lease with Sierra Oil Management at a monthly rent of 15% of net sales, well below the

14  rent of $14,492.92 that Morabito/Eureka/Tibarom had agreed to pay and well below the monthly

15  mortgage of $7,731.00 that the Wiley's owed on the property.

16       170.    Throughout the course of the Wileys' relationship with M&M Real Estate, Weston,

17  Sovereign JF, Morabito and the various other members of the M&M Enterprise, Defendants made

18  false and misleading statements and omissions regarding the fair market value, future rents, business

19  prospects, security and stability of the Wiley's investment – exploiting the relationship of trust that

20  they had intentionally built with the Wileys.   These false and misleading statements were

21  communicated to the Wileys via U.S. mail, e-mail, facsimile and over the phone.  During this time,

22  Defendants knew that the fair market value of the investment property was artificially inflated, that the

23  purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the

24  property, wiping out the artificial inflation in the fair market value of the property, and eviscerating the

25  future rents.

26       171.    So, as was the case with every other investor, Defendants' conspiracy to scam the

27  Wileys was a complete success.  Defendants artificially inflated the value of the property that the

28  Wileys were induced to purchase, which value plummeted when the Defendants walked away.  As a

1    result, the Wileys suffered severe financial damages, including the loss of fair market value of their

2    investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

3         172.    M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign Scranton, Sovereign

4    Investment, Morabito, and the various other members of the M&M Enterprise engaged in a

5    continuous pattern of racketeering activity as they used U.S. mail and wire to orchestrate and carry

6    out the sale of Vestal Jiffy Lube property to the Wileys.

7         173.    M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign Scranton, Sovereign

8    Investment, Morabito, and the various other members of the M&M Enterprise conducted and

9    directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth

10   herein, which caused the Wileys to purchase a Jiffy Lube property at a grossly and artificially

11   inflated price.  The value of the property plummeted when Morabito and his shell companies

12   abandoned it.

13        174.    As demonstrated through their ongoing conduct, M&M Real Estate, M&M,

14   Muirhead, Kunofsky, Sovereign Scranton, Sovereign Investment, Morabito, and the various other

15   members of the M&M Enterprise shared the common purpose of luring investors like the Wileys

16   into purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

17        175.    The sale of the Vestal Jiffy Lube to the Wileys was by no means a random, isolated

18   transaction, but part of the same fraudulent scheme devised by Defendants to sell triple net properties

19   using bogus sale-leaseback agreements.  In fact, the Vestal Jiffy Lube property was one of the

20   "portfolio" properties that Sovereign Investment had previously agreed to purchase from Morabito.

21   From the outset, Sovereign Investment had planned to purchase these portfolio properties "in bulk"

22   with the intention of re-selling them to unwitting investors at drastically inflated prices.  The sale to the

23   Wileys was consummated exactly as it had been planned and conceived by Defendants.

24        176.    In addition, the statements made by Defendants to the Wileys and referenced herein

25   were each materially false and misleading when made as they represented and/or omitted adverse

26   facts which then existed and disclosure of which was necessary to make the statements not false

27   and/or misleading.  The then-existing facts that make those statements false and misleading are set

28   forth in ¶149.

## Chronology of the Wileys' purchase of the Jiffy Lube property located at 137 Vestal Parkway East, Vestal, New York 13850

### OCTOBER 15, 2003

Morabito/Eureka purchased the Vestal Jiffy Lube property as part of a group of three properties from a third-party for a combined price of **$4,085,356.00** - an average price of **$1,361,785.00** per property**



### OCTOBER 16, 2003

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$14,472.92** per month and a 10% increase every 5 years through October 15, 2028



### OCTOBER 28, 2003

Sovereign JF purchased the same three properties, including the Vestal Jiffy Lube property from Morabito/Eureka for a combined price of **$4,472,163.00** - an average of **$1,490,721.00** per property



### JANUARY 30, 2004

The Wileys purchased the Vestal Jiffy Lube property from Sovereign JF for **$2,144,135.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$14,492.92**



### DECEMBER 2007

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia



### FEBRUARY 2008

Macchia abandoned the property



### MARCH 17, 2008

The Wileys mitigated their damages and signed a new lease with Sierra Oil for a 10 year term at a rental rate of 15% of net sales



### Damages as a Result of Defendants' Fraud

**$5,985,306.00**: **$1,044,135.00** as of closing plus **$4,941,171.00** in future rent, plus misc. out-of-pocket expenses

**Morabito/Eureka purchased the Vestal Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/Eureka attributed to the Vestal Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Wileys.

1    **C.    Eileen and Johannes Moderbacher[14]**

2    **The Sale of the Clarks Summit Jiffy Lube to the Moderbachers**

3    177.    In August 2005, Eileen and Johannes Moderbacher (the "Moderbachers") were

4    introduced to Muirhead and M&M Real Estate when they sold an Arizona apartment complex they

5    owned with Amirkhas and Etemad.    In the course of Muirhead and M&M Real Estate's

6    representation of Amirkhas in connection with the sale of the apartment complex, the Moderbachers

7    and Etemad were advised about Amirkhas' prior investment in M&M Real Estate's 1031 exchange

8    properties.    Having trusted and relied on M&M Real Estate previously, Amirkhas arranged a

9    meeting at his house in San Francisco so that the Moderbachers and Etemad could meet with

10   Muirhead.

11   178.    The initial meet and greet with Muirhead lasted at least two hours.    Muirhead did

12   most of the talking and made triple net lease investments sound like fantastic, safe and secure

13   investments.    Muirhead, as an agent of M&M Real Estate, aggressively marketed triple net leases as

14   an investment for "Baby Boomers."    The Moderbachers specifically told Muirhead they were

15   seeking steady income and an investment where the rental income was more than their monthly

16   mortgage obligation.    They wanted a stream of income with low personal involvement and no hassle.

17   179.    Muirhead repeatedly represented to the Moderbachers that triple net lease investments

18   were ideal for people who do not want the hassles of maintenance and whose primary goal was to

19   generate a consistent and reliable income stream. Muirhead represented to the Moderbachers that

20   triple net lease properties were the best investments they could ever find, comparing them to a

21   pension fund.    Muirhead's representations led the Moderbachers to believe that triple net lease

22   investments were stable and reliable retirement options for people nearing retirement age.

23   180.    Following the San Francisco meeting, the Moderbachers had numerous phone

24   conversations with Muirhead wherein Muirhead pitched properties he said were available for a 1031

25   

26   _____

[14]    Eileen and Johannes Moderbacher took title to their property as Eileen Starr Moderbacher
27   and Johannes Moderbacher, husband and wife. On February 1, 2006, the Moderbachers transferred
title to The Moderbacher Family Trust, established by Declaration of Trust, dated February 1, 2006.

28

1    exchange.  Muirhead recommended three potential 1031 exchange options to the Moderbachers –

2    Jiffy Lube, Uni-Mart and KFC.  Muirhead assured the Moderbachers that these were all good, safe

3    investments, especially in light of Muirhead's specific knowledge of the Moderbachers risk tolerance

4    and income generation goals.  Jiffy Lube was touted as being particularly attractive because it was

5    owned by SOPUS.

6          181.    In September 2005, Muirhead and M&M Real Estate sent by U.S. mail to the

7    Moderbachers information and marketing documents relating to a Jiffy Lube in Clarks Summit,

8    Pennsylvania.  The brochure they received from M&M Real Estate for the Clarks Summit Jiffy Lube

9    property portrayed the location and the business opportunities as highly attractive.  M&M Real

10   Estate and Muirhead represented that Morabito – who controlled the tenants on the Clarks Summit

11   Jiffy Lube property, Eureka and Tibarom (which were alter egos of Morabito) – was a highly

12   successful Jiffy Lube operator.

13         182.    M&M Real Estate's glossy, full-color marketing brochure cleverly and conspicuously

14   focused on the concept of cap rates.  The Moderbachers believed that Muirhead, as their broker, was

15   looking out for their best interests.  Thus, when Muirhead touted the importance of cap rates in

16   determining which property to purchase, the Moderbachers took his advice.  Relying on Muirhead's

17   advice about investment criteria, the Moderbacher's main investment criteria was to invest in a

18   location with a cap rate of 8.0% or better.

19         183.    Muirhead, as an agent of M&M Real Estate, represented to the Moderbachers that

20   Morabito/Eureka/Tibarom was at the start of a new long-term lease on the Clarks Summit Jiffy Lube

21   property with a monthly income stream of $11,583.33 per month and with increases of 1.6% per

22   year.  Muirhead and M&M Real Estate convinced the Moderbachers that a 1031 investment property

23   was more valuable if the property had a newer lease, because then the landlord would have more

24   time with a tenant already under contract.  Muirhead made these statements to the Moderbachers in

25   person and during phone conversations.

26         184.    Muirhead maintained that the Clarks Summit Jiffy Lube property would be stable,

27   require very little oversight from the Moderbachers and be a positive investment. The Moderbachers

28   put their trust in Muirhead and in M&M Real Estate, in part because M&M Real Estate was a huge,

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                              - 47 -

1   reputable firm.  Because the Moderbachers trusted Muirhead and M&M Real Estate as their broker

2   and relied on the marketing materials they were provided, the Moderbachers did not get an

3   additional property inspection, relying instead on M&M Real Estate to protect them.   The

4   Moderbachers believed that they did not need to personally undertake additional analysis because

5   Muirhead convinced them that the Clarks Summit Jiffy Lube property was a fantastic investment.

6          185.    In addition to convincing them that he was working to protect their interests and that

7   the Clarks Summit Jiffy Lube property was a safe and secure investment, Muirhead pressured the

8   Moderbachers to move quickly.   Muirhead told the Moderbachers over the phone on several

9   occasions that there were not many properties available to them given their impending deadline to

10   select a property under the 1031 rules.  Muirhead further pressured the Moderbachers by telling them

11   that the sellers would offer a discount to them, but only if they and their partners (Amirkhas and

12   Etemad) purchased Jiffy Lube properties immediately.

13          186.    At the behest of M&M Real Estate, PGP prepared an appraisal of the Clarks Summit

14   Jiffy Lube property.   Unbeknownst to the Moderbachers, the appraisal included comparables

15   provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based

16   on leases with inflated rents, making the appraisal wholly unreliable.

17          187.    Sovereign Scranton initially offered to sell the Clarks Summit Jiffy Lube to the

18   Moderbachers for $1,720,000.00.  The Moderbachers eventually purchased this location effective

19   September 30, 2005 (although the closing was delayed until January 16, 2006) for $1,661,458.00.

20   The Moderbachers, Muirhead, M&M Real Estate, Morabito, PGP and Sovereign Scranton used

21   facsimile, e-mail, phone and U.S. mail by and between California, New York, and Arizona to

22   negotiate the transaction.

23   **The Fraudulent Sale-Leaseback on the Property**

24          188.    Little did the Moderbachers know that they had been defrauded into purchasing a

25   commercial property at a price that had been grossly inflated due to the existence of a sham lease

26   crafted by Defendants.  Indeed, Sovereign Scranton, as an alter ego and wholly-owned subsidiary of

27   Sovereign Investment, previously had purchased the Clarks Summit Jiffy Lube from Morabito on or

28   around June 30, 2004 (the very same day Morabito had purchased the property from a third-party).

1  Sovereign Scranton simultaneously executed a bogus sale-leaseback agreement with Morabito,

2  which had the intended effect of artificially increasing the price of the property to well beyond its

3  fair market value.

4       189.    Defendants intended from the very beginning to flip the overpriced property to

5  unwitting investors like the Moderbachers.  Accordingly, to conceal the fraudulent nature of the sale-

6  leaseback, Sovereign Scranton and Sovereign Investment turned to their sister company and co-

7  conspirator, M&M Real Estate, and its agent Muirhead, to list, market and sell the property.  M&M

8  Real Estate and Muirhead, as alter egos of M&M, misrepresented and concealed material adverse

9  facts concerning the property's true market value, future rents, business prospects, security and

10  stability.

11       190.    As discussed below, Morabito never intended to occupy the property nor operate the

12  Jiffy Lube franchise through the full term of the lease, despite the numerous misrepresentations

13  concerning his financial stability and the strength of his business operation.

14  **Morabito Abandons the Clarks Summit Jiffy Lube**

15       191.    Subsequent to the closing, Morabito/Eureka/Tibarom initially paid rent regularly by

16  mailing checks via U.S. mail to the Moderbachers from January 2006 through October 2007.  In the

17  fall of 2007, Breen purportedly took over managing the Morabito/Eureka/Tibarom offices, which

18  had been moved by Morabito from California to Nevada after the Moderbachers' closing.  After

19  Breen started working for Morabito/Eureka/Tibarom, the rent started arriving on the 25th of each

20  month – the very last day of the ten-day grace period provided for in the lease.

21       192.    In November 2007, Morabito called the Moderbachers from Nevada and

22  acknowledged that there had been some problems paying rent on time.  Morabito assured the

23  Moderbachers that he had a plan in place and that everything was going to be fine.  Shortly

24  thereafter, and unbeknownst to the Moderbachers, Morabito purportedly transferred his shares in

25  Eureka and Tibarom to Macchia and his company D and R Lube, Inc.  This transfer occurred without

26  the Moderbachers' knowledge or consent.

27       193.    In early January 2008, the Moderbachers learned, for the first time, that Macchia had

28  taken over a number of Jiffy Lube stores from Morabito/Eureka/Tibarom, including the Clarks

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)       - 49 -

1   Summit Jiffy Lube property.  Macchia told the Moderbachers that he was coming to San Francisco

2   later that month and scheduled a meeting with them, Amirkhas and Etemad.

3        194.    During the meeting, Macchia told the Moderbachers, Amirkhas and Etemad that his

4   experience with Morabito "taught him the difference between trusting and trustworthy."  Macchia

5   represented that Morabito came to Macchia and offered to pay him to acquire Eureka and Tibarom

6   because Morabito was having problems with the franchisor, Jiffy Lube International, Inc. ("JLI"),

7   and Morabito believed those problems would be resolved if he no longer owned Eureka and

8   Tibarom.  In reality, Morabito was just trying to dump the leases on the Jiffy Lubes, which were no

9   longer of value to him as he had monthly payment obligations coming due under the leases and had

10  already received his split of the scammed investors' monies.

11       195.    Macchia told the Moderbachers that he could not continue to pay the current rental

12  rate and asked for a new lease in which rent would be paid as a percentage of net sales.  This new

13  rent arrangement would have resulted in a significant rent reduction from the Moderbachers' original

14  lease with Morabito/Eureka/Tibarom.

15       196.    In order to attempt to mitigate their damages, the Moderbachers began talking to an

16  experienced Jiffy Lube franchisee in the area – Jim Millet ("Millet") – regarding taking over the

17  existing lease.  The Moderbachers learned from Millet that he had built several Jiffy Lube stores,

18  including the Clarks Summit Jiffy Lube property that the Moderbachers had purchased through

19  M&M Real Estate.   Millett sold 5 or 6 of the stores to Morabito. When Millett heard the

20  Moderbachers had paid $1,600,000.00 for the Clarks Summit Jiffy Lube property and had been led

21  to believe by M&M Real Estate and Muirhead that this was a fair price, "he was dumbfounded."

22  Millett told the Moderbachers that he would not pay more then $350,000.00 for the Clark's Summit

23  Jiffy Lube property.

24       197.    Facing mounting damages, the Moderbachers leased the property to a new tenant who

25  began operating a Valvoline Instant Oil service in May 2008.  While the new tenant is paying

26  $5,500.00 in rent per month, the Moderbachers' monthly mortgage payment is close to $6,800.00,

27  requiring the Moderbachers to take a loss every month.

28

198.    Throughout the course of the Moderbachers' relationship with M&M Real Estate, Sovereign Scranton, Muirhead, Morabito, PGP and the various other members of the M&M Enterprise, Defendants made false and misleading statements and omissions regarding the fair market value, future rents, business prospects, security and stability of the Moderbacher's investment – exploiting the relationship of trust that they had intentionally built with the Moderbachers.  These false and misleading statements were communicated to the Moderbachers via U.S. mail, e-mail, facsimile and by phone.  During this time, Defendants knew that the fair market value of the investment property was artificially inflated, that the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the property, wiping out the artificial inflation in the fair market value of the property, and eviscerating the future rents.

199.    So, as was the case with every other investor, Defendants' conspiracy to scam the Moderbachers was a complete success.  Defendants artificially inflated the value of the property that the Moderbachers were induced to purchase, which value plummeted when the Defendants walked away.  As a result, the Moderbachers suffered severe financial damages, including the loss of fair market value of their investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

200.    M&M Real Estate, M&M, Sovereign Scranton, Sovereign Investment, Muirhead, Morabito, and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity as they used U.S. mail and wire to transmit false and misleading statements to orchestrate and carry out the sale of the Clark Summit Jiffy Lube to the Moderbachers.

201.    M&M Real Estate, M&M, Sovereign Scranton, Sovereign Investment, Muirhead, Morabito, PGP, and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused the Moderbachers to purchase the Jiffy Lube property at a grossly and artificially inflated price.  The value of the property later plummeted when Morabito and his shell companies abandoned it.

202.    As demonstrated through their ongoing conduct, M&M Real Estate, M&M, Sovereign Scranton, Sovereign Investment, Muirhead, PGP, Morabito and his shell companies and

1    the various other members of the M&M Enterprise shared the common purpose of luring investors

2    like the Moderbachers into purchasing triple net properties with artificially-inflated prices and

3    unsustainable lease terms.

4    203.    The sale of the Clarks Summit Jiffy Lube to the Moderbachers was by no means a

5    random, isolated transaction, but part of the same fraudulent scheme devised by Defendants to sell

6    triple net properties using bogus sale-leaseback agreements.  Indeed, the Clarks Summit Jiffy Lube

7    property was one of multiple "portfolio" properties that Sovereign Investment had initially agreed to

8    purchase from Morabito.  From the outset, Sovereign Investment had planned to purchase these

9    portfolio properties "in bulk" from Morabito with the goal of re-selling them to unwitting investors

10   at drastically inflated prices.  The sale to the Moderbachers was consummated exactly as it had been

11   planned and conceived by Defendants.

12   204.    In addition, the statements made by Defendants to the Moderbachers and referenced

13   herein were each materially false and misleading when made as they represented and/or omitted

14   adverse facts which then existed and disclosure of which was necessary to make the statements not

15   false and/or misleading.  The then-existing facts that make those statements false and misleading are

16   set forth in ¶149.

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

## Chronology of the Moderbachers' purchase of the Jiffy Lube property located at 150 South Abington Road, Clarks Summit, Pennsylvania 18411

**JUNE 30, 2004**

Morabito/Scranton Lube purchased the Clarks Summit Jiffy Lube property from a third-party for **$1,386,000.00**



**JUNE 30, 2004**

Sovereign Scranton purchased the Clarks Summit Jiffy Lube property from Morabito/Scranton Lube for **$1,450,000.00**



**JULY 1, 2004**

Sovereign Scranton and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$11,588.33** per month with a 1.6% increase per annum through June 30, 2029



**JANUARY 12, 2006**

The Moderbachers purchased the Clarks Summit Jiffy Lube from Sovereign Scranton for **$1,661,458.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$11,588.33**



**DECEMBER 22, 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia/D&R Lube, and thereafter Macchia/D&R Lube abandoned the property



**MAY 1, 2008**

The Moderbachers mitigated their damages and signed a new lease with Snowdon for 35 months at a rental rate of **$5,500.00** per month



**Damages as a Result of Defendants' Fraud**

**$4,986,616.00**: **$1,251,458.00** as of closing plus **$3,735,158.00** in future rent, plus misc. out-of-pocket expenses

**Morabito/Scranton Lube purchased the Clarks Summit Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/Scranton Lube attributed to the Clarks Summit Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Moderbachers.

**D.    Thomas Linden[15]**

**The Sale of the Rochester Jiffy Lube to Linden**

205.    In late 2003 or early 2004, Thomas Linden ("Linden") sold an apartment building that he owned in Maywood, California.  At the time he sold the apartment building, Linden planned to enter into a 1031 tax deferred exchange.  The title company on the sale of the apartment building, First American Title Insurance Company, referred him to a subsidiary, First American Exchange Company, to perform the services as a 1031 intermediary.

206.    Julie Galvin ("Galvin"), Linden's contact at First American Exchange Company, explained to Linden – who was living in California at the time – that Linden needed to purchase a new investment property using the proceeds he received from the sale of the Maywood apartment building.  Galvin referred Linden to M&M Real Estate's Long Beach, California office to assist in finding a new investment property.

207.    From the outset, Linden told M&M Real Estate that he wanted an investment that was less of a hassle and less hands-on than the apartment building he had owned.  M&M Real Estate suggested Linden allow M&M Real Estate to search for a triple net lease investment with an 8.0% cap rate, which Linden understood to mean that he would earn 8.0% per year on his investment.  While Linden had heard of triple net leases, he did not have more than a cursory knowledge of them.  For this reason, and because he was using M&M Real Estate as his broker in the purchase of a new 1031 exchange property, he relied on M&M Real Estate to advise him regarding achieving his investment goals and protecting his interests.

208.    M&M Real Estate provided Linden with a spreadsheet identifying a number of Jiffy Lube locations being offered for sale.  The spreadsheet purported to show operating income, expenses and other information for each location listed.  The tenants on most of the Jiffy Lube properties were Eureka and Tibarom (which were alter egos of Morabito).  M&M Real Estate represented to Linden that Jiffy Lube was "supporting" Morabito's Eureka and Tibarom deals and

---

[15]    Thomas Linden took title to the property, with Sylvia E. Linden, as trustees of the Thomas H. Linden and Sylvia E. Linden Family Trust, dated September 19, 2000.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                    - 54 -

1   that they were safe and secure investments.  These representations were made to Linden by phone

2   and through in-person conversations with M&M Real Estate agents.

3     209. M&M Real Estate sent by U.S. mail marketing materials to Linden concerning certain

4   Jiffy Lube properties.  These marketing materials prominently featured the JLI logo, and Linden was

5   led to believe by M&M Real Estate that JLI was affiliated with or supported

6   Morabito/Eureka/Tibarom – the tenant on the Jiffy Lube properties.  M&M Real Estate also made a

7   representation in the marketing materials that the tenant is "Eureka Petroleum, Inc. (Oil agreement

8   with Shell is a 10 year agreement which Shell only signs with Eureka.  Shell Oil has a right to cure

9   any lease default under the oil agreement.)."  Based on these representations, as well as others made

10  by M&M Real Estate, at the time he was considering his investment options, Linden believed that if

11  Morabito/Eureka/Tibarom were to default, then SOPUS would take over any lease on the property.

12    210. M&M Real Estate also used Morabito, personally, as a selling point, representing that

13  Morabito's involvement greatly increased the stability of the Jiffy Lube investments.  For example,

14  M&M Real Estate provided Linden with M&M Real Estate marketing materials indicating that

15  Morabito's franchises sold 12.0% more than the average Jiffy Lube store and had an average per

16  service revenue of $56.00 compared to just $50.00 at other franchises.  Linden relied upon the

17  totality of M&M Real Estate's representations and assurances when he chose to invest.

18    211. During the sales process, and at the behest of M&M Real Estate, PGP prepared a land

19  comparison of the Rochester Jiffy Lube property.  Unbeknownst to Linden, the land comparison

20  included comparables provided by M&M Real Estate and Morabito/Eureka/Tibarom which

21  comparables were also based on leases with inflated rents, making the land comparison wholly

22  unreliable.

23    212. On April 20, 2004, Linden purchased the Jiffy Lube in Rochester, NY from

24  Sovereign JF for $1,240,425.00.  Linden, M&M Real Estate, Sovereign JF and Morabito used

25  facsimile, e-mail, phone and U.S. mail by and between California, New York, and Florida to

26  negotiate the transaction and effectuate the closing.

27    213. At the time of closing, Morabito/Eureka/Tibarom was Linden's tenant, and there were

28  24 years and eight-and-a-half months remaining on the long-term lease on the property.  The

1  monthly rent payment under the lease was $8,269.50, with an annual increase of 1.6% on each

2  March 5th.

3  **The Fraudulent Sale-Leaseback on the Property**

4      214.    Little did Linden know that he had been defrauded into purchasing a commercial

5  property at a price that had been grossly inflated due to the existence of a sham lease crafted by

6  Defendants. Indeed, Sovereign JF, as the alter ego and wholly-owned subsidiary of Sovereign

7  Investment, previously had purchased the Rochester Jiffy Lube from Morabito on or around

8  March 5, 2004 (just a day after Morabito had purchased the property from a third-party). Sovereign

9  JF simultaneously executed a fraudulent sale-leaseback agreement with Morabito, which had the

10  intended effect of artificially increasing the price of the property to well beyond its fair market value.

11      215.    Defendants intended from the very beginning to flip the overpriced property to an

12  unwitting investor like Linden. Accordingly, to conceal the fraudulent nature of the sale-leaseback

13  agreement, Sovereign JF and Sovereign Investment turned to their sister company and co-

14  conspirator, M&M Real Estate, to list, market and sell the property. M&M Real Estate, through its

15  agents and as an alter ego of M&M, misrepresented and concealed material adverse facts about the

16  property's true market value, future rents, business prospects, security and stability.

17      216.    As discussed below, Morabito (and the entities and agents under his control) never

18  intended to occupy the property nor operate the Jiffy Lube franchise through the full term of the

19  lease, despite the numerous misrepresentations concerning his financial stability and the strength of

20  his business operation.

21  **Morabito Abandons the Rochester Jiffy Lube**

22      217.    From the time of Linden's closing in 2004 until 2007, Linden received his rent from

23  Morabito/Eureka/Tibarom without any issues. Rent checks were delivered to Linden via U.S. mail.

24  However, in approximately the spring of 2007, Linden did not receive the monthly rent check.

25  Thereafter, Linden called Morabito's office in Reno, Nevada to find out why

26  Morabito/Eureka/Tibarom had not paid the rent for that month. At that time, he spoke with a person

27  he believes was Brianna Sartain ("Sartain"). Linden overheard Sartain confirm with another woman

28  in the office that his franchise had been "transferred" to DDS Management ("DDS") [which was an

1   alter ego of Samuel Pearson ("Pearson") and Deborah Pickett ("Pickett")]. Sartain then told Linden

2   that Morabito/Eureka/Tibarom had transferred his franchise and lease to DDS, but that DDS was

3   keeping the Eureka name.

4         218.    Shortly thereafter, Linden received a letter notifying him that Morabito was

5   purporting to "transfer" Linden's store to DDS. The letter explained that Linden's Rochester Jiffy

6   Lube would continue to be run by Pearson and Pickett. The letter noted that Pearson and Pickett

7   were experienced operators and had both previously worked for Morabito and JLI. The letter led

8   Linden to believe that Pearson and Pickett were well qualified to operate his Jiffy Lube property in

9   Rochester.

10         219.    Subsequent to the unapproved "transfer," DDS paid the rent under the long-term lease

11   for a few months. Thereafter, Linden started receiving unsigned checks in the mail from DDS as

12   well as checks drafted with the right amount but the wrong payee. DDS did not pay any rent in

13   September or October 2007.

14         220.    Remembering that M&M Real Estate represented to Linden in their marketing

15   materials that SOPUS had the right to cure any default under the lease, Linden contacted JLI

16   employees Paula Floeck ("Floeck") and Lenny Lestrovsky ("Lestrovsky") to see if SOPUS would

17   cure the default and take over his store or help him identify a replacement tenant. No one at JLI

18   offered any assistance.

19         221.    In November 2007, Pearson called Linden and offered to buy the Rochester Jiffy

20   Lube property. Linden asked for $1,200,000.00 but Pearson declined, stating that he might pay

21   $1,000,000.00. Linden sent Pearson an e-mail asking him to make a written offer. On

22   November 2, 2007, Pearson told Linden through e-mail that he was having his attorney prepare a

23   purchase contract, and Linden could expect to get a written offer.

24         222.    Then, on November 8, 2007, Pearson asked Linden through e-mail whether Linden

25   would let DDS out of the lease if Pearson did not purchase the property. Pearson provided Linden

26   with calculations indicating that, based upon the property's revenues, the rent should have been more

27   along the lines of $4,500.00 to $5,000.00 per month, not the $8,878.00 originally agreed to under the

28   long-term lease that Morabito and Sovereign JF put in place. When Linden refused to agree to a

1   modification of the existing rental rate, DDS abandoned the Rochester Jiffy Lube property.  As of

2   the time of abandonment, Linden was already owed approximately $40,000.00 in unpaid rent, late

3   fees and penalties.

4        223.    When Linden made his investment, M&M Real Estate did not disclose that Sovereign

5   JF had only purchased the location a few months before it was resold to him.  He only learned this

6   information much later, when he retained a local appraiser out of Rochester, New York to appraise

7   the property.  The appraisal concluded that Linden's store was valued at approximately $400,000.00

8   – a far cry from the $1,200,000.00 that M&M Real Estate, Sovereign JF and Morabito had induced

9   Linden to pay.

10        224.    In December 2007, Linden received a call from Jim O'Leary ("O'Leary"), President

11   of Fast Track Oil Change.  O'Leary had heard that when other local Jiffy Lubes had been

12   abandoned, the tenant came back and took all the equipment and machinery from the store.  O'Leary

13   offered to lock the Rochester Jiffy Lube store for Linden to prevent it from being stripped.  Linden

14   accepted this assistance.  O'Leary then offered to lease the location and run it and try to make it

15   grow.  In order to mitigate his damages, Linden re-let his property to O'Leary, who signed a new

16   lease with Linden on December 31, 2007 and agreed to pay Linden 12% of sales, approximately

17   $2,600.00 per month (as opposed to the $8,269.50 that Linden was supposed to be paid under the

18   lease with Morabito/Eureka/Tibarom).

19        225.    Throughout the course of Linden's relationship with M&M Real Estate, Sovereign

20   JF, Morabito and the various other members of the M&M Enterprise, Defendants made false and

21   misleading statements and omissions regarding the fair market value, future rents, business

22   prospects, security and stability of Linden's investment – exploiting the relationship of trust that they

23   had intentionally built with the Linden.  These false and misleading statements were communicated

24   to Linden via U.S. mail, e-mail, facsimile and through the phone.  During this time, Defendants

25   knew that the fair market value of the investment property was artificially inflated, that the purported

26   long-term lease was a farce, and that the "tenant" would walk away, abandoning the property,

27   wiping out the artificial inflation in the fair market value of the property, and eviscerating the future

28   rents.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)          - 58 -

226. So, as was the case with every other investor, Defendants' conspiracy to scam Linden was a complete success. Defendants artificially inflated the value of the property that Linden was induced to purchase, which value plummeted when the Defendants walked away. As a result, Linden suffered severe financial damages, including the loss of fair market value of his investment, future rents and out-of-pocket damages, all of which he is entitled to recover.

227. M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Morabito and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity as they used U.S. mail and wire to orchestrate and carry out the sale of the Rochester Jiffy Lube to Linden.

228. M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, PGP, Morabito, and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused Linden to purchase the Jiffy Lube property at a grossly and artificially inflated price. The value of the property plummeted when Morabito and his shell companies abandoned it.

229. As demonstrated through their ongoing conduct, M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, PGP, Morabito, and the various other members of the M&M Enterprise shared the common purpose of luring investors like Linden into purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

230. The sale of the Rochester Jiffy Lube to Linden was by no means a random, isolated transaction, but part of the same fraudulent scheme devised by Defendants to sell triple net properties using bogus sale-leaseback agreements. Indeed, the Jiffy Lube property was one of the multiple "portfolio" properties that Sovereign Investment had initially agreed to purchase from Morabito. From the outset, Sovereign Investment had planned to purchase these portfolio properties "in bulk" with the goal of re-selling them to unwitting investors at drastically inflated prices. The sale to Linden was consummated exactly as it had been planned and conceived by Defendants.

231. In addition, the statements made by Defendants to Linden and referenced herein were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or

1   misleading.  The then-existing facts that make those statements false and misleading are set forth in

2   ¶149.  In addition to the previously identified false statements, the following adverse facts were also

3   known by Defendants at the time their false and misleading statements and misrepresentations were

4   made:

- • Morabito and his alter egos were not supported by or affiliated with JLI. Notwithstanding Defendants holding Morabito out as an executive of JLI, Morabito was merely a franchisee.

- • Pearson, Pickett and DDS were neither well-capitalized nor capable of efficiently operating the Jiffy Lube franchise.  At the time of the purported assignment, Pearson's franchise license with Jiffy Lube had been suspended for failure to provide the appropriate financial documentation for the prior two years.  Shortly after Defendants' fraud was uncovered, Pickett, Pearson and DDS filed for bankruptcy protection.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                    - 60 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Linden's purchase of the Jiffy Lube property located at 3022 Ridge Road, West Rochester, New York 14626

**MARCH 5, 2004**

Morabito/Rochester Lube purchased the Rochester Jiffy Lube property from a third-party for **$1,004,006.00**

**MARCH 5, 2004**

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$8,269.17** per month with a 1.6% increase per annum through March 4, 2029

**MARCH 5, 2004**

Sovereign JF purchased the Rochester Jiffy Lube property from Morabito/Rochester Lube for **$1,086,439.00**

**APRIL 5, 2007**

Linden purchased the Rochester Jiffy Lube property from Sovereign JF for **$1,240,425.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$8,269.17**

**APRIL 10, 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/DDS

**NOVEMBER 2007**

Pearson/Pickett/DDS abandoned the property

**DECEMBER 31, 2007**

Linden mitigated his damages and signed a new lease with Fast Track for a term of two years at a rental rate of 12% of net sales calculated at the end of each calendar month

**Damages as a Result of Defendants' Fraud**

**$3,383,370.00**: **$600,425.00** as of closing plus **$2,782,945.00** in future rent, plus misc. out-of-pocket expenses

1    **E.     Sylvia and Kevork Belikian[16]**

2    **The Sale of the Brockport Jiffy Lube to the Belikians**

3          232.    In 2000, Sylvia Belikian read about M&M Real Estate's purported expertise

4    regarding triple net lease investments on its website, and called M&M Real Estate for further

5    information.  After being introduced to Mickle, a broker in M&M Real Estate's San Diego office,

6    Belikian explained to Mickle that she and her husband Kevork Belikian (the "Belikians") were

7    interested in obtaining more information regarding a triple net lease property for a 1031 exchange.

8    Sylvia Belikian told Mickle that it was important that any investment property be "secure" and

9    "reputable."

10         233.    Mickle provided the Belikians with information regarding a medical building in

11   Houston Texas, which, because of Sylvia Belikian's previous experience as a nurse, was of some

12   interest to her.  Relying on Mickle's advice, the Belikians ultimately purchased the medical building

13   in 2000 for $1,700,000.00.

14         234.    Because Mickle acted as the Belikians' agent in connection with their purchase of the

15   medical building, the Belikians came to accept him as a trustworthy representative.  As such, when,

16   in early 2004, the Belikians sold their commercial printing business in Pasadena, California, they

17   contacted Mickle regarding another potential 1031 exchange.

18         235.    The Belikians told Mickle that they wanted to reinvest the proceeds from the printing

19   business in a secure investment and were interested in possibly purchasing an additional medical

20   building.  Mickle called the Belikians back several days later and told them that there were no other

21   medical buildings available, but that he did know of a property that would be a safe and secure

22   investment that would meet the Belikians' needs – a Jiffy Lube property in Brockport, New York.

23         236.    As the Belikians were not familiar with the oil change business, they were cautious

24   and hesitant about investing in a property with an operating quick lube business on it.  In order to

25   allay their fears, Mickle, as an agent of M&M Real Estate, repeatedly represented that an investment

26   _____

27   [16]     The Belikians took title to their property as Trustees under the Kevork Belikian and Sylvia S.
     Belikian Living Trust, dated July 10, 2000.

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1    in the Brockport Jiffy Lube would be secure and would pay a steady stream of rental income.  In

2    fact, Mickle promised the Belikians that investing in the Jiffy Lube property would be "very

3    lucrative" since, among other things, it provided a cap rate 8.24%.  Mickle described the Brockport

4    Jiffy Lube property as being relatively new and located in a high traffic area in Brockport, New

5    York, near a large university.  Mickle made these representations to the Belikians by phone.

6        237.    Consistent with the ongoing scheme, M&M Real Estate used Morabito as an

7    additional inducement to convince the Belikians to invest in the Brockport Jiffy Lube property.[17]  In

8    his phone calls to the Belikians, Mickle represented that Morabito was the owner of 42 other Jiffy

9    Lube franchises, and represented that Morabito's other locations were doing very well.  Mickle

10   assured the Belikians that the rental income from the Brockport Jiffy Lube property would be secure

11   and steady as there were 21 years remaining on Morabito's 25-year lease.  Mickle further

12   represented to the Belikians that the lease was "guaranteed."  In addition, Mickle and M&M Real

13   Estate represented that SOPUS – the parent company of the franchisor JLI – had a 10-year oil

14   agreement with Morabito and that SOPUS had the right to cure any default under the lease

15   agreement.  Mickle and M&M Real Estate's representations led the Belikians to believe that SOPUS

16   would cover any unpaid rent if there were any problems with Morabito/Eureka/Tibarom.

17       238.    Based on these and other repeated representations by Mickle and M&M Real Estate,

18   the Belikians reasonably believed that the Jiffy Lube property in Brockport was a safe, secure

19   investment that would provide a guaranteed income stream each month for the next two decades.

20   Indeed, Mickle created the illusion that even if the Brockport Jiffy Lube did not do well, Morabito

21   would offset any potential losses with the revenue generated from one of Morabito's other Jiffy Lube

22   properties – insuring that the rent on the Brockport property would continue uninterrupted.

23       239.    In furtherance of Mickle and M&M Real Estate's attempts to convince the Belikians

24   to invest in the Brockport Jiffy Lube property, Mickle provided the Belikians with an electronic

25   password so that the Belikians could access M&M Real Estate's secure website.  Mickle also sent

26

27   [17]    Tibarom and Eureka (which were alter egos of Morabito) were the tenants and guarantors of
     the long-term lease already in place on the Brockport Jiffy Lube property.

28

the Belikians a 35-page glossy, color brochure about the Brockport Jiffy Lube property.  M&M Real

Estate's website and brochure made many representations regarding the Belikian's potential

investment, including that:

- The investment is a triple net lease for 25 years with 21 years remaining (landlord has "absolutely no responsibilities");

- Cap rate of 8.24% and net operating income of $147,670.00;

- Rent increased by 1.6% each year;

- Lease is guaranteed by Eureka Petroleum;

- Eureka Petroleum has an oil agreement with Shell and Shell has the right to cure any lease default;

- The property is located in an "excellent" area close to SUNY Brockport;

- Tibarom, Inc. is a highly successful Jiffy Lube franchisee, owned and operated by Paul Morabito; and

- Morabito-owned Jiffy Lube franchises, on average, do 12% better than other Jiffy Lube franchises.

240.    Mickle explained to the Belikians that the reported net operating income generated by

the Brockport Jiffy Lube location was based on the $12,305.00 monthly rent that the Belikians, as

landlords, would receive.  Mickle represented that the $1,900,000.00 listing price of the property was

based on the rental income that would be generated from the property – not the value of the

underlying property itself.  In fact, on more than one occasion, Mickle told Sylvia Belikian not to

worry about what the building or its fixtures were actually worth because the value of the property

was based on the income that the property could generate from the long-term lease already in place

on the property between Sovereign JF, the current landlord, and Morabito/Eureka/Tibarom.

241.    During the time that the Belikians were evaluating the Jiffy Lube property, Mickle

also sent them a purported balance sheet for Tibarom, prepared by BMI.  The Belikians were never

told that BMI was controlled by Morabito, and the documents did not reveal this.

242.    The Belikians reviewed the financials and discussed them with Mickle, questioning

whether the financials showed sufficient net profits to support the rental rate.  Mickle represented

that Morabito/Eureka/Tibarom had incurred substantial expenses for renovations to its Jiffy Lube

properties which were reflected in the balance sheet, but assured them that the property would

1  generate the rental income reflected in the materials provided to the Belikians by M&M Real Estate

2  and Mickle.

3        243.    While the Belikians dealt primarily with Mickle, on one occasion Mickle's supervisor

4  participated in a conference call wherein he reiterated many of the representations made by Mickle,

5  including that Morabito had 42 extremely successful Jiffy Lube franchises, that the rent on the

6  Brockport Jiffy Lube property was guaranteed, and that there was an agreement with SOPUS.

7        244.    After Mickle made the above representations to the Belikians, Sylvia Belikian visited

8  other Jiffy Lube properties in Pasadena and Arcadia, California and talked to the employees in those

9  shops about how the franchise operated.  Sylvia Belikian was told that to generate rental income in

10 excess of $12,000.00 a month (as advertised by Mickle and M&M Real Estate), a Jiffy Lube would

11 have to process about 60 oil changes a day.  However, she was told that the Jiffy Lubes in Pasadena

12 and Arcadia had, at best, 10-12 cars pass through a day.  Based upon this anecdotal information, the

13 Belikians became concerned about what Mickle and M&M Real Estate had represented to them

14 concerning the Brockport Jiffy Lube property.

15       245.    Thereafter, Sylvia Belikian called Mickle regarding her conversations with the Jiffy

16 Lube employees at the Pasadena and Arcadia locations and voiced her concerns about the income

17 potential.  Mickle assured Sylvia Belikian that the Brockport location would generate significantly

18 more income then the California locations, stressing that the Jiffy Lube property that he and M&M

19 Real Estate were recommending to the Belikians was located in a very busy part of New York, near

20 a big university, and close to an industrial center.  After several conversations, Mickle persuaded the

21 Belikians that the Pasadena and Arcadia Jiffy Lubes were not good comparables for the Brockport

22 Jiffy Lube.

23       246.    Relying on Mickle's representations, as well as their belief that M&M Real Estate

24 was acting to protect their interests, the Belikians decided to purchase the Brockport Jiffy Lube

25 property, offering $1,700,000.00.   The offer was submitted via facsimile from Mickle on

26 April 7, 2004 to Sovereign JF.  Kunofsky of M&M's New York office was the listing/selling agent

27 on the Brockport Jiffy Lube property.

28

247. As the offer prepared by Mickle was sent to Kunofsky – another M&M Real Estate agent – the Belikians asked Mickle to confirm that he and M&M Real Estate represented them and were looking out for their best interests. Mickle stated that he only represented the Belikians and served their best interests. Mickle told the Belikians that Kunofsky was solely a listing agent and that there was no conflict of interest. Mickle further represented to the Belikians that he had done "a lot of other deals" with Kunofsky in the past. Mickle also reiterated that M&M Real Estate had sold a lot of Jiffy Lube properties and that all of the investors in those properties did well.

248. In July 2004, the Belikians received by facsimile a counter-offer from Sovereign JF, through Kunofsky, of $1,737,294.00. Concerned that $1,737,294.00 was too much to pay for the property, the Belikians discussed the counter-offer with Mickle. Mickle assured the Belikians that the price was worth paying because of the stable and consistent income stream that would be generated from the property. Ultimately, reasonably relying on the myriad of representations made by Mickle, M&M Real Estate, and Morabito/Eureka/Tibarom, the Belikians accepted the counter-offer on July 21, 2004. The Belikians, Mickle, Kunofsky, M&M Real Estate, Morabito, PGP and Sovereign JF used facsimile, e-mail, phone and U.S. mail by and between California and New York to negotiate the transaction.

249. Mickle and M&M Real Estate did not disclose to the Belikians the extent of Sovereign JF's relationship with M&M and the Belikians had no idea that they were buying a property from an M&M subsidiary. As the Belikians trusted Mickle and M&M Real Estate and believed that they were looking out for the Belikians' best interests, the Belikians did not have an attorney or accountant review the purchase agreement or any other document provided by M&M Real Estate.

250. At the behest of M&M Real Estate, PGP prepared an appraisal of the Brockport Jiffy Lube property. Unbeknownst to the Belikians, the appraisal included comparables provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based on leases with inflated rents, making the appraisal wholly unreliable. The PGP appraisal was transmitted, through mail, facsimile or e-mail, to the Belikians' lender during the course of the sale and closing.

**The Fraudulent Sale-Leaseback on the Property**

251.     Little did the Belikians know that they had been defrauded into purchasing a commercial property at a price that had been grossly inflated due to the existence of a sham lease crafted by Defendants.  Indeed, Sovereign JF, as the alter ego and wholly-owned subsidiary of Sovereign Investment, previously had purchased the Brockport Jiffy Lube from Morabito on or around October 27, 2003 (just three days after Morabito had purchased the property from a third-party).  Sovereign JF simultaneously executed a fraudulent sale-leaseback agreement with Morabito, which had the intended effect of artificially increasing the price of the property to well beyond its fair market value.

252.     Defendants intended from the very beginning to flip the overpriced property to unwitting investors like the Belikians.  Accordingly, to conceal the fraudulent nature of the sale-leaseback agreement, Sovereign JF and Sovereign Investment turned to their sister company and co-conspirator, M&M Real Estate, to list, market and sell the property.  M&M Real Estate, through its agents and as an alter ego of M&M, misrepresented and concealed material adverse facts about the property's true market value, future rents, business prospects, security and stability.

253.     As discussed below, Morabito (and the agents and entities under his control) never intended to occupy the property nor operate the Jiffy Lube franchise through the full term of the lease, despite the numerous misrepresentations concerning his financial stability and the strength of his business operation.

**Morabito Abandons the Brockport Jiffy Lube**

254.     After the Belikians' Jiffy Lube purchase closed, problems began to arise with the tenant on the property – Morabito/Eureka/Tibarom.  In February 2007, Morabito/Eureka/Tibarom was late in paying the rent that was due to the Belikians under the long-term lease.  Accordingly, the Belikians called Morabito/Eureka/Tibarom to inquire about the rent.  During that call, the Belikians were told that Morabito/Eureka/Tibarom was no longer their tenant and that Peanut Oil, LLC ("Peanut Oil") (which was an alter ego of Pearson and Pickett) had taken over the lease.

255.     The Belikians were shocked at this news because it was the Belikians' understanding based upon their review of the closing documents and based upon conversations with Mickle that

Morabito/Eureka/Tibarom could not avoid its obligations under the lease. Furthermore, the Belikians did not receive any notice, written or otherwise, of the purported substitution of tenants.

256. After their call to Morabito/Eureka/Tibarom, the Belikians called Pearson, the President of the purported new tenant, Peanut Oil. During that conversation, Sylvia Belikian asked Pearson, "Who are you?" and told him, "You're not supposed to be here." Pearson explained to Sylvia Belikian that he used to work for Morabito as a Jiffy Lube manager and that he had experience in the quick lube industry. Pearson told Sylvia Belikian that Morabito had suggested he "take over" the Jiffy Lube in Brockport.

257. Neither Morabito nor Pearson paid the February 2007 rent. Thereafter, in March 2007, Peanut Oil abandoned the Belikians' Jiffy Lube property and stripped the fixtures from the premises.

258. When the Belikians turned to Mickle for help, Mickle referred them to Kunofsky in M&M Real Estate's New York office. On a call to M&M Real Estate's New York office, Gomez, who worked with Kunofsky, treated Sylvia Belikian rudely and did nothing to help. Likewise, when the Belikians contacted JLI headquarters to see if the company could help with the situation, JLI did nothing.

259. In an attempt to mitigate their damages, the Belikians ultimately re-let the property for $5,000.00 per month ($60,000.00 per year) with the Belikians agreeing to pay the taxes on the property. The Belikians' replacement tenant pays the property insurance, and has a two-year lease with an option to renew with no annual rent increases. Despite finding a replacement tenant, and receiving $5,000.00 in rent each month, the Belikians must pay a debt service of $7,241.00 per month and must pay property taxes.

260. Throughout the course of the Belikians' relationship with Mickle, M&M Real Estate, Sovereign JF, Kunofsky, Morabito, PGP and the various other members of the M&M Enterprise, Defendants made false and misleading statements and omissions regarding the fair market value, future rents, business prospects, security and stability of the Belikian's investment – exploiting the relationship of trust that they had intentionally built with the Belikians. These false and misleading statements were communicated to the Belikians via U.S. mail, e-mail, facsimile and through the

1  phone.  During this time, Defendants knew that the fair market value of the investment property was

2  artificially inflated, that the purported long-term lease was a farce, and that the "tenant" would walk

3  away, abandoning the property, wiping out the artificial inflation in the fair market value of the

4  property, and eviscerating the future rents.

5      261.    So, as was the case with every other investor, Defendants' conspiracy to scam the

6  Belikians was a complete success.  Defendants artificially inflated the value of the property that the

7  Belikians were induced to purchase, which value plummeted when the Defendants walked away.  As

8  a result, the Belikians suffered severe financial damages, including the loss of fair market value of

9  their investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

10     262.    M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Kunofsky, Morabito,

11  PGP and the various other members of the M&M Enterprise engaged in a continuous pattern of

12  racketeering activity as they each used U.S. mail and wire to orchestrate and carry out the sale of the

13  Brockport Jiffy Lube to the Belikians.

14     263.    M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Kunofsky, Morabito,

15  PGP and the various other members of the M&M Enterprise conducted and directed the affairs of the

16  Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused the

17  Belikians to purchase a Jiffy Lube property at a grossly and artificially inflated price.  The value of

18  the property plummeted when Morabito and his shell companies abandoned it.

19     264.    As demonstrated through their ongoing conduct, M&M Real Estate, M&M,

20  Sovereign JF, Sovereign Investment, Kunofsky, Morabito, PGP and the various other members of

21  the M&M Enterprise shared the common purpose of luring investors like the Belikians into

22  purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

23     265.    The fraudulent sale of the Brockport Jiffy Lube to the Belikians was by no means a

24  random, isolated transaction, but part of a single, coordinated scheme devised by Defendants to sell

25  triple net properties using bogus sale-leaseback agreements.  Indeed, the Brockport Jiffy Lube

26  property was one of multiple "portfolio" properties that Sovereign Investment had previously agreed

27  to purchase from Morabito.  From the outset, Sovereign had planned to purchase these portfolio

28  properties "in bulk" with the intention of re-selling them to unwitting investors at drastically inflated

1   prices.  The sale to the Belikians was consummated exactly as it had been planned and conceived by

2   Defendants.

3          266.    In addition, the statements made by Defendants to the Belikians and referenced herein

4   were each materially false and misleading when made as they represented and/or omitted adverse

5   facts which then existed and disclosure of which was necessary to make the statements not false

6   and/or misleading.  The then-existing facts that make those statements false and misleading are set

7   forth in ¶149.  In addition to the previously identified false statements, the following adverse facts

8   were also known by Defendants at the time their false and misleading statements and

9   misrepresentations were made:

- Sovereign JF was a subsidiary of Sovereign Investment, which was a subsidiary of M&M, and not an independent entity.

- Morabito and his alter egos were not backed by SOPUS.  At the time of the transaction, Morabito and SOPUS merely had an existing oil supply agreement for SOPUS to provide, and Morabito to purchase and re-sell, Quaker State oil products.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of the Belikians' purchase of the Jiffy Lube property located at 1010 Transit Way, Brockport, New York 14420

**OCTOBER 24, 2003**

Morabito/NY Seven Lube purchased the Brockport Jiffy Lube property from a third-party for **$618,972.33**\*\*



**OCTOBER 27, 2003**

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$12,305.83** with a 1.60% increase per annum through October 26, 2028



**OCTOBER 27, 2003**

Sovereign JF purchased the Brockport Jiffy Lube property from Morabito/NY Seven Lube for **$1,595,192.00**



**FEBRUARY 15, 2005**

The Belikians purchased the Brockport Jiffy Lube property from Sovereign JF for **$1,737,294.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$12,305.83**

**FEBRUARY 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/Peanut Oil



**MARCH 2007**

Pearson/Pickett/Peanut Oil abandoned the property



**APRIL 1, 2008**

The Belikians mitigated their damages and signed a new lease with Fast Track for the greater of **$5,000.00** per month or 12% of net sales calculated at the close of each month



**Damages as a Result of Defendants' Fraud**

**$5,135,285.00**: **$1,154,244.00** as of closing plus **$3,981,041.00** in future rent, plus misc. out-of-pocket expenses

\*\*Morabito/NY Seven Lube purchased the Brockport Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/NY Seven Lube attributed to the Brockport Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Belikians.

**F.      Sam and Arleen Risola**[18]

**The Sale of the Warsaw Jiffy Lube to the Risolas**

267.     In January 2004, Sam and Arleen Risola (the "Risola") sold a Burger King franchise property for $1,030,000.00.  In an effort to minimize their tax liability, the Risolas sought to find another property for a 1031 exchange.  Sam Risola contacted Terry Marks ("Marks"), an agent with National Net Lease Realty, whom the Risolas had dealt with before on other triple net lease transactions.  Marks presented the Risolas with multiple triple net lease opportunities, including a Jiffy Lube property in Warsaw, New York.  The Warsaw Jiffy Lube property was being marketed by M&M Real Estate and the seller was Sovereign JF.

268.     When the Risolas expressed some interest in the Warsaw Jiffy Lube property, they were mailed M&M Real Estate's color sales brochure, as well as the financial statements from the purported lessees – Eureka and Tibarom (which were alter egos of Morabito).  Based upon the documents sent to them by M&M Real Estate, the Risolas decided that Morabito/Eureka/Tibarom's financials looked strong and that Morabito/Eureka/Tibarom would be a secure tenant.  Indeed, the M&M Real Estate marketing materials touted Tibarom as having annual revenues of $20 million and virtually no long-term debt.

269.     Moreover, the Risolas relied upon and were very impressed with M&M Real Estate's written representations regarding Morabito's prior business success as a Jiffy Lube operator.  M&M Real Estate represented that Morabito was one of the largest and most successful Jiffy Lube operators in the U.S.  Based solely on M&M Real Estate's representations, the Risolas further understood that Morabito would continue to operate the Warsaw Jiffy Lube if the Risolas were to purchase the property.  Morabito's continued involvement was a critically important factor in their decision to invest in the Warsaw Jiffy Lube property.

---

[18]      The Risolas took title to their property under the Risola Family Partnership II, a Florida Limited Partnership. On November 15, 2004, the Risolas transferred title to the Risola Family Limited Partnership II, a Florida Limited Partnership.

270.   M&M Real Estate's written representations convinced the Risolas that the Warsaw Jiffy Lube property was an attractive investment opportunity.  M&M Real Estate marketed the property as having a 25-year triple net lease with no landlord responsibilities.  In addition, M&M Real Estate represented that the property would provide an 8.0% cap rate.  The M&M Real Estate marketing materials noted that the annual rent on the Warsaw Jiffy Lube property could start as high as $81,683.00 (around $6,800.00 per month) with 10% increases in the rental rate every five years.

271.   M&M Real Estate also represented to the Risolas that the Warsaw Jiffy Lube property was located in a "prime" location near a number of retail chains including Wal-Mart and McDonalds, and further that the property was located on a major commercial artery and therefore highly trafficked.  Additionally, M&M Real Estate's marketing brochure indicated that Morabito had a ten-year agreement with SOPUS, which the Risolas understood to mean that SOPUS was somehow involved in the operation of the property and the long-term lease in place on the property.

272.   Based upon M&M Real Estate's representations, the Risolas believed that an investment in the Warsaw Jiffy Lube property would be secure and stable.  On May 12, 2004, the Risolas submitted a written cash offer to purchase the Warsaw Jiffy Lube property for $990,000.00.  The Risolas' cash offer of $990,000.00 was accepted by Sovereign JF.  Thereafter, on June 22, 2004, the Risolas sent a purchase and sale agreement by FedEx to the listing agent on the property, Kunofsky, at M&M's New York office.  Escrow closed in July 2004. The Risolas, M&M Real Estate, Kunofsky, Morabito and Sovereign JF used facsimile, e-mail, phone and U.S. mail by and between California, New York, Florida and North Carolina to negotiate the transaction.

273.   As part of the sale, Sovereign JF assigned its 25-year lease with Morabito/Eureka/Tibarom to the Risolas. The lease called for rental payments of $6,806.92 per month with a 1.6% increase every year.  The lease was triple net with the tenant bearing responsibility for maintenance, taxes and property insurance.

**The Fraudulent Sale-Leaseback on the Property**

274.   Little did the Risolas know that they had been defrauded into purchasing a commercial property at a price that had been grossly inflated due to the existence of a sham lease crafted by Defendants.  Indeed, Sovereign JF, as the alter ego and wholly-owned subsidiary of

1    Sovereign Investment, previously had purchased the Warsaw Jiffy Lube from Morabito on or around

2    October 27, 2003 (just three days after Morabito had purchased the property from a third-party).

3    Sovereign JF simultaneously executed a fraudulent sale-leaseback agreement with Morabito, which

4    had the intended effect of increasing the price of the property to well beyond its fair market value.

5    　　　　275.    Defendants intended from the very beginning to flip the overpriced property to

6    unwitting investors like the Risolas.  Accordingly, to conceal the fraudulent nature of the sale-

7    leaseback, Sovereign Scranton and Sovereign Investment turned to their sister company and co-

8    conspirator, M&M Real Estate, to list, market and sell the property.  M&M Real Estate, through its

9    agents and as an alter ego of M&M, misrepresented and concealed material adverse facts about the

10   property's true market value, future rents, business prospects, security and stability.

11   　　　　276.    As discussed below, Morabito (and the agents and entities under his control) never

12   intended to occupy the property nor operate the Jiffy Lube franchise through the full term of the

13   lease, despite the numerous misrepresentations concerning his financial stability and the strength of

14   his business operation.

15   **Morabito Abandons the Warsaw Jiffy Lube**

16   　　　　277.    Initially after closing on the purchase of the property, the Risolas received regular

17   rent checks from Morabito/Eureka/Tibarom.  Morabito/Eureka/Tibarom also paid for maintenance,

18   utilities, taxes and property insurance on the property.  However, on May 12, 2005, the Risolas

19   received a letter from Morabito/Eureka/Tibarom stating that it had assigned the lease to Peanut Oil

20   (which was an alter ego of Pearson and Pickett), purportedly a qualified Jiffy Lube franchisee.  The

21   letter stated that Peanut Oil was operated by Pearson and Pickett, who purportedly had 30 years of

22   experience operating Jiffy Lube franchises.  The letter also noted that Peanut Oil was debt free and

23   capable of becoming one of the preeminent Jiffy Lube franchisees in the country.

24   　　　　278.    Shortly after the lease was purportedly assigned to Peanut Oil, Peanut Oil had

25   problems paying the rent on time.  The Risolas frequently had to call and e-mail Pearson to make

26   sure that Peanut Oil would pay rent, and to check rent status.  By 2007, the Risolas were tired of

27   dealing with Pearson and the late rent payments and decided to sell the Warsaw Jiffy Lube property.

28

279.     Soon after the Risolas listed the property, Pearson called them and said he was interested in purchasing the property.  After negotiations, Pearson ultimately agreed to a purchase price of $992,000.00 – a price that was inclusive of the unpaid back rent.  The transaction was supposed to be an all-cash deal with Pearson paying $10,000.00 upfront. The sale of the Warsaw Jiffy Lube property to Pearson was supposed to close in January 2008, but Pearson did not go through with the purchase, and never even sent the initial $10,000.00 payment.  Instead he delayed and strung along the Risolas for six months.  Eventually, Pearson stopped taking their phone calls.

280.     On February 20, 2008, the Risolas sent a letter to Pearson notifying him that he was in breach of the lease agreement and had failed to pay rent from November 2007, through January 2008.  Then, on or around April 23, 2008, a formal notice of eviction was served on Pearson.

281.     On June 11, 2008, an employee at the Warsaw Jiffy Lube property called the Risolas and informed them that Pearson had vacated the premises.  When Pearson abandoned the property, the taxes and insurance on the property were left unpaid – an obligation that Morabito/Eureka/Tibarom had agreed to undertake as part of the long-term triple net lease.  As such, the Risolas were required to pay approximately $11,000.00 for the annual property tax and $2,600.00 for property insurance.

282.     Throughout the course of the Risolas' relationship with M&M Real Estate, Sovereign JF, Morabito and the various other members of the M&M Enterprise, Defendants made false and misleading statements and omissions regarding the fair market value, future rents, business prospects, security and stability of the Risolas' investment – exploiting the relationship of trust that they had intentionally built with the Risolas.  These false and misleading statements were communicated to the Risolas via U.S. mail, e-mail, facsimile and by phone.  During this time, Defendants knew that the fair market value of the investment property was artificially inflated, that the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the property, wiping out the artificial inflation in the fair market value of the property, and eviscerating the future rents.

283.     Despite efforts to mitigate the damages suffered as a result of Defendants' scam, the Risolas have been unable to find another tenant, or sell the property.  So, as was the case with every

other investor, Defendants' conspiracy to scam the Risolas was a complete success.  Defendants artificially inflated the value of the property that the Risolas were induced to purchase, which value plummeted when the Defendants walked away.  As a result, the Risolas suffered severe financial damages, including the loss of fair market value of their investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

284.    M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Morabito and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity as they used U.S. mail and wire to orchestrate and carry out the sale of Warsaw Jiffy Lube to the Risolas.

285.    M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Morabito and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused the Risolas to purchase the Jiffy Lube property at a grossly and artificially inflated price.  The value of the property later plummeted when Morabito and his shell companies abandoned it.

286.    As demonstrated through their ongoing and systematic conduct, M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Morabito and the various other members of the M&M Enterprise shared the common purpose of luring investors like the Risolas into purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

287.    The fraudulent sale of the Warsaw Jiffy Lube to the Risolas was by no means a random, isolated transaction, but part of a single, coordinated scheme orchestrated by Defendants to sell triple net properties with bogus sale-leaseback agreements.  Indeed, the Warsaw Jiffy Lube property was one of multiple "portfolio" properties that Sovereign Investment had initially agreed to purchase from Morabito.  From the outset, Sovereign had planned to purchase these portfolio properties "in bulk" with the intention of re-selling them to unwitting investors at drastically inflated prices.  The sale to the Risolas was consummated exactly as it had been planned and conceived by Defendants.

288.    In addition, the statements made by Defendants to the Risolas and referenced herein were each materially false and misleading when made as they represented and/or omitted adverse

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1   facts which then existed and disclosure of which was necessary to make the statements not false

2   and/or misleading.  The then-existing facts that make those statements false and misleading are set

3   forth in ¶149.  In addition to the previously identified false statements, the following adverse facts

4   were also known by Defendants at the time their false and misleading statements and

5   misrepresentations were made:

6   •   Morabito and his alter egos were not backed by SOPUS.  At the time of the
       transaction, Morabito and SOPUS merely had an existing oil supply agreement for
7      SOPUS to provide, and Morabito to purchase and re-sell, Quaker State oil products.

8   •   Pearson, Pickett and Peanut Oil were neither well-capitalized nor capable of
       efficiently operating the Jiffy Lube franchise.  Indeed, shortly after Defendants' fraud
9      was uncovered, Pickett, Pearson and Peanut Oil filed for bankruptcy protection.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                      - 77 -

## Chronology of the Risolas' purchase of the Jiffy Lube property located at 2418 North Main Street, Warsaw, New York 14569

### OCTOBER 24, 2003

Morabito/NY Seven Lube purchased the Warsaw Jiffy Lube property from a third-party for **$632,500.00**\*\*



### OCTOBER 27, 2003

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$6,806.92** per month with a 1.60% increase per annum through October 26, 2028



### OCTOBER 27, 2003

Sovereign JF purchased the Warsaw Jiffy Lube property from Morabito/NY Seven Lube for **$852,000.00**



### JULY 13, 2004

The Risolas purchased the Warsaw Jiffy Lube property from Sovereign JF for **$990,000.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$6,806.92**



### MAY 12, 2005

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/Peanut Oil



### JUNE 11, 2008

Pearson/Pickett/Peanut Oil abandoned the property. The Risolas have been unable to re-let the Warsaw Jiffy Lube property despite attempting to do so.

### Damages as a Result of Defendants' Fraud

**$2,532,124.00**: **$380,000.00** as of closing plus **$2,152,124.00** in future rent, plus misc. out-of-pocket expenses

\*\*Morabito/NY Seven Lube purchased the Warsaw Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/NY Seven Lube attributed to the Warsaw Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Risolas.

**G.     Justus and Susan Ahrend[19]**

**The Sale of the Scranton Jiffy Lube to the Ahrends**

289.    Justus ("Jay") and Susan Ahrend ("the Ahrends") are residents of Long Beach, California.  The Ahrends previously owned the "Scorpions Restaurant" – a triple net lease property in Huntington Beach, California.  In January 2005, the Ahrends were convinced by their neighbor, Mike Vescovi ("Vescovi"), to sell the restaurant and invest in a more secure triple net lease property.  Vescovi worked for King, who was an agent of M&M Real Estate in Long Beach, California.

290.    The Ahrends placed the Scorpions Restaurant on the market in March 2005 and sold it in July of that year for $2,500,000.00.  As the Ahrends wanted to avoid being taxed on the proceeds of the sale, they sought a suitably safe and secure 1031 property to reinvest the proceeds from the sale of the Scorpions Restaurant in.  King – who represented himself to the Ahrends as an "expert" in 1031 exchanges – subsequently showed the Ahrends a number of triple net lease opportunities, none of which really interested them.

291.    Sometime in July/August 2005, King met with the Ahrends and told them that Gomez of M&M Real Estate's New York office had a good investment opportunity to present them.[20]  When the Ahrends met with Gomez, Gomez told them that said she had a "little jewel" she had been "saving" that she wanted to share with them.  Gomez gave the Ahrends M&M Real Estate's marketing materials on the Jiffy Lube store at 739 Oak Street, Scranton, Pennsylvania and described how "wonderful" the property was.

292.    Gomez and King explained that the Scranton Jiffy Lube provided an 8.0% cap rate, which was significantly higher than the 5.0% - 7.0% cap rates offered on other properties listed by M&M Real Estate.  Gomez and King also claimed that the 25-year triple net lease on the property was "guaranteed" and "backed" by SOPUS.  Based on Gomez and King's representations, the

---

[19]     The Ahrends took title to their property as Trustees of the Justus & Susan Ahrend Trust, dated December 6, 1990.

[20]     Gomez was held out by M&M Real Estate as being "Marketing and Transactions Coordinator for Glen Kunofsky."

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1    Ahrends reasonably believed that whether the tenant occupied the property or not, rental payments

2    would be guaranteed.

3         293.    After the presentation, the Ahrends reviewed the M&M Real Estate marketing

4    materials, which affirmed Gomez and King's representations.  The brochure listed the Scranton Jiffy

5    Lube at $2,746,000.00 with a base rent of $219,725.00 annually and 1.6% annual rent increase.  The

6    brochure represented that the tenants, Tibarom and Eureka (which were alter egos of Morabito) had

7    entered into a 25-year long-term lease (until year 2029) to remain on the property.  The brochure

8    also stated that Tibarom had a 10-year "oil agreement" with SOPUS, which, based upon Gomez and

9    King's representations to the Ahrends, the Ahrends understood to be a "guarantee" by SOPUS.

10        294.    Based on Gomez and King's representations and the statements in the M&M Real

11   Estate marketing materials, the Ahrends assumed that the Scranton Jiffy Lube was a safe and secure

12   investment.  Thereafter, the Ahrends submitted a letter of intent on August 3, 2005, offering

13   $2,668,500.00 for the property.  The Ahrends were not advised as to the extent of the relationship

14   between Sovereign JF and M&M.  The Ahrends' offer was accepted by Sovereign JF, and they

15   executed a purchase and sale agreement on August 9, 2005.

16        295.    On August 16, 2005, shortly after executing the purchase and sale agreement,

17   Jay Ahrend flew out to Scranton, Pennsylvania to take a look a the property.  During his site visit,

18   Jay Ahrend saw that the Scranton Jiffy Lube property was in terrible condition and that the

19   photographs in the sales brochure failed to tell the "true story" about the property.  The building was

20   old, and the driveway had cracks and weeds everywhere.  Moreover, Jay Ahrend thought that the

21   Scranton Jiffy Lube business seemed depressed, and witnessed only a few cars pass through the

22   store.

23        296.    Concerned about the condition of the Scranton Jiffy Lube property, Jay Ahrend called

24   King and said that the property was not worth $2,600,000.00.  King advised Jay Ahrend that the

25   value of the property was based on the long-term lease with Morabito/Eureka/Tibarom.  King

26   convinced the Ahrends that the price of the property was high because of the 25-year lease and the

27   high cap rate of 8.0% generated by the lease, and the Ahrends reasonably relied on these

28   representations.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                    - 80 -

1    297.    Around the fall of 2005, King called the Ahrends and told them that the seller was

2    getting irritated and was about to pull out because the Ahrends were taking too long to close on the

3    property.  King also mentioned that another investor was interested in buying the Scranton Jiffy

4    Lube property.  Accordingly, the Ahrends felt they had to move quickly on the property or else lose

5    this "little jewel."

6    298.    At M&M Real Estate's direction, Stewart Title Guaranty Company ("Stewart Title")

7    was designated as the escrow company on the transaction.  The Ahrends were surprised that they had

8    to pay out-of-pocket closing fees in the amount of $25,000.00, which they assumed would come out

9    of their mortgage.

10    299.    On September 9, 2005, Benchmark Financial procured a mortgage for the Ahrends

11    from California Credit Union in the amount of $1,543,000.00 with monthly mortgage payments of

12    $10,000.00.  On November 1, 2005, the Ahrends closed escrow on the Scranton Jiffy Lube property.

13    M&M Real Estate, King, Gomez, Sovereign JF, and Morabito used facsimile, e-mail, phone and

14    U.S. mail to negotiate the transaction and close escrow.

15    **The Fraudulent Sale-Leaseback on the Property**

16    300.    Little did the Ahrends know at the time of the closing that they had been defrauded

17    into purchasing a commercial property at a price that had been grossly inflated due to the existence

18    of a sham lease crafted by Defendants.  Indeed, Sovereign Scranton, as the alter ego and wholly-

19    owned subsidiary of Sovereign Investment, had previously purchased the Scranton Jiffy Lube

20    property from Morabito on or around July 1, 2004 (a day after Morabito had purchased the property

21    from a third-party).  Sovereign Scranton simultaneously executed a fraudulent sale-leaseback

22    agreement with Morabito, which had the intended effect of increasing the price of the property to

23    well beyond its fair market value.

24    301.    Defendants intended from the very beginning to flip the overpriced property to

25    unwitting investors like the Ahrends.  Accordingly, to conceal the fraudulent nature of the sale-

26    leaseback, Sovereign Scranton and Sovereign Investment turned to their sister company and co-

27    conspirator, M&M Real Estate and its agents King and Gomez, to list, market and sell the property.

28    M&M Real Estate, King and Gomez, as alter egos of M&M, misrepresented and concealed material

1    adverse facts about the property's true market value, future rents, business prospects, security and

2    stability.

3        302.    As discussed below, Morabito (and the agents and entities under his control) never

4    intended to occupy the property nor operate the Jiffy Lube franchise through the full term of the

5    lease, despite the numerous misrepresentations concerning his financial stability and the strength of

6    his business operation.

7    **Morabito Abandons the Scranton Jiffy Lube**

8        303.    In October 2006, the Ahrends received a certified letter from Sujata Yalamanchili

9    ("Yalamanchili"), Morabito's personal attorney and agent.    The letter indicated that

10   Morabito/Eureka/Tibarom had assigned the lease on the Scranton Jiffy Lube property to Tibarom

11   PA.  There was no explanation as to why assignment occurred, and the letter did not seek the

12   Ahrends' consent for the assignment.

13       304.    Surprised by the assignment, the Ahrends called Yalamanchili and asked for an

14   explanation.  Yalamanchili assured the Ahrends that everything was fine and that the assignment was

15   nothing more than a "company name change."  Yalamanchili told the Ahrends that they would still

16   receive rent checks from Tibarom PA.

17       305.    For the next year, the Ahrends received timely rental payments from Tibarom PA.

18   However, in September 2007, Tibarom PA was late with rent, which was unusual because it had

19   never tendered late payment.  As they were out of the country, the Ahrends had their son call Breen,

20   the general manager of a number of Morabito/Eureka/Tibarom's Jiffy Lube stores, and ask about the

21   status of the rent.  Breen subsequently cut a check and sent it to the Ahrends.

22       306.    Tibarom PA was then late with the November 2007 rent.  On New Year's Eve of

23   2007, Breen called Jay Ahrend and advised him that the Scranton Jiffy Lube would be closing down

24   and would be sold to Macchia.  Breen explained that the Scranton Jiffy Lube was not bringing in

25   money.  Breen told Jay Ahrend that the sale to Macchia would be a seamless transition.

26       307.    A few days later, the Ahrends met with King at his M&M Real Estate office in Long

27   Beach to discuss the sale to Macchia.  After the Ahrends explained the situation, King told them

28   there was nothing he could do and that they were out of luck.  The Ahrends asked King about the

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                    - 82 -

1  purported guarantees on the lease, which they understood to mean that they would continue to

2  receive rent payments, even if the tenant breached the lease.  King responded that there was no such

3  guarantee in the lease.  The Ahrends were shocked by King's response because he had been present

4  at Gomez's presentation in July/August 2005 when she had represented that there was such a

5  guarantee.

6          308.   On January 4, 2008, a day after their meeting with King, the Ahrends received a call

7  from Macchia.  Macchia told the Ahrends that Tibarom's Jiffy Lube franchises had been having

8  financial problems for years.  Macchia asked the Ahrends if they would be willing to accept between

9  $3,000.00 and $6,000.00 per month in rent (instead of the $20,000.00 per month they were supposed

10 to getting paid under the long-term lease).  The Ahrends thought that Macchia's offer was ridiculous,

11 as his offer was substantially lower than their monthly mortgage obligation of $10,000.00.  The

12 Ahrends told Macchia that his offer would not even cover their mortgage and to come up with

13 something else.  Macchia said he would get back to them, but he never did.

14         309.   Later in January 2008, Breen called the Ahrends and told them that the employees of

15 Tibarom PA would be moving out of the Scranton Jiffy Lube property by February and that he

16 would be taking the fixtures from the property.  On or around January 26, 2008, Jay Ahrend

17 contacted a local realtor in Scranton to inspect the property.  The realtor advised Jay Ahrend that the

18 property had been abandoned.

19         310.   At the time, the realtor also told the Ahrends that Millet had been the owner of the

20 Scranton Jiffy Lube property prior to Morabito.  Thereafter, the Ahrends called Millet and told him

21 about their situation and how they had purchased the property for $2,600,000.00.  Millet was

22 "astounded" at the price, and said that the property was not worth anywhere near that amount, but

23 rather in the ballpark of $300,000.00 to $400,000.00.

24         311.   Having relied on the representations that their investment would be safe and secure,

25 the rent from the Scranton Jiffy Lube property was the Ahrends' only source of income.  When

26 Morabito/Eureka/Tibarom/Tibarom PA abandoned the property and failed to pay rent, the Ahrends

27 could not pay their monthly mortgage payment.  Accordingly, they were forced into bankruptcy and

28

1  on June 25, 2008, signed a deed in lieu of foreclosure to their lender, California Credit Union. By

2  handing title of the property directly to the bank, the Ahrends avoided foreclosure.

3       312.   Throughout the course of the Ahrends' relationship with M&M Real Estate, King,

4  Gomez, Sovereign JF, Morabito, PGP and the various other members of the M&M Enterprise,

5  Defendants made false and misleading statements and omissions regarding the fair market value,

6  future rents, business prospects, security and stability of the Ahrend's investment – exploiting the

7  relationship of trust that they had intentionally built with the Ahrends. These false and misleading

8  statements were communicated to the Ahrends via U.S. mail, e-mail, facsimile and through the

9  phone. During this time, Defendants knew that the fair market value of the investment property was

10  artificially inflated, that the purported long-term lease was a farce, and that the "tenant" would walk

11  away, abandoning the property, wiping out the artificial inflation in the fair market value of the

12  property, and eviscerating the future rents.

13       313.   So, as was the case with every other investor, Defendants' conspiracy to scam the

14  Ahrends was a complete success. Defendants artificially inflated the value of property that the

15  Ahrends were induced to purchase, which value plummeted when the Defendants walked away. As a

16  result, the Ahrends suffered severe financial damages, including the loss of fair market value of their

17  investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

18       314.   M&M Real Estate, M&M, King, Gomez, Sovereign JF, Sovereign Investment,

19  Morabito, PGP and the various other members of the M&M Enterprise engaged in a continuous

20  pattern of racketeering activity as they used U.S. mail and wire to orchestrate and carry out the sale

21  of Scranton Jiffy Lube to the Ahrends.

22       315.   M&M Real Estate, M&M, King, Gomez, Sovereign JF, Sovereign Investment,

23  Morabito, PGP and the various other members of the M&M Enterprise conducted and directed the

24  affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which

25  caused the Ahrends to purchase the Jiffy Lube property at a grossly and artificially inflated price.

26  The value of the property plummeted when Morabito and his shell companies abandoned it.

27       316.   As demonstrated through their ongoing and systematic conduct, M&M Real Estate,

28  M&M, King, Gomez, Sovereign JF, Sovereign Investment, Morabito, PGP and the various other

1    members of the M&M Enterprise shared the common purpose of luring investors like the Ahrends

2    into purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

3         317.    The sale of the Scranton Jiffy Lube to the Ahrends was by no means a random,

4    isolated transaction, but part of a single, coordinated scheme orchestrated by Defendants to sell triple

5    net properties using bogus sale-leaseback agreements. Indeed, the Scranton Jiffy Lube property was

6    one of multiple "portfolio" properties that Sovereign Investment had previously agreed to purchase

7    from Morabito. From the outset, Sovereign Investment planned to purchase these portfolio

8    properties "in bulk" with the goal of re-selling them to unwitting investors at artificially inflated

9    prices. The sale to the Ahrends was consummated exactly as it had been planned and conceived by

10    Defendants.

11         318.    In addition, the statements made by Defendants to the Ahrends and referenced herein

12    were each materially false and misleading when made as they represented and/or omitted adverse

13    facts which then existed and disclosure of which was necessary to make the statements not false

14    and/or misleading. The then-existing facts that make those statements false and misleading are set

15    forth in ¶149.

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of the Ahrends' purchase of the Jiffy Lube property located at 739 Oak Street, Scranton, Pennsylvania 18508

**JUNE 30, 2004**

Morabito/Scranton Lube purchased the Jiffy Lube property from a third-party for **$924,000.00**\*\*



**JUNE 30, 2004**

Sovereign Scranton purchased the Jiffy Lube property from Morabito/Scranton Lube for **$2,350,000.00**



**JULY 1, 2004**

Sovereign Scranton and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$18,310.42** with a 1.60% increase per annum through June 30, 2029



**OCTOBER 31, 2005**

The Ahrends purchased the Jiffy Lube property from Sovereign Scranton for **$2,668,500.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$18,310.42**



**OCTOBER 2006**

Morabito/Eureka/Tibarom purportedly assigned the lease to Morabito/Tibarom PA



**JANUARY 2008**

Morabito/Tibarom PA abandoned the property. The Ahrends were forced to sign a deed in lieu of foreclosure in favor of their lender, California Credit Union and thereafter filed bankruptcy.



**Damages as a Result of Defendants' Fraud**

**$8,082,874.00**: **$2,178,500.00** as of closing plus **$5,904,374.00** in future rent, plus misc. out-of-pocket expenses

\*\*Morabito/Scranton Lube purchased the Scranton Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/Scranton Lube attributed to the Scranton Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Ahrends.

**H.     Gary Reid[21]**

**The Sale of the Geneva and Binghamton Jiffy Lubes to Reid**

319.    In late 2003, Gary Reid ("Reid") was approached by Jeremy Byk ("Byk") of Sperry Van Ness in connection with several properties that Reid had listed for sale.  Byk offered to sell the properties for Reid, and thereafter, introduced Reid to Ed Breslin ("Breslin"), another broker at Sperry Van Ness, who specialized in helping investors find commercial properties to purchase.  Reid was familiar with 1031 exchanges and planned to use 1031 exchanges for his next investments.

320.    Two of the 1031 exchange properties that were presented to Reid were Jiffy Lube properties – one in Warsaw, New York and one in Geneva, New York.  At this time, Breslin provided Reid with an M&M Real Estate marketing brochure for the Geneva Jiffy Lube property.  According to the marketing materials prepared by M&M Real Estate, the Geneva Jiffy Lube property was being offered at an asking price of $975,513.00 by Sovereign JF.  The M&M Real Estate marketing materials represented that the property had an 8.0% cap rate.

321.    The M&M Real Estate marketing materials represented that Morabito – the purported operator of the Geneva Jiffy Lube property – was "targeted to be the highest net worth ($75 million) Jiffy Lube Operator."  The M&M Real Estate marketing materials also represented that Morabito had taken over the Geneva Jiffy Lube property in March 2003, and that the property was slated for significant renovations in 2003 and 2004.  The M&M Real Estate marketing materials further represented that the Geneva Jiffy Lube property would be "updated with all the newest Jiffy Lube equipment."  The M&M Real Estate marketing materials noted that Morabito/Eureka/Tibarom had recently executed a 25 year triple net lease to operate a Jiffy Lube in the Geneva property, with a base rent of $6,503.42 per month and annual increases of 1.6%.

---

[21]     Gary Reid took title to the properties with Claudine E. Reid.  On May 18, 2006, the Reid's transferred title of the properties to their limited partnership, CECA 3000, LP, a Nevada Limited Partnership.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

322.   The M&M Real Estate marketing materials convinced Reid that Morabito's involvement in operating the Geneva Jiffy Lube was an important consideration, promising that Morabito had a strong track record for improving Jiffy Lubes post-acquisition:

> *Relative to the overall Jiffy Lube system average Tibarom has an average ticket amount over 12% higher, making the franchise 23rd out of 212 Jiffy Lube entities. Mr. Morabito has demonstrated his ability to achieve these results quickly, usually within six months of acquiring and/or converting to a Jiffy Lube store. With his latest acquisition presented in this portfolio of five properties Mr. Morabito increased monthly store level sales by over 20% in the first three months of operations.*

Morabito was "sold as king of the lube business." Reid reasonably relied on M&M Real Estate's representations, and believed, based on M&M Real Estate's claims, that Morabito was "the Jiffy Lube whiz."

323.   M&M Real Estate also highlighted Morabito's purported relationship with SOPUS to induce Reid to invest. The M&M Real Estate marketing materials noted that by virtue of pumping 100% Pennzoil Products, Morabito had developed "a very strong relationship with Royal Dutch Shell, parent company of Pennzoil Quaker State, and this relationship has been beneficial to Mr. Morabito's expansion and acquisition growth strategy." M&M Real Estate represented to Reid that SOPUS had executed a 10-year oil agreement with Eureka (which was an alter ego of Morabito) – one of the tenants on the Geneva Jiffy Lube property (Tibarom, another alter ego of Morabito, was the other tenant) – and that SOPUS had a right to cure under the lease.

324.   M&M Real Estate's representations led Reid to believe that if Morabito had a problem in operating the Geneva Jiffy Lube property, SOPUS or its subsidiary JLI would take over the lease. The M&M Real Estate marketing materials promised that the Geneva Jiffy Lube property was a prime location with "significant potential for future appreciation." Reid reasonably relied on these representations, believing that they were evidence that the location had a great income stream, and also that the property would appreciate in value.

325.   As a result of M&M Real Estate's representations, on March 17, 2004, Reid delivered a letter of intent to purchase the Geneva Jiffy Lube property for $867,122.00 to Kunofsky at M&M Real Estate's New York office. Kunofsky was the listing agent for the seller of the property, Sovereign JF.

326.    After Reid executed and delivered the letter of intent on the Geneva Jiffy Lube property, Morabito/Eureka/Tibarom, through M&M Real Estate, provided Reid with financial statements, including a first quarter 2004 monthly profit and loss showing that Eureka had strong cash flow.    These documents gave Reid further comfort because they represented that Morabito/Eureka/Tibarom was financially successful and stable.

327.    Thereafter, Reid visited the Geneva Jiffy Lube property, and then the Jiffy Lube property in Warsaw, New York.  After visiting the Warsaw location, Reid decided not to proceed further on that property because it was in a remote location that did not look like it would do much business.[22]

328.    On May 12, 2004, Breslin sent Gomez, Kunofsky's assistant at M&M Real Estate, an e-mail with a list of questions that Reid wanted answered with regards to his potential investments. Reid questioned the financial stability of the Geneva Jiffy Lube property, noting that it seemed to have been operating at a loss for some time.  Gomez, as an agent of M&M Real Estate, replied that the Geneva Jiffy Lube property was a recently opened store and had a tough winter. Gomez attempted to assuage Reid's concerns by representing that Morabito/Eureka/Tibarom had 47 stores and had been in business for seven years.  Gomez also represented to Reid that there was a car wash "planned" for the Geneva Jiffy Lube property.[23]

329.    In early June 2004, Gomez and Kunofsky advised Breslin and Reid over the phone that an additional Jiffy Lube in Binghamton, NY had fallen out of escrow with another buyer and had become available.  Thereafter, M&M Real Estate sent Breslin and Reid marketing materials for the Binghamton Jiffy Lube property.  The M&M Real Estate marketing materials represented that

---

[22]    As set forth in detail above, Sam and Arlene Risola purchased this Warsaw, New York location, apparently after Reid rejected it.  Defendants did not disclose to the Risolas that Reid was able to close but chose not to.  Instead, Defendants misrepresented to the Risolas that the only reason that the Property was available was that another investor was unable to close on the Warsaw location.

[23]    Contrary to these representations, no car wash was ever built on the Property.

1    Morabito/Eureka/Tibarom had recently executed a 25 year triple net lease to operate a Jiffy Lube on

2    the Binghamton property, with a base rent of $9,150.00 per month and annual increases of 1.6%.

3         330.    Kunofsky introduced Reid to Geoff Harris ("Harris") of BMC Capital ("BMC") to

4    locate financing for his triple net lease investments.[24]  Citizens Bank and Trust ("Citizens") served as

5    the lender for each of Reid's investments.  Reid was told by Defendants that Citizens was a small

6    town bank in Missouri that would not loan money unless they thought the deals were solid.  Based

7    on these representations, Reid reasonably believed that Citizen's would not loan him money unless

8    the investments looked secure.

9         331.    At M&M Real Estate's request, PGP appraised the Geneva Jiffy Lube property for

10   $960,000.00 and the Binghamton Jiffy Lube property for $1,370,000.00.  M&M Real Estate gave

11   Reid the impression that if the appraisals came in at the price he was paying, then the properties were

12   safe investments.  As Reid had agreed to pay Sovereign JF only $951,719.00 for the Geneva Jiffy

13   Lube property and $1,307,143.00 for the Binghamton Jiffy Lube property, he felt good about the

14   appraisals.  Of course, no one told Reid that the PGP appraisals included comparables provided by

15   M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based on leases with

16   inflated rents, making the PGP appraisals wholly unreliable.  The PGP appraisal was transmitted,

17   through mail, facsimile or e-mail, to Reid's lender in the course of the sales process and closing.

18        332.    Reid closed on the two Jiffy Lube properties on July 2, 2004.  Reid, Kunofsky, M&M

19   Real Estate, Sovereign JF and Morabito used facsimile, e-mail, phone and U.S. mail by and between

20   California and New York to negotiate the transaction.

21   **The Fraudulent Sale-Leasebacks on the Properties**

22        333.    Little did Reid know at the time of the closing that he had been defrauded into

23   purchasing commercial properties at prices that had been substantially inflated due to the existence

24   of a sham lease crafted by Defendants.  Indeed, Sovereign JF, as an alter ego and wholly-owned

25   _____

26   [24]    Upon information and belief, Harris, who brokered several of the loans referenced herein, has
     since been hired by MarkOne Capital – a subsidiary of Marcus and Millichap Capital Corporation –
27   as a Senior Director.

28

1   subsidiary of Sovereign Investment, had previously purchased both Jiffy Lube properties from

2   Morabito in or around October 2003 (shortly after Morabito had purchased the properties from third-

3   parties). Around that time, Sovereign JF executed a fraudulent sale-leaseback agreement with

4   Morabito for both properties, which had the intended effect of artificially increasing the price of the

5   properties to well beyond their fair market values.

6       334.    Defendants intended from the very beginning to re-sell the artificially-inflated

7   properties to an unwitting investor like Reid. To conceal the fraudulent nature of the sale-leaseback

8   agreements, Sovereign JF and Sovereign Investment turned to their sister company and co-

9   conspirator, M&M Real Estate, to list, market and sell the properties. M&M Real Estate, through its

10  agents and as an alter ego of M&M, misrepresented and concealed material adverse facts about the

11  properties' true market value, future rents, business prospects, security and stability.

12      335.    As discussed below, Morabito (and the agents and entities under his control) never

13  intended to occupy the properties nor operate the Jiffy Lube franchises through the full term of the

14  leases, despite the numerous misrepresentations concerning his financial stability and the strength of

15  his business operation.

16  **Morabito Abandons Both Jiffy Lube Properties**

17      336.    From closing through May 2005, Reid received rent under both leases. Then, in early

18  May 2005, Reid received a letter from Morabito/Eureka/Tibarom purporting to have assigned the

19  long-term lease on the Geneva Jiffy Lube property to Peanut Oil. Though the letter claimed that

20  Pearson of Peanut Oil was an experienced operator and approved Jiffy Lube franchisee, Reid never

21  consented to the assignment because Morabito/Eureka/Tibarom never provided evidence, as required

22  under the long-term lease, that Peanut Oil was a sufficient assignee.

23      337.    Subsequent to the purported assignment by Morabito/Eureka/Tibarom, Peanut Oil fell

24  three months behind on its rent and failed to pay the taxes on the property, forcing Reid to take steps

25  to terminate the lease. In response, Peanut Oil sent Reid a check for an amount in excess of

26  $20,000.00 for back rent and to avoid eviction. Peanut Oil eventually fell months delinquent on the

27  rent again, and on August 21, 2006, Reid declared Morabito/Eureka/Tibarom/Peanut Oil to be in

28  default under the lease and gave 30 days to cure.

338.    On October 13, 2006, Morabito/Eureka/Tibarom notified Reid of a purported assignment of the Binghamton Jiffy Lube property to Tibarom NY (which was an alter ego of Morabito).  Salvatore Morabito signed the assignment on behalf of Eureka, Tibarom and Tibarom NY.[25]

339.    In September 2007, Morabito/Eureka/Tibarom/Tibarom NY was late with the rent on the Binghamton Jiffy Lube property.    Reid sent a demand letter by mail to Morabito/Eureka/Tibarom/Tibarom NY on September 24, 2007 and sent similar letters by mail on October 22, 2007 and December 28, 2007.  Thereafter, Morabito/Eureka/Tibarom/Tibarom NY paid the September rent but failed to pay the late fees.

340.    In December 2007, Morabito purportedly assigned his interest in Tibarom to David Macchia.[26]    Neither Morabito/Eureka/Tibarom/Tibarom NY nor Macchia paid rent on the Binghamton Jiffy Lube location thereafter, causing Reid to send an election to terminate the Binghamton store lease on January 9, 2008.

341.    Reid eventually contacted Macchia, who told Reid that the Geneva and Binghamton Jiffy Lube stores were not performing well.  Macchia initially told Reid he was going to keep the Geneva Jiffy Lube store open.  Then, Macchia called back a few weeks later and told Reid that he was going to close the store because there was another Jiffy Lube in town.  Thereafter, Reid asked Macchia to keep operating at the location without paying rent until Reid could get a new tenant. Macchia agreed to this and had Reid send him an e-mail to confirm the arrangement.

342.    Morabito/Eureka/Tibarom/Peanut Oil defaulted on the Geneva Jiffy Lube property in January 2008, and abandoned the store shortly thereafter.  Reid has been unable to re-let either property to fulfill the remainder of the lease terms. Reid is continuing to have to make monthly mortgage payments of approximately $10,000.00 on both properties combined.

---

[25]    Reid formally rejected the purported assignment because it violated the lease for the same reasons that he rejected the purported assignment of the Geneva Jiffy Lube Property to Peanut Oil.

[26]    Reid was not told of this assignment and only learned of it when he called Morabito/Eureka/Tibarom to inquire about late rent.

1    343.   Throughout the course of Reids' relationship with M&M Real Estate, Sovereign JF,

2    Kunofsky, Gomez, Morabito, and the various other members of the M&M Enterprise, Defendants

3    made false and misleading statements and omissions regarding the fair market value, future rents,

4    business prospects, security and stability of Reid's investments – exploiting the relationship of trust

5    that they had intentionally built with Reid.   These false and misleading statements were

6    communicated to Reid via U.S. mail, e-mail, facsimile and through the phone.   During this time,

7    Defendants knew that the fair market value of the investment properties was artificially inflated, that

8    the purported long-term leases were a farce, and that the "tenants" would walk away, abandoning the

9    properties, wiping out the artificial inflation in the fair market value of the properties, and

10   eviscerating the future rents.

11   344.   So, as was the case with every other investor, Defendants' conspiracy to scam Reid

12   was a complete success.   Defendants artificially inflated the values of the properties that Reid was

13   induced to purchase, which values plummeted when the Defendants walked away. As a result, he

14   suffered severe financial damages, including the loss of fair market values of his investments, future

15   rents and out-of-pocket damages, all of which he is entitled to recover.

16   345.   M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Kunofsky, Gomez,

17   Morabito and the various other members of the M&M Enterprise engaged in a continuous pattern of

18   racketeering activity as they used U.S. mail and wire to orchestrate and carry out the sale of the

19   Geneva and Binghamton Jiffy Lube properties to Reid.

20   346.   M&M Real Estate, M&M, Sovereign JF, Sovereign Investment, Kunofsky, Gomez,

21   Morabito and the various other members of the M&M Enterprise conducted and directed the affairs

22   of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused

23   Reid to purchase the Jiffy Lube properties at artificially inflated prices.   The value of the properties

24   plummeted when Morabito and his shell companies abandoned them.

25   347.   As demonstrated through their ongoing and systematic conduct, M&M Real Estate,

26   M&M, Sovereign JF, Sovereign Investment, Kunofsky, Gomez, Morabito and the various other

27   members of the M&M Enterprise shared the common purpose of luring investors like Reid into

28   purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

348.    The sales of the Geneva and Binghamton Jiffy Lube properties to Reid were not random, isolated transactions, but were part of a single, coordinated scheme orchestrated by Defendants to sell triple net properties using bogus sale-leaseback agreements.   Indeed, the properties were part of the "portfolio" that Sovereign Investment had initially agreed to purchase from Morabito.  From the outset, Sovereign Investment had planned to purchase these portfolio properties "in bulk" with the goal of re-selling them to unwitting investors at drastically inflated prices.  The sales to Reid were consummated exactly as they had been planned and conceived by Defendants.

349.    In addition, the statements made by Defendants to Reid and referenced herein were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The then-existing facts that make those statements false and misleading are set forth in ¶149.  In addition to the previously identified false statements, the following adverse facts were also known by Defendants at the time their false and misleading statements and misrepresentations were made:

- Pearson, Pickett and Peanut Oil were neither well-capitalized nor capable of efficiently operating the Jiffy Lube franchises.  Indeed, shortly after Defendants' fraud was uncovered, Pickett, Pearson and Peanut Oil filed for bankruptcy protection.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                    - 94 -

## Chronology of Reid's purchase of the Jiffy Lube property located at 234-330 North Main Street, Binghamton, New York 13905

### OCTOBER 15, 2003

Morabito/Eureka purchased the Binghamton Jiffy Lube property as part of a group of three properties from a third-party for a combined price of **$4,085,356.00** - an average price of **$1,361,785.00** per property **

### OCTOBER 15, 2003

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$9,150.00** per month with a 1.60% increase per annum through October 14, 2029

### OCTOBER 15, 2003

Sovereign JF purchased the same three properties, including the Binghamton Jiffy Lube from Morabito/Eureka for a combined price of **$4,472,163.00** - an average of **$1,490,721.00** per property

### JULY 2, 2004

Gary Reid purchased the Binghamton Jiffy Lube property from Sovereign JF for **$1,307,143.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$9,1500.00**

### DECEMBER 2007

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia

### FEBRUARY 2008

Macchia abandoned the property. Reid has been unable to re-let the Binghamton Jiffy Lube property despite attempting to do so.

### Damages as a Result of Defendants' Fraud

**$3,660,573.00**: **$787,143.00** as of closing plus **$2,873,430.00** in future rent, plus misc. out-of-pocket expenses

**Morabito/Eureka purchased the Binghamton Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. According to the appraisal prepared by PGP for the Binghamton Jiffy Lube property:

The subject is currently vested in the name of Sovereign Investment Company (under a separate LLC), which purchased in November 2003 as part of a bulk sale for a price of $1.00. The sale price is not the actual price paid as one bulk price was paid and the sale price was divided among the different portions of the portfolio without regard to market.

While Plaintiffs have been unable to determine the exact allocation of proceeds that Morabito/Eureka attributed to the Binghamton Jiffy Lube property, evidence to be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Reid.

## Chronology of Reid's purchase of the Jiffy Lube property located at 288 Hamilton Street, Geneva, New York 14456

### OCTOBER 24, 2003

Morabito/NY Seven Lube purchased the Geneva Jiffy Lube property from a third-party for **$1,380,237.15**\*\*



### OCTOBER 27, 2003

Sovereign JF and Morabito/NY Seven Lube entered into a sham lease at an inflated rental rate of **$6,503.42** with a 1.60% increase per annum through October 26, 2029



### OCTOBER 27, 2003

Sovereign JF purchased the Geneva Jiffy Lube property from Morabito/NY Seven Lube for **$812,446.00**



### JULY 2, 2004

Reid purchased the Geneva Jiffy Lube property from Sovereign JF for **$951,719.00** and assumed the lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$6,503.42**

### MAY 2005

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/Peanut Oil



### JANUARY 2008

Pearson/Pickett/Peanut Oil abandoned the property. Reid has been unable to re-let the Geneva Jiffy Lube property despite attempting to do so.



### Damages as a Result of Defendants' Fraud

**$2,367,094.00**: **$331,719.00** as of closing plus **$2,035,375.00** in future rent, plus misc. out-of-pocket expenses

\*\* Morabito/NY Seven Lube purchased the Geneva Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. According to the appraisal prepared by PGP for the Geneva Jiffy Lube property:

> The subject is currently vested in the name of New York 7 Lube, LLC, which purchased the property on October 24, 2003 for $1,380,237.00. The Subject was part of a bulk sale, therefore the sale is not actual price paid as one price was paid for the whole portfolio and individual sale prices were allocated among the different portion of the portfolio.

While Plaintiffs have been unable to determine the exact allocation of proceeds that Morabito/Eureka attributed to the Geneva Jiffy Lube property, evidence to be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Reid.



1    **I.        Eugenia Gagnon[27]**

2    **The Sale of the Transit Road Jiffy Lubes to Gagnon**

3            350.      In the late 1980's, Eugenia ("Genie") Gagnon ("Gagnon") and her late husband

4    purchased a Jack-in-the-Box restaurant using M&M Real Estate broker Mitch LaBar ("LaBar").

5    M&M Real Estate broker Emas represented the seller in the transaction.   The Jack-in-the-Box

6    property was a triple net lease investment purchased as a 1031 exchange property.  Following her

7    husband's death, Gagnon held the property until 2004, when she decided to invest in a new 1031

8    exchange property.

9            351.      Gagnon called LaBar, who was working at the Ontario, California office of M&M

10   Real Estate, to represent her in the sale of the Jack-in-the-Box.  Upon reaching M&M Real Estate's

11   Ontario office, Gagnon was told that LaBar was now in management at M&M Real Estate and no

12   longer represented clients.  Over the years, Emas had continued to send her flyers about other

13   properties, and as Emas was the only other name that Gagnon knew at M&M Real Estate, she asked

14   to be transferred to him.

15           352.      Emas, as an agent of M&M Real Estate, represented over the phone to Gagnon and

16   Henry Shuda ("Shuda"), Gagnon's significant other, that triple net leases were his specialty.  Based

17   on her prior business relationship with M&M Real Estate, and based on Emas' title as Senior

18   Investment Associate, and his representations regarding his experience and expertise, Gagnon

19   believed that Emas was an expert on advising purchasers and sellers of triple net lease investments

20   and would represent and protect her interests.

21           353.      Emas represented to Gagnon and Shuda (who acts as an advisor to Gagnon) that he

22   would represent Gagnon's interests in the sale of the Jack-in-the-Box and would find her a safe and

23   secure 1031 exchange property.  Gagnon made clear to Emas from the outset that she was especially

24   concerned with protecting her income stream.

25

26   _____

27   [27]       Eugenia Gagnon took title to the properties as trustee of The Genie Debs Revocable Trust,
     dated October 10, 1995.

28

354.   As there were only five years left on Gagnon's Jack-in-the-Box lease, Emas set the asking price on the Jack-in-the-Box using a formula that involved rental rates and a discount.  He listed her Jack-in-the-Box for approximately $1,750,000.00 in the summer or early fall of 2004.

355.   Thereafter, Emas provided to Gagnon and Shuda a list of prospective triple net lease investments to purchase using the proceeds of Gagnon's Jack-in-the-Box sale.  Early on, Emas attempted to focus Gagnon and Shuda on two Jiffy Lube properties in the Buffalo, New York area that were located on Transit Road.  These properties purportedly had long-term leases already in place with Eureka and Tibarom (which were alter egos of Morabito) as tenants.  Emas represented that M&M Real Estate had sold six other similar properties with Morabito/Eureka/Tibarom as the tenant/operator, and that those stores were doing well.

356.   Emas provided to Gagnon and Shuda glossy marketing brochures supplied by M&M Real Estate touting two other Morabito-run Jiffy Lube locations in New York – one for 50 Liberty Street in Batavia and one for a store on South Hamilton, in Painted Post.  Though Emas did not have a brochure for the two properties that he was marketing to Gagnon and Shuda, Emas promised Gagnon that the brochures for her potential investments would have looked exactly the same as the brochures that he provided to her for the Batavia and Painted Post properties.  The brochures provided to Gagnon and Shuda described the "investment attributes" in the following manner:

- Attractive Yield: 8.00% Initial Return, with 1.6% annual increases;

- 25-year Absolute NNN Lease: no Landlord responsibilities; Tenant pays all expenses;

- Prime location with significant potential for future appreciation;

- Highly recognized brand;

- Strong sales unit at location;

- This particular franchise is the fastest growing franchisee in the Jiffy Lube system;

- Jiffy Lube International is a wholly owned subsidiary of Shell Oil Company (NYSE: RD); and

- 10-year Oil agreement with Shell Oil Company.

357.   Emas emphasized that the brochures for the Transit Road Jiffy Lube properties would have contained the identical glowing reviews of Morabito's business acumen.  Emas represented to

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                    - 98 -

1    Gagnon that the only differences in brochures regarding the Transit Road Jiffy Lube properties and

2    the other locations would have been the specific rent amounts, the square footage of the building,

3    and the local demographics.  Emas made these various representations to Gagnon on the phone.

4         358.    As Gagnon had more experience owning restaurants, she was more interested in

5    finding a triple net lease on a restaurant building as her next 1031 exchange property.  Shortly after

6    reviewing the Jiffy Lube brochures, Gagnon and Shuda drove to Arizona to look at El Pollo Loco

7    investments and they also drove to Texas to look at Taco Cabana restaurants.  They were very

8    interested in one Taco Cabana property in Woodlands, Texas, and phoned Emas about it.  On that

9    call, Emas told Gagnon and Shuda that the Taco Cabana property had already been purchased by

10   someone else.

11        359.    On that same phone call, Emas again counseled Gagnon that the Transit Road Jiffy

12   Lube locations were the right investments for her.  In fact, Emas advised Gagnon and Shuda to start

13   negotiations with Morabito that very day so they could "hold their spot."  Otherwise, Emas claimed,

14   other investors would buy the properties first.  Emas proclaimed that "it is a great deal, you won't be

15   sorry."  Thereafter, Emas continuously pushed Gagnon to purchase the Transit Road Jiffy Lube

16   properties.  Whenever Gagnon and Shuda mentioned restaurants, Emas attempted to talk them out of

17   these investments and to talk them into investing in the Transit Road Jiffy Lubes.

18        360.    Emas and M&M Real Estate represented that Morabito was tremendously wealthy

19   and successful and that he was "extremely capable with a monster operation and huge cash flow."

20   Emas further represented that Morabito was an expert at operating Jiffy Lubes efficiently,

21   consistently producing more revenue than other Jiffy Lube locations.  For example, Emas and M&M

22   Real Estate represented that Morabito, on average, generated 12% higher revenues per car serviced

23   than other Jiffy Lubes.  Emas and M&M Real Estate also represented to Gagnon and Shuda that

24   Morabito was going to install cameras at the Transit Road Jiffy Lube locations so that he could

25   monitor their operations remotely.

26        361.    Emas and M&M Real Estate further lured Gagnon and Shuda into purchasing the

27   Transit Road Jiffy Lubes by telling them that Morabito was the second or third largest Jiffy Lube

28   operator, as well as the fastest growing, with existing stores in New York, Nevada, California and

1   Pennsylvania (and future expansion into Connecticut).  Emas and M&M Real Estate represented to

2   Gagnon and Shuda that Morabito was selling the properties solely because he wanted to focus his

3   money and attention on the operations aspect of the business.  Emas and M&M Real Estate also

4   represented to Gagnon and Shuda that SOPUS was "fully backing Morabito" and that SOPUS had

5   an agreement with Morabito because he was using their oil exclusively.  Emas also said that under

6   that agreement, Morabito would buy large quantities of Jiffy Lube franchises and then sell them one

7   or two at a time.

8          362.   Although Gagnon trusted Emas and M&M Real Estate and believed the protection of

9   her investment was paramount to them, she and Shuda still asked a lot of questions.  Specifically,

10   Gagnon and Shuda asked whether Morabito/Eureka/Tibarom's business could support the substantial

11   rent it had agreed to pay.  Emas advised Gagnon and Shuda that "this is not like flipping burgers,

12   [Morabito] is really smart and he knows what he is doing."  Emas consistently trumpeted Morabito's

13   skill and experience to dispel any questions that Gagnon and Shuda had about the properties.

14          363.   Before purchasing the Jack-in-the-Box, Gagnon and her late husband had asked for,

15   and received, financial history, including rents and revenue for the location.  Gagnon and Shuda

16   asked Emas for similar financial information regarding the Transit Road Jiffy Lube properties.  Emas

17   responded that M&M Real Estate would provide financial due diligence when Gagnon applied for

18   her loan because the bank would want to see it.  Emas told Gagnon and Shuda that "[w]e need to

19   close quickly because Morabito is conducting an exchange, but [you] will get the information later."

20   However, when Gagnon and Shuda later asked additional questions about Morabito/Eureka/Tibarom

21   or the financials supporting Gagnon's investment, Emas told them "it was Morabito's business" and

22   made Gagnon feel like her questions were intrusive personal questions of Morabito.

23          364.   Gagnon and Shuda trusted and relied upon the information provided by Emas and

24   M&M Real Estate, and from Morabito though Emas and M&M Real Estate.  Emas, for his part, said

25   that he was in contact with Morabito and knew him personally.  Gagnon, at all times, believed that

26   Emas and M&M Real Estate represented her and would protect her interests in the Jiffy Lube

27   purchases.  Neither Emas nor M&M Real Estate disclosed that they were also representing Morabito,

28   or, in fact, that Emas had actually brought Morabito to M&M Real Estate.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

365.    Gagnon and Shuda had several concerns about purchasing the Transit Road Jiffy Lube properties.  For one, the asking price of $2,500,000.00 for the two Transit Road Jiffy Lube properties would require a very large loan, and Gagnon had not made any efforts to secure financing.  Also, Gagnon and Shuda had very limited knowledge about the quicklube business.  As Gagnon was to receive only $1,700,000.00, minus fees and costs, from the sale of her Jack-in-the-Box property, she told Emas that she wanted to buy just one of the Transit Road Jiffy Lube properties for $1,250,000.00 and a smaller second property with the excess proceeds to eliminate or minimize the need for a mortgage.

366.    Notwithstanding this fact, Emas pressured Gagnon into buying the two Transit Road Jiffy Lube properties for a total of $2,500,000.00, emphasizing that the Jiffy Lube properties were the best possible investment and that her money would be safe and her income stream secure.  Additionally, Emas told Gagnon that the Transit Road Jiffy Lube properties were only going to be sold as a set of two.  Emas, on multiple occasions, attempted to assuage Gagnon's concerns by emphasizing the great rent that Gagnon and Shuda were going to receive from the Jiffy Lube properties and the stability of Morabito/Eureka/Tibarom as a tenant.

367.    To allay Gagnon's mortgage payment concerns, Emas showed her a document with anticipated mortgage monthly payments based upon her anticipated loan amount, compared to the monthly rent.  These calculations showed that Gagnon was going to be "in the black," or cash flow positive, each month.  And with 2% annual rent increases, Emas represented to Gagnon that "it was only going to get better over time."

368.    During the sales process, and at the behest of M&M Real Estate, PGP prepared land comparisons of the Transit Road Jiffy Lube properties.  Unbeknownst to Gagnon and Shuda, the land comparisons included comparables provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based on leases with inflated rents, making the land comparisons wholly unreliable.

369.    On September 17, 2004, Gagnon signed an offer that Emas had prepared of $2,500,000.00 for the two Transit Road Jiffy Lube locations.  To seal the deal, Emas represented to Gagnon and Shuda that Morabito/Eureka/Tibarom was to sign a new 20-year lease with Gagnon

1  paying $103,125.00 per year in rent for each property, with 2% annual rent increases. Even though

2  they were still in Texas at the time looking at other properties, Emas convinced Gagnon to sign the

3  purchase and sale agreement and to fax it to him immediately given that the properties could be

4  purchased by another investor at any time.

5      370.    The offer that Emas and M&M Real Estate prepared for Gagnon to sign was

6  addressed to "Mr. Paul Morabito, President and Chief Executive of Jiffy Lube."  There was no

7  reference to Eureka, Tibarom, or any other Morabito-controlled entity in the offer that M&M Real

8  Estate had prepared.  Based on the offer that Emas and M&M Real Estate prepared, Gagnon and

9  Shuda believed that Morabito was an executive of, or directly affiliated with, JLI, the franchisor.

10  Emas and M&M Real Estate never disclosed to Gagnon and Shuda that Morabito was only a

11  franchisee of JLI.

12      371.    The offer drawn up by Emas and M&M Real Estate required Morabito to provide all

13  documentation relating to the Jiffy Lube locations within a week, and thereafter provided for Gagnon

14  to only have a two week due diligence period.  Emas told Gagnon that the short time period was due

15  to the fact that Morabito was in the midst of conducting his own 1031 exchange.

16      372.    Even after submitting the offer prepared by Emas and M&M Real Estate, Gagnon had

17  not secured financing.  However, Emas continually reassured her that financing would not be a

18  problem.  Emas told Gagnon that there was a guy down the hall from Emas who worked for Marcus

19  & Millichap Capital Corporation, stating that "[h]e's good, he'll get you the loan."  Gagnon

20  expressed discomfort and concern, but Emas told her again "don't worry, he's good."  Emas never

21  disclosed to Gagnon that Marcus & Millichap Capital Corporation was actually brokering a loan, not

22  acting as the lender, and charging Gagnon a fee of 1% of the loan amount for arranging a loan from a

23  third party.

24      373.    Gagnon and Shuda drove to New York from Florida to visit the properties on

25  September 24, 2004 – visiting the properties on the 26th or 27th.  The locations were on the smaller

26  side, and had double tandem work bays situated front to back, as opposed to two bays next to each

27  other side to side.  Notwithstanding this fact, Emas told Gagnon and Shuda that these locations

28  would still be able to handle the same volume of cars as locations with side-to-side bays.

374.     While Emas did not accompany them on their visit, he did instruct Gagnon and Shuda that they could not go into the stores because doing so would alarm the employees, who were apparently not aware that Morabito was selling the properties.  At the time of Gagnon and Shuda's visit to the Transit Road Jiffy Lube properties, the stores were not yet being operated as Jiffy Lube franchises.  They were being operated as "No Bull Fast Lube" stores.  When Gagnon and Shuda inquired about this, Emas represented to Gagnon and Shuda that the stores were in the process of being converted to Jiffy Lubes, and that Morabito "has a tight time limit" running to get it done.

375.     Based upon Emas' representations, Gagnon and Shuda believed that Morabito already owned the facilities, and was just in the process of converting them to Jiffy Lubes.  Emas and M&M Real Estate never disclosed that Morabito, in fact, did not own Gagnon's potential locations at the time of the negotiations for Gagnon and Shuda to purchase them.

376.     The sale of Gagnon's Jack-in-the-Box closed on September 29, 2004 and Gagnon and Shuda were required to fax documents to Emas from the road relating to that transaction.  The proceeds from the closing of the Jack-in-the-Box sale went into a 1031 escrow account handled by Downstream Exchange Company in Pasadena, California, which was the 1031 intermediary that Gagnon was directed to by Emas.

377.     On October 12, 2004, Gagnon and Shuda received the lease agreements sent from California by Jeffrey Langan ("Langan"), General Counsel for Eureka and Tibarom.  The leases required total monthly rent payments of $8,593.75.00 consistent with the prior representations made by Emas and M&M Real Estate.

378.     On October 13, 2004, in reliance on the representations made by Emas, M&M Real Estate, and Morabito, Gagnon put a $50,000.00 deposit on the Transit Road Jiffy Lube properties using proceeds from her Jack-in-the-Box sale.  As soon as she put their deposit down, Gagnon began receiving documents to be signed and sometimes notarized, all of which Emas and M&M Real Estate said had to be returned right away.  These documents came from Emas, from Eureka and Tibarom's attorney Langan, and from Morabito's personal attorney in New York, Yalamanchili.  The documents often arrived with the notation "sign and return in 24 hours, we need to get JLI signatures."  For instance, on October 13, 2004, Gagnon and Shuda received a FedEx package sent

1  from Yalamanchili in New York enclosing documents that needed to be signed and returned by

2  October 16, 2004.

3       379.    Gagnon and Shuda did not want to complain about the short turnaround time, and

4  believed Emas, M&M Real Estate and Morabito knew what they were doing, and were, at all times,

5  acting with Gagnon's best interests in mind.  Gagnon kept asking Emas, "have they started

6  paperwork on my loan?"  When Emas said no, Gagnon asked "what if I don't qualify?"  Emas told

7  her "don't worry about it.  This is what I'm here for.  I'll do the worrying for you.  I'll take care of

8  it."  Gagnon told Emas she did not know how to fill out the loan paperwork coming in.  Emas told

9  her to send him her financial information and "I'll fill it out for you."

10      380.    Some documents received by Gagnon identified New York Lube 3, with no

11  explanation of how that entity was related to Morabito.  Gagnon and Shuda asked Emas questions

12  about this entity and the others they would occasionally see mentioned, and Emas told them, "this is

13  just another Morabito business.  He is really big with lots of different entities to manage properties in

14  different states."  Every time that Gagnon or Shuda would have a question concerning Morabito or

15  his entities, Emas would just reply that Morabito was "very large and successful and this is just how

16  successful people do business."

17      381.    During this process, Gagnon received a request from M&M Real Estate to sign and

18  send back a document indicating that Gagnon was removing all contingencies to the closing of the

19  transaction.   Relying on Emas and M&M Real Estate's trustworthiness, Gagnon signed the

20  document, although the absence of financing and magnitude of documents that had to be signed and

21  returned with virtually no time for review began to make Gagnon very uncomfortable.

22      382.    As a result of her discomfort, Gagnon told Emas that she thought she might need an

23  attorney to review the documents.  Emas talked her out of retaining an attorney, stating "it will take a

24  while to get someone."  When Gagnon insisted, Emas told her that "there is no time to do that, this

25  sale has to close by October 18 or you will lose your $50,000.00 deposit."  Emas also said "this guy

26  [Morabito] is powerful, I don't know what he'll do.  You'll lose your $50,000.00 and hopefully that

27  is all."

28

383.   Emas' comment was the first Gagnon learned that she had to close the transaction by October 18, 2004.  Gagnon asked why he had never told her about the impending October 18, 2004 closing date and Emas said "I thought you knew."  As it was only a few days before the newly announced closing date of October 18, 2004, Gagnon was concerned that she might not get her loan.  She told Emas she could not close on October 18, 2004 because she did not have a loan.  Emas told her that Morabito himself was willing to provide a bridge loan.  Emas had evidently already spoken with Morabito about this and said "don't worry about it, Morabito will cover you until you get the loan."

384.   The Purchase and Sale Agreement stated that Gagnon and Shuda were buying the two Transit Road Jiffy Lube properties from New York Lube 3 (which was yet another alter ego of Morabito).  The Purchase and Sale Agreement further noted that New York Lube 3 was already under contract to purchase the properties from Izydorczak.  Gagnon was confused by this document and asked Emas what it meant.  Emas told Gagnon that "this is the exchange."  Emas explained "New York Lube was Morabito's business.  No Bull is the old company but it is becoming Jiffy Lube."  Emas said "they just haven't been repainted yet.  It is all in the process of being done."

385.   Based on Emas and M&M Real Estate's representations, Gagnon and Shuda believed that Morabito already owned the property and the purchase and sale agreement disclosing No Bull Fast Lube LLC was just about the transition from that operational entity to a Jiffy Lube franchise.  Gagnon, Shuda, Emas, M&M Real Estate, Morabito, and New York Lube 3 used facsimile, e-mail, phone and U.S. mail by and between Florida, California and New York to negotiate the transaction.

**The Fraudulent Sale-Leasebacks on the Properties**

386.   Little did Gagnon know that she had been defrauded into purchasing two commercial properties at prices that had been grossly inflated due to sham leases crafted by Defendants.  Indeed, M&M Real Estate and Morabito orchestrated the sale of the properties using bogus sale-leaseback agreements, which had the intended effect of artificially increasing the price of the properties to well beyond their fair market values at the time of purchase by Gagnon.  Moreover, M&M Real Estate and Morabito misrepresented and concealed the fact that Morabito had purchased the properties from a third-party right before they were sold to Gagnon on the very same day.

387.   As discussed below, Morabito (and the agents and entities under his control) never intended to occupy the properties through the full term of the leases, despite the numerous misrepresentations concerning his financial stability and the strength of his business operation.

**Morabito Abandons Both Properties**

388.   On October 29, 2004, Langan, on behalf of Morabito/Eureka/Tibarom, sent Gagnon her first rent check via FedEx.  Then, on November 1, 2004, Langan sent Gagnon a FedEx asking her to sign and return a Contingent Assignment and Assumption Agreement purportedly required by JLI.  The agreement appeared to grant JLI a right to cure any defaults by Morabito/Eureka/Tibarom.  Gagnon called Morabito/Eureka/Tibarom to inquire about the document but never received a call back.  Gagnon then asked Emas about the document and he responded that "[i]t is a good thing, sign them and send them in.  That is more protection for you."  Gagnon signed the document and sent it back, but she never received a copy of the document counter-signed by JLI.

389.   On November 30, 2004, Gagnon received her rent check for $17,187.50 for both properties combined.  Thereafter, Gagnon continued to receive her rent, but the account on which the checks were drawn changed from a bank in California to a bank in Nevada.  In early 2005, Gagnon sent her property tax bill to Morabito's Laguna Beach, California office to be paid, but got a return receipt indicating it was instead delivered to Reno, Nevada.  Thereafter, Gagnon called Emas, who confirmed that Morabito had moved a few months prior.

390.   Emas then disclosed to Gagnon for the first time that a company named Berry-Hinckley Industries, Inc. ("Berry-Hinckley") was now operating the Transit Road Jiffy Lube properties instead of Morabito/Eureka/Tibarom.  Gagnon and Shuda were shocked by this news because Morabito was the "superstar" whose involvement and reputation was so highly touted by Emas and M&M Real Estate as insuring the success of Gagnon's investment.  When Gagnon told Emas of her concern, Emas told her not to worry.

391.   When Gagnon did not receive her December 1, 2006 rent check, Gagnon called Berry-Hinckley to find out why.  Gagnon was told that Berry-Hinckley would get the check to her, and the rent arrived shortly thereafter.  However, the name "Eureka Petroleum" no longer appeared on the rent check.  Instead, the payor was Tibarom NY.  Gagnon called Berry-Hinckley to ask why

1    Morabito/Eureka/Tibarom was not the payor and was told that Morabito had many Tibarom entities

2    and Tibarom NY was just one of them.

3        392.    In March 2007, Gagnon's rent checks did not arrive.  Thereafter, no one answered the

4    phones at Berry-Hinckley and Gagnon's subsequent e-mails did not receive responses.  Emas

5    claimed not to know anything about Berry-Hinckley's sudden unresponsiveness.

6        393.    Gagnon eventually reached Audrey Hanson ("Hanson"), an employee of

7    Morabito/Eureka/Tibarom.  Hanson advised Gagnon that "we no longer own this. The stores have

8    been assigned to Sam Pearson of Peanut Oil."  Gagnon asked why she had not been given notice and

9    Hanson responded that "I don't know."  Hanson then whispered to Gagnon, "you need to get a

10    lawyer and do exactly what he tells you to do.  I don't want to lose my job, I need to work.  Do what

11    you have to do."

12        394.    Eventually Gagnon learned that Morabito/Eureka/Tibarom had purportedly assigned

13    the leases for the Transit Road Jiffy Lube properties to Peanut Oil (which was an alter ego of

14    Pearson and Pickett) on October 9, 2006.  This purported assignment was done without Gagnon's

15    consent.  When Gagnon discovered Morabito's attempt to avoid his obligations under the leases,

16    Gagnon wrote letters to Pearson's attorney Brian Melber ("Melber"), Pearson, Pickett, Morabito, and

17    Langan complaining about the failure to gain the consent and provide the notice of the assignment

18    that was required under the lease agreement.  Though Pearson responded that he had documentation

19    to support his role as the new tenant, no documentation was ever provided to Gagnon.

20        395.    Gagnon and Shuda called Emas to try to get more information.  Emas said they

21    should have received a notice if their properties were assigned.  Emas e-mailed Phil Tripoli

22    ("Tripoli") on March 14, 2007 at Morabito/Eureka/Tibarom to inquire about the non-payment of rent

23    by Morabito/Eureka/Tibarom.  Tripoli did not get back to Emas, but Morabito did respond to the e-

24    mail on March 15, 2007, even though he was not an addressee on Emas' initial e-mail.  Morabito

25    claimed to have sold the leases in the two Transit Road Jiffy Lube properties six months earlier to

26    Peanut Oil.  Morabito said that Gagnon and Shuda could call Pearson at Peanut Oil, or Kevin Lyng

27    ("Lyng"), Vice President of JLI, if they had any questions.

28

396.     Gagnon eventually spoke with Lesorovsky and Floeck at JLI in Houston, but never got hold of Lyng.  Lesorovsky and Floeck made it clear that JLI had been aware for some time about what was going on with Morabito and the assignments of leases.  However, JLI was continuing to receive royalty payments from Morabito.  As long as JLI received such payments, Gagnon was told that JLI was not going to do anything.  Lesorovsky and Floeck claimed they could take no action to compel Morabito to honor his leases because their legal department was afraid that JLI would get sued.

397.     In March 2007, Gagnon and Shuda also got in touch with M&M Real Estate agent LaBar.  Gagnon told LaBar that they were getting nervous and wanted to sell the Transit Road Jiffy Lube properties.  LaBar agreed that they should sell the Transit Road Jiffy Lube properties and recommended they use another M&M Real Estate broker – Kunofsky – because Kunofsky was located in New York where the properties were situated.

398.     On March 15, 2007, Gagnon telephoned Kunofsky and left a message with his secretary.  Thereafter, Kunofsky agreed to review their purchase agreements and other information, but a week or two later told Gagnon that he could not sell the Transit Road Jiffy Lube properties because there were eight to 10 other 1031 exchange investors who owned properties that were in a similar situation to Gagnon.  Gagnon asked for the names of the other scammed investors, but Kunofsky refused to provide that information.

399.     On March 16, 2007, Gagnon got a call from Pearson, who said he was interested in buying Gagnon's properties, but that the stores were not worth what Gagnon had paid.  Pearson offered Gagnon $900,000.00 for both stores, despite the fact that, based upon the advice and counsel of Emas and M&M Real Estate, Gagnon had paid $2,500,000.00 for those same stores.

400.     At this time, Pearson told Gagnon he was still working for Morabito.  Pearson further stated that Gagnon's locations were not making enough to cover the rents owed.  Yet, in the same conversation, Pearson mentioned that out of the 12 Jiffy Lubes he had contracted to operate for Morabito/Eureka/Tibarom, Pearson had already purchased six.  Gagnon could not understand how Pearson could claim the stores were not generating sufficient income for Morabito or Pearson to pay

1    rent, but that Pearson, who purportedly operated those very stores, could afford to buy six of the

2    stores and was trying to acquire even more.

3        401.    On March 18, 2007, Gagnon and Shuda got a call from Emas who had purportedly

4    been making inquiries on her behalf.  Emas told Gagnon and Shuda that the taxes on the Transit

5    Road Jiffy Lube properties had not been paid.  Gagnon called Pearson and left him a voice-mail

6    message that the taxes needed to be paid and she wanted to talk with him.  She also sent Pearson

7    notice of the taxes by registered mail, which was delivered, but Pearson never responded.  Gagnon

8    also left voice messages and e-mails for Morabito to this effect, but these were all ignored.  Gagnon

9    and Shuda eventually paid the $9,553.81 in taxes themselves.

10       402.    From April to September 2007, Gagnon received no rent, although she made demands

11   monthly to Morabito/Eureka/Tibarom and Pearson.  During this time, Gagnon continued to pay the

12   mortgage of $5,204.00 per month plus two tax bills from New York.  By May 15, 2007,

13   Morabito/Eureka/Tibarom owed Gagnon $9,134.08 in unpaid taxes and unpaid rent of $56,327.91.

14   Thereafter, in November 2007, Gagnon's stores were abandoned.  At this time, inventory and

15   machinery were removed from both stores, leaving the locations essentially inoperable.  In order to

16   mitigate their damages, Gagnon has leased one store to a tenant that pays an average of

17   approximately $2,450.00 per month.  The other store is empty.  Gagnon's mortgage obligation for

18   the two Transit Road Jiffy Lube properties is $5,204.00 per month.

19       403.    Throughout the course of Gagnon's relationship with Emas, M&M Real Estate,

20   Morabito and the various other members of the M&M Enterprise, Defendants made false and

21   misleading statements and omissions regarding the fair market value, future rents, business

22   prospects, security and stability of Gagnon's investments – exploiting the relationship of trust that

23   they had intentionally built with Gagnon.   These false and misleading statements were

24   communicated to Gagnon via U.S. mail, e-mail, facsimile and by phone.  During this time,

25   Defendants knew that the fair market value of the investment properties was artificially inflated, that

26   the purported long-term leases were a farce, and that the "tenants" would walk away, abandoning the

27   properties, wiping out the artificial inflation in the fair market value of the properties, and

28   eviscerating the future rents.

404.    So, as was the case with every other investor, Defendants' conspiracy to scam Gagnon was a complete success.  Defendants artificially inflated the values of the properties that Gagnon was induced to purchase, which values plummeted when the Defendants walked away.  As a result, Gagnon suffered severe financial damages, including the loss of fair market value of her investments, future rents and out-of-pocket damages, all of which she is entitled to recover.

405.    Emas, M&M Real Estate, M&M, Morabito and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity as they each used U.S. mail and wire to orchestrate and carry out the sale of the Transit Road Jiffy Lube properties to Gagnon.

406.    Emas, M&M Real Estate, M&M, Morabito and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused Gagnon to purchase the Jiffy Lube properties at grossly and artificially inflated prices.  The value of the properties plummeted when Morabito and his shell companies abandoned them.

407.    As demonstrated through their ongoing conduct, Emas, M&M Real Estate, M&M, Morabito and the various other members of the M&M Enterprise shared the common purpose of luring investors like Gagnon into purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

408.    In addition, the statements made by Defendants to Gagnon and referenced herein were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading.  The then-existing facts that make those statements false and misleading are set forth in ¶149.  In addition to the previously identified false statements, the following adverse facts were also known by Defendants at the time their false and misleading statements and misrepresentations were made:

- Morabito was not an executive or affiliated in any executive-level capacity with JLI – Morabito was merely a franchisee of that entity.

- The six Jiffy Lube properties that Defendants had sold to other investors with Morabito as a tenant were not doing "well."  Sales at Morabito-operated Jiffy Lube

locations had been in a steady decline since 2001, and the revenues being generated at the six stores did not come close to supporting the rent that "Morabito" had agreed to pay under the long-term leases on those properties.  Indeed, Kunofsky even admitted to Gagnon after Morabito abandoned her properties that Kunofsky could not sell the Jiffy Lube properties for her because there were eight to 10 other 1031 exchange investors whose properties Morabito had also abandoned.

- Morabito did not own the properties at the time of the negotiations for the sale to Gagnon and was not conducting his own 1031 exchange.  The actual reason that the sale to Gagnon had to close by October 18, 2004 was because Jerome Izydorczak ("Izydorczak"), the then-current owner of No Bull Fast Lube LLC – who was selling the properties to Morabito – had grown tired of negotiating with Morabito and Morabito's brother Salvatore.  Izydorczak set October 18, 2004 as the final date to either close the purchase of his stores or else he would not sell to Morabito.  It was this deadline that meant that Gagnon had to close her purchase by October 18, 2004 as well.  In fact, well after Morabito had abandoned his properties and breached the long-term leases, Gagnon and Shuda learned that Morabito paid $800,000.00 to Izydorczak for the No Bull/Jiffy Lube properties on the same day Defendants sold them to Gagnon and Shuda for $1,250,000.00.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Gagnon's purchase of the Jiffy Lube property located at 4885 Transit Road, Lancaster, New York 14086

### OCTOBER 18, 2004

Morabito/New York Lube 3 purchased the 4885 Transit Road Jiffy Lube from a third-party for **$800,000.00**



### OCTOBER 18, 2004

Morabito/Eureka/Tibarom and Gagnon entered into a sham lease which, unbeknownst to Gagnon, contained an inflated rental rate of **$8,593.75** with a 2.00% increase per annum through October 31, 2024



### OCTOBER 18, 2004

Gagnon purchased the Transit Road Jiffy Lube from Morabito/New York Lube 3 for **$1,250,000.00**



### OCTOBER 9, 2006

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/Peanut Oil



### NOVEMBER 2007

Pearson/Pickett/Peanut Oil abandoned the property and removed the trade fixtures. Gagnon was forced to sell the Transit Road Jiffy Lube on February 17, 2009 for **$317,750.00**



### Damages as a Result of Defendants' Fraud

**$2,872,649.00**: **$620,000.00** as of closing plus **$2,252,649.00** in future rent, plus misc. out-of-pocket expenses

**Chronology of Gagnon's purchase of the Jiffy Lube property located at 6480 Transit Road, Cheektowaga, New York 14043**

**OCTOBER 18, 2004**

Morabito/New York Lube 3 purchased the Transit Road Jiffy Lube from a third-party for **$800,000.00**

**OCTOBER 18, 2004**

Morabito/Eureka/Tibarom and Gagnon entered into a sham lease which, unbeknownst to Gagnon, contained an inflated rental rate of **$8,593.75** with a 2.00% increase per annum through October 31, 2024

**OCTOBER 18, 2004**

Gagnon purchased the Transit Road Jiffy Lube from Morabito/New York Lube 3 for **$1,250,000.00**

**OCTOBER 9, 2006**

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/Peanut Oil

**NOVEMBER 2007**

Pearson/Pickett/Peanut Oil abandoned the property and removed the trade fixtures

**JANUARY 2008**

Gagnon mitigated her damages and signed a new lease with Fast Track for a period of two years at a rental rate of 12% of net sales at the end of each calendar month

**Damages as a Result of Defendants' Fraud**

**$2,952,649.00**: **$700,000.00** as of closing plus **$2,252,649.00** in future rent, plus misc. out-of-pocket expenses

**J.     Joseph Amirkhas[28]**

**The Sale of the Albany Church's Chicken to Amirkhas**

409.     In June 2004, M&M Real Estate broker Muirhead contacted Amirkhas regarding the sale of a small office building Amirkhas owned in the Phoenix, Arizona area.  Muirhead, who was based in the Phoenix, Arizona office of M&M Real Estate, represented to Amirkhas that he was very experienced at selling commercial real estate in the Phoenix area. Amirkhas decided to have Muirhead list the property for him, and Muirhead was successful in selling the office building.

410.     Amirkhas called Muirhead and indicated that he wanted to reinvest the proceeds from the office building in an easy-to-manage investment.  In response, Muirhead advised Amirkhas to purchase a triple net lease investment because such investments were safe and extremely low maintenance.  In convincing Amirkhas to continue working with M&M Real Estate, Muirhead assured Amirkhas that M&M Real Estate brokers were triple net lease "experts" and that M&M Real Estate brokers would provide all the information necessary to enable Amirkhas to choose which property to purchase.

411.     Amirkhas believed that Muirhead and M&M Real Estate were trustworthy and were protecting his interests in helping him to identify a safe, conservative investment. In convincing Amirkhas that the triple net lease properties in the M&M Real Estate portfolio – and in particular, the Church's Chicken in Albany, Georgia that Amirkhas ended up purchasing – were an excellent fit for Amirkhas, Muirhead repeatedly told Amirkhas that triple net lease investments were very secure, safe and hassle-free, involving essentially no ongoing oversight by Amirkhas. This information was particularly important to Amirkhas, who, as a retiree, did not want the responsibility of ongoing management duties and liked the idea of a passive, yet safe, investment.

412.     Eventually, Muirhead convinced Amirkhas to focus on a Church's Chicken in Albany, Georgia being sold by Sovereign CC.  Muirhead represented to Amirkhas that the Albany

---

[28]     Joseph Amirkhas took title to the first property, the Church's Chicken in Albany, Georgia, as trustee under the Amirkhas Trust, dated January 14, 2000.  Amirkhas took title to the second property, the Jiffy Lube in Wilkes-Barre, Pennsylvania, as "Joseph Amirkhas, an unmarried man."

1   Church's Chicken property would be an excellent investment because Church's Chicken was a very

2   well-established franchise and the operator, Waelti, was very successful and experienced.  Amirkhas

3   knew nothing about Church's Chicken or Waelti prior to Muirhead touting the investment.

4        413.   Based on Muirhead and M&M Real Estate's representations, Amirkhas became

5   interested in the Albany Church's Chicken location.  As such, Muirhead began providing due

6   diligence to Amirkhas on the Albany Church's chicken property.  During the due diligence process,

7   Muirhead provided Amirkhas financials with respect to the Church's Chicken location in Albany,

8   Georgia. When Amirkhas expressed the desire to retain an accountant to help him analyze the

9   investment, Muirhead told him that it was unnecessary and that Muirhead and M&M Real Estate

10  could do the financial and due diligence analysis for him.

11       414.   Accordingly, Muirhead (who told Amirkhas that he had a lot more commercial real

12  estate experience than Amirkhas did) and M&M Real Estate purportedly reviewed the financials and

13  other due diligence related to the Albany Church's Chicken property.  Aside from reviewing the

14  M&M Real Estate marketing brochure for the property, Muirhead led Amirkhas to believe that he

15  and M&M Real Estate conducted independent research, including conducting a financial analysis of

16  the property and obtaining additional information from Kunofsky – the M&M Real Estate listing

17  agent for the property.  Based upon the due diligence purportedly conducted by Muirhead and M&M

18  Real Estate on Amirkhas' behalf, Muirhead and M&M Real Estate represented to Amirkhas that the

19  Church's Chicken property was a very good investment.

20       415.   As part of his review of the materials and information fed to him by Muirhead and

21  M&M Real Estate, Amirkhas questioned Waelti's experience and results.  In order to attempt to

22  negate any hesitation by Amirkhas, Muirhead arranged a conference call between himself, Amirkhas

23  and the listing broker Kunofsky to provide Amirkhas more information about Waelti and Church's

24  Chicken.

25       416.   Before the conference call, Muirhead told Amirkhas that Kunofsky, based in M&M

26  Real Estate's New York office, was the biggest, most knowledgeable and successful real estate agent

27  at M&M Real Estate.  Muirhead represented to Amirkhas that Kunofsky hunted for valuable

28  investment properties and convinced their owners to sell their properties using M&M Real Estate.

1   Muirhead convinced Amirkhas that Kunofsky knew "everything about all the properties he was

2   listing," leading Amirkhas to believe that Kunofsky knew "everything" about the property

3   M&M Real Estate wanted him to purchase, the property's tenant, QSR One (which was an alter ego

4   of Waelti), and the seller, Sovereign CC.

5       417.    During the conference call, Kunofsky assured Amirkhas that Waelti was very

6   experienced in franchised fast food operations, and had been very successful as a Jack-in-the-Box

7   franchisee.  Kunofsky further allayed any fears that Amirkhas had by reiterating Muirhead's prior

8   representations that the Albany Church's Chicken property was a great investment.  Kunofsky

9   specifically told Amirkhas that small operators like Waelti and QSR One "can be better than big

10  operators because they have more time to pay attention to all their stores."

11      418.    Kunofsky and Muirhead convinced Amirkhas to focus on Waelti's backing and

12  experience.  They reassured Amirkhas that he was "buying something from someone with lots of

13  experience."  Kunofsky reiterated to Amirkhas the security of the investment, representing that

14  Church's Chicken "was a big franchise and very secure."  Kunofsky said the investment was "very

15  safe and hassle free." Amirkhas relied on Muirhead, M&M Real Estate, and Kunofsky's due

16  diligence, financial analysis and representations when he decided to take their advice and purchase

17  the Albany Church's Chicken property.

18      419.    Despite the numerous representations made to Amirkhas by Muirhead, Kunofsky and

19  M&M Real Estate, no one revealed to Amirkhas the extent of the relationship between Sovereign

20  CC and M&M.  In fact, Kunofsky actually described Sovereign CC as an independent institution that

21  invested in restaurants and other businesses – a bulk buyer of franchises which then "breaks them up

22  and sells them one by one."  Kunofsky represented to Amirkhas that Sovereign CC bought

23  franchises at a discount because it bought so many at a time (up to 20 or more franchise locations in

24  a single transaction), thus receiving a volume discount which enabled Sovereign to turn a profit by

25  then selling those properties individually at market prices.

26      420.    In order to further induce Amirkhas to close on the Church's Chicken property,

27  Kunofsky advised Amirkhas that there "was a big budget for a complete image upgrade renovation"

28  to the Church's Chicken location "which would increase its value."  Kunofsky advised Amirkhas

1   that the renovation would be funded by Waelti and the franchisor itself, Church's Chicken's parent

2   company Cajun Operating Co. (which was requiring the renovation).  Kunofsky further represented

3   to Amirkhas that this renovation would occur within one year following Amirkhas' purchase.[29]

4   Again, these representations were made to Amirkhas during phone calls with Kunofsky and

5   Muirhead.

6         421.   Amirkhas specifically asked Kunofsky whether the existing (pre-renovation)

7   equipment in the store was included in his purchase and Kunofsky assured him that it was.

8   Kunofsky also assured Amirkhas that Amirkhas would own the new equipment that was to be

9   installed as part of the major renovation, and that this was very good news because it would make

10  the building and the franchise more valuable.  In fact, Amirkhas asked for a list of any items that

11  were excluded from his purchase, and the exclusion list that was part of his purchase agreement did

12  not identify any excluded property.

13        422.   Amirkhas signed the purchase agreement for the Albany Church's Chicken property

14  on April 15, 2005, with a purchase price of $1,088,000.00.  Amirkhas, Muirhead, Kunofsky,

15  M&M Real Estate, Waelti and Sovereign CC used facsimile, e-mail, phone and U.S. mail by and

16  between California, New York, and Arizona to negotiate the transaction.

17        423.   Muirhead, Kunofsky and M&M Real Estate marketed the location as having an 8.0%

18  cap rate, backed by rent of $7,477.83 per month, with annual rent increases of 1.75%.  Amirkhas'

19  purchase of the Albany Church's Chicken property was driven entirely by representations made by

20  Muirhead, Kunofsky, M&M Real Estate and Waelti with respect to the value, security, safety and

21  ease of management of that "triple net lease" investment.  Indeed, Muirhead, Kunofsky, and

22  M&M Real Estate convinced Amirkhas that the $7,477.83 per month long-term lease already in

23  place on the property with Waelti/QSR One as tenant would generate the 8.0% cap rate and

24  guarantee Amirkhas a safe, consistent source of retirement income for at least 20 years.

25

26  _____

27  [29]      Contrary to Kunofsky's promises, the renovation never occurred.

28

424.     Muirhead directed Amirkhas to Pinnacle 1031 Exchange Services ("Pinnacle") to be the required, disinterested intermediary to complete the 1031 exchange, and to Stewart Title Insurance Company for the title work.[30]   Muirhead told Amirkhas to use BMC as his lender, representing that BMC financed many of M&M Real Estate's brokered transactions.

425.     Amirkhas financed $387,000.00 to purchase the Albany Church's Chicken property, and put $700,000.00 as a down payment.  Although Amirkhas was led to believe he was getting a good deal on the loan because BMC worked with M&M Real Estate frequently, Amirkhas learned later that the 7.2% interest rate BMC gave him was not competitive.

**The Fraudulent Sale-Leaseback Agreement on the Church's Chicken Property**

426.     Little did Amirkhas know at the time of the closing that he had been defrauded into purchasing a commercial property at a price that had been grossly inflated due to the existence of a sham lease crafted by Defendants.  Indeed, Sovereign CC, as the alter ego and wholly-owned subsidiary of Sovereign Investment, had previously purchased the Albany Church's Chicken from Waelti/QSR on December 17, 2004 (just a month after Waelti had purchased the property from a third-party).  Sovereign CC executed a fraudulent sale-leaseback agreement with Waelti, which had the intended effect of artificially increasing the price of the property.

427.     Defendants intended from the very beginning to flip the property to an unwitting investor like Amirkhas.  Accordingly, to conceal the fraudulent nature of the sale-leaseback, Sovereign CC and Sovereign Investment turned to their sister company and co-conspirator, M&M Real Estate and its agents Muirhead and Kunofsky, to list, market and sell the property.  M&M Real Estate, Muirhead and Kunofsky, as alter egos of M&M, misrepresented and concealed material adverse facts about the property's true market value, future rents, business prospects, security and stability.

---

[30]     Federal tax rules require use of a disinterested intermediary to complete a 1031 tax deferred exchange.

428.   As discussed below, Waelti never had the intention of occupying the property and operating the Church's Chicken franchise through the full term of the lease, despite the numerous misrepresentations concerning the stability and safety of his business operation.

**Waelti Abandons the Church's Chicken**

429.   Several months after the closing on Amirkhas' Church's Chicken property, problems began to arise.  Initially, during the first few months of ownership, rent payments to Amirkhas were late and no one at Waelti/QSR One was returning his phone calls.  Waelti attempted to justify the late payments by claiming that he was not making any money because the restaurants did not generate sufficient income to support the rents that Waelti/QSR One had agreed to pay.

430.   Amirkhas told Muirhead about these problems from the beginning.  Amirkhas also sent e-mails to Kunofsky about the problems that he was having concerning the rent being paid timely and getting return contacts from the Waelti/QSR One office, but Kunofsky ignored his repeated requests for help.

431.   On January 10, 2006, Amirkhas sent a notice of default and demand for $7,608.69 in rent to Waelti/QSR One.  Waelti/QSR One eventually paid the past due rent for that month, but for each subsequent month thereafter until Waelti/QSR One abandoned the property, Waelti/QSR One did not pay the monthly rent until Amirkhas sent a demand letter.  Ultimately, Waelti/QSR One abandoned the Albany Church's Chicken property in October 2007.

432.   In order to mitigate his damages, Amirkhas agreed to enter into a new lease with Cajun Operating Co. for $4,900.00 per month, significantly less than the $7,440.00 per month rent that Amirkhas was entitled to under the original lease.  As a result, the fair market value of his investment has plummeted, and he has suffered severe economic damages.

**The Sale of the Wilkes-Barre Jiffy Lube to Amirkhas**

433.   In 2005, Amirkhas was also a partial owner (with the Moderbachers and Etemad as other partial owners) of an 80-unit apartment building in Phoenix known as Andover Square which

1    the partners decided to sell.[31]  After selling Andover Square, Amirkhas began looking into additional

2    triple net lease investments with M&M Real Estate, again spearheaded by Muirhead.[32]

3    434.    Muirhead began talking up a Wilkes-Barre, Pennsylvania Jiffy Lube property, again

4    being sold by a subsidiary of Sovereign.  Muirhead, as an agent of M&M Real Estate, glowingly told

5    Amirkhas that the Jiffy Lube property was "so good, so secure, it was almost like buying an interest in

6    an oil company."   Again, Muirhead made these representations during phone calls with Amirkhas.

7    Near the start of Amirkhas' discussions with Muirhead about the Wilkes-Barre Jiffy Lube property,

8    Muirhead sent Amirkhas an extensive marketing brochure about the Wilkes-Barre location and the co-

9    tenants/operators of the location – Eureka and Tibarom (both of which were alter egos of Morabito).

10    435.    The marketing brochure touted the investment as a "True NNN Lease – Tenant Pays

11    All Expenses" and boasted an 8.25% cap rate.  The marketing brochure further sold Morabito as the

12    wonder boy of Jiffy Lube, noting:

> Tibarom, Inc., a Jiffy Lube franchisee which operates 24 stores in the Reno-Tahoe, NV (11), Coachella Valley, CA (8), and Binghamton, NY (5) markets, was founded by Paul Morabito in 1999. Prior to forming Tibarom, Mr. Morabito owned and operated 18 Q Lube stores in Texas and Colorado, which were sold due to territorial conflicts after Jiffy Lube merged with Q Lube. ***With his extensive experience in the quick lube industry, Mr. Morabito has established a successful track record of building and acquiring new and existing Jiffy Lube stores as well as converting other quick lube stores into profitable Jiffy Lube stores***.
>
> ***Tibarom, Inc. currently has annual revenue of approximately $20 million, EBITDA of $4.5 million and total assets of $11.5 million. This substantial cash flow supports a balance sheet with virtually no long debt term.***
>
> ***Mr. Morabito has proven his ability to add-value to both existing Jiffy Lubes and independent operators through cost-effective marketing, branding and improved operations.  This is evidenced by a consistent post-acquisition increase in average***

---

[31]    Around the time of the sale of Andover Square, Amirkhas' partners asked him how he was going to invest his portion of the proceeds of the sale.  Amirkhas told them he had recently invested (through M&M Real Estate) in the Church's Chicken location, a single tenant triple net lease Property and that he was considering purchasing additional triple net lease investments through M&M Real Estate using his portion of the Andover Square sale proceeds.  When his partners in the Andover Square Property expressed interest in discussing these investments with M&M Real Estate, Muirhead came out to San Francisco for a meeting at Amirkhas' house with Amirkhas and his partners.

[32]    At this time, Amirkhas had no idea that the problems with his Church's Chicken property were anything other then issues caused by a bad tenant.

*ticket size by bundling more services to the usual oil chance as well as managing resources more efficiently.*

*Relative to the overall Jiffy Lube system average, Tibarom has an average ticket amount that is 12% higher, ranking the franchise 23rd out of 212 Jiffy Lube entities. Mr. Morabito has demonstrated his ability to achieve these results quickly, usually within six (6) months of acquiring and/or converting to a Jiffy Lube store. With his latest acquisition, presented in this portfolio of five properties, Mr. Morabito increased monthly store level sales by over 2% in the first three (3) months of operations.*

Part of Tibarom's operating strategy is to pump 100% Pennzoil products versus 70% for other franchises and also to focus on high margin style synthetic oil (30% of sales versus the 5% franchise average). This has resulted in stores that are disproportionately profitable to Pennzoil and has led to a very strong relationship with Royal Dutch Shell, the parent company of Pennzoil Quaker State. This relationship has been beneficial to Mr. Morabito's expansion and acquisition growth strategy.

436. Muirhead repeatedly assured Amirkhas that Kunofsky could not say enough good things about the Jiffy Lube franchise and that Kunofsky personally vouched for Morabito. At no time did Muirhead or Kunofsky disclose to Amirkhas that Kunofsky had a personal and business relationship with Morabito – Muirhead merely told Amirkhas that Kunofsky knew a great deal about Morabito/Eureka/Tibarom and that they operated many Jiffy Lube locations.[33]

437. Muirhead recommended that Amirkhas divide his $1,700,000.00 in cash proceeds from the sale of Andover Square into two bundles – one to be used to purchase the Wilkes-Barre Jiffy Lube and the other to be used to purchase three Uni-Mart locations. Muirhead continuously touted the Jiffy Lube investment as being oil-related and Morabito and Jiffy Lube as being highly successful.

438. As with his Church's Chicken purchase, Muirhead's representations led Amirkhas to believe that he and M&M Real Estate were working to protect Amirkhas' interests and that Amirkhas was buying a very secure property in Jiffy Lube.[34] In a September 20, 2005 e-mail to

---

[33]     Additionally, Defendants never disclosed to any of the Plaintiffs that Bernard Haddigan, the Managing Director of M&M, was conducting business with Morabito/Tibarom/Eureka on the side for his own personal profit. In a March 7, 2004 e-mail concerning Tibarom's 2004 strategic outlook, Morabito noted "Bernie Haddigan, the Managing Director of Marcus and Millichap, is personally taking $8 million worth of the $27 million in exchanged Expressway real estate. . . ."

[34]     In furtherance of the scheme, Amirkhas was told by Muirhead and/or Kunofsky that Sovereign JF made a deal to buy multiple locations from Morabito. As with the Church's Chicken

Amirkhas, Muirhead wrote that "I do consider you a friend over a client. I enjoy our conversations and think we have built and continue to build a good partnership that will benefit us not only on these transactions but for many transactions and years to follow."

439.    In a separate e-mail on September 20, 2005, Muirhead wrote to Amirkhas that "I have extreme confidence in the team we have formed – us, Glen's [Kunofsky] team and Brandon/Barbara." Once again, Muirhead, Kunofsky, and M&M Real Estate all failed to disclose the extent of M&M Real Estate's relationship with Sovereign, JF – the seller of the Wilkes-Barre Jiffy Lube property.

440.    Muirhead told Amirkhas that Amirkhas was Kunofsky's darling because Amirkhas had already bought a Church's Chicken location from him and was in discussions to buy several more triple net lease investments from him. Amirkhas had also referred the Moderbachers and Etemad to Kunofsky, and they were in discussions to each buy multiple properties as well.

441.    As he had done in the Church's Chicken transaction, Amirkhas relied on Muirhead and M&M Real Estate's purported expertise. Before deciding to purchase the Wilkes-Barre Jiffy Lube, Amirkhas again asked Muirhead to assist with the due diligence and analyze the financials for the Jiffy Lube transaction. Amirkhas soon received purportedly independently audited written financial statements from Morabito/Eureka/Tibarom indicating that the entities had $16,000,000.00 in cash on hand. Additionally, Amirkhas was told that there was a long-term lease on the Wilkes-Barre Jiffy Lube property with a monthly rental stream of $20,490.67.

442.    Muirhead and M&M Real Estate represented to Amirkhas that they had "reviewed" the financials and the lease and conducted other due diligence. During the sales process, and at the behest of M&M Real Estate, PGP prepared an appraisal of the property. The appraisal included comparables provided by M&M Real Estate and Morabito/Eureka/Tibarom which comparables were also based on leases with inflated rents, making the appraisal wholly unreliable. The PGP appraisal was transmitted, through mail, facsimile or e-mail, to Amirkhas' lender in the course of the sales

purchase, Amirkhas was led to believe that Sovereign JF made money by purchasing locations in bulk and then selling them off individually.

1   process and closing.  However, the appraisal information was not disclosed to Amirkhas.  Muirhead

2   reviewed the appraisal and assured Amirkhas that the investment "was very, very strong."

3       443.   The transaction was completed on November 14, 2005 with Amirkhas again using

4   Pinnacle for all the 1031 exchange intermediary services for the transaction.  Although Amirkhas

5   had worked with BMC as the lender for his earlier Church's Chicken purchase, he switched to the

6   California Credit Union for the Jiffy Lube purchase at M&M Real Estate's suggestion.  Once again,

7   Amirkhas, Muirhead, Kunofsky, M&M Real Estate, Morabito and Sovereign JF used facsimile, e-

8   mail, phone and U.S. mail by and between California, New York, and Arizona to negotiate the

9   transaction.

10  **The Fraudulent Sale-Leaseback Agreement on the Jiffy Lube Property**

11      444.   Once again, Amirkhas had been defrauded into purchasing a triple net commercial

12  property, this time a Jiffy Lube property, at a price that had been grossly inflated due to Defendants'

13  collective deception and fraud.  Sovereign Scranton, as the alter ego and wholly-owned subsidiary of

14  Sovereign Investment, had previously purchased the Jiffy Lube from Morabito on or around July 1,

15  2004 (just a day after Morabito had purchased the property from a third-party).  Sovereign Scranton

16  simultaneously executed a fraudulent sale-leaseback agreement with Morabito, which had the

17  intended effect of increasing the price of the property to well beyond its fair market value.

18      445.   Defendants intended from the outset to flip the overpriced property to an unwitting

19  investor like Amirkhas.  To conceal the fraudulent nature of the sale, Sovereign Scranton and

20  Sovereign Investment relied on their sister company, M&M Real Estate and its employee Muirhead,

21  to list, market and sell the property.  M&M Real Estate and Muirhead, as alter egos of M&M,

22  misrepresented and concealed material adverse facts about the property's true market value, future

23  rents, business prospects, security and stability.

24      446.   As discussed below, Morabito never had the intention of occupying the property and

25  operating the Jiffy Lube franchise through the full term of the lease, despite the numerous

26  misrepresentations concerning the stability and safety of his business operation.

27

28

**Morabito Abandons the Jiffy Lube**

447.    After the Jiffy Lube purchase closed, Muirhead sent Amirkhas the name of the person to contact at Morabito/Eureka/Tibarom for purposes of collecting rent or addressing any other problems. Initially, Amirkhas dealt with Sartain out of the Morabito/Eureka/Tibarom office in Laguna Beach, California. Two to three months after Amirkhas purchased his Jiffy Lube location, Morabito moved his Eureka and Tibarom alter egos to Reno, Nevada.

448.    In approximately September 2007, Breen joined Tibarom and Eureka as Vice President and General Manager, and Sartain was fired shortly thereafter. Once Sartain was fired, Breen became Amirkhas' contact at Morabito/Eureka/Tibarom. For several months after Breen took over the managerial duties at Morabito/Eureka/Tibarom, the rent arrived on the 25th of each month – the very last day of the ten-day grace period provided for in the lease. Sartain had always ensured that the rent for the Wilkes-Barre Jiffy Lube property arrived by the 15th of each month – the date the rent was due under the lease.

449.    Then, in January 2008, Amirkhas received a call from Etemad who told him that Macchia was now operating their Jiffy Lube locations. Macchia had told Etemad in a prior conversation that Macchia now owned the franchises, that he would be closing some stores, and that there would be no other rental payments forthcoming. At this time, Amirkhas continued to attempt to deal with Morabito because Amirkhas had not consented to Macchia becoming his tenant. Unfortunately, Morabito was nowhere to be found.

450.    Around the same time that Macchia appeared and stopped paying rent, Amirkhas got a letter by mail from Morabito's personal attorney Yalamanchili directing Amirkhas to send all rent questions to her going forward. Yalamanchili stopped answering e-mails and returning calls shortly thereafter.

451.    Soon after Macchia appeared on Amirkhas' property, Macchia proposed paying Amirkhas $9,000.00 in total rent for the two months of back rent instead of the $43,000.00 owed by Morabito/Eureka/Tibarom. In order to attempt to limit his ever-growing damages, Amirkhas accepted the $9,000.00 rent, but did so while explicitly retaining rights to claims for unpaid rents or other claims. Macchia and his company, D&R Lube, Inc., eventually vacated the premises in

1    December 2007.  Ultimately, Amirkhas found a replacement tenant who agreed to lease Amirkhas'

2    location for $11,500.00 per month, significantly less then the rent that the lease with

3    Morabito/Tibarom/Eureka had called for.

4            452.    Throughout the course of Amirkhas' relationship with M&M Real Estate, Muirhead,

5    Kunofsky, Sovereign JF, Morabito, Waelti and the various other members of the M&M Enterprise,

6    Defendants made false and misleading statements and omissions regarding the fair market value,

7    future rents, business prospects, security and stability of Amirkhas' investments – exploiting the

8    relationship of trust that they had intentionally built with Amirkhas.  These false and misleading

9    statements were communicated to Amirkhas via U.S. mail, e-mail, facsimile and by phone.  During

10   this time, Defendants knew that the fair market value of the investment properties were artificially

11   inflated, that the purported long-term leases were a farce, and that the "tenants" would walk away,

12   abandoning the properties, wiping out the artificial inflation in the fair market value of the

13   properties, and eviscerating the future rents.

14           453.    So, as was the case with every other investor, Defendants' conspiracy to scam

15   Amirkhas was a complete success.  Defendants artificially inflated the value of the properties that

16   Amirkhas was induced to purchase, which values plummeted when the Defendants walked away.

17   As a result, Amirkhas suffered severe financial damages, including the loss of fair market value of

18   the property that Amirkhas was induced to purchase, future rents and out-of-pocket damages, all of

19   which he is entitled to recover.

20           454.    M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign CC, Sovereign Scranton,

21   Sovereign Investment, Morabito, Waelti and the various other members of the M&M Enterprise

22   engaged in a continuous pattern of racketeering activity as they used U.S. mail and wire to

23   orchestrate and carry out the sale of the Church's Chicken and Jiffy Lube properties to Amirkhas.

24           455.    M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign CC, Sovereign Scranton,

25   Sovereign Investment, Morabito, Waelti and the various other members of the M&M Enterprise

26   conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit,

27   as set forth herein, which caused Amirkhas to purchase the Jiffy Lube and Church's Chicken

28

1    properties at artificially inflated prices.  The value of the properties plummeted when Waelti and

2    Morabito abandoned them.

3        456.    As demonstrated through their ongoing conduct, M&M Real Estate, M&M,

4    Muirhead, Kunofsky, Sovereign CC, Sovereign Scranton, Sovereign Investment, Morabito, Waelti

5    and the various other members of the M&M Enterprise shared the common purpose of luring

6    investors like Amirkhas into purchasing triple net properties with artificially inflated prices and

7    unsustainable lease terms.

8        457.    The fraudulent sales of the Albany Church's Chicken and the Scranton Jiffy Lube to

9    Amirkhas were by no means random, isolated transactions, but part of a single, coordinated scheme

10   devised by Defendants to sell triple net properties using bogus sale-leaseback agreements.  Indeed,

11   the Albany Church's Chicken property and the Scranton Jiffy Lube property were two of multiple

12   "portfolio" properties that Sovereign Investment had previously agreed to purchase from Morabito.

13   From the outset, Sovereign had planned to purchase these portfolio properties "in bulk" with the

14   intention of re-selling them to unwitting investors at drastically inflated prices.  The sales to

15   Amirkhas were consummated exactly as they had been planned and conceived by Defendants.

16       458.    In addition, the statements made by Defendants to Amirkhas and referenced herein

17   were each materially false and misleading when made as they represented and/or omitted adverse

18   facts which then existed and disclosure of which was necessary to make the statements not false

19   and/or misleading.  The then-existing facts that make those statements false and misleading are set

20   forth in ¶¶149, 458.  In addition to the previously identified false statements, the following adverse

21   facts were also known by Defendants at the time their false and misleading statements and

22   misrepresentations were made:

23            •    The Church's Chicken investments were not safe and secure as Waelti (through his
                  alter egos) and Sovereign CC had entered into long-term leases the obligations of
24                which Waelti never intended to fulfill.  At the time that Waelti and Sovereign CC
                  entered into the sham leases, the rental rates that Waelti had agreed to pay were
25                significantly more than the fair and customary market value rents for Church's
                  Chicken franchises on the properties, and were not supported by the revenues being
26                generated by the properties.  Indeed, well after the close of the Church's Chicken
                  transactions, Waelti told several Plaintiffs that the Church's Chicken restaurants did
27                not generate sufficient income to support the rents that Waelti had "agreed" to pay.

28

- Waelti was not a successful Jack-in-the-Box franchisee and had actually been removed as a Jack-in-the-Box franchisee for bad business practices. Further, Waelti had no experience operating Church's Chicken franchises and had only recently purchased the Church's Chicken stores. Waelti then immediately turned around and sold the locations to Sovereign CC and entered into sham long-term leases with that entity.

- Even assuming Defendants had not agreed to abandon the Properties, the Defendants knew that the collapse of the franchises on the Properties was inevitable, and that such collapse was imminent at the time of the sales to Plaintiffs, because Waelti was a Sub-Credit Tenant obligated to pay artificially-inflated and commercially unreasonable rents.

- Prior to Defendants' sales of the Church's Chicken properties to Plaintiffs, Waelti took a loan of over $3,000,000.00 from GE Capital and used the equipment in the Church's Chicken restaurants as security. Not only was this fact concealed from Plaintiffs, but the security interest was contrary to the leases and purchase agreements which Defendants induced Plaintiffs to enter into. The leases and the purchase agreements stated that all equipment belonged to the Plaintiffs. Following Defendants abandonment of the Church's Chicken properties, Plaintiffs were forced to either pay additional monies to purchase the equipment in their own stores from GE Capital, or surrender that equipment to GE Capital.

- Sovereign CC was not an independent institution, but in fact a subsidiary of M&M and Sovereign Investment.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Amirkhas's purchase of the Church's Chicken property located at 401 West Oglethorpe Blvd., Albany, Georgia 31701

**NOVEMBER 19, 2004**

Waelti/QSR purchased the Albany Church's Chicken property from a third-party for **$897,400.00**\*\*



**NOVEMBER 19, 2004**

Sovereign CC purchased the Albany Church's Chicken property from Waelti/QSR for **$898,000.00**



**DECEMBER 17, 2004**

Sovereign CC and Waelti/QSR One entered into a sham lease with an inflated rental rate of **$7,477.83** with a 1.75% increase per annum through December 31, 2019



**APRIL 15, 2005**

Amirkhas purchased the Albany Church's Chicken property from Sovereign CC for **$1,088,000.00** and assumed the sham lease with Waelti/QSR One as tenant with a monthly rent of **$7,477.83**



**OCTOBER 1, 2007**

Waelti/QSR One abandoned the property



**NOVEMBER 2007**

Amirkhas mitigated his damages and signed a new lease with Cajun Operating Co. for an initial term of 5 years at $**4,900.00** a month



**Damages as a Result of Defendants' Fraud**

**$1,988,625.00**: **$723,000.00** as of closing plus **$1,265,625.00** in future rent, plus misc. out-of-pocket expenses

\*\*Waelti/QSR purchased the Albany Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Waelti/QSR attributed to the Albany Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Amirkhas.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Amirkhas's purchase of the Jiffy Lube property located at 92 Mundy Street, Wilkes-Barre, Pennsylvania, 18702

**JUNE 30, 2004**

Morabito/Scranton Lube purchased the Jiffy Lube property from a third-party for $<u>770,000.00</u>**



**JUNE 30, 2004**

Sovereign Scranton purchased the Jiffy Lube property from Morabito/Scranton Lube for <u>$2,925,000.00</u>



**JULY 1, 2004**

Sovereign Scranton and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of <u>$20,490.67</u> with a 1.60% increase per annum through June 30, 2029



**NOVEMBER 15, 2005**

Amirkhas purchased the Jiffy Lube property from Sovereign Scranton for <u>$2,939,082.00</u> and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of <u>$20,490.67</u>



**JANUARY 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Macchia/D&R Lube



**DECEMBER 2007**

Macchia/D&R Lube abandoned the property



**APRIL 1, 2008**

Amirkhas mitigated his damages and signed a new lease with Snowdon for 36 months at a rental rate of <u>$11,500.00</u> per month



**Damages as a Result of Defendants' Fraud**

<u>$8,937,989.00</u>: <u>$2,309,082.00</u> as of closing plus <u>$6,628,907.00</u> in future rent, plus misc. out-of-pocket expenses

**Morabito/Scranton Lube purchased the Wilkes-Barre Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/Scranton Lube attributed to the Wilkes-Barre Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Amirkhas.

1  **K.     Allen Hom[35]**

2  **The Sale of the Painted Post and the Hornell Jiffy Lube Properties to Hom**

3        459.    In 2004, Allen Hom's ("Hom") sister-in-law purchased a Captain D's seafood

4  restaurant through Mickle, an M&M Real Estate agent based in San Diego, California.  After his

5  sister-in-law referred Hom to M&M Real Estate, Hom purchased two Captain D's restaurants with

6  Mickle's guidance.

7        460.    In mid-2004, Mickle, as an agent of M&M Real Estate, advised Hom that M&M Real

8  Estate was marketing a few Jiffy Lube triple net lease investments with high cap rates.  Hom had

9  previously expressed to Mickle his interest in pursuing investments with high cap rates.  Mickle and

10  M&M Real Estate represented that the tenants on the Jiffy Lube properties – Eureka and Tibarom

11  (which were alter egos of Morabito) – were experienced operators who had signed 25-year long-term

12  leases for both locations.  These representations were made to Hom by phone.

13        461.    Hom was interested in the Jiffy Lube properties because of the high cap rates, 25-year

14  lease terms, and because of the fact that he believed that M&M Real Estate and Mickle were

15  trustworthy and were making truthful representations to him.  M&M Real Estate and Mickle

16  represented to Hom that the Painted Post Jiffy Lube property had a 25-year lease beginning

17  March 4, 2004 with a base lease rate of $9,711.00, and 1.6% annual increases.  M&M Real Estate

18  and Mickle represented to Hom that the Hornell Jiffy Lube property had a 25-year term lease

19  beginning October 2003 with a base lease rent of $7,585.00, and 1.6% annual increases.  Again,

20  these representations were made to Hom by phone.

21        462.    Though Hom was told that Sovereign JF owned the stores, no one disclosed to Hom

22  the extent of Sovereign JF's relationship with M&M.  Kunofsky of M&M Real Estate's New York

23  office was the listing agent on the Jiffy Lube properties.[36]  Throughout the process, Mickle,

24  _____

25  [35]      Hom took title to his properties as Trustee for the Allen Ernest Hom Trust, dated August 19,

26  1992.

27  [36]      Much of the information for the Jiffy Lube properties was provided from Kunofsky to Mickle
   who, in turn, passed it along to Hom.

28

1   Kunofsky and M&M Real Estate continuously represented to Hom that the stores were profitable

2   and would be safe, secure investments.

3        463.   Hom believed that Mickle and M&M Real Estate were representing him as a buyer

4   and were looking out for his best interests.  M&M Real Estate's reputation and the combination of

5   the long lease terms and experienced operators made the properties seem to be very safe

6   investments.

7        464.   In approximately June 2004, in reasonable reliance on M&M Real Estate's

8   representations, Hom signed letters of intent for the Painted Post and Hornell Jiffy Lube properties.

9   The price for the Painted Post Jiffy Lube was $1,338,448.00 and the price for the Hornell Jiffy Lube

10  was $1,046,310.00, both with an 8.7% cap rate.  Mickle advised Hom as to what prices to offer.

11  Based on their prior relationship as well as M&M Real Estate's reputation, Hom believed that

12  Mickle and M&M Real Estate were representing him and would act in his best interests.

13       465.   Once Hom signed the purchase agreements, M&M Real Estate began sending him,

14  through U.S. mail, due diligence information about his Jiffy Lube locations, including a Phase I

15  Environmental Report, Pre-title report, site maps and the leases.  M&M Real Estate also provided

16  Hom with a Tibarom compilation report of assets, liabilities and shareholder equity for the period

17  ended December 31, 2003 showing that Tibarom had a strong balance sheet.  The report was

18  prepared by BMI (which was an alter ego of Morabito).[37]

19       466.   Hom closed on the Painted Post Jiffy Lube property on August 25, 2004, paying

20  $1,396,048.99, and on the Hornell Jiffy Lube property on August 27, 2004, paying $1,070,929.00.

21  On August 26, 2004, Mickle faxed Hom the settlement statements for the two Jiffy Lube properties.

22  Hom, Mickle, Kunofsky, M&M Real Estate, Sovereign JF and Morabito/Eureka/Tibarom used

23  facsimile, e-mail, phone and U.S. mail by and between California and New York to negotiate the

24  transaction.

25  _____

26  [37]     Morabito is identified as President of BMI according to http://www.manta.com/coms2/
    dnbcompany_dmmlsf.  Salvatore Morabito identified himself as Vice President of BMI in political
27  donations in 2004.  *See* http://fundrace.huffingtonpost.com/neighbors.php?type=name&lname=
    Morabito&fname=Salvatore.

28

**The Fraudulent Sale-Leaseback on the Properties**

467.    Little did Hom know that he had been defrauded into purchasing commercial properties at prices that had been grossly inflated due to the existence of sham leases crafted by Defendants.  Indeed, Sovereign JF, as an alter ego and wholly-owned subsidiary of Sovereign Investment, had previously purchased the Painted Post and Hornell Jiffy Lube properties from Morabito (on the same days Morabito purchased the properties from third-parties).  Sovereign JF simultaneously executed fraudulent sale-leaseback agreements with Morabito, which had the intended effect of artificially increasing the price of the properties to well beyond their fair market values.

468.    Defendants intended from the outset to flip the overpriced properties to an unwitting investor like Hom.  Accordingly, to conceal the fraudulent nature of the sale, Sovereign JF and Sovereign Investment turned to their sister company, M&M Real Estate, to list, market and sell the property.  M&M Real Estate, through its agents and as an alter ego of M&M, misrepresented and concealed material adverse facts about the property's true market value, future rents, business prospects, security and stability.

469.    As discussed below, Morabito had no intention of occupying the property and operating the Jiffy Lube franchises through the full term of the leases, despite the numerous misrepresentations concerning the stability and safety of his operation.

**Morabito Abandons the Jiffy Lube Properties**

470.    Morabito/Eureka/Tibarom paid rent from the close of the transaction in August 2004, through May 2005.  However, on May 12, 2005, Morabito/Eureka/Tibarom purportedly assigned both long-term leases on the Jiffy Lube properties to Peanut Oil – without Hom's consent and in violation of the express language in the lease agreements.  The purported notice of assignment received by Hom in a certified letter from Morabito/Eureka/Tibarom identified Pearson and Pickett as the proprietors of Peanut Oil, but Morabito/Eureka/Tibarom provided no evidence to Hom that Peanut Oil was as well capitalized as Morabito/Eureka/Tibarom – a requirement for such an assignment under the leases. The notice of assignment from Morabito indicated that "[a]part from having tremendous experience in operating Jiffy Lubes, they have a company [Peanut Oil] that is

debt free, and capable of becoming one of the preeminent franchises within the over 2,300 Jiffy Lube Store Community."

471.    Peanut Oil made rent payments for several months before problems began.  On January 9, 2006, Yalamanchili, counsel for Morabito/Eureka/Tibarom, sent a letter to Hom stating that Morabito had sold his interest in Hom's property on May 15, 2005, and that Morabito/Eureka/Tibarom were no longer obligated to pay any taxes related to the property.  Hom eventually was forced to pay a tax lien after Morabito/Eureka/Tibarom and Peanut Oil both refused to pay the taxes.

472.    In both January and February 2006, the rent for the Hornell and Painted Post Jiffy Lube properties was late.  Peanut Oil eventually paid the rent and a late fee, and then subsequently paid April rent late, but did not pay the required late fees.

473.    On May 1, 2006, Peanut Oil failed to make monthly rent payments on the properties, and, thereafter, did not pay any further rent on Hom's two Jiffy Lube properties.  Several months later, despite the large amount of unpaid rent, Pearson contacted Hom and offered to purchase the Hornell and Painted Post Jiffy Lube properties from him for an amount much lower than what Hom had paid.

474.    Then, on August 8, 2006, Peanut Oil sent correspondence by U.S. mail to Hom requesting a rent reduction, ostensibly because construction near their facility was negatively impacting the business.  In order to mitigate his damages, Hom faxed a letter to Peanut Oil on August 17, 2006 offering a 10% rent reduction on the condition that Peanut Oil paid $48,000.00 in unpaid rent.  Hom received no response.

475.    On September 18, 2006, Hom made an additional demand for unpaid rent and on October 4, 2006, Hom wrote to Morabito/Eureka/Tibarom regarding the troubling situation with Peanut Oil.  Hom never received a response from Morabito/Eureka/Tibarom.  Thereafter, Hom continued to demand back rent payments for the Hornell and Painted Post Jiffy Lube properties from Morabito/Eureka/Tibarom and Peanut Oil, but still no rent was paid.

476.    In May 2008, Peanut Oil abandoned the Hornell and Painted Post Jiffy Lube properties after operating the locations without paying rent for approximately two years.  Around

1  that time, Hom paid approximately $10,000.00 - $11,000.00 on each property to clear outstanding

2  tax liens.

3      477.    In order to further mitigate his damages, Hom leased the stores to Ben Kohberger

4  ("Kohberger "). Kohberger 's rent for the Hornell location started at $1,500.00, and for the Painted

5  Post location, the rent started at $3,500.00. In addition, Kohberger agreed to pay taxes and insurance

6  on the properties. Hom is receiving from Kohberger only about one-third of the payments agreed to

7  by Morabito/Eureka/Tibarom under the original long-term leases.

8  **The Sale of the Jacksonville Church's Chicken to Hom**

9      478.    In April 2006, Mickle began to market a Church's Chicken at 3007 W. Edgewood

10  Ave., Jacksonville, Florida to Hom.[38] Mickle and M&M Real Estate represented in a fax to Hom

11  that "This property can be delivered at a 9.0% CAP. The operator currently has 10 stores and is

12  merging with a 20 unit operator in the next few weeks. The guarantee will triple in size." The

13  asking price for the Jacksonville Church's Chicken was $1,223,405.00. Mickle told Hom that the

14  property was located in a middle-class area in Jacksonville. Based upon these and other

15  representations made by Mickle and M&M Real Estate, the property seemed like a good opportunity

16  to Hom.

17      479.    M&M Real Estate's marketing materials promised a "[s]trong tenant with proven

18  restaurant experience." Hom was led to believe the tenant on the Jacksonville Church's Chicken

19  property, QSR II (which was an alter ego of Waelti), and the seller, Sovereign CC, were big

20  operators. He concluded, in reasonable reliance on Mickle and M&M Real Estate's representations,

21  that Waelti/QSR II was a financially stable lessee and a solid company.

22      480.    Hom wanted to buy the Jacksonville Church's Chicken property at a 9.0% cap rate,

23  which equated to a $1,020,000.00 purchase, so he offered that amount to Sovereign CC. Sovereign

24  CC agreed to the $1,020,000.00 offer on the condition that the due diligence period be shortened to

25  10 days because Sovereign CC wanted to close escrow quickly.

26

27  [38]    At this time, Hom had no idea that the problems with his Jiffy Lube properties were anything other then issues caused by a single bad tenant.

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)          - 134 -

481.   M&M Real Estate provided Hom with a Title Commitment, Survey, Phase I Environmental Audit, Lease and Budget documents as part of the due diligence process.  M&M Real Estate and Mickle continued to represent that the investment was solid and safe and that Waelti/QSR II was a large operator with a number of stores.  Hom was told that QSR One (which was an alter ego of Waelti) and QSR II were operating in different states, and that the property Hom was buying was a part of QSR II.  According to the lease already in place between Waelti/QSR II and Sovereign CC, the monthly rent on November 19, 2004 was $7,693.58 per month with 1.75% annual increases.

482.   M&M Real Estate provided Hom with a series of Waelti/QSR II financial spreadsheets that purported to show performance of the Jacksonville Church's Chicken location and other Waelti/QSR II Church's Chicken locations for the years 2001 through 2003.[39]  Indeed, Hom was persuaded by M&M Real Estate and Mickle that Waelti/QSR II was so big with QSR One, QSR II, and QSR (which was an alter ego of Waelti) that Waelti/QSR II would have enough cash flow to carry a low performing store if there was one – *i.e.*, to have a financial cushion that would insure the safety, security and success of his investment.

483.   In reasonable reliance on M&M Real Estate and Mickle's representations, Hom signed a purchase and sale agreement on May 1, 2006 for the purchase of the Jacksonville Church's Chicken property.  Thereafter, Sovereign CC pushed for a quick closing while Mickle and M&M Real Estate continued to assure Hom that the property was a very stable investment.

484.   On June 20, 2006, just days before closing, Sovereign CC and Waelti/QSR II amended the long-term lease agreement in place on the property with Sovereign CC agreeing to accept a 20% rent reduction from June 1, 2006 through May 31, 2007.  The total amount of the rent reduction was $18,952.12 over the 12 month period.  Hom closed on approximately June 26, 2006, financing $700,000.00 of the purchase, with an interest rate of 7.375% fixed for five years.  Hom,

---

[39]   In fact, during the time period referenced in the financials, the Church's Chicken locations were operated by the prior owner, Lewis Siplin, not Waelti/QSR II.  This fact was never disclosed to Hom.

1   Mickle, M&M Real Estate, Sovereign CC and Waelti/QSR II used facsimile, e-mail, phone and U.S.

2   mail by and between California, New York, and Florida to negotiate the transaction.

3   **The Fraudulent Sale-Leaseback on the Property**

4   485.   Once again, Hom had no way of knowing at the time of closing that the price of the

5   Jacksonville Church's Chicken had been grossly and artificially inflated due to the sham lease.

6   Sovereign CC, as the alter ego and wholly-owned subsidiary of Sovereign Investment, had

7   previously purchased the Jacksonville Church's Chicken from Waelti on or around October 27, 2003

8   (the very same day Waelti had purchased the property from a third-party).   Sovereign CC

9   simultaneously executed a fraudulent sale-leaseback agreement with Morabito, which had the

10  intended effect of increasing the price of the property to well beyond its fair market value.

11  486.   Defendants intended from the outset to sell the grossly-inflated property to an

12  unwitting investor like Hom.  Thus, to conceal the fraudulent nature of the sale, Sovereign CC and

13  Sovereign Investment turned to their sister company, M&M Real Estate, to list, market and sell the

14  property.  M&M Real Estate, through its agents and as an alter ego of M&M, misrepresented and

15  concealed material adverse facts about the property's true market value, future rents, business

16  prospects, security and stability.

17  487.   Waelti also had no intention of occupying the property and operating the Church's

18  Chicken franchise through the full term of the lease, despite the numerous misrepresentations

19  concerning the stability and safety of his operation.

20  **Waelti Abandons the Church's Chicken**

21  488.   Hom received rent for the Jacksonville Church's Chicken property through April

22  2007.  However, on May 11, 2007, Waelti/QSR II sent Hom correspondence by mail notifying him

23  that Waelti/QSR II intended to unilaterally reduce its rent by 50% due to the financial hardships it

24  was purportedly facing.  Though Hom never consented to Waelti/QSR II's unilateral rent reduction,

25  he only received 50% of his normal rent in May, June and July.  In August 2007, Hom did not

26  receive any rent payment from Waelti/QSR II.

27  489.   In September 2007, Hom received a check for $6,683.83, presumably for August and

28  September 2007 rent.  The check initially bounced for insufficient funds, but Hom's bank attempted

1    to deposit the check again, and it went through on the second try.  Hom received no further rent

2    payments thereafter.

3        490.    Waelti/QSR II abandoned the Jacksonville Church's Chicken property in the fall of

4    2007.  In May 2008, in an effort to mitigate his damages, Hom signed a lease with a new tenant,

5    Florida Chicken, for $3,300.00 per month, which is approximately 50% of the rent under the original

6    long-term lease with Waelti/QSR II.  The new lease will increase by 2% starting in year six.

7        491.    Throughout the course of Hom's relationship with M&M Real Estate, Sovereign CC,

8    Morabito, Waelti and the various other members of the M&M Enterprise, Defendants made false and

9    misleading statements and omissions regarding the fair market value, future rents, business

10   prospects, security and stability of Hom's investments – exploiting the relationship of trust that they

11   had intentionally built with Hom.  These false and misleading statements were communicated to

12   Hom via U.S. mail, e-mail, facsimile and by phone.  During this time, Defendants knew that the fair

13   market value of the investment properties was artificially inflated, that the purported long-term

14   leases were a farce, and that the "tenants" would walk away, abandoning the properties, wiping out

15   the artificial inflation in the fair market value of the properties, and eviscerating the future rents.

16       492.    So, as was the case with every other investor, Defendants' conspiracy to scam Hom

17   was a complete success.  Defendants artificially inflated the values of the properties that Hom was

18   induced to purchase, which values plummeted when the Defendants walked away.  As a result, Hom

19   suffered severe financial damages, including the loss of fair market values of his investments, future

20   rents and out-of-pocket damages, all of which he is entitled to recover.

21       493.    M&M Real Estate, M&M, Sovereign CC, Sovereign JF, Sovereign Investment,

22   Morabito, Waelti and the various other members of the M&M Enterprise engaged in a continuous

23   pattern of racketeering activity as they used U.S. mail and wire to orchestrate and carry out the sale

24   of the properties to Hom.

25       494.    M&M Real Estate, M&M, Sovereign CC, Sovereign JF, Sovereign Investment,

26   Morabito, Waelti and the various other members of the M&M Enterprise conducted and directed the

27   affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1    caused Hom to purchase the Jiffy Lube and Church's Chicken properties at grossly inflated prices.

2    The value of the properties later plummeted when Defendants abandoned them.

3         495.    As demonstrated through their ongoing conduct, M&M Real Estate, M&M,

4    Sovereign CC, Sovereign JF, Sovereign Investment, Morabito, Waelti and the various other

5    members of the M&M Enterprise shared the common purpose of luring investors like Hom into

6    purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

7         496.    The sale of the Jiffy Lube and Church's Chicken properties to Hom were by no means

8    separate and isolated transactions, but were part of the same single, coordinated scheme devised by

9    Defendants using bogus sale-leaseback agreements.  Indeed, the Jiffy Lube and Church's Chicken

10   properties were part of the "portfolio" that Sovereign Investment had previously agreed to purchase

11   from Morabito and Waelti, respectively.  From the outset, Sovereign had planned to purchase these

12   portfolio properties "in bulk" with the goal of re-selling them to unwitting investors at artificially

13   inflated prices.  The sales to Hom were consummated exactly as it had been planned and conceived

14   by Defendants.

15        497.    In addition, the statements made by Defendants to Hom and referenced herein were

16   each materially false and misleading when made as they represented and/or omitted adverse facts

17   which then existed and disclosure of which was necessary to make the statements not false and/or

18   misleading.  The then-existing facts that make those statements false and misleading are set forth in

19   ¶¶149 and 458.  In addition to the previously identified false statements, the following adverse facts

20   were also known by Defendants at the time their false and misleading statements and

21   misrepresentations were made:

22        •    Morabito was an executive of, and controlled, BMI and thus the financial documents
               provided to Plaintiffs did not come from an independent entity.

23

24        •    Pearson, Pickett and Peanut Oil were neither well-capitalized nor capable of
               efficiently operating the Jiffy Lube franchise.  Indeed, shortly after Defendants' fraud
               was uncovered, Pickett, Pearson and Peanut Oil filed for bankruptcy protection

25

26

27

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Hom's purchase of the Church's Chicken property located at 3007 W. Edgewood Avenue, Jacksonville, Florida 32209

### NOVEMBER 19, 2004

Waelti/QSR purchased the Jacksonville Church's Chicken property in a group of four properties from a third-party for a combined price of **$3,223,800.00** - or an average of **$805,950.00** per property**



### NOVEMBER 19, 2004

Sovereign CC and Waelti/QSR II entered into a sham lease with an inflated rental rate of **$7,693.58** per month with a 1.75% increase per annum



### NOVEMBER 19, 2004

Sovereign CC purchased the same four properties, including the Jacksonville Church's Chicken property from Waleti/QSR for a combined price of **$3,223,800.00** - an average of **$805,950.00** per property



### JUNE 22, 2006

Hom purchased the Jacksonville Church's Chicken property from Sovereign CC for **$1,020,000.00** and assumed the lease with Waelti/QSR II as tenants with a monthly rent of **$7,693.58**



### FALL 2007

Waelti/QSR II abandoned the property



### MAY 2008

Hom mitigated his damages and signed a new lease with Florida Chicken for **$3,300.00** a month with a 2% yearly increase beginning in the sixth year of the lease



### Damages as a Result of Defendants' Fraud

**$1,914,176.00**: **$620,000.00** as of closing plus **$1,294,176.00** in future rent, plus misc. out-of-pocket expenses

** Waelti/QSR purchased the Jacksonville Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of proceeds that Waelti/QSR attributed to the Jacksonville Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Hom.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Hom's purchase of the Jiffy Lube property located at 141 Seneca Street, Hornell, New York, 14843

---

**OCTOBER 27, 2003**

Morabito/NY Seven Lube purchased the Hornell Jiffy Lube property from a third-party for **$650,000.00**\*\*



**OCTOBER 27, 2003**

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease with an inflated rental rate of **$7,585.75** per month and a 10% increase every 10 years through October 26, 2028



**OCTOBER 27, 2003**

Sovereign JF purchased the Hornell Jiffy Lube from Morabito/NY Seven Lube for **$961,785.00**



**AUGUST 25, 2004**

Hom purchased the Hornell Jiffy Lube from Sovereign JF for **$1,070,929.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$7,585.75**



**MAY 12, 2005**

Morabito/Eureka/Tibarom assigned the lease to Pearson/Pickett/Peanut Oil



**MAY 2008**

Pearson/Pickett/Peanut Oil abandoned the property



**July 15, 2008**

Hom mitigated his damages and signed a new lease with Oil Xpress for a five year term at an initial rental rate of **$1,500.00** per month



**Damages as a Result of Defendants' Fraud**

**$3,456,411.00**: **$720,929.00** as of closing plus **$2,735,482.00** in future rent, plus misc. out-of-pocket expenses

\*\*Morabito/NY Seven Lube purchased the Hornell Jiffy Lube property at the same time he purchased several other Jiffy Lube properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of the proceeds that Morabito/NY Seven Lube attributed to the Hornell Jiffy Lube property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Hom.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Hom's purchase of the Jiffy Lube property located at 321 S. Hamilton Street, Painted Post, New York 14870

**MARCH 5, 2004**

Morabito/Rochester Lube purchased the Painted Post Jiffy Lube property from a third-party for **$1,105,000.00**

**MARCH 5, 2004**

Sovereign JF and Morabito/Eureka/Tibarom entered into a sham lease at an inflated rental rate of **$9,711.00** per month with a 1.60% increase per annum through March 4, 2029

**MARCH 5, 2004**

Sovereign JF purchase the Painted Post Jiffy Lube property from Morabito/Rochester Lube for **$1,246,332.00**

**AUGUST 27, 2004**

Hom purchased the Painted Post Jiffy Lube property from Sovereign JF for **$1,370,964.00** and assumed the sham lease with Morabito/Eureka/Tibarom as tenants with a monthly rent of **$9,711.00**

**MAY 12, 2007**

Morabito/Eureka/Tibarom purportedly assigned the lease to Pearson/Pickett/Peanut Oil

**MAY 2008**

Pearson/Pickett/Peanut Oil abandoned the property

**JULY 15, 2008**

Hom mitigated his damages and signed a new lease with Oil Xpress for a five year period at **$3,500.00** per month

**Damages as a Result of Defendants' Fraud**

**$4,343,721.00**: **$1,050,964.00** as of closing plus **$3,292,757.00** in future rent, plus misc. out-of-pocket expenses

**L.    Mary Cheatham[40]**

**The Sale of the Jacksonville Church's Chicken to Cheatham**

498.    In 2001, Mary Cheatham ("Cheatham") assisted her mother in the purchase of an IHOP property in Oklahoma.  Through that transaction, Cheatham was introduced to M&M Real Estate Senior Investment Associate Emas in the Ontario, California M&M Real Estate office.  Emas helped Cheatham's mother buy an IHOP triple net lease property as an exchange for a property previously sold.

499.    In approximately January 2005, Cheatham contacted Emas to represent her in connection with her own potential triple net lease investment.  Thereafter, Emas, as an agent of M&M Real Estate, provided Cheatham with a list of available properties.  According to the materials that Emas and M&M Real Estate provided to Cheatham, there were only a limited number of properties available in her price range of approximately $500,000.00.

500.    Despite her limited finances and her expressed desire to invest in a stable, secure property with a consistent income stream, Emas convinced Cheatham to spend more than the $500,000.00 she wanted to invest.  Indeed, Emas insisted that Cheatham should invest in a property in the $1,000,000.00 price range "to find a quality property," even though it meant she would need to finance the property.  Towards that end, Emas sent by U.S. mail a brochure to Cheatham for a Church's Chicken property in Jacksonville, Florida, along with marketing and financial information for the property.  Those materials included representations that caused Cheatham to believe that the Jacksonville Church's Chicken property was the safe and secure investment with a consistent income stream that she required.

501.    Waelti, the operator of the Jacksonville Church's Chicken property, was prominently featured in the marketing materials provided by Emas and M&M Real Estate.  The materials touted Waelti's experience and success.  As a result of these and other representations made by Emas and

---

[40]    Mary Cheatham took title to the property in Cheatham Properties, LLC, a California Limited Liability Company.

1   M&M Real Estate, Cheatham believed that Waelti's involvement as operator of the Jacksonville

2   Church's Chicken was an indication of the stability of the investment.

3       502.    During their phone conversations, Emas told Cheatham that Emas himself owned a

4   Church's Chicken in Monrovia, California – leading Cheatham to believe that Church's Chicken

5   properties were reliable investments.  Cheatham also conducted research regarding the franchisor.

6   Further, Cheatham sent her accountant a copy of financial statements she received early in the

7   process from QSR II (which was an alter ego of Waelti) – the tenant and guarantor of the long-term

8   lease in place on the Jacksonville Church's Chicken property.  Cheatham's accountant reviewed the

9   financials and gave Cheatham the green light to proceed.

10      503.    In reasonable reliance on M&M Real Estate, Emas and Waelti/QSR II's

11  representations, Cheatham selected the Jacksonville Church's Chicken restaurant as a good

12  candidate for her investment.  Cheatham was told by Emas that she needed to act quickly given that

13  the seller of the property, Sovereign CC, had already sold two of the five Church's Chicken

14  properties that it owned.

15      504.    Cheatham initially thought that the purchase price for the Jacksonville Church's

16  Chicken property was a bit high.  M&M Real Estate represented that the restaurant's monthly sales

17  were reportedly $65,000.00 to $70,000.00, which seemed comparable to the monthly sales of

18  $70,000.00 to $80,000.00 generated by the Taco Bell that Cheatham owned with her sister in

19  Sacramento, California.  The rent on the long-term lease at the Jacksonville Church's Chicken was

20  starting at $6,812.42 per month, which was approximately 10% of the purported gross sales.  The

21  Taco Bell property only paid her approximately 5% of gross sales in rent at the time. Yet, the Taco

22  Bell property, which was near the end of its lease, appraised for $360,000.00 to $380,000.00 based

23  on the presence of that tenant.  Cheatham was uncertain why the Church's Chicken property was

24  purportedly worth so much more than the Taco Bell property and could pay her so much more rent

25  as a percentage of sales.

26      505.    Cheatham expressed these concerns to Emas, who told her that Church's Chicken was

27  a different operation than Taco Bell, and therefore valued differently.  Emas represented to

28  Cheatham that Church's Chicken had a different business model then Taco Bell – making larger

1    profits which, in turn, allowed it to afford higher rents.  Emas represented that Church's Chicken "is

2    lower volume and higher profit, and rent is typically 10% of sales."  Emas and M&M Real Estate

3    further represented to Cheatham that the $6,800.00 per month rent was the proper market rent for a

4    tenant on a Church's Chicken property.  Emas made these representations to Cheatham during

5    multiple phone calls.  Cheatham trusted Emas and M&M Real Estate, was confident in their

6    knowledge, abilities and advice, and believed they represented her and would protect her interests.

7    As such, she relied on Emas and M&M Real Estate's explanation.  Thereafter, Cheatham signed a

8    letter of intent to purchase the property for $1,000,000.00 on February 16, 2005.

9        506.    On February 24, 2005, M&M Real Estate provided Cheatham with pro forma

10   financials, store sales by location, a property condition report and conditional title, among other

11   things.  Thereafter, Cheatham undertook independent due diligence, visiting the Jacksonville

12   Church's Chicken property between March 17 and March 18, 2005.  On this visit, Cheatham was

13   told about renovation plans to bring the store up to the latest and greatest Church's Chicken design.

14   Cheatham went to the store at two different times of day to check the traffic in the store, see the

15   building location, and observe how well the store was kept.

16       507.    On March 22, 2005, Cheatham requested additional financial information about

17   Waelti/QSR II, but was told by M&M Real Estate that no additional information was available.

18   Apparently in an attempt to allay her fears, Waelti/QSR II re-confirmed in writing that the lease was

19   in force and that Waelti/QSR II was paying $6,812.42 per month to Sovereign CC.  M&M Real

20   Estate and Emas also provided Cheatham a copy of the long-term lease.  The lease had commenced

21   on November 15, 2004 and had a 15-year term, with annual rent of $81,749.00 in year one,

22   increasing by 1.75% per year.

23       508.    Also on March 22, 2005, Cheatham inquired, in an e-mail to Emas, about an entity

24   named Lewis Siplin Enterprises, Inc., whose name had appeared in documents related to the

25   Jacksonville Church's Chicken property.  Emas wrote to Cheatham that "Lewis Siplin was the prior

26   franchisee who sold his business to the QSR Group.  He has owned his businesses, and these

27   locations in Florida and Georgia since roughly 1990 (we can verify the exact time period)."

28   Cheatham also asked in that same e-mail "When did QSR Group II, LLC become the franchisee?"

1   and she was told that "[I]n December, 2004 AFC Enterprises, the parent to Church's, approved the

2   transfer of the franchise agreement for these locations from Siplin to QSR Group."

3        509.    On March 30, 2005, in reliance upon the various representations made by M&M Real

4   Estate, Emas and Waelti/QSR II, Cheatham removed her due diligence contingencies.

5        510.    On April 22, 2005, Cheatham closed on the Jacksonville Church's Chicken property,

6   paying $1,000,000.00 for her store, with a $525,000.00 mortgage and additional costs and expenses

7   of $23,110.00, for a total of $1,023,110.  Cheatham, Emas, M&M, Sovereign CC and Waelti used

8   facsimile, e-mail, phone and U.S. mail by and between California, New York and Florida to

9   negotiate the transaction.

10  **The Fraudulent Sale-Leaseback on the Property**

11       511.    Little did Cheatham know that she had been defrauded into purchasing a commercial

12  property at a price that had been grossly inflated due to the existence of a sham lease crafted by

13  Defendants.  Indeed, Sovereign CC, as the alter ego and wholly-owned subsidiary of Sovereign

14  Investment, had previously purchased the Jacksonville Church's Chicken from Waelti on or around

15  November 19, 2004 (the very same day Waelti had purchased the property from a third-party).

16  Sovereign CC executed a fraudulent sale-leaseback agreement with Waelti, which had the intended

17  effect of artificially increasing the price of the property to well beyond its fair market value.

18       512.    Defendants intended from the very beginning to flip the overpriced property to an

19  unwitting investor like Cheatham.  Accordingly, to conceal the fraudulent and deceptive nature of

20  the sale, Sovereign CC and Sovereign Investment turned to their sister company, M&M Real Estate,

21  to list, market and sell the property.  M&M Real Estate, through its agents and as an alter ego of

22  M&M, misrepresented and concealed material adverse facts about the property's true market value,

23  future rents, business prospects, security and stability.

24       513.    As discussed below, Waelti had no intention of occupying the property and operating

25  the Church's Chicken franchise through the full term of the lease, despite the numerous

26  misrepresentations concerning the stability and safety of his operation.

27

28

**Waelti Abandons the Church's Chicken**

514.    From the close of the sale through May 2006, Cheatham received monthly rent checks (many of which were late) from Waelti/QSR II for the Church's Chicken property, although several bounced and had to be resent.  In May 2006, the rent was again very late and wired to Cheatham at the end of the month.  Prior to receiving the May 2006 rent, Cheatham received a phone call and numerous e-mails from an individual named Clinton Barrow ("Barrow"), purportedly an employee at QSR II, who told her that all the Church's Chicken landlords would be receiving 80% rent for the next year, and after that QSR II would pay all of the landlords their full rent.

515.    On June 1, 2006, Cheatham received an e-mail from Michelle Piercy ("Piercy") at QSR II in regards to a wire payment for the May 2006 rent.  Thereafter, Cheatham received a letter from Waelti/QSR II dated July 1, 2006, asking her to agree to accept 80% rent.  Cheatham did not agree to this rent reduction.  Nonetheless, the next month Waelti/QSR II unilaterally began paying 80% of its monthly rental obligations under the long-term lease.  In an effort to mitigate her damages, Cheatham accepted the reduced rent payment.

516.    On November 13, 2006, Cheatham advised Emas that she was only receiving $5,545.00 in rent from Waelti/QSR II instead of the $6,931.00 she was supposed to be receiving. Emas did not provide any assistance.

517.    On May 11, 2007, Waelti/QSR II sent Cheatham a letter by U.S. mail purporting to unilaterally reduce its rent by an additional 50%.  Cheatham called Waelti/QSR II right away and told Waelti/QSR II that the additional purported unilateral rent reduction was not acceptable. Nevertheless, Waelti/QSR II paid only $1,966.74 for May rent, which was $1,000.00 short of 50% of the previous rent payment.  In response, Cheatham sent Waelti/QSR II an e-mail pointing out the shortfall (off of the additional unilateral 50% reduction) and was sent a check for the missing $1,000.00.  That check bounced.

518.    Then, on May 18, 2007, Cheatham received an e-mail from Barrow in response to an e-mail that she had sent, advising Cheatham that Barrow no longer worked for QSR II and could not speak on any matters relating to the restaurants.  Thereafter, Cheatham received a call from Barrow who started the call by telling her if she ever told anyone he had called he would deny it.  He advised

1  her "to play hard-ball with QSR II.  He didn't know what they were up to but [she] shouldn't trust

2  them."

3       519.  On June 21, 2007, Waelti/QSR II paid $8,900.20 in unpaid rent, which Cheatham

4  used to pay the delinquent 2006 property taxes of $8,748.21 (which were supposed to be paid by

5  Waelti/QSR II).  Waelti/QSR II attempted to pay reduced rent in July 2007, in the amount of

6  $2,966.74, but Cheatham did not accept the rent because she had filed eviction proceedings.

7       520.  From July through August 2007, Cheatham had several telephone conversations with

8  Aslam Khan ("Khan"), an individual who, at the time, owned 132 Church's Chicken locations.

9  After explaining the situation to Khan, Khan told Cheatham that her store would likely have to be

10  closed because the location's rent as a percentage of gross sales was way too high.  Cheatham's

11  Jacksonville Church's Chicken store rent was 13.2% of gross sales, while Khan's locations averaged

12  5.5%.  Cheatham was shocked by this information because it was directly at odds with what M&M

13  Real Estate, Emas and Waelti/QSR II had represented to her to induce her to purchase the property.

14       521.  On or about August 27, 2007, Cheatham found out that Waelti/QSR II was

15  abandoning the property.  When Cheatham was able to have someone inspect the property thereafter,

16  she found out that Waelti/QSR II had left the property in a poor condition.  There was approximately

17  $40,000.00 in damage to the roof and air conditioning unit, with copper and other materials stripped

18  from the property.

19       522.  In order to mitigate her damages, on April 15, 2008, Cheatham entered into a five-

20  year lease with Wireless America (which lease was to begin in July 2008), with monthly rent starting

21  at $4,000.00 per month, and increasing by three percent annually.  On April 29, 2008, Cheatham also

22  paid delinquent 2007 property taxes of $8,375.41 – taxes which should have been paid by

23  Waelti/QSR II.

24       523.  Throughout the course of Cheatham's relationship with Emas, M&M Real Estate,

25  Sovereign CC, Waelti and the various other members of the M&M Enterprise, Defendants made

26  false and misleading statements and omissions regarding the fair market value, future rents, business

27  prospects, security and stability of Cheatham's investment – exploiting the relationship of trust that

28  they had intentionally built with Cheatham.  These false and misleading statements were

1  communicated to Cheatham via U.S. mail, e-mail, facsimile and through the phone.  During this

2  time, Defendants knew that the fair market value of the investment property was artificially inflated,

3  that the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning

4  the property, wiping out the artificial inflation in the fair market value of the property, and

5  eviscerating the future rents.

6      524.    So, as was the case with every other investor, Defendants' conspiracy to scam

7  Cheatham was a complete success.  Defendants artificially inflated the value of the property that

8  Cheatham was induced to purchase, which value plummeted when the Defendants walked away.  As

9  a result, she suffered severe financial damages, including the loss of fair market value of her

10  investment, future rents and out-of-pocket damages, all of which she is entitled to recover.

11      525.    Emas, M&M Real Estate, M&M, Sovereign CC, Sovereign Investment and the

12  various other members of the M&M Enterprise engaged in a continuous pattern of racketeering

13  activity as they used U.S. mail and wire to orchestrate and carry out the sale of the Jacksonville

14  Church's Chicken to Cheatham.

15      526.    Emas, M&M Real Estate, M&M, Sovereign CC, Sovereign Investment, Waelti and

16  the various other members of the M&M Enterprise conducted and directed the affairs of the

17  Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused

18  Cheatham to purchase a Church's Chicken property at a grossly inflated price.  The value of the

19  property later plummeted when Defendants abandoned it.

20      527.    As demonstrated through their ongoing conduct, Emas, M&M Real Estate, M&M,

21  Sovereign CC, Sovereign Investment and the various other members of the M&M Enterprise shared

22  the common purpose of luring investors like Cheatham into purchasing triple net properties with

23  artificially inflated prices and unsustainable lease terms.

24      528.    The fraudulent sale of the Jacksonville Church's Chicken to Cheatham was by no

25  means a random, isolated transaction, but part of the same single, coordinated scheme devised by

26  Defendants to sell triple net properties using bogus sale-leaseback agreements.  Indeed, the

27  Jacksonville Church's Chicken property was one of multiple "portfolio" properties that Sovereign

28  Investment had previously agreed to purchase from Waelti.  From the outset, Sovereign Investment

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1    had planned to purchase these portfolio properties "in bulk" with the goal of re-selling them to

2    unwitting investors at artificially inflated prices.  The sale to Cheatham was consummated exactly as

3    it had been planned and conceived by Defendants.

4           529.    In addition, the statements made by Defendants to Cheatham and referenced herein

5    were each materially false and misleading when made as they represented and/or omitted adverse

6    facts which then existed and disclosure of which was necessary to make the statements not false

7    and/or misleading.  The then-existing facts that make those statements false and misleading are set

8    forth in ¶458.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Cheatham's purchase of the Church's Chicken property located at 5809 North Main Street, Jacksonville, Florida 32208

**NOVEMBER 19, 2004**

Waelti/QSR purchased the Jacksonville Church's Chicken property in a group of four properties from a third-party for a combined price of **$3,223,800.00** - or an average of **$805,950.00** per property**



**NOVEMBER 19, 2004**

Sovereign CC and Waelti/QSR II entered into a sham lease with an inflated rental rate of **$6,812.42** with a 1.75% increase per annum through November 30, 2019



**NOVEMBER 19, 2004**

Sovereign CC purchased the same four properties, including Jacksonville Church's Chicken property from Waelti/QSR for a combined price of **$3,223,800.00** - an average of **$805,950.00** per property



**APRIL 22, 2005**

Cheatham purchased the Jacksonville Church's Chicken property from Sovereign CC for **$1,000,000.00** and assumed the sham lease with Waelti/QSR II as tenants with a monthly rent of **$6,812.42**



**AUGUST 27, 2007**

Waelti/QSR II abandoned the property and removed the trade fixtures



**JULY 1, 2008**

Cheatham mitigated her damages and signed a new lease with Wireless America, LLC for five years with a rental rate of **$4,000.00** a month



**Damages as a Result of Defendants' Fraud**

**$1,675,951.00**: **$530,000.00** as of closing plus **$1,145,951.00** in future rent, plus misc. out-of-pocket expenses

** Waelti/QSR purchased the Jacksonville Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of proceeds that Waelti/QSR attributed to the Jacksonville Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Cheatham.

## M.      Amnon and Rivka Danus

## The Sale of the Jacksonville Church's Chicken to the Danuses

530.    In December 2004, Amnon and Rivka Danus (the "Danuses") sold a residential condominium investment property.  Thereafter, the Danuses decided to invest the proceeds into a new property through a 1031 exchange.  As such, the Danuses called Perkin of M&M Real Estate's Los Angeles office.  The Danuses had previously met Perkin through a family member who had completed a prior real estate transaction with Perkin.

531.    The Danuses originally instructed Perkin that they were interested in purchasing a residential property in Los Angeles.  However, as time passed and their 1031 deadline loomed, Perkin convinced them to invest in a triple net lease on a commercial property.  As the Danuses had never invested in a triple net lease property, Perkin educated them – describing the investment concept and providing substantial background information to the Danuses.  Perkin further instructed the Danuses as to what factors should be important to them when deciding whether to invest.  After making representations regarding the criteria they should review, Perkin provided information to the Danuses via e-mail on six to eight properties.

532.    Perkin assisted the Danuses in assessing the investments he showed them, advising the Danuses to analyze cap rates, the background of the tenant, the amount the tenant pays in rent, and the leasehold on the property.  Using Perkin's investment analysis criteria, it was obvious that, as it was described by M&M Real Estate, a Jacksonville Church's Chicken location was the most attractive investment.

533.    Perkin and M&M Real Estate made many representations to the Danuses, orally, by phone and in writing, concerning the Jacksonville Church's Chicken property.  Perkin and M&M Real Estate represented to the Danuses that the Church's Chicken on the Jacksonville property had been built in 1984 and had been in operation since then as a Church's Chicken. The M&M Real Estate marketing materials further gave the Danuses the impression that the Jacksonville Church's Chicken had been run by the same entity since 1984.

534.    The Danuses also were also led to believe that the tenant – QSR II (which was an alter ego of Waelti) – had been paying the same rent for the 20 years it had been at that location.

Perkin and M&M Real Estate also represented to the Danuses that the original tenant planned to continue operating the Jacksonville Church's Chicken for at least another 14 years.  Based on these and other representations, the Danuses were led to believe that the only thing that would change if they purchased the property was that they would own the building.

535.    Perkin and M&M Real Estate repeatedly represented that the Jacksonville Church's Chicken property was a stable, low hassle investment, with a 20-year history of stable income.  The Danuses relied on Perkin's statements and explanations of documents he provided to them, and were led to believe that the only real risk to the investment was the possibility of a natural disaster.

536.    Perkin and M&M Real Estate led the Danuses to believe that BMC, the lender recommended by M&M Real Estate, was going to conduct a very thorough investigation because of the value of the investment.  Perkin and M&M Real Estate marketed BMC as a very conservative lender who would not make the loan for the Danuses' purchase of the Jacksonville Church's Chicken property unless it was a good investment.  These representations were made to the Danuses primarily by phone.

537.    Reasonably relying on the representations made by M&M Real Estate and Perkin, the Danuses closed on the Jacksonville Church's Chicken on April 8, 2005, paying $896,000.00.  The Danuses, Perkin, M&M Real Estate, Waelti and Sovereign CC used facsimile, e-mail, phone and U.S. mail by and between California, New York, and North Carolina to negotiate the transaction.

538.    M&M Real Estate required that the Danuses use Stewart Title out of North Carolina as the title company for the closing.  At the closing, the Danuses noticed that the final closing statement reflected a one percent origination fee charged by BMC for the loan.  The Danuses found this very odd because Perkin and M&M Real Estate had never informed them that BMC was not acting as a lender, but rather as a loan broker.  The final closing statement also reflected $2,000.00 in lender document preparation fees, $3,700.00 for an appraisal and $3,000.00 in fees to Stewart Title, all charged to the Danuses.

539.    When the Danuses questioned the fees they were being charged, they were told to "either take it or leave it."  Since the Danuses did not have any time remaining to complete their

1   1031 exchange, walking away from the deal would have meant a huge tax liability.  Thus, there was

2   no other option available to them other then paying the undisclosed fees.

3   **The Fraudulent Sale-Leaseback on the Property**

4   540.   Little did the Danuses know that they had been defrauded into purchasing a

5   commercial property at a price that had been grossly inflated due to Defendants' collective deception

6   and fraud.  Indeed, Sovereign CC, as an alter ego and wholly-owned subsidiary of Sovereign

7   Investment, had previously purchased the Jacksonville Church's Chicken from Waelti on or around

8   November 19, 2004 (the very same day Waelti had purchased the property from a third-party).

9   Sovereign CC simultaneously executed a fraudulent sale-leaseback agreement with Waelti, which

10   had the intended effect of artificially increasing the price of the property to well beyond its fair

11   market rate.

12   541.   Defendants intended from the outset to re-sell the property, at an artificially-inflated

13   price, to unwitting investors like the Danuses.  To conceal the fraudulent and deceptive nature of the

14   sale, Sovereign CC and Sovereign Investment turned to their sister company, M&M Real Estate, to

15   list, market and sell the property.

16   542.   As discussed below, Waelti had no intention of occupying the property and operating

17   the Church's Chicken franchise through the full term of the lease, despite the numerous

18   misrepresentations concerning the stability and safety of his operation.  The lease was a sham.

19   **Waelti Abandons the Jacksonville Church's Chicken**

20   543.   Within a few months of their investment, a rent check from Waelti/QSR II was

21   returned for insufficient funds.  Thereafter, the Danuses did not receive rent checks until a week or

22   two after they were due each month.  Amnon Danus spoke with Waelti/QSR II about the late rent

23   checks and asked that Waelti/QSR II send the rent checks via FedEx at the Danuses' expense.

24   Following this conversation, the rent problems improved for a short time.

25   544.   Then, in early May 2007, the Danuses received a call from Barrow asking for a 20%

26   rent reduction for the next year.  Fearing the worst, the Danuses reluctantly agreed to the reduced

27   rent, believing Waelti/QSR II would repay the 20% over time.

28

545.     Thereafter, on May 11, 2007, Waelti/QSR II told the Danuses that it was unilaterally reducing the rent payments to the Danuses by another 50%.  Then, around the end of August 2007, the Danuses' store was abandoned, leaving them without a tenant or an income stream.  In order to mitigate the damages caused by Defendants' scam, the Danuses re-let their property for approximately 50% of the rent set fourth in the original lease that the Danuses had received from Waelti/QSR II.

546.     Throughout the course of the Danuses' relationship with M&M Real Estate, Sovereign CC, Waelti and the various other members of the M&M Enterprise, Defendants made false and misleading statements and omissions regarding the fair market value, future rents, business prospects, security and stability of the Danuses' investment – exploiting the relationship of trust that they had intentionally built with the Danuses.  These false and misleading statements were communicated to the Danuses via U.S. mail, e-mail, facsimile and through the phone.  During this time, Defendants knew that the fair market value of the investment property was artificially inflated, that the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the property, wiping out the artificial inflation in the fair market value of the property, and eviscerating the future rents.

547.     So, as was the case with every other investor, Defendants' conspiracy to scam the Danuses was a complete success.  Defendants artificially inflated the value of the property that the Danuses were induced to purchase, which value plummeted when the Defendants walked away.  As a result, the Danuses suffered severe financial damages, including the loss of fair market value of their investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

548.     M&M Real Estate, M&M, Sovereign CC, Sovereign Investment, Waelti and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity as they used U.S. mail and wire to orchestrate and carry out the sale of the Jacksonville Church's Chicken to the Danuses.

549.     M&M Real Estate, M&M, Sovereign CC, Sovereign Investment, Waelti and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, which caused the Danuses to purchase a Church's

1   Chicken property at a grossly inflated price.  The value of the property later plummeted in value
2   when Defendants abandoned it.

3       550.    As demonstrated through their ongoing conduct, M&M Real Estate, M&M,
4   Sovereign CC, Sovereign Investment, Waelti and the various other members of the M&M Enterprise
5   shared the common purpose of luring investors like the Danuses into purchasing triple net properties
6   with artificially inflated prices and unsustainable lease terms.

7       551.    The fraudulent sale of the Jacksonville Church's Chicken to the Danuses was by no
8   means a random, isolated transaction, but part of a single, coordinated scheme devised by
9   Defendants to sell triple net properties using bogus sale-leaseback agreements.  Indeed, the
10  Jacksonville Church's Chicken property was one of multiple "portfolio" properties that Sovereign
11  Investment had previously agreed to purchase from Waelti.  From the outset, Sovereign had planned
12  to purchase these portfolio properties "in bulk" with the intention of re-selling them to unwitting
13  investors at drastically inflated prices.  The sale to the Danuses was consummated exactly as it had
14  been planned and conceived by Defendants.

15      552.    In addition, the statements made by Defendants to the Danuses and referenced herein
16  were each materially false and misleading when made as they represented and/or omitted adverse
17  facts which then existed and disclosure of which was necessary to make the statements not false
18  and/or misleading.  The then-existing facts that make those statements false and misleading are set
19  forth in ¶458.

20
21
22
23
24
25
26
27
28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of the Danus' purchase of the Church's Chicken property located at 4250 Moncrief Road, Jacksonville, Florida 32208

**NOVEMBER 19, 2004**

Waelti/QSR purchased the Jacksonville Church's Chicken property in a group of four properties from a third-party for a combined price of **$3,223,800.00** - or an average of **$805,950.00** per property**



**NOVEMBER 19, 2004**

Sovereign CC and Waelti/QSR II entered into a sham lease with an inflated rental rate of **$5,973.33** with a 1.75% increase per annum through November 30, 2019



**NOVEMBER 19, 2004**

Sovereign CC purchased the same four properties, including the Jacksonville Church's Chicken property from Waelti/QSR for a combined price of **$3,223,800.00** - an average of **$805,950.00** per property



**APRIL 8, 2005**

The Danuses purchased the Jacksonville Church's Chicken property from Sovereign CC for **$896,000.00** and assumed the sham lease with Waelti/QSR II as tenants with a monthly rent of **$5,973.33**



**AUGUST 2007**

Waelti/QSR II abandoned the property



**FEBRUARY 1, 2008**

The Danuses mitigated their damages and signed a new lease with Hook Fish & Chicken for three years and one month for **$3,500.00** a month



**Damages as a Result of Defendants' Fraud**

**$1,500,804.00**: **$496,000.00** in closing costs plus **$1,004,804.00** in future rent, plus misc. out-of-pocket expenses

** Waelti/QSR purchased the Jacksonville Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of proceeds that Waelti/QSR attributed to the Jacksonville Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Danuses.

**N.      Richard and Debra Siebert**[41]

**The Sale of the Thomasville Church's Chicken to the Sieberts**

553.      In approximately 2004, Richard and Debra Siebert (the "Sieberts") retained M&M Real Estate to sell a quadraplex they owned in Rohnert Park, California.  The Rohnert Park quadraplex was part of a set of 10 such residences in the same complex.  The building next door to the Sieberts was listed for sale in 2004 by Lesher, an agent located in M&M Real Estate's San Francisco office.  After deciding to sell the quadraplex, the Sieberts retained Lesher and M&M Real Estate to sell both the quadraplex and a five-unit apartment building they owned in Santa Rosa, California.

554.      At one of their first meetings with Lesher, Lesher, as an agent of M&M Real Estate, mentioned that the Sieberts should consider investing in a 1031 triple net lease property with the proceeds of the sale of their Rohnert Park quadraplex.  At that time, the Sieberts were not interested in a commercial property, preferring instead to invest in other residential investment properties in the area.  Lesher persisted in marketing triple net lease properties to the Sieberts, finally piquing their interest in December 2004. Lesher repeatedly represented to the Sieberts that triple net lease investments would provide a safe return with minimal investment.

555.      In February 2005, the Sieberts sold the Rohnert Park building and, relying on Lesher and his representations that triple net lease properties were safe, income-producing investments, started searching in earnest for a  triple net lease property for their 1031 exchange.  Over the course of the next month, Lesher persuaded the Sieberts that a Church's Chicken property in Thomasville, Georgia was a great investment opportunity for them.

556.      Lesher represented to the Sieberts that the Thomasville Church's Chicken property was a safe, solid investment.  Lesher advised the Siebert's that an investment in the Thomasville Church's Chicken property – inclusive of projected mortgage expenses – would provide them with

---

[41]      Richard Siebert took title to the property with Debra Siebert.  Thereafter, the Sieberts transferred the property to the Siebert Family Trust U/D/T, dated January 13, 2003 of which they are the Trustees.

1   $2,000.00 in profit per month.[42]  Lesher led the Sieberts to believe that there was no way that a

2   purchase of the Thomasville Church's Chicken would lose money unless the Church's Chicken

3   franchise went bankrupt.

4        557.    Lesher also represented to the Sieberts that the tenant on the Thomasville Church's

5   Chicken property would pay all expenses on the property.  Lesher told the Sieberts that Waelti, the

6   then-current operator of the Thomasville Church's Chicken, owned other Church's Chicken

7   locations that were doing very well.  Lesher repeatedly trumpeted the investment opportunity in the

8   Thomasville Church's Chicken, saying "these are the greatest things going and they never fail."

9        558.    The Sieberts were convinced by Lesher and M&M Real Estate that any investment in

10  the Thomasville Church's Chicken would be backed by the Church's Chicken franchise.  Lesher told

11  the Sieberts that QSR One (which was an alter ego of Waelti) was the franchisee, but that Church's

12  Chicken corporate was behind them.  Further, Lesher promised the Sieberts that if Waelti/QSR One

13  ever pulled out, Church's Chicken would bring in another franchisee to fill that spot at the same rent.

14       559.    Lesher and M&M Real Estate intended to, and did, induce the Sieberts' reliance on

15  their advice throughout the transaction.  Lesher and M&M Real Estate reviewed the purchase

16  agreement and purportedly conducted due diligence on the Sieberts' behalf.  Though Richard Siebert

17  visited the Thomasville Church's Chicken property on April 8, 2005, because of M&M Real Estate's

18  purported expertise in triple net leases and continued reassurances that they were taking care of the

19  Sieberts, the Sieberts relied on Lesher and M&M Real Estate regarding all other due diligence.

20       560.    Prior to their investment, the Sieberts were told by Lesher that the Thomasville

21  Church's Chicken property was going to be remodeled in the next year.  Lesher promised that

22  Church's Chicken was going to "sweep through the South" and renovate Church's Chicken

23  franchises that needed to be modernized.  Lesher further represented to the Sieberts that the

24  remodeling would further increase the value of their investment.

25

26

---

27  [42]    Lesher represented to the Sieberts specifically how much they would be paying on their
    mortgage and how much rent they would receive.

28

561.    The decision made by the Sieberts to purchase the Thomasville Church's Chicken property for their 1031 exchange was based upon the representations made by Lesher, M&M Real Estate, Sovereign CC and Waelti.  The Sieberts relied on the representations concerning the safety of the investment, the income potential of the investment, the stability of the tenant, and the due diligence that had purportedly been performed by Lesher and M&M Real Estate.

562.    Reasonably relying on Lesher's representations that he and M&M Real Estate were experts in triple net lease properties and that Lesher and M&M Real Estate were representing their interests, the Sieberts agreed to purchase the Thomasville Church's Chicken from Sovereign CC in May 2005.  The Sieberts, Lesher, M&M Real Estate, Waelti and Sovereign CC used facsimile, e-mail, phone and U.S. mail by and between California, North Carolina, and New York to negotiate the transaction.

563.    Since the Sieberts had never sought funding for a commercial investment, Lesher referred them to BMC for a loan.  The Sieberts financed $386,091.00 of the $759,091.00 purchase price of the Thomasville Church's Chicken property.   The total included fees of $22,114.00, including $3,500.00 for an appraisal that the Sieberts were never provided, though it was supposedly reviewed by M&M Real Estate as part of M&M Real Estate's due diligence on the Sieberts' behalf.  M&M Real Estate and Lesher chose Stewart Title in Charlotte, North Carolina to handle the closing for the Sieberts.  The Sieberts had no prior experience with Stewart Title in North Carolina and do not know why that entity was chosen.

**The Fraudulent Sale-Leaseback on the Property**

564.    Little did the Sieberts know that they had been defrauded into purchasing a commercial property at a price that had been grossly inflated due to the existence of a sham lease crafted by Defendants.  Indeed, Sovereign CC, as the alter ego and wholly-owned subsidiary of Sovereign Investment, had previously purchased the Thomasville Church's Chicken from Waelti on or around November 19, 2004 (the very same day Waelti had purchased the property from a third-party).  Sovereign CC simultaneously executed a fraudulent sale-leaseback agreement with Waelti, which had the intended effect of artificially increasing the price of the property to well beyond its fair market rate.

565.    Defendants intended from the outset to flip the overpriced property to unwitting investors like the Sieberts.  Accordingly, to conceal the fraudulent and deceptive nature of the sale, Sovereign CC and Sovereign Investment turned to their sister company, M&M Real Estate, to list, market and sell the property.  M&M Real Estate, through its agents and as an alter ego of M&M, misrepresented and concealed material adverse facts about the property's true market value, future rents, business prospects, security and stability.

566.    As discussed below, Waelti had no intention of occupying the property and operating the Church's Chicken franchise through the full term of the lease, despite the numerous misrepresentations concerning the stability and safety of his operation.

**Waelti Abandons the Thomasville Church's Chicken**

567.    After the close of the transaction in May 2005, Waelti/QSR One started sending rent checks to the Sieberts.  In April 2006, Waelti/QSR One sent the Sieberts a rent check that bounced. The Sieberts called Waelti/QSR One Controller Piercy, who apologized and sent the Sieberts a new check that cleared.  Thereafter, from April 2006, until Waelti/QSR One eventually abandoned the premises in 2007, Waelti/QSR One paid the rent late every month, and did not pay the associated late fees as required under the long-term lease.

568.    In April or May 2006, Barrow called the Sieberts and told them he was an executive with Waelti/QSR One.  Barrow told the Sieberts that because Waelti/QSR One's Church's Chicken stores were losing money, Waelti/QSR One was asking owners to accept 20% reduced rent for the next 12 months.  Barrow represented to the Sieberts that after 12 months, Waelti/QSR One would resume paying full rent under the lease and would repay the discounted rent over the next two to three years.

569.    The Sieberts told Barrow that they needed some time before giving him an answer to his inquiry about reducing the rent, and after hanging up the phone, expected that there would be some further discussion regarding Waelti/QSR One's proposal of reduced rent, since they had not agreed to it.  However, a few weeks later, on July 1, 2006, Waelti/QSR One sent the Sieberts correspondence by U.S. mail indicating that they were going to unilaterally reduce the rent they paid by 20% for 12 months.  Thereafter, in June 2006, Waelti/QSR One started unilaterally paying rent

1    reduced by 20%. In order to attempt to mitigate their damages, the Sieberts accepted the reduced

2    rent, believing the balance would eventually be paid.

3       570.    The Sieberts continued to receive the 20% discounted rent, albeit with constant late

4    payments, through May 2007. Under the original long-term lease with Waelti/QSR One, the

5    Sieberts were originally receiving $5,218.75 per month in rent, which went up to $5,310.07 per

6    month in March 2006. In June 2006, Waelti/QSR One reduced the rent they paid to $4,248.00 per

7    month. Then in May 2007, Waelti/QSR One again unilaterally reduced the amount of rent that it

8    was paying the Sieberts to $2,124.00 per month. This new amount was less than 40% of what

9    Waelti/QSR One was obligated to pay under the original long-term lease.[43]

10      571.    From mid-to-late June 2007, the Sieberts exchanged e-mails with Waelti/QSR One

11   regarding Waelti/QSR One's failure to maintain liability insurance on their property as required

12   under the long-term lease. Waelti wrote to the Sieberts that he was not sure he would obtain the

13   insurance until he knew whether Church's Chicken would renew his "temporary franchise

14   agreement." Notwithstanding Lesher and M&M Real Estate's purported due diligence, this was the

15   first the Sieberts learned of Waelti/QSR One having only a temporary franchise agreement.

16      572.    Ultimately, in October 2007, Waelti/QSR One abandoned the Thomasville Church's

17   Chicken property. In September 2008, in order to mitigate their damages, the Sieberts re-let the

18   Thomasville Church's Chicken property the property to Radhike Inc. at a rate significantly below

19   what Waelti/QSR One agreed to pay under the original long-term lease.

20      573.    Throughout the course of the Sieberts' relationship with M&M Real Estate,

21   Sovereign CC, Waelti and the various other members of the M&M Enterprise, Defendants made

22

---

23   [43]    Around this time, the Sieberts called Lesher to discuss the disturbing developments related to
24   Waelti/QSR One and to inquire as to how something that Lesher and M&M Real Estate represented
     was such a solid, safe investment was in fact, a disaster. Lesher said he would talk to Richard
25   Merryman ("Merryman"), a colleague in M&M Real Estate's San Francisco office, and another
     purported "expert" on triple net leases. After Lesher's conversation with Merryman, Lesher told the
26   Sieberts that Merryman looked into it, and said that the Sieberts should sue Sovereign and M&M.
     The Sieberts were surprised at this response, considering that Merryman worked for M&M Real
27   Estate. Specifically, Lesher told the Sieberts that Merryman thought the Sieberts had a claim for
     "misrepresentation."

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1   false and misleading statements and omissions regarding the fair market value, future rents, business

2   prospects, security and stability of the Siebert's investment – exploiting the relationship of trust that

3   they had intentionally built with the Sieberts.   These false and misleading statements were

4   communicated to the Sieberts via U.S. mail, e-mail, facsimile and through the phone.   During this

5   time, Defendants knew that the fair market value of the investment property was artificially inflated,

6   that the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning

7   the property, wiping out the artificial inflation in the fair market value of the property, and

8   eviscerating the future rents.

9          574.   So like every other investor, Defendants' conspiracy to scam the Sieberts was a

10   complete success.   Defendants artificially inflated the value of the property that the Sieberts were

11   induced to purchase, which value plummeted when the Defendants walked away.   As a result, the

12   Sieberts suffered severe financial damages, including the loss of fair market value of their

13   investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

14          575.   M&M Real Estate, M&M, Sovereign CC, Sovereign Investment, Waelti and the

15   various other members of the M&M Enterprise engaged in a continuous pattern of racketeering

16   activity as they used U.S. mail and wire to orchestrate and carry out the sale of the Thomasville

17   Church's Chicken to the Sieberts.

18          576.   M&M Real Estate, M&M, Sovereign CC, Sovereign Investment and the various other

19   members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in

20   various acts of fraud and deceit, as set forth herein, which caused the Sieberts to purchase the

21   Church's Chicken property at a grossly inflated price.   The value of the property later plummeted

22   when Defendants abandoned it.

23          577.   As demonstrated through their ongoing conduct, M&M Real Estate, Sovereign CC,

24   Waelti and the various other members of the M&M Enterprise shared the common purpose of luring

25   investors like the Sieberts into purchasing triple net properties with artificially inflated prices and

26   unsustainable lease terms.

27          578.   The fraudulent sale of the Thomasville Church's Chicken to the Sieberts was by no

28   means a random, isolated transaction, but part of a single, coordinated scheme devised by

1   Defendants to sell triple net properties using bogus sale-leaseback agreements.   Indeed, the

2   Jacksonville Church's Chicken property was one of multiple "portfolio" properties that Sovereign

3   Investment had previously agreed to purchase from Waelti.   From the outset, Sovereign had planned

4   to purchase these portfolio properties "in bulk" with the intention of re-selling them to unwitting

5   investors at drastically inflated prices.   The sale to the Sieberts was consummated exactly as it had

6   been planned and conceived by Defendants.

7        579.    In addition, the statements made by Defendants to the Sieberts and referenced herein

8   were each materially false and misleading when made as they represented and/or omitted adverse

9   facts which then existed and disclosure of which was necessary to make the statements not false

10  and/or misleading.   The then-existing facts that make those statements false and misleading are set

11  forth in ¶458.   In addition to the previously identified false statements, the following adverse facts

12  were also known by Defendants at the time their false and misleading statements and

13  misrepresentations were made:

14       •      Waelti was not "backed" by Church's Chicken but was merely a franchisee of that
                entity, and actually only a "temporary franchisee" at that.   Further, Waelti never
15              intended to invest money to modernize the Church's Chicken stores and increase the
                value of Plaintiffs' investments.

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of the Sieberts' purchase of the Church's Chicken property located at 448 East Jackson Street, Thomasville, Georgia 31792

### NOVEMBER 19, 2004

Waelti/QSR purchased the Thomasville Church's Chicken property from a third-party for **$533,400.00**\*\*



### NOVEMBER 19, 2004

Sovereign CC and Waelti/QSR entered into a sham lease with an inflated rental rate of **$5,218.75** per month with a 1.75% increase per annum through November 30, 2019



### NOVEMBER 19, 2004

Sovereign CC purchased the Thomasville Church's Chicken property from Waelti/QSR for **$626,300.00**



### MAY 16, 2005

The Sieberts purchased the Thomasville Church's Chicken property from Waelti/QSR for **$759,091.00** and assumed the lease with Waelti/QSR One as tenants with a monthly rent of **$5,218.75**



### OCTOBER 2007

Waelti/QSR One abandoned the property



### SEPTEMBER 1, 2008

The Sieberts mitigated their damages and signed a new lease with Radhike Inc. for 122 months at an initial rental rate of **$3,391.67** per month



### Damages as a Result of Defendants' Fraud

**$1,222,366.00**: **$339,091.00** as of closing plus **$883,275.00** in future rent, plus misc. out-of-pocket expenses

\*\* Waelti/QSR purchased the Thomasville Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of proceeds that Waelti/QSR attributed to the Thomasville Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to the Sieberts.

## O.     Linda Farrell and Fred Engelberg[44]

**The Sale of the Jacksonville Church's Chicken to Farrell and Engelberg**

580.     In 2005, Linda Farrell ("Farrell") sold a Captain D's restaurant and wanted to conduct a 1031 tax deferred exchange to roll the proceeds into another triple net lease investment.  As part of that process, Farrell had to identify three properties that she might buy with the proceeds of the Captain D's sale in a 1031 exchange within 45 days after the sale of the Captain D's.  Farrell would then be required to then close on the purchase of one of those three identified properties within a certain number of days thereafter.

581.     Farrell needed to identify potential exchange properties in a timely manner so that she did not have to pay otherwise avoidable taxes and, as important, she needed to generate income each month on which to live.  Farrell was having a difficult time identifying suitable triple net leases to buy as part of her 1031 exchange, and began to be concerned that she would not find a 1031 replacement property in time.

582.     When Farrell originally purchased the Captain D's property back in approximately 2003, she had some dealings with Kunofsky at M&M Real Estate.  Farrell also believes that she initially met Harris, a Vice-President at BMC, when she purchased the Captain D's.

583.     Following her sale of the Captain D's property, Farrell researched potential 1031 exchange properties using M&M Real Estate's website.  Farrell always ran potential properties by Harris to get his analysis and advice of whether they were good investments.  In advising her about the quality of possible investments, Harris counseled Farrell to focus on the strength of the franchises' parent company and the strength of the operator.

584.     In approximately March or April 2005, after having searched on her own for several weeks to no avail, Farrell called Harris and told him that she was under a tight deadline to identify potential 1031 exchange properties.  Harris offered his assistance, and said that he would get back to

---

[44]     Linda Farrell and Fred Engelberg ("Engelberg") took title to the property as Fred Engelberg, single man, and Linda Farrell, single woman, tenants in common.  On February 20, 2007, they transferred title to the property to Fred Engelberg, single man, and Linda Farrell, single woman, as joint tenancy with rights of survivorship.

1    her.  Harris soon called Farrell back and told her that he contacted a "very important" agent at M&M

2    Real Estate – Kunofsky – who he had worked with successfully in the past.  Harris arranged a

3    conference call for the three of them.

4          585.    On the conference call, Kunofsky, as an agent of M&M Real Estate, assured Farrell

5    that he had a good investment property for her, identifying a Church's Chicken location in

6    Jacksonville, Florida.  Farrell told Kunofsky that she had heard of the operator, QSR II (which was

7    an alter ego of Waelti), but expressed concern that Waelti/QSR II was a smaller operator and

8    therefore not as secure as a larger operator would be.[45]  In response to Farrell's expressed concern

9    that Waelti/QSR II only owned and operated 10 properties, Kunofsky assured Farrell that the

10    Jacksonville Church's Chicken location with Waelti/QSR II as a tenant was a "spectacular property

11    that was high in demand."

12          586.    In reliance on these and other representations by Kunofsky and M&M Real Estate

13    regarding the strength and safety of the investment, Farrell and Engelberg designated the

14    Jacksonville Church's Chicken as one of their potential 1031 exchange properties.

15          587.    Shortly after the conference call with Kunofsky, Kunofsky sent Farrell and Engelberg

16    an M&M Real Estate brochure regarding the Jacksonville Church's Chicken property.  The brochure

17    touted the stability of Waelti/QSR II, though Defendants and the M&M Real Estate marketing

18    materials failed to disclose to Farrell and Engelberg that Waelti was not the owner of the property

19    that Farrell was buying, but rather just the tenant.  In fact, the Jacksonville Church's Chicken

20    location had recently been operated by Crescent Capital Investments.

21          588.    Farrell was told by Kunofsky that she "was buying the lease and track record" of

22    Waelti/QSR II and that the property "was secure and low maintenance."  Kunofsky told her that he

23    knew what she needed, and that M&M Real Estate was on top of its game.  Farrell relied on

24    Kunofsky and M&M Real Estate's triple net leasing "expertise" and on their representations.  Based

25

26    [45]      In doing her own research, Farrell read advertisements for various Church's Chicken

27    locations run by Waelti.  Farrell was initially hesitant to invest because Waelti seemed like a small operator with only approximately 10 stores.

28

1   on the statements in the M&M Real Estate marketing brochure and statements made by Kunofsky,

2   Farrell and Engelberg reasonably believed Waelti/QSR II was an experienced operator and that the

3   Jacksonville Church's Chicken property would be a safe, secure investment.

4          589.    Thereafter, Farrell and Engelberg elected to purchase the Jacksonville Church's

5   Chicken property and closed on their purchase in June 2005.  Farrell, Engelberg, Kunofsky, M&M

6   Real Estate and Sovereign CC used facsimile, e-mail, phone and U.S. mail by and between

7   California, New York and Florida to negotiate the transaction.  Prior to investing, Farrell and

8   Engelberg were never told the extent of Sovereign CC's relationship with M&M.

9          590.    As part of her due diligence, Farrell had the property inspected by a property

10  inspection company in Florida.  While the inspection identified a number of potential problems,

11  Farrell was assured by Defendants that Waelti/QSR II would resolve the problems to comply with

12  the lease provisions requiring the premises to be maintained in good condition.  Further, Farrell was

13  told the Jacksonville Church's Chicken property was going to be renovated – an action that

14  Defendants told her would further increase the value of her investment.

15         591.    Once Farrell and Engelberg accepted and relied upon Kunofsky and M&M Real

16  Estate's representations and decided to invest, they used BMC, Harris's company, to obtain a loan

17  for the Jacksonville Church's Chicken property purchase.  Harris represented to Farrell that BMC

18  was a very conservative lending institution and that BMC would not provide the loan if the property

19  was overpriced.  Farrell believes she paid for an appraisal as part of her loan fees, but was never

20  provided with a copy of the appraisal.

21  **The Fraudulent Sale-Leaseback on the Property**

22         592.    Little did Farrell and Engelberg know that they had been defrauded into purchasing a

23  commercial property at a price that had been grossly inflated due to the existence of a sham lease

24  crafted by Defendants.  Indeed, Sovereign CC, as an alter ego and wholly-owned subsidiary of

25  Sovereign Investment, had previously purchased the Jacksonville Church's Chicken from Waelti on

26  or around November 19, 2004 (the very same day Waelti had purchased the property from a third-

27  party).  Sovereign CC simultaneously executed a fraudulent sale-leaseback agreement with Waelti,

28

1    which had the intended effect of artificially increasing the price of the property to well beyond its

2    fair market rate.

3         593.    Defendants intended from the outset to flip the overpriced property to unwitting

4    investors like Farrell and Engelberg.  Accordingly, to conceal the fraudulent and deceptive nature of

5    the sale, Sovereign CC and Sovereign Investment turned to their sister company, M&M Real Estate,

6    to list, market and sell the property.  M&M Real Estate, through its agents and as an alter ego of

7    M&M, misrepresented and concealed material adverse facts about the property's true market value,

8    future rents, business prospects, security and stability.

9         594.    As discussed below, Waelti had no intention of occupying the property and operating

10   the Church's Chicken franchise through the full term of the lease, despite the numerous

11   misrepresentations concerning the stability and safety of his operation.

12   **Waelti Abandons the Jacksonville Church's Chicken**

13        595.    Immediately after closing on the Jacksonville Church's Chicken property, Farrell and

14   Engelberg began having problems with the tenant, Waelti/QSR II.  Initially, the first month's rent

15   check was late.  As such, Farrell called the Waelti/QSR II office to inquire about the first month's

16   rent payment.  Farrell was told that the only person that could help her was Brandi Trotter

17   ("Trotter"), the purported CFO of QSR II, but that Trotter was out of the office on vacation.[46]

18        596.    When Trotter returned from vacation, Farrell demanded her rent check, but Trotter

19   claimed not to know Farrell and denied knowing Farrell had purchased the property.  Waelti/QSR II

20   eventually began paying the rent under the lease with Farrell, but refused to pay her by direct bank

21   payment as required by the lease.  Sometimes the monthly rent check from Waelti/QSR II came on

22   time and sometimes it came late.

23        597.    In the fall or winter of 2005, Trotter purportedly took a leave of absence due to an

24   illness.  After Trotter left Waelti/QSR II, Farrell dealt with Valerie Williams ("Williams"), who

25

26   _____

27   [46]    Upon information and belief, Trotter is Waelti's daughter.

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)       - 168 -

1   identified herself as the new CFO of QSR II.  Farrell corresponded with Williams regularly because
2   Waelti/QSR II often paid rent late and not always in the full amount due.

3       598.    After they had owned the Jacksonville Church's Chicken property for approximately
4   six months, Farrell and Engelberg were told that the store was losing money and was being
5   mismanaged.  Farrell and Engelberg were shocked to hear this news because this information
6   contradicted what they had been expressly told by Kunofsky and M&M Real Estate prior to
7   purchasing the property.

8       599.    Also around this same time, Barrow called Farrell and identified himself as the head
9   of finance for Waelti/QSR II.  Barrow told Farrell to contact him in the future regarding her
10  property, not Waelti.  Barrow told Farrell that he was expecting to receive money from The QSR III
11  Group, LLC ("QSR III") (which was an alter ego of Waelti) shortly, and that cash infusion would
12  help QSR II to clear up all of the problems with her store.  Thereafter, Farrell called Waelti and told
13  him that her lease was with Waelti and that she did not want to deal with Barrow.  Waelti told Farrell
14  that Barrow gave Farrell bad information and that QSR III had nothing to do with QSR II.
15  Waelti/QSR II ultimately abandoned Farrell's Jacksonville Church's Chicken property on
16  October 16, 2007.

17      600.    Farrell called Kunofsky approximately 12 to 18 months after her purchase because
18  she was not receiving her full rent payments, her checks were regularly arriving late, and because
19  Kunofsky had assured her that she was investing in a safe, secure, and time-tested operator.  On this
20  call – and contrary to his prior representation and purported "expertise" – Kunofsky told Farrell that
21  he did not really know anything about the property or Waelti/QSR II and had just handled the sale as
22  a favor for someone.

23      601.    Eventually, Farrell became very frustrated in dealing with Waelti/QSR II given their
24  refusal to live up to the terms of the lease.  As Waelti/QSR II had only been paying portions of their
25  rent for some time, Waelti/QSR II owed Farrell more than $40,000.00.  As such, and receiving no
26  help from Kunofsky or M&M Real Estate, Farrell called counsel for the Church's Chicken
27  franchisor, Peter Dosick ("Dosick"), to see if he had any advice on how to collect from
28  Waelti/QSR II.

602.    Dosick advised Farrell to issue Waelti/QSR II a five-day notice of default.  Farrell hired an attorney to prepare the notice and delivered it to Waelti/QSR II.  QSR II's new CFO, Kimberly Harnage ("Harnage"), responded to Farrell via e-mail that "we can't pay you, we are sending you the keys."

603.    During this process, Farrell learned that GE Capital was somehow involved with Waelti/QSR II.[47]  As such, Farrell called Zack Thaler ("Thaler") at GE Capital.  Over the course of several conversations, Farrell discussed with Thaler the problems that she was having with Waelti/QSR II and the fact that they were going to close her Jacksonville Church's Chicken property.  Thaler told Farrell that he would "take care of it," and the store stayed open for a short time.

604.    Thereafter, it was Farrell's understanding that GE Capital and United Enterprise Fund ("UEF") began running the Jacksonville Church's Chicken property.[48]  Around this same time, Church's Chicken purportedly sold QSR III thirteen more Church's Chicken franchises in Alabama. Again, UEF was involved with the transaction.

605.    When Farrell and Engelberg's Church's Chicken store was eventually closed, they received documents from GE Capital claiming that GE Capital owned the equipment in their store by virtue of a security interest GE Capital had received in exchange for loaning Waelti/QSR II money. Neither Kunofsky, M&M Real Estate, Sovereign CC, nor Waelti/QSR II ever disclosed this alleged security interest to Farrell or Engelberg before they purchased the Jacksonville Church's Chicken property.  GE Capital demanded that Farrell give GE Capital access to the store to collect the equipment, but Farrell refused.  Eventually Farrell and Engelberg offered a sum of money for the equipment and GE Capital accepted.

---

[47]    Farrell had no idea at this time that GE Capital had a loan secured by the equipment in her store.  Based on the representations made by Kunofsky, M&M Real Estate and Waelti/QSR II, Farrell believed that she owned the equipment.

[48]    Upon information and belief, UEF held an equity interest in QSR, the parent company of QSR II.

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

606.     Throughout the course of Farrell and Engelberg's relationship with M&M Real Estate, Kunofsky, Sovereign CC, Waelti and the various other members of the M&M Enterprise, Defendants made false and misleading statements and omissions regarding the fair market value, future rents, business prospects, security and stability of Farrell and Engelberg's investment – exploiting the relationship of trust that they had intentionally built with Farrell and Engelberg. These false and misleading statements were communicated to Farrell and Engelberg via U.S. mail, e-mail, facsimile and through the phone.  During this time, Defendants knew that the fair market value of the investment property was artificially inflated, that the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the property, wiping out the artificial inflation in the fair market value of the property, and eviscerating the future rents.

607.     So, as was the case with every other investor, Defendants' conspiracy to scam Farrell and Engelberg was a complete success.  Defendants artificially inflated the value of the property that Farrell and Engelberg were induced to purchase, which value plummeted when the Defendants walked away.  As a result, Farrell and Engelberg suffered severe financial damages, including the loss of fair market value of their investment, future rents and out-of-pocket damages, all of which they are entitled to recover.

608.     M&M Real Estate, M&M, Kunofsky, Sovereign CC, Sovereign Investment, Waelti and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity, as they used U.S. mail and wire to orchestrate and carry out the sale of the Jacksonville Church's Chicken to Farrell and Engelberg.

609.     M&M Real Estate, M&M, Kunofsky, Sovereign CC, Sovereign Investment, Waelti and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused Farrell and Engelberg to purchase the Church's Chicken property at a grossly inflated price.  The value of the property later plummeted when Defendants abandoned it.

610.     As demonstrated through their ongoing conduct, M&M Real Estate, M&M, Kunofsky, Sovereign CC, Sovereign Investment, Waelti and the various other members of the M&M

1    Enterprise shared the common purpose of luring investors like Farrell and Engelberg into purchasing

2    triple net properties with artificially inflated prices and unsustainable lease terms.

3         611.    The fraudulent sale of the Jacksonville Church's Chicken to Farrell and Engelberg

4    was by no means a random, isolated transaction, but part of a single, coordinated scheme devised by

5    Defendants to sell triple net properties using bogus sale-leaseback agreements.   Indeed, the

6    Jacksonville Church's Chicken property was one of multiple "portfolio" properties that Sovereign

7    Investment had previously agreed to purchase from Waelti.  From the outset, Sovereign had planned

8    to purchase these portfolio properties "in bulk" with the intention of re-selling them to unwitting

9    investors at drastically inflated prices.  The sale to the Farrell and Engelberg was consummated

10   exactly as it had been planned and conceived by Defendants.

11        612.    In addition, the statements made by Defendants to Farrell and referenced herein were

12   each materially false and misleading when made as they represented and/or omitted adverse facts

13   which then existed and disclosure of which was necessary to make the statements not false and/or

14   misleading.  The then-existing facts that make those statements false and misleading are set forth in

15   ¶458.  In addition to the previously identified false statements, the following adverse facts were also

16   known by Defendants at the time their false and misleading statements and misrepresentations were

17   made:

18        •    Waelti was not "backed" by Church's Chicken but was merely a franchisee of that
             entity, and actually only a "temporary franchisee" at that.  Further, Waelti never
19           intended to invest money to modernize the Church's Chicken stores and increase the
             value of Plaintiffs' investments.
20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)                                    - 172 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Farrell and Engelberg's purchase of the Church's Chicken property located at 1060 East 21st Street, Jacksonville, Florida 32206

### NOVEMBER 19, 2004

Waelti/QSR purchased the Jacksonville Church's Chicken property in a group of four properties from a third-party for a combined price of **$3,223,800.00** - or an average of **$805,950.00** per property**

### NOVEMBER 19, 2004

Sovereign CC and Waelti/QSR II entered into a sham lease with an inflated rental rate of **$6,385.25** with a 1.75% increase per annum through November 20, 2019

### NOVEMBER 19, 2004

Sovereign CC purchased the same four properties, including the Jacksonville Church's Chicken property from Waelti/QSR for a combine price **$3,223,800.00** - an average of **$805,950.00** per property

### JUNE 6, 2005

Farrell and Engelberg purchased the Jacksonville Church's Chicken property from Sovereign CC for **$957,800.00** and assumed the sham lease with Waelti/QSR II as tenants with a monthly rent of **$6,385.25**

### OCTOBER 16, 2007

Waelti/QSR II abandoned the property. Farrell and Engelberg have been unable to re-let the Jacksonville Church's Chicken property despite attempting to do so.

### Damages as a Result of Defendants' Fraud

**$1,570,284.00**: **$502,800.00** as of closing plus **$1,067,484.00** in future rent, plus misc. out-of-pocket expenses

** Waelti/QSR purchased the Jacksonville Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of proceeds that Waelti/QSR attributed to the Jacksonville Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Farrel and Engelberg.

**P.      Victoria Armenta**[49]

**The Sale of the Albany Church's Chicken to Armenta**

613.     Victoria Armenta ("Armenta") sold a shopping center she owned in Azusa, California and began looking for 1031 exchange replacement properties.  Her primary investment criteria were secure cash flow and return on investment.  Armenta preferred a triple net lease to any other investment type because she desired that the tenant pay all the costs and taxes associated with the property.

614.     Initially, Armenta used the proceeds from her sale of the Azusa property to buy two other properties in California.  Afterwards, Armenta realized that she was going to have some taxable proceeds from the sale of the Azusa property unless she found an additional 1031 exchange property to invest in.

615.     In February or early March 2005, the brokers that Armenta used to sell her Azusa property sent Armenta marketing materials from M&M Real Estate concerning potential triple net lease investment properties.  Subsequent to being provided with M&M Real Estate's marketing materials, Armenta was introduced to Kunofsky in M&M Real Estate's New York office.  Thereafter, Kunofsky and his team at M&M Real Estate's New York office became Armenta's only contact from M&M Real Estate with respect to her potential 1031 investment.

616.     Armenta reviewed the information provided by Kunofsky and M&M Real Estate.  The materials set forth information concerning a Church's Chicken property that was for sale in Albany, Georgia.  The marketing materials contained representations that Church's Chicken was the landlord on, and the seller of, the property.  Armenta reasonably relied on these representations, in part because all the materials she received said Church's Chicken and had the Church's Chicken

---

[49]     Victoria Armenta took title to the property in her own name.  On March 24, 2008, Armenta transferred title to the property to VAS Enterprises 1, LLC, a California Limited Liability Company.

1   logo on them.[50]   Kunofsky, as an agent of M&M Real Estate, also told Armenta verbally on the

2   phone that the seller, Sovereign CC, was part of or affiliated with Church's Chicken.

3      617.   Kunofsky and the M&M Real Estate marketing materials emphasized the prior

4   business successes and ongoing involvement of Waelti – the operator of the Albany Church's

5   Chicken.  Specifically, Kunofsky and M&M Real Estate represented that Waelti had previously

6   owned and operated many successful franchises, and would be operating the Church's Chicken that

7   Kunofsky and M&M Real Estate were pitching to Armenta.

8      618.   Kunofsky further stated that Waelti had been granted operating rights by Church's

9   Chicken and was working for Sovereign CC.  Kunofsky and M&M Real Estate sold Waelti as

10  competent, experienced and very financially secure.  Kunofsky promised that Waelti had "deep

11  pockets" and assured Armenta that her investment and income stream would be safe and secure.

12  Kunofsky and M&M Real Estate also repeatedly represented that Armenta would own the equipment

13  and fixtures on the Albany Church's Chicken property.  Again, these representations were made to

14  Armenta by phone.

15     619.   Armenta reasonably believed that Kunofsky and M&M Real Estate were representing

16  her and would protect her interests.  Further, Armenta relied on Kunofsky and M&M Real Estate's

17  representations concerning the reputation of Church's Chicken as a high quality franchise and

18  Waelti's purported business acumen.  As such, Armenta reasonably believed an investment in the

19  Albany Church's Chicken property would be safe and secure.

20     620.   On April 29, 2005, Armenta received by U.S. mail a purchase and sale agreement for

21  the Albany Church's Chicken property.  The purchase and sale agreement had been prepared by

22  Defendants.  Thereafter, Armenta continued to review the materials provided by Kunofsky and

23  M&M Real Estate.

24

25

26  [50]   On April 12, 2005, Waelti, through one his alter egos – QSR – provided Armenta with a QSR
    financial summary document which indicated that Church's Chicken had provided the financial
27  information contained in the document.  Kunofsky and M&M Real Estate also made statements and
    representations that led Armenta to believe that Church's Chicken had an equity interest in QSR.

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

621.     Armenta's purchase of the property was set to close on May 30, 2005. At M&M Real Estate's direction, Armenta used Stewart Title in Charlotte, North Carolina for the closing. Armenta was surprised when M&M Real Estate insisted that she use a Stewart Title office in North Carolina to handle the transaction and that using that office was "non-negotiable." It was not clear to Armenta why M&M Real Estate required that they use a North Carolina office which had no clear ties to any of the parties or the property.

622.     On May 16, 2005, QSR One (which was an alter ego of Waelti) – the tenant on the Albany Church's Chicken property – signed a certification that the rental rate for the triple net lease on the Albany Church's Chicken property was $4,450.00 per month. Also, on May 16, 2005, Armenta was provided with a property profile for the Albany Church's Chicken, indicating that the assessed value of the property was only $129,600.00. This figure was very concerning to Armenta given that M&M Real Estate was marketing the property to her at a price of over $600,000.00.

623.     As such, Armenta questioned Kunofsky and others at M&M Real Estate about the fair market value of the Albany Church's Chicken property. In response, Kunofsky represented to Armenta that the "assessed value doesn't matter to you. That is just state tax valuation. You are not buying the property you are buying the payment stream which is very secure through Church's Chicken." Kunofsky assured Armenta numerous times that $129,000.00 was not the value of the investment. Instead, Kunofsky promised that Armenta was buying the annual return on the investment through the rent, which was safe and secure given that Waelti/QSR was such a solid tenant. Armenta was further told by Kunofsky that the property was a going concern that would create a secure yield on her investment.

624.     Having been convinced by Kunofsky and M&M Real Estate that the investment and income stream would be safe and secure, Armenta purchased the property for $635,000.00 in approximately May 2005. Kunofsky represented to Armenta that she was actually getting a discounted price because she was paying all cash and had agreed to a quick closing. Of the $635,000.00 invested by Armenta, $335,000.00 came from the proceeds of the sale of the Azusa property.

**The Fraudulent Sale-Leaseback on the Property**

625.    Little did Armenta know that she had been defrauded into purchasing a commercial property at a price that had been grossly inflated due to the existence of a sham lease crafted by Defendants.  Indeed, Sovereign CC, as an alter ego and wholly-owned subsidiary of Sovereign Investment, had previously purchased the Albany Church's Chicken from Waelti on or around November 19, 2004 (the very same day Waelti had purchased the property from a third-party). Sovereign CC simultaneously executed a fraudulent sale-leaseback agreement with Waelti, which had the intended effect of artificially increasing the price of the property to well beyond its fair market value.

626.    Defendants intended from the outset to flip the overpriced property to an unwitting investor like Armenta.  Accordingly, to conceal the fraudulent and deceptive nature of the sale, Sovereign JF and Sovereign Investment turned to their sister company, M&M Real Estate, to list, market and sell the property.  M&M Real Estate, through its agents and as an alter ego of M&M, misrepresented and concealed material facts concerning the property's fair market value, future rents, business prospects, security and stability.

627.    As discussed below, Waelti had no intention of occupying the property and operating the Church's Chicken franchise through the full term of the lease, despite the numerous misrepresentations concerning the stability and safety of his operation.

**Waelti Abandons the Albany Church's Chicken**

628.    After closing on the Albany Church's Chicken property, Waelti/QSR One paid the first six months of rent to Armenta in a timely fashion.  During this time, on August 22, 2005, Armenta received a letter from Waelti/QSR One indicating there had been three months of rent overpayments and that Waelti/QSR One was going to take an offset on September's rent.

629.    Beginning in December 2005, and for several months thereafter, Waelti/QSR One started sending the rent to Armenta after the due date under the long-term lease.  Armenta sent correspondence by mail on January 9, 2006 reminding Waelti/QSR One of the need to pay rent on time.  In March, the rent check sent to Armenta by Waelti/QSR One was returned for insufficient funds.  In response, Armenta sent a demand letter to Waelti/QSR One for that month's rent plus a

1   late fee and other late fees for January and February 2006, totaling $5,308.92.  Waelti/QSR One did

2   not respond to this demand.

3       630.    Thereafter, Armenta was advised by Waelti/QSR One employees that Waelti – the

4   individual who had been touted by Kunofsky and M&M Real Estate as the reason to invest in the

5   Albany Church's Chicken property, given his experience and past successes – had abandoned QSR

6   One.  Armenta was also advised that Barrow was now in charge of QSR One.

7       631.    Subsequent to Waelti purportedly walking away, QSR One requested a 20% rent

8   reduction, which Armenta rejected.  Nevertheless, beginning in June 2006, QSR One unilaterally

9   reduced its rental payments to Armenta by 20%.  In order to mitigate her damages, Armenta

10  accepted the reduced payments.  On July 1, 2006, Waelti/QSR One sent Armenta correspondence by

11  mail, again asking that Armenta accept a reduction in rent, which she refused to do.

12      632.    From that time through the end of 2006, Armenta had to constantly struggle with

13  Waelti/QSR One so that Waelti/QSR One would fulfill its obligations under the long-term lease

14  agreement.[51]  After months of fighting with Waelti/QSR One to get the full rent paid, Armenta hired

15  an attorney.  Thereafter, Armenta made a demand on Waelti/QSR One for the total past due rent of

16  $13,138.85 through May 2007.  After June rent was not paid, Armenta sent Waelti/QSR One a letter

17  demanding possession of the property.

18      633.    As she was concerned about Waelti's purported departure, and Waelti/QSR One's

19  refusal to pay full rent, Armenta called an independent broker about the value of the Albany

20  Church's Chicken property.  Shockingly, and in contrast to everything that Kunofsky and M&M

21  Real Estate had represented to her, Armenta was told that the property was worth only $125,000.00.

22      634.    In September 2007, Armenta learned during a phone call with representatives from

23  QSR One and a representative of GE Capital that GE Capital claimed to own the equipment located

24  on her property.  Based upon the representations made by M&M Real Estate and Kunofsky, as well

---

[51]   On at least one occasion in 2007, Armenta received a rent payment from The QSR Group Three, LLC (which was an alter ego of Waelti).  Plaintiffs reserve the right to amend this First Amended Complaint to name The QSR Group Three, LLC as a Defendant should Plaintiffs uncover additional information to implicate The QSR Group Three, LLC in Defendants' fraudulent scheme.

1  as the plain language set forth in her lease with Waelti/QSR One, Armenta believed that she owned

2  the equipment.   Neither Kunofsky, M&M Real Estate nor Waelti/QSR One ever disclosed to

3  Armenta the fact that Waelti/QSR One took a large loan from GE Capital secured by the equipment

4  in Waelti/QSR One's Church's Chicken restaurants prior to Armenta's purchase of the property.

5       635.   On October 11, 2007, Armenta received an e-mail which confirmed that the

6  remaining Church's Chicken stores were being closed.  Thereafter, Waelti/QSR One abandoned

7  Armenta's Church's Chicken property.  On October 12, 2007, Armenta learned that GE Capital,

8  without her knowledge or consent, removed the equipment from her store.  Thereafter, in November

9  2007, Daugherty County, Georgia sent Armenta a tax bill Jeopardy Assessment for unpaid taxes of

10  $2,875.53.   Armenta paid this bill in order to mitigate her damages, even though the bill was

11  Waelti/QSR One's responsibility under the long-term lease.  In late 2008, Armenta was able to re-let

12  the Albany Church's Chicken property, but only at a rental rate that was significantly below the

13  amount that Defendants had originally agreed to pay in the long-term lease.

14       636.   Throughout the course of Armenta's relationship with M&M Real Estate, Sovereign

15  CC, Kunofsky, Waelti and the various other members of the M&M Enterprise, Defendants made

16  false and misleading statements and omissions regarding the fair market value, future rents, business

17  prospects, security and stability of Armenta's investment – exploiting the relationship of trust that

18  they had intentionally built with Armenta.   These false and misleading statements were

19  communicated to Armenta via U.S. mail, e-mail, facsimile and through the phone.  During this time,

20  Defendants knew that the fair market value of the investment property was artificially inflated, that

21  the purported long-term lease was a farce, and that the "tenant" would walk away, abandoning the

22  property, wiping out the artificial inflation in the fair market value of the property, and eviscerating

23  the future rents.

24       637.   So, as was the case with every other investor, Defendants' conspiracy to scam

25  Armenta was a complete success.  Defendants artificially inflated the value of the property that

26  Armenta was induced to purchase, which value plummeted when the Defendants walked away. As a

27  result, she suffered severe financial damages, including the loss of fair market value of her

28  investment, future rents and out-of-pocket damages, all of which she is entitled to recover.

638.    M&M Real Estate, M&M, Sovereign CC, Sovereign Investment, Kunofsky, Waelti and the various other members of the M&M Enterprise engaged in a continuous pattern of racketeering activity, as they used U.S. mail and wire to orchestrate and carry out the sale of the Albany Church's Chicken to Armenta.

639.    M&M Real Estate, M&M, Sovereign CC, Sovereign Investment, Kunofsky, Waelti and the various other members of the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts of fraud and deceit, as set forth herein, which caused Armenta to purchase the Church's Chicken property at a grossly inflated price. The value of the property later plummeted when Defendants abandoned it.

640.    As demonstrated through their ongoing and systematic conduct, M&M Real Estate, M&M, Sovereign CC, Sovereign Investment, Kunofsky, Waelti and the various other members of the M&M Enterprise shared the common purpose of luring investors like Armenta into purchasing triple net properties at artificially inflated prices with bogus and unsustainable lease terms.

641.    The fraudulent sale of the Albany Church's Chicken to the Armenta was by no means a random, isolated transaction, but part of a single, coordinated scheme devised by Defendants to sell triple net properties using bogus sale-leaseback agreements. Indeed, the Albany Church's Chicken property was one of multiple "portfolio" properties that Sovereign Investment had previously agreed to purchase from Waelti. From the outset, Sovereign had planned to purchase these portfolio properties "in bulk" with the intention of re-selling them to unwitting investors at drastically inflated prices. The sale to Armenta was consummated exactly as it had been planned and conceived by Defendants.

642.    In addition, the statements made by Defendants to Armenta and referenced herein were each materially false and misleading when made as they represented and/or omitted adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading. The then-existing facts that make those statements false and misleading are set forth in ¶458. In addition to the previously identified false statements, the following adverse facts were also known by Defendants at the time their false and misleading statements and misrepresentations were made:

1

- • Sovereign CC was not affiliated with Church's Chicken, and Church's Chicken did not have any equity interests in Sovereign CC or any of the Waelti Entities. Further, Sovereign CC was not an independent institution, but in fact a subsidiary of M&M and Sovereign.

2

3

- • Waelti was not "backed" by Church's Chicken but was merely a franchisee of that entity, and actually only a "temporary franchisee" at that. Further, Waelti never intended to invest money to modernize the Church's Chicken stores and increase the value of Plaintiffs' investments.

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### Chronology of Armenta's purchase of the Church's Chicken property located at 1926 Martin Luther King Jr. Blvd., Albany, Georgia 31701

**NOVEMBER 19, 2004**

Waelti/QSR purchased the Albany Church's Chicken property from a third-party for **$1,029,000.00**\*\*



**NOVEMBER 19, 2004**

Sovereign CC and Waelti/QSR One entered into a sham lease with an inflated rental rate of **$4,445.00** with a 1.75% increase per annum through November 30, 2019



**NOVEMBER 19, 2004**

Sovereign CC purchased the Albany Church's Chicken property from Waelti/QSR for **$1,029,000.00**



**MAY 18, 2005**

Armenta purchased the Albany Church's Chicken property from Waelti/QSR for **$635,000.00** and assumed the sham lease with Waelti/QSR One as tenants with a monthly rent of **$4,445.00**



**OCTOBER 11, 2007**

Waelti/QSR One abandoned the property and removed the trade fixtures. Armenta has been unable to re-let the Albany Church's Chicken property despite attempting to do so.

**Damages as a Result of Defendants' Fraud**

**$1,156,124.00**: **$390,000.00** as of closing plus **$766,124.00** in future rent, plus misc. out-of-pocket expenses

\*\* Waelti/QSR purchased the Albany Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of proceeds that Waelti/QSR attributed to the Albany Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Armenta.

1   **Q.   Linda Call**[52]

2   **The Sale of the Jacksonville Church's Chicken**

3       643.   In approximately May 2005, Linda Call ("Call") received a phone call from M&M

4   Real Estate agent Head.  Head encouraged Call to sell the 19-unit apartment building that she owned

5   at the time and to use the proceeds from that sale to purchase a triple net lease investment.  Head

6   explained to Call that triple net lease investments were very safe and required no management by the

7   investor.  Head represented to Call that an investment through Head and M&M Real Estate would

8   increase her cash flow.  Further, Head claimed that he had helped several other people acquire triple

9   net lease investments and that all of those individuals were very satisfied with their investments.

10      644.   When Call expressed uncertainty about triple net lease investments, Head sent via

11   U.S. mail M&M Real Estate materials to Call that explained triple net lease investments and

12   included some property listings.  The marketing materials M&M Real Estate and Head provided to

13   Call were for properties with cap rates from approximately 6.5% to 7.5%, but there were also some

14   8.0%+ cap rate properties as well.  The 19-unit apartment building Head was advising Call to sell

15   had a cap rate of approximately 5.5%.  Head repeatedly represented that he could get Call a secure

16   7.5% cap rate property.

17      645.   Head followed up by phoning Call approximately a week after dropping off the

18   materials.  Call thought the investments looked attractive but was nervous because she had never

19   purchased a triple net investment before and had owned the 19-unit apartment building for less than

20   a year.  Call specifically told Head that she was a single mother in her early 50s with two daughters

21   and she could not afford to make a mistake by investing in something that was not safe and secure.

22      646.   When Call expressed her fears to Head, Head reassured her by insisting that he would

23   increase her income, and that there were single tenants with guaranteed leases on the triple net lease

24   properties which made them safe and secure.  Head exuded a lot of confidence and promised Call

25   _____

26   [52]      Linda Call took title to the property in her own name.  Thereafter, Call transferred the
property to the Linda Jeanne Call Family Trust, dated September 12, 2002, of which she is the
27   Trustee.

28

1   that the investment was very safe.  Head was very persistent and made Call feel inadequate any time

2   she asked a question or showed any hesitation.

3        647.    Head continued to contact Call for several weeks after providing the marketing

4   materials to her.  In June 2005, after about a month of cajoling by Head, Call agreed to give him the

5   listing for the sale of her 19-unit apartment building.  Thereafter, Head increased the frequency and

6   volume of triple net listings that he sent to Call.

7        648.    At this point Call's 19-unit apartment building was already in escrow, and the agreed-

8   upon sale price of $2,250,000.00 would leave her with more than $1,000,000.00 to invest in a 1031

9   exchange property.  Call planned to split the money between at least two replacement properties to

10  further limit her risk.  Immediately after agreeing to sell her apartment building, Call began having

11  terrible seller's remorse.  Head calmed Call by telling her "you are going to be in a much better

12  position.  Don't worry."  Call specifically advised Head "I'm relying on you because I don't know

13  anything about triple net leases."  Head reassured Call by stating that he had many satisfied

14  customers, an MBA, and that he was an expert on triple net lease properties.

15       649.    On October 31, 2005, Head sent Call an e-mail with the subject line "have no fear, the

16  8+ Cap's are here" in which Head wrote "Once again, sorry for the delay with Ramesh, but his funds

17  are here tomorrow and WE WILL EXCEED YOUR PRESENT CASH FLOW IN YOUR UPLEG

18  PROPERTY OR PROPERTIES."  (Capital letters in original.)  Thereafter, Head sent Call M&M

19  Real Estate marketing materials for the Jacksonville, Florida Church's Chicken property that Call

20  eventually purchased, and for a Skinny's Diner.

21       650.    On December 19, 2005, a few days before her 1031 deadline to identify a

22  replacement property, Call selected the Jacksonville Church's Chicken property and the Skinny's

23  Diner property.  Call's decision to buy the Jacksonville Church's Chicken property was based

24  primarily on the offering proposal, and M&M Real Estate and Head's representations and purported

25  expertise.  The tenant on the Jacksonville Church's Chicken property was QSR II (which was an

26  alter ego of Waelti).  The M&M Real Estate marketing materials represented that Waelti was very

27

28

1    experienced, and that the long-term lease on the property was personally guaranteed by Waelti.[53]

2    Kunofsky of M&M Real Estate's New York office was the listing agent for the Jacksonville

3    Church's Chicken property.

4         651.    Call had never invested in a sale leaseback property before. Head explained to her

5    that Waelti/QSR II wanted to sell the property to free-up cash so they could purchase additional

6    franchises. When Call inquired about financials, Head represented that Waelti/QSR II and M&M

7    Real Estate did not have any rent history because Waelti/QSR II owned the property and did not pay

8    rent to itself. All the other comparables in the M&M Real Estate marketing materials showed other

9    Church's Chicken locations paying similar rent to the location Head advised Call to purchase.

10        652.    The M&M Real Estate marketing brochure originally listed the price of the

11   Jacksonville Church's Chicken property at $1,220,000.00.[54] Although Waelti/QSR II was asking

12   $1,220,000.00, Call was already committed to spend $1,400,000.00 on her Skinny's purchase. As

13   such, Call had less than $1,200,000.00 to spend on the Church's Chicken property. Notwithstanding

14   the fact that Call could not offer to pay the asking price, Head encouraged Call to make an offer

15   because the seller's prior deal purportedly fell through. Call took Head's advice and was surprised

16   when her offer was accepted.

17        653.    Call signed a December 12, 2005 purchase agreement provided to her by M&M Real

18   Estate. The purchase agreement provided Call with seven calendar days from the effective date in

19   which to conduct a physical inspection of the Jacksonville Church's Chicken property and three days

20

21

_____

22   [53]    The M&M Real Estate marketing materials identified a traffic count of 25,000 cars per day in
23   front of the Jacksonville Church's Chicken property. However, contrary to M&M Real Estate's
     representations, according to information provided by the City of Jacksonville, the average daily
24   traffic count in front of Call's Church's Chicken location was approximately 7,300 vehicles.

25   [54]    Call showed the M&M Real Estate marketing materials to her mortgage broker to get his
     opinion on the investment. The mortgage broker told Call that the rent per square foot seemed
26   unusually high. The broker's conclusion was based upon his understanding that the annual rent of
     $100,000.00 was for a 2,500 square feet building – the size represented in the M&M Real Estate
27   marketing materials. In fact, Call learned after the transaction closed that the Property was only
     1,251 square feet.

28

1  to confirm the site was in compliance with applicable safety standards.  The monthly rent under the

2  long-term lease with Waelti/QSR II was $8,333.33, with scheduled 1.75% annual rent increases.

3          654.    During the contingency period, Call traveled to Jacksonville to visit the property.

4  Call observed both the foot traffic and the drive through traffic.  The store appeared to be very busy.

5          655.    Call was originally supposed to have a 30-day escrow on the Jacksonville Church's

6  Chicken property.  However, the closing was delayed because of appraisal and title issues and efforts

7  to try to get due diligence items from Waelti/QSR II.  From approximately December 2005 through

8  the closing in early May 2006, there was a lot of back and forth between Call's lender and M&M

9  Real Estate via e-mail, with Call's mortgage broker seeking due diligence and financials from

10  Waelti/QSR II.

11          656.    The only financial information and due diligence that Call received regarding

12  Waelti/QSR II was a two column accounting ticker that purported to show monthly sales for her

13  store for the preceding two years.  Call understood she would have to pay a substantial amount of

14  taxes if she did not complete the 1031 exchange, so she decided to proceed, even though she was

15  concerned that M&M Real Estate and Waelti/QSR II had not provided all the financial disclosures

16  that Call and her lender had requested.  Call was comforted by the fact that she believed that M&M

17  Real Estate and Head were looking out for her best interests.

18          657.    In early April 2006, less then 20 days before closing, Call learned that there was an

19  appraisal from her lender on the Jacksonville Church's Chicken property that came in low.  When

20  Call confronted Head about the appraisal, Head told Call the appraisal was low because the appraiser

21  made a mistake and had not taken into consideration the value of the income stream she was going to

22  receive.  Head told Call that the appraiser only valued the real estate, when much of the value was in

23  the 15-year lease with great cash flow and increasing rents.

24          658.    Head's justification for the low appraisal seemed somewhat plausible to Call and put

25  her at ease.  Head told Call that M&M Real Estate was going to order another appraisal with the

26  same appraisal company and have them review it.  Call did not get either appraisal until after the

27  transaction had been closed for some time.

28

FIRST AMENDED COMPLAINT - 09-cv-00511-RMW(HRL)

659.    On April 7, 2006, Call requested a list of equipment included with the sale from M&M Real Estate so she could appropriately depreciate those assets.  Although Head and M&M Real Estate represented to Call that the equipment on the Jacksonville Church's Chicken property was going to be hers, they never provided her with the equipment inventory.

660.    The transaction closed on May 3, 2006, with Call contributing $218,793.00 in exchange proceeds and obtaining an $870,949.00 mortgage.  Call paid $1,100,000.00 plus closing costs for the Jacksonville Church's Chicken property.

**The Fraudulent Sale-Leaseback on the Property**

661.    Little did Call know that she had been defrauded into purchasing a commercial property at a price that had been grossly inflated due to the existence of a sham lease crafted by Defendants.  Indeed, M&M Real Estate and Waelti orchestrated the sale of the property using a bogus sale-leaseback, which had the intended effect of artificially increasing the price of the Jacksonville Church's Chicken property to well beyond its fair market value at the time of purchase by Call.

662.    As discussed below, Waelti never had the intention of occupying the property and operating the Church's Chicken franchise through the full term of the lease, despite the numerous misrepresentations concerning the stability and safety of his operation.

**Waelti Abandons the Jacksonville Church's Chicken**

663.    Starting immediately after her purchase, Waelti/QSR II failed to pay rent.  On June 6, 2006, Call wrote an e-mail to Clinton Wu ("Wu") at Kunofsky's office at M&M Real Estate in New York seeking her May and June rent as well as the name of the person at Waelti/QSR II to contact regarding rent.  On June 10, 2006, Call sent an e-mail to Head complaining about not having received rent, a copy of her lease, and other closing documents she should have received.  Head wrote an e-mail to Call on June 10, 2006 stating that Kunofsky had told him that Waelti/QSR II should be cutting a check to her soon.

664.    Thereafter, Head wrote in an e-mail to Call that "[g]oing for the gusto in terms of the cap rate has backfired a bit – not that you, me or any client deserves non-payment.  I've not experienced @$!* like this before." (Symbols in original.)  Call was surprised to receive this e-mail

1   because before the e-mail, Head always made it seem like 8%+ cap rates were readily available and

2   safe. Head never indicated that by pursuing an 8%+ cap rate she was "going for the gusto" or taking

3   on any unusual risk. To the contrary, Head told Call "it is a matter of fact that you get 8 cap deals."

4   In fact, Call specifically told Head she did not want and could not accept much risk.

5       665.    On June 12, 2006, Call sent an e-mail to Waelti/QSR II asking for unpaid rent and an

6   update. On June 14, 2006, Head sent Call an e-mail indicating he had been in touch with Kunofsky

7   and was going to have Kunofsky phone Call to discuss the Waelti/QSR II situation. Kunofsky never

8   phoned Call. On June 15, 2006, Head wrote to Call that Kunofsky had told him that Waelti/QSR II

9   was acquiring 30 more stores and had their accounting backed up. Kunofsky was supposed to phone

10   Call later that day to explain, but again never called.

11       666.    Call eventually received her rent, and continued to receive rent until approximately

12   April 2007, though the rent payments were always eight to 10 days late. When Call did not receive

13   her rent in April 2007, she sent e-mails to Waelti/QSR II. Call received a check for the May 2007

14   rent, but when she tried to deposit the check, Call's bank told her that they had information to

15   indicate the check would not clear. Call found it odd that the bank knew in advance the check would

16   not clear.

17       667.    On approximately May 16, 2007, Call received a letter from Waelti/QSR II stating

18   that Waelti/QSR II would pay only 50% of the rent due under the long-term lease going forward.

19   Call was shocked to get the letter from Waelti/QSR II because 50% rent would not even cover Call's

20   mortgage payments on the Jacksonville Church's Chicken property. On June 30, 2007, Call wrote to

21   Waelti/QSR II asking for her full rent, and explaining her precarious financial position. The last rent

22   check that Call received was in July 2007. Thereafter, on October 15, 2007, Waelti/QSR II

23   abandoned the Jacksonville Church's Chicken property.

24       668.    Despite her efforts to mitigate her damages, Call has not yet been able to find a new

25   tenant. Call was forced to spend $70,000.00 over the last year making mortgage payments even

26   though she was not collecting rent, had no cash flow and her credit had been ruined.

27       669.    Throughout the course of Call's relationship with M&M Real Estate, Head, Waelti,

28   Kunofsky and the various other members of the M&M Enterprise, Defendants made false and

1   misleading statements and omissions regarding the fair market value, future rents, business

2   prospects, security and stability of Call's investment – exploiting the relationship of trust that they

3   had intentionally built with Call.  These false and misleading statements were communicated to Call

4   via U.S. mail, e-mail, facsimile and through the phone.  During this time, Defendants knew that the

5   fair market value of the investment property was artificially inflated, that the purported long-term

6   lease was a farce, and that the "tenant" would walk away, abandoning the property, wiping out the

7   artificial inflation in the fair market value of the property, and eviscerating the future rents.

8       670.    So, as was the case with every other investor, Defendants' conspiracy to scam Call

9   was a complete success.  Defendants artificially inflated the value of the property that Call was

10  induced to purchase, which value plummeted when the Defendants walked away.  As a result, Call

11  suffered severe financial damages, including the loss of fair market value of her investment, future

12  rents and out-of-pocket damages, all of which she is entitled to recover.

13      671.    M&M Real Estate, Head, Waelti, Kunofsky and the various other members of the

14  M&M Enterprise engaged in a continuous pattern of racketeering activity, as they used U.S. mail

15  and wire to orchestrate and carry out the sale of the Jacksonville Church's Chicken property to Call.

16      672.    M&M Real Estate, M&M, Head, Waelti, Kunofsky and the various other members of

17  the M&M Enterprise conducted and directed the affairs of the Enterprise by engaging in various acts

18  of fraud and deceit, which caused Call to purchase the Church's Chicken property at a grossly

19  inflated price that later plummeted in value when Defendants abandoned it.

20      673.    As demonstrated through their ongoing conduct, M&M Real Estate, M&M, Head,

21  Waelti, Kunofsky and the various other members of the M&M Enterprise shared the common

22  purpose of luring investors like Call into purchasing triple net properties with artificially inflated

23  prices and unsustainable lease terms.

24      674.    In addition, the statements made by Defendants to Call and referenced herein were

25  each materially false and misleading when made as they represented and/or omitted adverse facts

26  which then existed and disclosure of which was necessary to make the statements not false and/or

27  misleading.  The then-existing facts that make those statements false and misleading are set forth in

28  ¶458.  In addition to the previously identified false statements, the following adverse facts were also

1  known by Defendants at the time their false and misleading statements and misrepresentations were

2  made:

3      •   The "comparables" that purportedly showed other Church's Chicken tenants paying
           similar rental rates were actually all properties owned and/or operated by Waelti, and
4          the rental rates on those properties were all artificially inflated due to Defendants'
           fraud.
5
       •   Waelti was not "backed" by Church's Chicken but was merely a franchisee of that
6          entity, and actually only a "temporary franchisee" at that.  Further, Waelti never
           intended to invest money to modernize the Church's Chicken stores and increase the
7          value of Plaintiffs' investments.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## Chronology of Call's purchase of the Church's Chicken property located at 1830 North Myrtle Avenue, Jacksonville, Florida 32209

### NOVEMBER 19, 2004

Waelti/QSR II purchased the Jacksonville Church's Chicken property from a third-party for **$866,400.00**\*\*



### MAY 3, 2006

Waelti/QSR II and Call entered into a sham lease with an inflated rental rate of **$8,333.33** with increases through May 3, 2021



### MAY 3, 2006

Call purchased the Jacksonville Church's Chicken property from Waelti/QSR II for **$1,100,000.00** with a monthly rent of **$8,333.33**



### OCTOBER 15, 2007

Waelti/QSR II abandoned the property. Call has been unable to re-let the property despite attempting to do so.



### Damages as a Result of Defendants' Fraud

**$2,306,049.00**: **$750,000.00** as of closing plus **$1,556,049.00** in future rent, plus misc. out-of-pocket expenses

\*\* Waelti/QSR II purchased the Jacksonville Church's Chicken property at the same time he purchased several other Church's Chicken properties from a third-party and allocated the purchase price as he saw fit. While Plaintiffs have been unable to determine the exact allocation of proceeds that Waelti/QSR II attributed to the Jacksonville Church's Chicken property, discovery which will be obtained in this case will demonstrate that Defendants artificially inflated the value of the property before selling it to Call.