**E-FILED on**   4/12/2011

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| ECLECTIC PROPERTIES EAST, LLC, a California Limited Liability Company, et al., <br><br> Plaintiffs, <br><br> v. <br><br> THE MARCUS & MILLICHAP COMPANY, a California corporation, et al., <br><br> Defendants. | No. C-09-00511 RMW <br><br> [TENTATIVE] ORDER GRANTING MOTIONS TO DISMISS <br><br> [Re Docket Nos. 267, 268, 269, 271, 272, 273 and 277] |

On June 11, 2010, the court heard six motions to dismiss the First Amended Complaint ("FAC") brought by, or joined by, all defendants who have appeared in this action, as well as a motion to strike plaintiffs' jury demand. This is plaintiffs' second attempt to plead a RICO claim arising out of the seventeen plaintiffs' individual purchases of twenty-two commercial real estate properties in New York, Pennsylvania, Georgia and Florida in distinct transactions. The alleged scheme involves thirty-one defendants; the FAC now numbers 231 pages and 820 paragraphs. The FAC continues to assert the same seven causes of action:

    1.    RICO (18 U.S.C. §1962(c)-(d));

    2.    Negligent Misrepresentation;

    3.    Fraudulent Concealment under California Civil Code §1710;

    4.    Unjust enrichment and imposition of a constructive trust;

     5.     Money had and received;

     6.     Violation of California Business and Professions Code Section 17500; and

     7.     Violation of California Business and Professions Code Section 17200.

The court's subject matter jurisdiction is based solely on the RICO claim.

     Plaintiffs' overarching theory is that defendants defrauded each of the plaintiffs into investing in a commercial property that was subject to a long-term lease. As described by plaintiffs, the scheme took place in three stages: first, defendant Paul Morabito or Jack Waelti (or one of their respective companies) sold a commercial property to an entity (generally, one of the Sovereign defendants) at an inflated price and immediately entered into a leaseback transaction, with the lease payments set significantly higher than fair rental value. These long-term leases made each property appear to be worth significantly more than its alleged true market value. Second, the purchasing entity then marketed the properties for sale (through the Broker defendants) to real estate investors, such as plaintiffs, using allegedly sham appraisals (only some of which are alleged to have been prepared by defendant PGP) to support the artificially high values. Third, after a plaintiff's purchase, the underlying tenant walked away from the lease, causing the value of the property to plummet. Plaintiffs contend that through this scheme, each plaintiff was defrauded into paying significantly more than the properties were actually worth.

     Various defendants moved to dismiss the original complaint for failure to state a claim. On January 29, 2010, the court granted the motions and found that the complaint did not plead the RICO claim with the required degree of particularity. Specifically, the complaint did not allege facts demonstrating that each defendant conducted or participated in the conduct of the enterprise's affairs, *i.e.* participated in the operation or management of the enterprise itself, nor did it allege facts demonstrating a common purpose. The court also found that the complaint's alter ego allegations were unsupported by facts and therefore deficient. The other asserted claims, which relied on the same underlying fraudulent conduct, failed to provide the degree of factual specificity required by Rule 9(b). The court granted the motions to dismiss with leave to amend.

     The present motions seek to dismiss the FAC filed on March 22, 2010. Once again, the RICO claim is the primary target of the motions, although the state law claims are also challenged.

1  Most of the arguments raised by the parties revisit arguments made in the earlier motions to dismiss,
2  with the defendants making the additional argument that plaintiffs have not cured the defects
3  identified by the court's prior order, and that because plaintiffs have already been given one
4  opportunity to amend, this time the dismissal should be with prejudice.

At the hearing on the motions, the court asked plaintiffs' counsel to identify new factual allegations in the First Amended Complaint that addressed the deficiencies of the dismissed complaint. Following argument, the court took the motions under submission and informed counsel that the matter would likely be set for further argument after the court analyzed the FAC and the parties' motions. The court has now done so and tentatively finds that the FAC lacks the pleading specificity required for fraud-based RICO claims. The RICO claim of the FAC is therefore tentatively dismissed with leave to make a final attempt to successfully amend.

## FACTS

Plaintiffs allege a purported conspiracy involving 32 co-conspirators and 22 properties–14 containing Jiffy Lube franchises run by defendant Paul Morabito or companies he allegedly controlled, and eight containing Church's Chicken franchises run by Jack Waelti or companies he allegedly controlled. Plaintiffs allege that Sovereign Investment financed Morabito and Waelti's purchases of Jiffy Lube and Church's Chicken franchises, respectively. ¶ 97. Next,

> [e]ither immediately thereafter, or simultaneously, Morabito and Waelti (through one of their alter ego companies) then sold each property to one of the Sovereign Entities and immediately leased back the business at an artificially high lease rate. The sale-leaseback agreements between the Sovereign Entities and Morabito's and Waelti's alter ago entities were, in each case, set at rental rates that were dramatically higher (usually by more than 50%) than the reasonable, fair market, arms-length rental rate.

¶ 98. Plaintiffs allege that the rents Morabito and Waelti agreed to pay were more "more than double the fair market lease rates for similarly situated franchises." ¶ 3. Since "commercial rental property is appraised using the value of any long-term lease on the property, the sham leases had the direct and intended effect of inflating the apparent values of the Properties significantly higher than their legitimate fair market values." ¶ 4. Moreover, plaintiffs allege that the brokers who facilitated their purchases told them that the "listing price of the property was based on the rental income that would be generated from the property–not the value of the underlying property itself." ¶ 240. After months or years of paying rent, Morabito and Waelti allegedly defaulted, and plaintiffs were forced

[TENTATIVE] ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC                                                                                      3

to re-rent the properties at much lower rates. ¶¶ 7-8, 27. In particular, plaintiffs allege that "[o]nce the sales were completed and Defendants had Plaintiffs' monies in hand, all Defendants had to do to accomplish their goal of defrauding Plaintiffs was to walk away." ¶ 108. Yet plaintiffs also allege that the tenants operated the businesses for up to four years, ¶ 108, and that tenants paid $8,192,938 in rent to the plaintiffs before walking away from the leases. ¶ 27.

The FAC describes the commercial investments involved in this case as "Sub-Credit Tenant Leases" or "SCTLs." Plaintiffs define SCTLs as follows:

> The seller/business operator sells the real estate at a multiple of the actual market value and the seller/business operator usually agrees to pay an even greater multiple of market rent to compensate the purchaser for the risk that the seller/business operator will default on the SCTL. If the seller/business operator defaults, the purchasers is typically only able to re-let the property at a small portion of what the SCTL had agreed to pay. In SCTLs, "Sub-Credit" refers to the fact that the tenant has not been rated by a credit rating agency, and there is thus no available independent analysis of the risk of bankruptcy and default.

¶ 12. Plaintiffs go on to explain the basis of their claims as follows:

> Had Defendants revealed to Plaintiffs that they were selling complex real estate/debt hybrids in which a significant portion of the value of the purchase price was secured not by real estate, but only by a promise to pay from a Sub-Credit grade debtor, Plaintiffs never would have purchased the Properties.

¶ 14. Plaintiffs do not, however, allege that any defendant gave them any reason to believe that the tenants had been rated by a credit agency.

## REQUEST FOR JUDICIAL NOTICE

Defendants request judicial notice of the purchase sale agreements and leases for the properties at issue in deciding defendants' motion to dismiss. In particular, defendants wish to introduce portions of the agreements in which plaintiffs purportedly disclaimed relying on anything anyone told them about the properties in question, and instead promised to rely only on their own independent investigation, as well as portions of the agreements disclosing risks inherent in purchasing the properties.

In ruling on a Rule 12(b)(6) motion to dismiss, the court "may generally consider only allegations contained in the pleadings, exhibits attached to the complaint, and matters properly subject to judicial notice." *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th Cir. 2007) (citation and quotation marks omitted). The court may take judicial notice of matters of

public record, but it "may not take judicial notice of a fact that is 'subject to reasonable dispute.'" *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing Fed. R. Evid. 201(b)).  Under the "incorporation by reference" doctrine, a court may also review documents "'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'" *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).  That doctrine also applies "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Id.*

Defendants contend that the court should take judicial notice of the documents under the incorporation by reference doctrine, because the FAC purportedly references the purchase sale agreements and leases numerous times and pleads that every single one of the transactions at issue is governed by the purchase sale agreements and leases.  They cite allegations that defendants entered into "sham leases with dummy corporations" for each property; that "[i]n every single one of the 22 transactions" at issue, defendants failed to honor the terms of the leases; and that plaintiffs entered into the purchase sale agreements "in reliance on [defendants'] representations." FAC ¶¶ 2, 110, 790.  But these references do not constitute allegations of the *contents* of the documents; at most, they refer to the fact that sale and lease contracts existed, and they do not support taking judice notice of the contents of the contracts and leases in the context of a motion to dismiss.

Defendants further argue that the court should take judicial of the purchase sale agreements and leases because plaintiffs' claims "depend[] on the content" of the documents. *Knievel v. ESPN*, 393 F.3d at 1076.  If plaintiffs had not signed the purchase sale agreements and assumed the leases, defendants contend, there would be no litigation.  The documents are plainly relevant to the ultimate determination of liability.  Nonetheless, unlike a claim for breach of contract, fraud-based claims do not legally depend on the contracts governing allegedly fraudulent transactions.  To consider the documents would impermissibly convert this motion to one for summary judgment.  The request for judicial notice is denied.

[TENTATIVE] ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC                                                                                       5

**DISCUSSION**

In evaluating the complaint, the court must identify and eliminate allegations "that, because there are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). The court must then evaluate the remaining, non-conclusory allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

Federal Rule of Civil Procedure 9(b) requires that fraud be pled with particularity, and provides: "In all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Rule 9(b) "requires the identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Odom v. Microsoft Corp.*, 486 F.3d 541, 553 (9th Cir. 2007) (en banc) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986). "[T]he pleader must state the time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentation." *Id.* (citing *Schreiber Distrib. Co.*, 806 F.2d at 1401). Plaintiffs' fraud-based RICO claims must meet both the standard articulated in *Iqbal* and Rule 9(b).

### I. The Marcus & Millichap Company

The Marcus & Millichap Company ("M&M") argues that it is in this case only because it is a corporate parent of other defendants, and that plaintiffs have not adequately alleged that M&M is an alter ego of Sovereign, Marcus & Millichap Real Estate Investment Services ("M&M Investment"), or Marcus & Millichap Real Estate Investment Brokerage Company ("M&M Real Estate").

Plaintiffs contend that they have alleged M&M's "direct involvement" in the alleged RICO scheme. The allegations plaintiffs cite, however, fail to address M&M directly or with particularity, other than to argue that M&M is indirectly liable as an alleged alter ego. *See* ¶¶ 1-2, 16, , 19-23, 98, 443, 466, 510, 537, 684, 723-27. Moreover, in the section of the complaint describing the alleged "predicate acts," plaintiffs attribute no predicate acts of mail or wire fraud directly to M&M. ¶¶ 708-31. Although plaintiffs need not allege that each defendant personally used the mail or wires,

they must allege facts showing the existence of a fraudulent scheme and that each defendant "knowingly cause[d]" use of the mails or wires to further that alleged scheme. 18 U.S.C. § 1341; *see also, e.g. Craig Outdoor Adver., Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008). They have not done so. Plaintiffs argue that the use of the mail or wires was foreseeable in the course of defendants' business generally, but that also is insufficient to allege M&M's direct involvement.

Nor do plaintiffs adequately allege that acts of mail or wire fraud may be attributed to M&M under an alter ego theory. In order to plead alter ego liability, plaintiffs must allege facts showing that (1) there is such a unity of interest and ownership between the corporation and its subsidiary that the two no longer exist as separate entities, and (2) honoring corporate separateness would result in fraud or injustice. *See Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979); *Matter of Christian & Porter Aluminum Co.* 584 F.2d 326, 338 (9th Cir. 1978).

Plaintiffs allege a unity of interest and ownership between all of the M&M and Sovereign companies based on the alleged facts that they occupy the same company headquarters, share the same principals, share many of the same employees and agents, and share the same corporate philosophy and operating principles. ¶¶ 748-750. M&M owns 100% of the stock of both M&M Investment and Sovereign Investment. ¶ 748. In addition, plaintiffs allege that the co-founders and co-chairmen of M&M, George Marcus and William Millichap, are the registered principals of both M&M Investment and Sovereign Investment. *Id.*

Plaintiffs further allege that M&M Real Estate is the alter ego of M&M Investment and M&M, and that these entities also occupy the same corporate headquarters, share many of the same employees and agents, and share the same corporate philosophy and operating principles. ¶ 752. In addition, the M&M Brokers allegedly identified themselves to plaintiffs as employees of "Marcus and Millichap," although many of them were employed by one of the subsidiaries. ¶ 753. Plaintiffs allege that the marketing materials refer to the companies interchangeably, and that as a result, plaintiffs had no way of knowing with which M&M entity they were dealing. ¶¶ 753, 755.

These allegations are not sufficient to plead alter ego liability. In *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, the Ninth Circuit held that "the injustice that allows a corporate veil to

[TENTATIVE] ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC                                                         7

be pierced is not a general notion of injustice; rather, it is the injustice that results only when corporate separateness is illusory." 394 F.3d 1143, 1149 (9th Cir. 2004) (internal citations omitted). The court noted that factors signaling it would be inequitable to respect separate corporate identities included "inadequate capitalization, commingling of assets, [or] disregard of corporate formalities." *Id.* None of these factors has been alleged in this case. Plaintiffs' allegations regarding common principals do not plausibly demonstrate alter ego liability, because "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988)). With respect to the alleged failure of the marketing materials to distinguish among the corporate defendants, such ambiguities do not provide a basis for piercing the corporate veil. *See, e.g., Ministry of Def. of Islamic Republic v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992) ("a few instances where Hoffman's relationship to Gould, Inc. was mislabeled do not create a genuine issue as to Gould, Inc.'s separateness from Hoffman and its successors"). Nor does 100% control through stock ownership or the fact that companies share the same offices necessarily make companies alter egos. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003). Plaintiffs do not allege any facts showing that an inequitable result would follow from respecting corporate separateness.

Plaintiffs cite a New Jersey district court case and a California state trial decision that they contend held that the plaintiff could proceed against M&M on an alter ego theory. *See Smith v. Marcus & Millichap Real Estate Inv. Brok. Co.*, No. 06-cv-1968, 2006 WL 3043127 (D.N.J. Oct. 24, 2006); *Ozuna v. Marcus & Millichap Co.*, Case No. 1-09-CV-149708 (Santa Clara County Superior Court). In *Smith*, the court did not conduct an alter ego analysis and instead applied a specialized Title VII test for determining when a parent company can be liable for a subsidiary's corporate acts. *Id.* at *2. In *Ozuna*, the court gave no reasoning as to the basis of the ruling overruling a demurrer. The decisions are not helpful.

The claims against M&M are dismissed without prejudice. Facts must be alleged showing that separate entities do not exist and why honoring separation would result in an injustice.

## II. Racketeer Influenced and Corrupt Organizations

To state a claim for conducting a RICO enterprise under 18 U.S.C. § 1962(c), a plaintiff must allege (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5) causing injury to plaintiffs' business or property. *See Sedima, S.P.R.L. v. IMREX Co.*, 473 U.S. 479, 496 (1985). The term "racketeering activity" is defined to include various predicate acts, including "any act which is indictable under . . . section 1341 (relating to mail fraud)."  § 1961(1)(B).

> The upshot is that RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud. Mail fraud, in turn, occurs whenever a person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail "for the purpose of executing such scheme or artifice or attempting so to do. § 1341. The gravaman of the offense is the scheme to defraud, and any "mailing that is incident to an essential part of the scheme satisfies the mailing element," *Schmuck v. United States*, 489 U.S. 705, 712 (1989) (citation and internal quotation marks omitted), even if the mailing itself "contain[s] no false information," *id.*, at 715.

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

Section 1962(c)'s requirements must be established as to each individual defendant. *Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008).

**A.   Conducted the Affairs**

The conduct requirement under § 1962(c) means that "[i]n order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those affairs." *Reves v. Erst & Young*, 507 U.S. 170, 183 (1993); see also *Walter v. Drayson*, 538 F.3d 1244, 1247-48 (9th Cir. 2008). An enterprise "also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it as, for example, by bribery." *Reves*, 507 U.S. at 184. Sovereign Investment, M&M Investment, and the M&M Brokers contend that the FAC fails to allege with particularity that they conducted the affairs of the alleged enterprise.

The complaint alleges that Sovereign Investment agreed to provide financing on unusually favorable terms to Morabito and Waelti in 2004 to enable them to purchase Jiffy Lube and Church's Chicken properties. The complaint also alleges that the Sovereign Subsidiaries furthered the fraudulent scheme by executing the artificially inflated sale-leaseback agreements and selling the overvalued properties to plaintiffs. These allegations are sufficient to plead that Sovereign Investment and the Sovereign Subsidiaries conducted the affairs of the alleged enterprise within the meaning of § 1962(c).

1     The complaint also alleges that the M&M Investment furthered the fraudulent scheme by
2 executing the artificially inflated sale-leaseback agreements and selling the overvalued properties to
3 plaintiffs. These allegations are sufficient to plead that M&M Investment conducted the affairs of
4 the alleged enterprise within the meaning of § 1962(c). The court also rejects M&M's Investment's
5 argument that plaintiffs have not adequately pled a continuing unit with a common purpose. The
6 FAC alleges that M&M Investment and M&M Brokers were involved in every transaction. That is
7 sufficient at this stage.

**B.     Common Purpose**

Under RICO, "an associated-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'" *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir. 2007) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981). The FAC alleges that all defendants shared the common purpose of defrauding real estate investors into purchasing properties at artificially inflated prices with unsustainable lease terms. ¶¶ 677-679, 681-701. Since the court dismissed the original complaint for failure to plead common purpose with specificity, plaintiffs have added the following allegation:

> As demonstrated through their ongoing conduct, M&M Real Estate, M&M, Muirhead, Kunofsky, Sovereign Scranton, Sovereign Investment, Morabito, and the various other members of the M&M Enterprise shared the common purpose of luring investors like Etemad into purchasing triple net properties with artificially inflated prices and unsustainable lease terms.

¶ 147. Although the court previously found that plaintiffs had not adequately alleged common purpose, in light of the added allegation and upon further consideration, the court finds that plaintiffs have adequately alleged that defendants have associated for " a common purpose of engaging in a course of conduct." *Odom*, 486 F.3d at 552 (9th Cir. 2007). In *Odom*, the Ninth Circuit found plaintiffs adequately alleged that defendants Best Buy and Microsoft had the common purpose of increasing the number of people using Microsoft's Internet service through fraudulent means, where Best Buy had furthered the common purpose by distributing internet trial CD's and conveying customers' debit and credit card information to Microsoft, and Microsoft used the information to activate customer accounts. *Id.*

1	Here, plaintiffs have adequately alleged that the defendants acted for the common purpose of
2	defrauding investors into purchasing triple net properties with artificially inflated prices.

3	**C.	Pattern of Racketeering Activity**

4	Plaintiffs must allege that defendants engaged in a "pattern" of racketeering activity.  "[T]wo
5	isolated acts of racketeering activity do not constitute a pattern.  As the Senate Report explained:
6	'The target of [RICO] is not sporadic activity.  The infiltration of legitimate business normally
7	requires more than one 'racketeering activity' and the threat of continuing activity to be effective.  It
8	is this factor of continuity plus relationship which combines to produce a pattern.'" *Sedima*, 105 S.
9	Ct. at 3285 n.14.  "A 'pattern' of racketeering activity also requires proof that the racketeering
10	predicates are related and 'that they amount to or pose a threat of continued criminal activity.'"
11	*Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004).

12	The alleged pattern of racketeering activity in this case consists of acts of mail fraud.
13	Plaintiffs contend that the FAC describes a cohesive, overarching scheme to market and sell an
14	artificially inflated portfolio of Jiffy Lube and Church's Chicken properties, not a series of isolated
15	transactions.  They point out that all 22 transactions were initiated and carried out by M&M brokers,
16	and that the brokers misrepresented the financial stability of the tenants and the risk of the
17	investment.  ¶ 6.

18	The M&M Brokers argue that they could not have participated in a pattern of racketeering
19	activity because each broker was involved in only a handful of the underlying transactions.  The
20	FAC alleges that the Brokers were responsible for marketing the properties to plaintiffs; they
21	allegedly misrepresented and concealed the true financial characteristics of the properties.  They
22	allegedly made similar representations that the properties were "safe" and "secure" investments, that
23	they would generate high capitalization rates.  To allege a pattern of racketeering activity, plaintiffs
24	must show that the predicate acts are related–that they have the "same or similar purposes, results,
25	participants, victims, or methods of commission." *Northwestern Bell*, 492 U.S. at 240.  The court
26	agrees that the FAC merely cobbles together a disparate group of twenty-two distinct property
27	transactions, rather than the well-orchestrated conspiracy plaintiffs purport to allege.  The
28

United States District Court
For the Northern District of California

connections among those transactions are alleged in conclusory fashion, and plaintiffs fail to allege that each individual defendant engaged in a pattern.

In addition, brokers Muirhead and Emas argue that their alleged conduct, which occurred over the course of six to nine months, did not occur over a significant enough period of time to establish a pattern. Plaintiffs argue that in determining whether there is a pattern, courts must look at the scheme as a whole and all acts of racketeering–the alleged scheme was carried out from 2003 to 2008. However, Section 1962(c)'s requirements must be established as to each individual defendant. *Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008). For purposes of establishing individual liability under 1962(c), plaintiffs must allege that Muirhead and Emas personally committed acts constituting a pattern of racketeering. They have failed to do so.

**D.      Proximate Causation**

RICO provides a civil remedy only to those persons injured "by reason of" the defendants' predicate acts. Defendants argue that because plaintiffs admit that they were alerted to the risks of so-called SCTLs before they decided to invest, plaintiffs have failed to allege that defendants proximately caused any injury.[1] This contention is unpersuasive in light of the fact that plaintiffs specifically allege that they did not know that they were investing in a debt/real estate hybrid and did not understand the risks of the investment. Even though plaintiffs now define SCTLs as investments whose value is partially based on rental income from a "Sub-Credit" tenant–i.e., one which "has not been rated by a credit rating agency" and about which there was "no available independent analysis of the risk of bankruptcy and default," ¶ 12, those allegations do not necessarily demonstrate that plaintiffs' alleged injury is due to deliberate investment choices because they knew or should have known that the investments they were pursuing carried a high rate of return to offset the significant risks.

Plaintiffs' allegations regarding proximate causation and injury are conclusory and implausible in light of plaintiffs' chart of purported "true fair market values." Plaintiffs' conclusions

---

[1] Defendants also argue that plaintiffs disclaimed reliance on representations by third parties in their purchase and sale agreements. For the reasons stated above, the court declines to take judicial notice of the purchase and sale agreements.

[TENTATIVE] ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC                                                            12

about "true fair market values" are implausible in light of the fact that they represent a 45.01% decrease from the prices the Tenants paid in arm's-length transactions with third parties. Plaintiffs allege that when a long-term tenant signs a lease agreeing to pay a high rent, that typically increases a property's fair market value by "a multiple of the actual market value." ¶ 12. When the Tenants originally purchased the properties, they did not include long-term leases. Those commitments were added before plaintiffs bought the properties.

This case is similar to *First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763 (2nd Cir. 1994). There, the Second Circuit upheld dismissal of an amended complaint which included a schedule purporting to set out the approximate amount by which the defendants had overstated property values. *Id.* at 770. The court found that the plaintiff failed to "adequately account for the contribution of external market factors to the loss," and that the allegations were implausible because they predicted a large increase in value "despite the fact of a general decline in the real estate market." *Id.* at 771. Unlike the plaintiffs in *First Nationwide*, plaintiffs have not even attempted to explain how they derived their conclusory allegations of true fair market value. More importantly, plaintiffs implausibly suggest very substantial declines in the properties' value despite the fact that their own theory implies an increase in value. The numbers do not make sense, and they demonstrate that plaintiffs' allegation fall "short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 129 S. Ct. at 1949.

### E.     Failure to Plead Predicate Acts of Mail and Wire Fraud With Specificity

Plaintiffs' conclusory allegations of predicate acts by the Sovereign Subsidiaries are insufficient under Rule 9(b). "No dates are given, and no acts are specified from which it would be inferred that the mails or interstate communications were involved." *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1530 (9th Cir. 1995). Plaintiffs simply repeat the identical allegations against each defendant. As in the original complaint, the FAC does not adequately allege the misrepresentations and omissions that form the foundation of the fraud and knowledge of falsity by the defendants who are alleged to have made them. Plaintiffs' RICO claim rests on the allegation that the Sovereign Subsidiaries knew that the Tenants intended to abandon their leases. ¶¶ 725-27. Yet Plaintiffs have pleaded no particular facts to support the conclusion that the Sovereign Subsidiaries knew of

Tenants' alleged intentions. In their opposition, plaintiffs contend that the "FAC also alleges in detail the authors and content of the false statements and misrepresentations made during the course of the sale of each of the properties," but the cited portions of the complaint provide no such detail.

M&M Investment argues that the plaintiffs impermissibly seek to hold M&M Investment liable based on its brokerage of a potentially risky type of commercial real estate investment. Brokering the sale of a high risk investment without intent to defraud does not constitute a RICO predicate offense of mail or wire fraud. *See Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1399-1400 (9th Cir. 1986). The mail fraud statute requires intent. The FAC remains silent with regard to each individual brokers' knowledge that the offered sales price was artificially inflated, that the underlying lease which purportedly supported the sales price was a sham, or that the tenant intended to walk away from the underlying lease after a plaintiff purchased the property. Individual broker defendants are alleged to have been involved in only one transaction or a couple of transactions in a short period of time. The allegations are inadequate to sustain plaintiffs' claim.

With respect to defendant Paul Morabito, the FAC alleges that Morabito and his agents and alter ego companies created and executed sham sale-leaseback agreements for the purpose of artificially inflating the values of the properties beyond their fair market value, falsely portrayed Morabito as a profitable and long-term Jiffy Lube operator/franchisee, and abandoned the properties on which his franchises were located, which left plaintiffs with devalued investments. The FAC also alleges that Morabito and BMI directly engaged in numerous acts of mail and wire fraud. ¶ 721. These allegations would be sufficient–were it not for the numerous other deficiencies in plaintiffs' FAC.

### III. State Law Claims

Because plaintiffs' RICO claim fails, the pendent state-law claims are dismissed. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). Plaintiffs do not dispute that Rule 9(b) applies to every one of their state-law claims; nor do they argue that their state claims succeed under Rule 9(b) if their RICO claims fail.

### ORDER

[TENTATIVE] ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC 14

This is a tentative order dismissing the RICO claim against all defendants, with leave to make a final attempt to successfully amend. The parties are to appear on April 29, 2011 at 9:00 to discuss the ruling unless the parties agree and notify the court that no further argument is necessary.

DATED: 4/12/2011

RONALD M. WHYTE
United States District Judge