1

2

3                                                        **E-FILED on**   3/5/2012

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                 FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   ECLECTIC PROPERTIES EAST, LLC, a          No. C-09-00511 RMW
     California Limited Liability Company, et al.,
13
                  Plaintiffs,
14                                             ORDER GRANTING MOTIONS TO
           v.                                  DISMISS
15
     THE MARCUS & MILLICHAP COMPANY,           **[Re Docket Nos. 267, 268, 269, 271, 272, 273**
16   a California corporation, et al.,          **and 277]**

17                Defendants.

18

19          On June 11, 2010, the court heard six motions to dismiss the First Amended Complaint

20   ("FAC") brought by, or joined by, all defendants who have appeared in this action, as well as a

21   motion to strike plaintiffs' jury demand.  The court issued a tentative order on the motions on April

22   12, 2011 and heard further argument on May 13, 2011.  Having considered the papers submitted by

23   the parties and the arguments of counsel, and for the reasons set forth below, the court grants the

24   motions to dismiss plaintiffs' RICO claim without leave to amend.  Since the RICO claim provided

25   the basis for federal jurisdiction, the court declines to exercise supplemental jurisdiction over

26   plaintiffs' state claims and dismisses them without prejudice.  The motion to strike plaintiffs' jury

27   demand is moot in light of the granting of the motion to dismiss.

28

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

**BACKGROUND**

This is plaintiffs' second attempt to plead a RICO claim arising out of the seventeen plaintiffs' individual purchases of twenty-two commercial real estate properties in New York, Pennsylvania, Georgia, and Florida in distinct transactions. The alleged scheme involves thirty-one defendants; the FAC now numbers 231 pages and 820 paragraphs. The FAC continues to assert the same seven causes of action:

      1.    RICO (18 U.S.C. § 1962(c)-(d));

      2.    Negligent misrepresentation;

      3.    Fraudulent concealment under California Civil Code § 1710;

      4.    Unjust enrichment and imposition of a constructive trust;

      5.    Money had and received;

      6.    Violation of California Business and Professions Code Section 17500; and

      7.    Violation of California Business and Professions Code Section 17200.

The court's subject matter jurisdiction is based solely on the RICO claim.

Plaintiffs' overarching theory is that defendants defrauded each of the plaintiffs into investing in a commercial property that was subject to a long-term lease. The purported conspiracy involved 32 co-conspirators and 22 properties–14 containing Jiffy Lube franchises run by defendant Paul Morabito ("Morabito") or companies he allegedly controlled, and eight containing Church's Chicken franchises run by Jack Waelti ("Waelti") or companies he allegedly controlled. Plaintiffs allege that Sovereign Investment financed Morabito's and Waelti's purchases of their respective franchises.

As described by plaintiffs, the scheme took place in three stages: first, the Morabito or Waelti entity resold the commercial real property to another entity (generally, one of the Sovereign defendants[1]) at an inflated price and immediately entered into a leaseback transaction, with the lease payments set significantly higher than fair rental value. In other words, the Morabito or Waelti entity became a tenant on the property it previously owned. Since commercial rental property is appraised using the value of any long-term lease on the property, the leases with inflated rent made

---

[1] Sovereign Investment Company ("Sovereign Investment"); and Sovereign Scranton LLC, Sovereign CC LLC, and Sovereign JF LLC (collectively, "Sovereign Subsidiaries").

each property appear to be worth significantly more than its alleged true market value.  Second, the purchasing entity then marketed the properties for sale (through the Broker defendants[2]) to real estate investors, such as plaintiffs, using allegedly sham appraisals (some of which were prepared by defendant PGP Valuation, Inc. ("PGP")) to support the artificially high values.  Third, after a plaintiff's purchase, the underlying tenant (a Morabito-Jiffy Lube franchisee or Waelti-Church's Chicken franchisee) walked away from the lease, causing the value of the property to plummet. Plaintiffs contend that through this scheme, the plaintiffs were defrauded into investing significantly more than the properties were actually worth.

In particular, plaintiffs allege that "[o]nce the sales were completed and Defendants had Plaintiffs' monies in hand, all Defendants had to do to accomplish their goal of defrauding Plaintiffs was to walk away."  FAC ¶ 108.  Yet plaintiffs also allege that the tenants operated the businesses for up to four years, *id.* at 45, and that tenants paid $8,192,938 in rent to the plaintiffs before walking away from the leases, *id.* ¶ 27.

The FAC describes the commercial investments involved in this case as "Sub-Credit Tenant Leases" or "SCTLs."  Plaintiffs define SCTLs as follows:

> The seller/business operator sells the real estate at a multiple of the actual market value and the seller/business operator usually agrees to pay an even greater multiple of market rent to compensate the purchaser for the risk that the seller/business operator will default on the SCTL.  If the seller/business operator defaults, the purchasers is typically only able to re-let the property at a small portion of what the SCTL had agreed to pay.  In SCTLs, "Sub-Credit" refers to the fact that the tenant has not been rated by a credit rating agency, and there is thus no available independent analysis of the risk of bankruptcy and default.

*Id.* ¶ 12.  Plaintiffs go on to explain the basis of their claims as follows:

> Had Defendants revealed to Plaintiffs that they were selling complex real estate/debt hybrids in which a significant portion of the value of the purchase price was secured not by real estate, but only by a promise to pay from a Sub-Credit grade debtor, Plaintiffs never would have purchased the Properties.

*Id.* ¶ 14.  Plaintiffs do not, however, allege that any defendant gave them any reason to believe that the tenants had been rated by a credit agency.

---

[2]  Marcus & Millichap Real Estate Investment Services ("M&M Investment"); Marcus & Millichap Real Estate Investment Brokerage Company ("M&M Real Estate"); and individual defendants Bret King, Sean Perkin, Stewart Weston, Andrew Lesher, Brice Head, Donald Emas, and Marcus Muirhead (collectively, "M&M Brokers").

1    Various defendants moved to dismiss the original complaint for failure to state a claim.  On

2    January 29, 2010, the court granted the motions and found that the complaint did not plead the RICO

3    claim with the required degree of particularity.  Specifically, the complaint did not allege facts

4    demonstrating that each defendant conducted or participated in the conduct of the enterprise's

5    affairs, *i.e.* participated in the operation or management of the enterprise itself, nor did it allege facts

6    demonstrating a common purpose.  The court also found that the complaint's alter ego allegations

7    were unsupported by facts and therefore deficient.  The other asserted claims, which relied on the

8    same underlying fraudulent conduct, failed to provide the degree of factual specificity required by

9    Rule 9(b).  The court granted the motions to dismiss with leave to amend.

10    The present motions seek to dismiss the FAC filed on March 22, 2010.  Once again, the

11    RICO claim is the primary target of the motions, although the state law claims are also challenged.

12    Most of the arguments raised by the parties revisit arguments made in the earlier motions to dismiss,

13    with the defendants making the additional argument that plaintiffs have not cured the defects

14    identified by the court's prior order, and that because plaintiffs have already been given one

15    opportunity to amend, this time the dismissal should be with prejudice.

16                              **REQUEST FOR JUDICIAL NOTICE**

17    Defendants request judicial notice of the purchase sale agreements and leases for the

18    properties at issue in deciding defendants' motion to dismiss.  In particular, defendants wish to

19    introduce portions of the agreements in which plaintiffs purportedly disclaimed relying on anything

20    anyone told them about the properties in question, and instead promised to rely only on their own

21    independent investigation, as well as portions of the agreements disclosing risks inherent in

22    purchasing the properties.

23    In ruling on a Rule 12(b)(6) motion to dismiss, the court "may generally consider only

24    allegations contained in the pleadings, exhibits attached to the complaint, and matters properly

25    subject to judicial notice."  *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 899 (9th

26    Cir. 2007) (citation and quotation marks omitted).  The court may take judicial notice of matters of

27    public record, but it "may not take judicial notice of a fact that is 'subject to reasonable dispute.'"  *Lee*

28    *v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (citing Fed. R. Evid. 201(b)).  Under the

"incorporation by reference" doctrine, a court may also review documents "'whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.'"  *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (quoting *In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 986 (9th Cir. 1999)).  That doctrine also applies "to situations in which the plaintiff's claim depends on the contents of a document, the defendant attaches the document to its motion to dismiss, and the parties do not dispute the authenticity of the document, even though the plaintiff does not explicitly allege the contents of that document in the complaint." *Id.*

Defendants contend that the court should take judicial notice of the documents under the incorporation by reference doctrine, because the FAC purportedly references the purchase sale agreements and leases numerous times and pleads that every single one of the transactions at issue is governed by the purchase sale agreements and leases.  They cite allegations that defendants entered into "sham leases with dummy corporations" for each property; that "[i]n every single one of the 22 transactions" at issue, defendants failed to honor the terms of the leases; and that plaintiffs entered into the purchase sale agreements "in reliance on [defendants'] representations."  FAC ¶¶ 2, 110, 790.  But these references do not constitute allegations of the *contents* of the documents; at most, they refer to the fact that sale and lease contracts existed, and they do not support taking judicial notice of the contents of the contracts and leases in the context of a motion to dismiss.

Defendants further argue that the court should take judicial of the purchase sale agreements and leases because plaintiffs' claims "depend[] on the content" of the documents.  *Knievel v. ESPN*, 393 F.3d at 1076.  If plaintiffs had not signed the purchase sale agreements and assumed the leases, defendants contend, there would be no litigation.  The documents are plainly relevant to the ultimate determination of liability.  Nonetheless, unlike a claim for breach of contract, fraud-based claims do not legally depend on the contracts governing allegedly fraudulent transactions.  To consider the documents would impermissibly convert this motion to one for summary judgment.  Thus, the request for judicial notice is denied.

/ / /

/ / /

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

**DISCUSSION**

2      In evaluating the complaint, the court must identify and eliminate allegations "that, because

3   they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*,

4   129 S. Ct. 1937, 1950 (2009).  The court must then evaluate the remaining, non-conclusory

5   allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 1951.  "A claim

6   has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

7   reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949.

8      Federal Rule of Civil Procedure 9(b) requires that fraud be pled with particularity and

9   provides: "In all averments of fraud . . . , the circumstances constituting fraud . . . shall be stated

10  with particularity.  Malice, intent, knowledge, and other condition of mind of a person may be

11  averred generally."  Rule 9(b) "requires the identification of the circumstances constituting fraud so

12  that the defendant can prepare an adequate answer from the allegations." *Odom v. Microsoft Corp.*,

13  486 F.3d 541, 553 (9th Cir. 2007) (en banc) (quoting *Schreiber Distrib. Co. v. Serv-Well Furniture

14  Co.*, 806 F.2d 1393, 1400 (9th Cir. 1986)).  "[T]he pleader must state the time, place, and specific

15  content of the false representations as well as the identities of the parties to the misrepresentation."

16  *Id.* (citing *Schreiber*, 806 F.2d at 1401).  Plaintiffs' fraud-based RICO claims must meet the

17  standards articulated in both *Iqbal* and Rule 9(b).  *See Iqbal*, 129 S. Ct. at 1954 (noting Rule 9

18  excuses a party from pleading intent under an elevated pleading standard but does not allow a

19  plaintiff "to evade the less rigid–though still operative–strictures of Rule 8").

20      **A.      Alter Ego Liability**

21      Defendant Marcus & Millichap Company ("M&M") argues that it is in this case only

22  because it is a corporate parent of other defendants, and that plaintiffs have not adequately alleged

23  that M&M is an alter ego of the Sovereign entities, M&M Investment, or M&M Real Estate.

24      Plaintiffs contend that they have alleged M&M's "direct involvement" in the alleged RICO

25  scheme.  The allegations plaintiffs cite, however, fail to address M&M directly or with particularity,

26  other than to argue that M&M is indirectly liable as an alleged alter ego. *See* FAC ¶¶ 1-2, 16, 19-23,

27  98, 443, 466, 510, 537, 684, 723-27.  Moreover, in the section of the complaint describing the

28  alleged "predicate acts," plaintiffs attribute no predicate acts of mail or wire fraud directly to M&M.

ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC/LJP                                                6

¶¶ 708-31.  Although plaintiffs need not allege that each defendant personally used the mail or wires, they must allege facts showing the existence of a fraudulent scheme and that each defendant "knowingly cause[d]" use of the mails or wires to further that alleged scheme.  18 U.S.C. § 1341; *see also, e.g.*, *Craig Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008).  They have not done so.  Plaintiffs argue that the use of the mail or wires was foreseeable in the course of defendants' business generally, but that also is insufficient to allege M&M's direct involvement.

Nor do plaintiffs adequately allege that acts of mail or wire fraud may be attributed to M&M under an alter ego theory.  In order to plead alter ego liability, plaintiffs must allege facts showing that (1) there is such a unity of interest and ownership between the corporation and its subsidiary that the two no longer exist as separate entities, and (2) honoring corporate separateness would result in fraud or injustice.  *See Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir. 1979); *Matter of Christian & Porter Aluminum Co.*, 584 F.2d 326, 338 (9th Cir. 1978).

Plaintiffs allege a unity of interest and ownership between all of the M&M and Sovereign companies based on the alleged facts that they occupy the same company headquarters, share the same principals, share many of the same employees and agents, and share the same corporate philosophy and operating principles.  FAC ¶¶ 748-750.  M&M owns 100% of the stock of both M&M Investment and Sovereign Investment.  *Id.* ¶ 748.  In addition, plaintiffs allege that the co-founders and co-chairmen of M&M, George Marcus and William Millichap, are the registered principals of both M&M Investment and Sovereign Investment.  *Id.*

Plaintiffs further allege that M&M Real Estate is the alter ego of M&M Investment and M&M, and that these entities also occupy the same corporate headquarters, share many of the same employees and agents, and share the same corporate philosophy and operating principles.  *Id.* ¶ 752.  In addition, the M&M Brokers allegedly identified themselves to plaintiffs as employees of "Marcus and Millichap," although many of them were employed by one of the subsidiaries.  *Id.* ¶ 753.  Plaintiffs allege that the marketing materials refer to the companies interchangeably, and that as a result, plaintiffs had no way of knowing with which M&M entity they were dealing.  *Id.* ¶¶ 753, 755.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

These allegations are not sufficient to plead alter ego liability. In *Katzir's Floor & Home Design, Inc. v. M-MLS.com*, the Ninth Circuit held that "the injustice that allows a corporate veil to be pierced is not a general notion of injustice; rather, it is the injustice that results only when corporate separateness is illusory." 394 F.3d 1143, 1149 (9th Cir. 2004) (internal citations omitted). The court noted that factors signaling it would be inequitable to respect separate corporate identities included "inadequate capitalization, commingling of assets, [or] disregard of corporate formalities." *Id.* None of these factors has been alleged in this case. Plaintiffs' allegations regarding common principals do not plausibly demonstrate alter ego liability, because "it is entirely appropriate for directors of a parent corporation to serve as directors of its subsidiary." *United States v. Bestfoods*, 524 U.S. 51, 69 (1998) (quoting *Am. Protein Corp. v. AB Volvo*, 844 F.2d 56, 57 (2d Cir. 1988)). With respect to the alleged failure of the marketing materials to distinguish among the corporate defendants, such ambiguities do not provide a basis for piercing the corporate veil. *See, e.g., Ministry of Def. of Islamic Republic v. Gould, Inc.*, 969 F.2d 764, 770 (9th Cir. 1992) ("a few instances where Hoffman's relationship to Gould, Inc. was mislabeled do not create a genuine issue as to Gould, Inc.'s separateness from Hoffman and its successors"). Nor does 100% control through stock ownership or the fact that companies share the same offices necessarily make companies alter egos. *See Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1135 (9th Cir. 2003). Plaintiffs do not allege any facts showing that an inequitable result would follow from respecting corporate separateness.

Plaintiffs cite a New Jersey district court case and a California state trial decision that they contend held that the plaintiff could proceed against M&M on an alter ego theory. *See Smith v. Marcus & Millichap Real Estate Inv. Brok. Co.*, No. 06-cv-1968, 2006 WL 3043127 (D.N.J. Oct. 24, 2006); *Ozuna v. Marcus & Millichap Co.*, Case No. 1-09-CV-149708 (Santa Clara County Superior Court). In *Smith*, the court did not conduct an alter ego analysis and instead applied a specialized Title VII test for determining when a parent company can be liable for a subsidiary's corporate acts. 2006 WL 3043127 at *2. In *Ozuna*, the court gave no reasoning as to the basis for overruling a demurrer. Thus, the decisions are not helpful. Because plaintiffs have failed to allege either direct or alter ego liability, the claims against M&M are dismissed.

ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC/LJP
8

**United States District Court**
For the Northern District of California

1    Defendant Sovereign Investment also argues that it should be dismissed because the only

2    basis for liability is an alter ego theory that plaintiffs have not adequately alleged.  However,

3    plaintiffs allege that Sovereign Investment provided sale-leaseback financing to Morabito and

4    Waelti, FAC ¶ 19, which is a form of direct participation.  Thus, the court need not address the alter

5    ego theory as to Sovereign Investment.

6    **B.      RICO Claim**

7    To state a claim for conducting a RICO enterprise under 18 U.S.C. § 1962(c), a plaintiff must

8    allege (1) the conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity (5)

9    causing injury to plaintiffs' business or property.  *See Sedima, S.P.R.L. v. IMREX Co.*, 473 U.S. 479,

10   496 (1985).  The term "racketeering activity" is defined to include various predicate acts, including

11   "any act which is indictable under . . . section 1341 (relating to mail fraud)."  18 U.S.C.

12   § 1961(1)(B).

13   > The upshot is that RICO provides a private right of action for treble damages to any
     > person injured in his business or property by reason of the conduct of a qualifying
14   > enterprise's affairs through a pattern of acts indictable as mail fraud.  Mail fraud, in
     > turn, occurs whenever a person, "having devised or intending to devise any scheme or
15   > artifice to defraud," uses the mail "for the purpose of executing such scheme or
     > artifice or attempting so to do.  § 1341.  The gravaman of the offense is the scheme to
16   > defraud, and any "mailing that is incident to an essential part of the scheme satisfies
     > the mailing element," *Schmuck v. United States*, 489 U.S. 705, 712 (1989) (citation
17   > and internal quotation marks omitted), even if the mailing itself "contain[s] no false
     > information," *id.*, at 715.

18   *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647 (2008).

19   Section 1962(c)'s requirements must be established as to each individual defendant.  *Craig*

20   *Outdoor Advertising, Inc. v. Viacom Outdoor, Inc.*, 528 F.3d 1001, 1027 (8th Cir. 2008).

21   **1.      Conduct of Affairs**

22   The conduct requirement under § 1962(c) means that "[i]n order to 'participate, directly or

23   indirectly, in the conduct of such enterprise's affairs,' one must have some part in directing those

24   affairs." *Reves v. Erst & Young*, 507 U.S. 170, 179 (1993); *see also Walter v. Drayson*, 538 F.3d

25   1244, 1247-48 (9th Cir. 2008).  "An enterprise is 'operated' not just by upper management but also

26   by lower rung participants in the enterprise who are under the direction of upper management."

27   *Reves*, 507 U.S. at 184.  An enterprise "also might be 'operated' or 'managed' by others 'associated

28   with' the enterprise who exert control over it as, for example, by bribery." *Id.* at 184.  The Sovereign

ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC/LJP                                                        9

United States District Court
For the Northern District of California

1  entities, M&M Investment, and the M&M Brokers contend that the FAC fails to allege with

2  particularity that they conducted the affairs of the alleged enterprise.

3      As noted above, the complaint alleges that Sovereign Investment agreed to provide financing

4  to Morabito and Waelti in 2004 to enable them to purchase Jiffy Lube and Church's Chicken

5  properties.  The sale-leaseback agreements, a critical component of plaintiffs' alleged scheme, were

6  part of the financing arrangement.  FAC ¶ 19.  The complaint also alleges that the Sovereign

7  Subsidiaries were the ones who actually executed the sale-leaseback agreements.  These allegations

8  are sufficient to plead that Sovereign Investment and the Sovereign Subsidiaries conducted the

9  affairs of the alleged enterprise within the meaning of § 1962(c).

10     The complaint alleges that M&M Investment and the M&M Brokers directed the enterprise's

11  affairs by acting as brokers in transactions and marketing and selling properties to investors,

12  including plaintiffs.  FAC ¶ 698(c).  These defendants argue that providing their usual services of

13  marketing and brokering properties cannot amount to conducting the affairs of the enterprise, relying

14  on *Walter v. Drayson*, 538 F.3d 1244, 1249 (9th Cir. 2008) ("Simply performing services for the

15  enterprise does not rise to the level of direction . . . .").  In *Walter*, an attorney was alleged to be part

16  of an enterprise whose purpose was to gain and maintain control of a trust.  The court held that the

17  attorney's alleged involvement was insufficient to show operation or management of the enterprise.

18  *Id.* at 1248.  The court reasoned that the attorney and her firm "were not acting under direction from

19  the trust or the trustees" but rather "allegedly wrote emails, gave advice, and took positions on

20  behalf of her clients."  *Id.*; *see also id.* at 1249 (finding attorney did not "occupy a position in the

21  'chain of command' . . . through which the affairs of the enterprise are conducted" (quoting *United

22  States v. Oreto*, 37 F.3d 739, 750 (1st Cir. 1994))).  The allegations here concerning M&M

23  Investment and the M&M Brokers appear akin to those about the attorney in *Walter*.  Plaintiffs point

24  to no allegations that these defendants acted under the direction of the enterprise or occupied a

25  position in the chain of command.  Rather, the allegations only reflect that M&M Investment and the

26  M&M Brokers marketed the properties to investors and allegedly made misrepresentations in the

27  process, which is insufficient to show direction of the enterprise.  *See Walter*, 538 F.3d at 1248

28

ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC/LJP                                                     10

1   (noting alleged deficiencies in attorney's performance did not affect conclusion that she did not

2   direct the enterprise).

3           **2.      Enterprise**

4           A RICO "enterprise" is an individual or legal entity such as a corporation, or "any union or

5   group of individuals associated in fact although not a legal entity."  18 U.S.C. § 1961(4).

6           "[A]n associated-in-fact enterprise is 'a group of persons associated together for a common

7   purpose of engaging in a course of conduct.'"  *Odom v. Microsoft Corp.*, 486 F.3d 541, 552 (9th Cir.

8   2007) (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  In addition to showing a

9   common purpose, plaintiffs must show that there is an ongoing organization and that the various

10  associates function as a continuing unit.  *Id.*; *see Boyle v. United States*, 129 S. Ct. 2237, 2244

11  (2009) ("From the terms of RICO, it is apparent that an association-in-fact enterprise must have at

12  least three structural features: a purpose, relationships among those associated with the enterprise,

13  and longevity sufficient to permit these associates to pursue the enterprise's purpose.").

14          **a.      Common Purpose**

15          The FAC alleges that all defendants shared the common purpose of defrauding real estate

16  investors into purchasing properties at artificially inflated prices with unsustainable lease terms.

17  FAC ¶¶ 677-679, 681-701.  Since the court dismissed the original complaint for failure to plead

18  common purpose with specificity, plaintiffs have added the following allegation:

19          As demonstrated through their ongoing conduct, M&M Real Estate, M&M,
            Muirhead, Kunofsky, Sovereign Scranton, Sovereign Investment, Morabito, and the
20          various other members of the M&M Enterprise shared the common purpose of luring
            investors like Etemad into purchasing triple net properties with artificially inflated
21          prices and unsustainable lease terms.

22  *Id.* ¶ 147.  Although the court previously found that plaintiffs had not adequately alleged common

23  purpose, in light of the added allegation and upon further consideration, the court finds that plaintiffs

24  have adequately alleged that defendants have associated for "a common purpose of engaging in a

25  course of conduct."  *Odom*, 486 F.3d at 552.  In *Odom*, the Ninth Circuit found plaintiffs adequately

26  alleged that defendants Best Buy and Microsoft had the common purpose of increasing the number

27  of people using Microsoft's Internet service through fraudulent means, where Best Buy had furthered

28  the common purpose by distributing internet trial CD's and conveying customers' debit and credit

card information to Microsoft, and Microsoft used the information to activate customer accounts.
*Id.* Here, plaintiffs have adequately alleged that the defendants acted for the common purpose of
defrauding investors into purchasing triple net properties with allegedly inflated prices.

### b.    Continuing Unit

The M&M Brokers argue that plaintiffs fail to allege they are a continuing unit because each
of these individual defendants only performed short-term services related to isolated transactions.
However, plaintiffs appear to be correct that this argument is not properly addressed to the
continuity requirement.  "The continuity requirement does not, in itself, require that every member
'be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated
in any way.'" *Odom*, 486 F.3d at 552 (quoting *United States v. Qaoud*, 777 F.2d 1105, 1116 (6th Cir.
1985)).  "Instead, the continuity requirement focuses on whether the associates' behavior was
'ongoing' rather than isolated activity." *Id.* at 553.  The *Odom* court's rejection of an individual
participation requirement and its reference to "the associates' behavior" suggests that the continuity
requirement looks to the behavior of the associates collectively.  Here, plaintiffs have sufficiently
alleged that the conduct of the enterprise as a whole was ongoing in that the transactions at issue
occurred over several years.  *See id.* ("An almost two-year time span is far more than adequate to
establish that Best Buy and Microsoft functioned as a continuing unit.").

In addition, an associated-in-fact enterprise "may continue to exist even though it undergoes
changes in membership." *United States v. Payne*, 591 F.3d 46, 60 (2d Cir. 2010); *see also Odom*,
486 F.3d at 553 (citing *United States v. Cagnina*, 697 F.2d 915, 921 (11th Cir. 1983), for the
proposition that "a growing membership and diversity of activities do not preclude a finding of
'continuity'").  Thus, whether the M&M Brokers are seen as constant members of the enterprise who
simply did not participate in every underlying act of racketeering, or as members who joined and left
as they completed their respective transactions, their limited involvement does not undermine
plaintiffs' allegations of a continuing unit.

M&M Investment and M&M Real Estate also challenge the adequacy of plaintiffs'
continuing unit allegations, arguing that plaintiffs have merely alleged disparate transactions.
However, under *Odom* there is no relatedness component to the continuity requirement.  To the

1  extent the ongoing conduct must use similar methods, enough of the alleged transactions follow the

2  same general sequence to satisfy that requirement. *See id.* (noting plaintiffs' allegations described

3  "similar methods of fraudulently charging Best Buy customers for MSN Internet accounts").

### 3.  Pattern of Racketeering Activity

5  A "'pattern of racketeering activity' requires at least two acts of racketeering activity." 18

6  U.S.C. § 1961(5). The statutory language that a pattern "requires" rather than "means" two acts

7  implies that "while two acts are necessary, they may not be sufficient." *Sedima*, 473 U.S. at 496

8  n.14. "[T]wo isolated acts of racketeering activity do not constitute a pattern. As the Senate Report

9  explained: 'The target of [RICO] is not sporadic activity. The infiltration of legitimate business

10  normally requires more than one 'racketeering activity' and the threat of continuing activity to be

11  effective. It is this factor of continuity plus relationship which combines to produce a pattern.'" *Id.*;

12  *see also Turner v. Cook*, 362 F.3d 1219, 1229 (9th Cir. 2004) ("A 'pattern' of racketeering activity

13  also requires proof that the racketeering predicates are related and 'that they amount to or pose a

14  threat of continued criminal activity.'"). "[P]redicate offenses are related if they have 'the same or

15  similar purposes, results, participants, victims or methods of commission." *Religious Tech. Ctr. v.*

16  *Wollersheim*, 971 F.2d 364, 366 (9th Cir. 1992) (quoting *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492

17  U.S. 229, 240 (1989)).

18  The pattern requirement must be satisfied as to each defendant individually. *Craig Outdoor*

19  *Advertising*, 528 F.3d at 1027; *United States v. Persico*, 832 F.2d 705, 714 (2d Cir. 1987) ("The

20  focus of section 1962(c) is on the individual patterns of racketeering engaged in by a defendant,

21  rather than the collective activities of the members of the enterprise . . . ."). Plaintiffs incorrectly

22  rely on *Best Deals on TV, Inc. v. Naveed*, 2007 WL 2825652 (N.D. Cal. 2007), and *Odom* for the

23  proposition that analyzing the pattern element requires looking at "the scheme as a whole and the

24  acts of racketeering committed by all of the participants in the scheme." Opp. at 32-33. Neither

25  case specifically addressed whether each member of the enterprise must participate in a pattern of

26  racketeering activity. Both cases simply quoted the Supreme Court's explanation of how an

27  enterprise is distinct from a pattern of racketeering activity, the latter being proven "by evidence of

28  the requisite number of acts of racketeering committed by the participants in the enterprise." *Best*

United States District Court
For the Northern District of California

*Deals on TV*, 2007 WL 2825652 at *5 (quoting *Odom*, 486 F.3d at 549); *Odom*, 486 F.3d at 549 (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)).  As noted above, *Odom* later states that the continuing unit requirement "does not, *in itself*, require that every member 'be involved in each of the underlying acts of racketeering, or that the predicate acts be interrelated in any way." 486 F.3d at 552 (emphasis added).  By implication, those elements are called for in other requirements of the RICO claim, namely, the pattern requirement.

The M&M Brokers argue that plaintiffs have not and cannot allege that they have engaged in a pattern of racketeering activity because each defendant was involved in only one or a few transactions over a short period of time.  Of the seven M&M Brokers, five were involved in the sale of only one property, Emas was involved in two sales over six months, and Muirhead was involved in four sales within nine months.  As to the five brokers who are only alleged to have been involved in one transaction, plaintiffs have clearly failed to allege a pattern.  Plaintiffs make no attempt to show how a single transaction can constitute a pattern, or even satisfy the minimum requirement of two predicate acts; instead, plaintiffs incorrectly focus on the alleged scheme as a whole without regard to individual defendants.

Similarly, plaintiffs fail to show a pattern as to Emas.  When viewed from Emas' perspective, the two transactions he was involved in do not constitute a pattern: one sale involved a Jiffy Lube and the other a Church's Chicken; one was a direct sale from a Morabito entity to the purchasing plaintiff, and the other was sold by Sovereign CC after it executed an allegedly fraudulent sale-leaseback with a Waelti entity.  Emas' involvement is almost the only thing the two transactions have in common.  In addition, Emas' alleged conduct did not take place over a significant period of time, nor do plaintiffs allege any facts showing how his actions posed a threat of continuing criminal activity.  *See H.J. Inc.*, 492 U.S. at 242 ("Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy [the continuity] requirement.").

Finally, although Muirhead was involved in a larger number of transactions, the court concludes that plaintiffs' allegations are insufficient to meet the continuity requirement.  First, although the Ninth Circuit has rejected a bright line, one-year rule for establishing continuity, *Allwaste, Inc. v. Hecht*, 65 F.3d 1523, 1528 (9th Cir. 1995), courts have rarely if ever found activity

lasting less than a year sufficient, *see Religious Tech. Ctr.*, 971 F.2d at 366-67 ("We have found no case in which a court has held the requirement to be satisfied by a pattern of activity lasting less than a year.").  Second, the three purchasers involved in Muirhead's transactions were real estate partners; Muirhead contacted one and was introduced to the other two as a result.  FAC ¶¶ 111, 177, 409.  Thus, although Muirhead's conduct spanned multiple property sales, the sales were interrelated and relatively discrete.  There are no allegations to plausibly suggest his conduct posed a threat of ongoing criminal activity.

Thus, because plaintiffs' allegations fail to establish that any of the M&M Brokers engaged in a pattern of racketeering activity, the claims against them must be dismissed.

### 4.      Predicate Acts of Mail and Wire Fraud

Mail and wire fraud under 18 U.S.C. §§ 1341 and 1343 each require the showing of a scheme to defraud involving use of the United States mails or wires, with the specific intent to defraud. *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997); *Schreiber*, 806 F.2d at 1400 ("[A] wire fraud violation consists of (1) the formation of a scheme or artifice to defraud; (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud.").  The mailing need not contain false statements itself; even "innocent" mailings may satisfy the mailing element.  *Schmuck v. United States*, 489 U.S. 705. 715 (1989).  In addition, a defendant's personal use of the mails is not required; "[u]se of the mails need only be reasonably foreseeable as part of the alleged scheme."  *Ikuno v. Yip*, 912 F.2d 306, 311 (9th Cir. 1990).

Rule 9(b) "requires a pleader of fraud to detail with particularity the time, place, and manner of each act of fraud, plus the role of each defendant in each scheme." *Lancaster Cmty. Hosp. v. Antelope Valley Hosp.*, 940 F.2d 397, 405 (9th Cir. 1991).  But "[w]hile the factual circumstances of the fraud itself must be alleged with particularity, the state of mind–or scienter–of the defendants may be alleged generally." *Odom*, 486 F.3d at 554.

#### a.      Intent

Although intent may be alleged generally under Rule 9(b), it is still subject to the plausibility requirement of Rule 8.  After *Iqbal* it is no longer sufficient, as earlier Ninth Circuit cases had held,

United States District Court
For the Northern District of California

1   to plead scienter "simply by saying that scienter existed," *In re GlenFed Sec. Litig.*, 42 F.3d 1541,

2   1547 (9th Cir. 1994).  *See Iqbal*, 129 S. Ct. at 1951, 1954.  In *Iqbal*, the plaintiff alleged that certain

3   defendants "knew of, condoned, and willfully and maliciously agreed to subject [him]" to harsh

4   conditions of confinement "as a matter of policy, solely on account of [his] religion, race, and/or

5   national origin and for no legitimate penological interest."  *Id.* at 1951.  The Court, however, found

6   that "[t]hese bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing

7   more than a 'formulaic recitation of the elements' of a constitutional discrimination claim . . . . As

8   such, the allegations are conclusory and not entitled to be assumed true."  *Id.* (citations omitted).

9   Later, the Court specifically rejected the plaintiff's argument that such an allegation was sufficient

10  under Rule 9(b), holding that "the Federal Rules do not require courts to credit a complaint's

11  conclusory statements without reference to its factual context."  *Id.* at 1954.  The Court held that

12  Rule 9(b) does not excuse one from complying with Rule 8, and the plaintiff's complaint failed

13  under Rule 8 because it did not "contain any factual allegation sufficient to plausibly suggest

14  petitioners' discriminatory state of mind."  *Id.* at 1952, 1954.

15          When viewed under this standard, the scheme alleged by plaintiffs here is not plausible.

16  Central to the alleged scheme is that tenants associated with Morabito or Waelti entered into

17  so-called "sham" leases to pay allegedly inflated rent, with the intent to walk away from the

18  property.  However, the allegation of intent is a mere conclusion.  The alleged facts show that these

19  tenants honored their leases for months or years and paid millions of dollars to plaintiffs in rent

20  before they abandoned the properties, which belies an intent to do so all along.

21          In some instances, the total rent paid to the plaintiff is more than any profit the tenant (owner

22  of the Morabito Jiffy Lube or Waelti Church's Chicken franchise) received when it originally sold

23  the property to one of the Sovereign entities at an inflated price.  For most of the properties at issue,

24  plaintiffs allege that the tenant acquired the property in a bulk transaction, i.e. purchased multiple

25  properties at the same time for a single price, and "allocated the purchase price as he saw fit."

26  Therefore, plaintiffs argue, they cannot determine the exact proceeds that should be allocated to the

27  property, making it impossible to compare the tenant purchase price to the Sovereign purchase price.

28  As an initial matter, the court questions whether plaintiffs' conceded inability to allege specific facts

1  could support a theory of liability that is plausible rather than simply conceivable. But setting that

2  aside, even where plaintiffs allege individual sale prices, the subsequent events do not bear out

3  plaintiffs' theory of fraud. In plaintiff Linden's claim for example, the tenant bought the property

4  from a third party and then resold it to Sovereign JF the same day for $82,433 more. FAC ¶ 231.

5  Linden assumed the allegedly "sham" lease a month later, and the original tenant continued to pay

6  rent for three years, for a total amount more than three times the net proceeds from selling the

7  property to Sovereign JF. *Id.* ¶¶ 212-13, 217. In total, Linden received $309,648 in rent before the

8  property was abandoned. *Id.* ¶ 27. These numbers do not plausibly suggest that the tenant had any

9  intent to run off with its gains after selling the property at an inflated price. In addition, it appears

10  that one tenant purchased a group of four properties and resold the group to Sovereign CC for the

11  exact same price, but despite having made no profit on the property transaction, the tenant honored

12  its leases with plaintiffs for more than two years on three of the properties and almost one year on

13  the fourth property. *See id.* at 139, 150, 156, 173. These plaintiffs received more than $1 million

14  combined on these properties before the properties were abandoned. *Id.* ¶ 27.

15      Plaintiffs' theory for the large sums the tenants paid in rent is the need for the conspirators to

16  continue the "farce" and "make it appear that 'guaranteed' rent would be paid, at least until the rest of

17  the properties could be unloaded." Opp. at 7. However, plaintiffs offer no facts plausibly

18  suggesting that the tenants would be complicit in a conspiracy in which they were paying out much

19  if not all of their gains. Plaintiffs' theory is further implausible because most of the properties were

20  sold in 2004 and 2005, with the remaining few sold by 2006, but most plaintiffs did not experience

21  problems in rent payments until 2007, with the properties being abandoned in late 2007 or 2008.

22  The long periods of steady rent payments, followed by gradually increasing problems, do not

23  plausibly support plaintiffs' theory of tenants eager to abandon their obligations and leave plaintiffs

24  with all of the risk.

25      Because plaintiffs' allegation of fraudulent intent on the part of the tenants is implausible, it

26  is yet more implausible that the other defendants knew what ultimately would happen and

27  intentionally concealed that result from plaintiffs.

28

ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC/LJP                                    17

United States District Court
For the Northern District of California

In addition to their theory that the tenants specifically intended to abandon the properties, plaintiffs allege that some defendants knew the leases were essentially doomed to fail because of the inflated rental rates the tenants were required to pay. Again, this theory is not plausible in light of the significant payments the tenants were able to make. Furthermore, plaintiffs offer little to support their contention that these rents were inflated at all other than the fact that plaintiffs were unable to find another tenant willing to pay the same amount after the original lease was breached. Plaintiffs' attempts to find new leases years later in substantially different economic conditions do not provide enough support for their allegation that the original rental rates were unsustainable from the outset.

### b.  Pleading of Factual Circumstances with Particularity

### i.  Sovereign Subsidiaries

The Sovereign Subsidiaries argue that plaintiffs fail to allege with particularity that they participated in a pattern of mail and wire fraud. Specifically, the Sovereign Subsidiaries assert that plaintiffs' allegations of predicate acts are simply a laundry list with no dates and no acts specified showing the use of mails or interstate communications. However, this ignores that for each transaction plaintiffs include a lengthy, if generic, summary of the course of communications between the plaintiff purchaser and a broker defendant. Plaintiffs also allege that the wires and U.S. mail were used in the course of those communications. Although plaintiffs do not specify the contents or date of every individual conversation, the court finds that there is sufficient detail in plaintiffs' complaint to satisfy Rule 9(b). *See In re Sumitomo Copper Litig.*, 995 F. Supp. 451, 456 (S.D.N.Y. 1998) (noting in cases where a plaintiff claims that the mails or wires were simply used in furtherance of a master plan to defraud, and therefore need not have contained false or misleading information themselves, "a detailed description of the underlying scheme and the connection therewith of the mail and/or wire communications[] is sufficient to satisfy Rule 9(b)"). Plaintiffs allege that the Sovereign Subsidiaries purchased certain of the properties at issue from the respective Morabito or Waelti entities and resold them to plaintiffs. This is sufficient to support an inference that the Sovereign Subsidiaries would reasonably foresee the use of the mails and wires during the sale process. Thus, plaintiffs have sufficiently alleged the factual circumstances of the fraud as to the Sovereign Subsidiaries.

### ii.     Morabito and BMI

Like the Sovereign Subsidiaries, defendants Morabito and Baruk Management, Inc. ("BMI") argue that plaintiffs fail to identify any predicate acts attributable to them.  Plaintiffs allege that the Jiffy Lube tenants, who executed sale-leaseback agreements with the Sovereign Subsidiaries and later walked away from the leases, were controlled by Morabito.  Morabito was an officer of Eureka Petroleum Inc. ("Eureka") and Tibarom Inc. ("Tibarom"), and a Member of other entities.  FAC ¶ 760.  In addition, the purchases and operation of Jiffy Lube franchises, apparently carried out by these companies, were sometimes attributed to Morabito himself.  *Id.* ¶¶ 22, 763.  Morabito was also quoted discussing his companies' sale-leaseback transactions.  *Id.* ¶ 22.  Morabito argues that the complaint fails to show that he personally represented, or knew that other defendants were representing, himself as the person behind the Jiffy Lube franchises.  However, at this stage of proceedings, the court finds that plaintiffs' allegations are sufficient to support an inference that Morabito was personally involved in the alleged purchases and subsequent sale-leaseback transactions, at least as an agent of the entities who actually executed the agreements.  It is also plausible that the mails or wires were used in these transactions or it was foreseeable to Morabito that the mails or wires would be used when the tenants' leases were later assigned to plaintiffs.  Thus, aside from the failure to plausibly allege fraudulent intent, discussed above, plaintiffs have adequately alleged Morabito's involvement in predicate acts.

As to BMI, the only predicate act alleged is the preparation and dissemination of false and fraudulent financial documents, namely balance sheets for Tibarom and Eureka that failed to reflect the present value of future lease obligations.  FAC ¶¶ 149, 728.  However, the only acts of dissemination specifically alleged are that, in two of the transactions, the broker sent the plaintiff a balance sheet or report that had been prepared by BMI.  *Id.* ¶¶ 241, 465.  These allegations lack the particularity required under Rule 9(b).  The complaint does not allege whether the transmitted documents are ones that contained the previously-alleged misstatement or, if not, how they are false.  In addition, no facts are alleged suggesting BMI's involvement in or knowledge of the dissemination step, without which there is no predicate act.  Plaintiffs also allege that BMI is an alter ego of Morabito, but the only supporting facts are that Morabito was a Member of BMI and BMI's principal

place of business was located at the same address as other Morabito entities.  This falls far short of the alter ego requirements discussed above.  Thus, plaintiffs have failed to allege a basis for BMI's liability under RICO.

### iii.     PGP

PGP argues that plaintiffs have failed to allege exactly how PGP was personally involved in the fraud.  Although plaintiffs allege that PGP prepared appraisals of the properties sold to certain plaintiffs, plaintiffs do not connect those appraisals to the alleged scheme to defraud plaintiffs.  Notably, plaintiffs do not allege that they ever received any of these appraisals, much less that they relied on them.  In some cases, plaintiffs allege that the appraisal was transmitted to their *lenders*, but again, there are no allegations connecting that fact to the alleged fraud against plaintiffs.  FAC ¶¶ 128, 250, 331, 442.  In other instances, plaintiffs simply allege that an appraisal was prepared, with no further facts as to how it was used or to whom it was sent.  FAC ¶¶ 158, 186, 211, 368.  It is these two sets of allegations that plaintiffs cite when they argue that they have alleged "PGP's specific involvement" with them.  Opp. at 37.  But the mere preparation of an appraisal, even a false one, does not amount to "involvement" with plaintiffs who are not alleged to have ever seen it.

Other than the fact that PGP prepared certain appraisals, the remainder of plaintiffs' allegations about PGP's conduct are simply bare recitations of RICO elements that lump PGP together with other defendants. *See, e.g.*, FAC ¶¶ 145-46, 187, 198, 201-02.  These conclusory allegations are not entitled to a presumption of truth, nor do they meet the requirement of particularity under Rule 9(b).  The closest plaintiffs come to alleging specific conduct taken by PGP with respect to plaintiffs is that it failed to reveal to plaintiffs "and so intentionally concealed" that it used comparables that were also properties whose values were intentionally inflated by Sovereign Investment.  FAC ¶ 102.  But because there are no allegations that PGP had any interaction with plaintiffs at all, a mere failure to disclose cannot plausibly be interpreted as concealment.  Thus, the factual allegations against PGP fail to show that PGP played a role in any fraudulent scheme directed at plaintiffs.

/ / /

/ / /

#### iv.      Tibarom Entities

Defendants Tibarom NY, LLC and Tibarom PA, LLC (collectively, "Tibarom Entities") argue that plaintiffs failed to supplement the insufficient allegations of the original complaint and do not allege any predicate acts by them.  Plaintiffs allege that certain leases were assigned to one of the Tibarom Entities after the properties were purchased by plaintiffs, and that the Tibarom Entities paid rent for varying periods of time and then abandoned the properties.  The court accepts the Tibarom Entities' assertion, unchallenged by plaintiffs, that the allegations remain substantially unchanged. However, upon consideration of the allegations in the FAC, the court finds that the problem is not a lack of particularized facts per se.  Plaintiffs have alleged the specific conduct in which these Tibarom Entities engaged and why plaintiffs contend that conduct was fraudulent.  As discussed above, plaintiffs' claim fails because there is no plausible allegation, with factual support, of intent.

Plaintiffs also allege that the Tibarom Entities are alter egos of Morabito.  But such allegations, even if sufficient, would only establish liability by Morabito for any conduct of the Tibarom Entities, not vice versa.  Plaintiffs have not asserted nor alleged facts to support a theory of reverse piercing nor of agent-principal liability.

#### 5.      Proximate Causation

RICO provides a civil remedy only to those persons injured "by reason of" the defendants' predicate acts.  Defendants argue that because plaintiffs admit that they were alerted to the risks of so-called SCTLs before they decided to invest, plaintiffs have failed to allege that defendants proximately caused any injury.[3]  This contention is unpersuasive in light of the fact that plaintiffs specifically allege that they did not know that they were investing in a debt/real estate hybrid and did not understand the risks of the investment.  Even though plaintiffs now define SCTLs as investments whose value is partially based on rental income from a "Sub-Credit" tenant–i.e., one which "has not been rated by a credit rating agency" and about which there was "no available independent analysis of the risk of bankruptcy and default," FAC ¶ 12, those allegations do not necessarily demonstrate that plaintiffs' alleged injury is due to deliberate investment choices because

---

[3]  Defendants also argue that plaintiffs disclaimed reliance on representations by third parties in their purchase and sale agreements.  For the reasons stated above, the court declines to take judicial notice of the purchase and sale agreements.

1   they knew or should have known at the time that the investments they were pursuing carried a high

2   rate of return to offset the significant risks.

3        Defendants also argue that plaintiffs' allegations regarding the purported "true fair market

4   values" of the properties are conclusory and implausible.  Specifically, the alleged "true fair market

5   values" are less than what the tenants paid in buying the properties from third parties, even though,

6   by plaintiffs' own theory, the value should have increased because the properties were now subject

7   to a long-term lease.  Plaintiffs provide no response except to argue that a challenge to these

8   allegations is premature.  The court agrees that plaintiffs' allegations of fair market values are

9   suspect in light of the prices paid by the tenants to third parties.  However, the issues of injury and

10  proximate causation are too fact-bound to be resolved at this stage.  It is undisputed that plaintiffs

11  paid more than the tenants for the properties.  Although, as defendants argue, the increase in price

12  may be consistent with a hot real estate market and the additional value from a long-term lease, it is

13  also plausible that plaintiffs paid more than what would have been a justified increase in value.  It is

14  also undisputed that plaintiffs have been harmed in that they no longer receive the monthly rent

15  payments to which they were contractually entitled.  Thus, at this stage, the allegations are sufficient

16  to support proximate cause.

17                    **6.    Conspiracy Claim**

18       Plaintiffs also allege that defendants are liable under § 1962(d).  Liability for a RICO

19  conspiracy claim under § 1962(d) does not require that the defendant commit or agree to commit

20  two or more predicate acts.  *Salinas v. United States*, 522 U.S. 52, 65-66 (1997).  It is sufficient that

21  the conspirator adopt the goal of furthering or facilitating an endeavor which, if completed, would

22  satisfy all of the elements of the substantive offense.  *Id.* at 65.  "One can be a conspirator by

23  agreeing to facilitate only some of the acts leading to the substantive offense." *Id.*  However, a civil

24  RICO plaintiff must still show injury caused by an act of racketeering.  *See Beck v. Prupis*, 529 U.S.

25  494, 507 (2000) ("[A] person may not bring suit under § 1964(c) predicated on a violation of

26  § 1962(d) for injuries caused by an overt act that is not an act of racketeering.").

27       Here, as discussed above, plaintiffs have failed to allege a plausible scheme to defraud and

28  therefore have not established any predicate acts of racketeering.  Thus, plaintiffs' conspiracy claim

**United States District Court**
For the Northern District of California

1   fails as well. *See also Religious Tech. Ctr.*, 971 F.2d at 367 n.8 (dismissing RICO conspiracy claim

2   because plaintiff "has failed to allege the requisite substantive elements of RICO").

3          Even if the alleged scheme to defraud were plausible, the conspiracy claim must still be

4   dismissed as against certain defendants. First, as discussed above, there are no allegations of direct

5   conduct by M&M, and plaintiffs' allegations are insufficient to support alter ego liability. In the

6   absence of factual allegations about M&M's involvement, plaintiffs' conclusory assertion that

7   "Defendants willfully agreed to, and did, materially participate, directly or indirectly, in" a § 1962(c)

8   violation, FAC ¶ 733, is insufficient under *Iqbal*.

9          Second, in the case of the M&M Brokers, the limited involvement alleged of these

10  individuals not only precludes a § 1961(c) claim but also renders a conspiracy claim implausible.

11  *See Salinas*, 522 U.S. at 65-66 ("In some cases the connection the defendant had to the alleged

12  enterprise or to the conspiracy to further it may be tenuous enough so that his own commission of

13  two predicate acts may become an important part of the [plaintiff's] case."). Indeed, plaintiffs

14  acknowledge that the primary factual support for the assertion of an agreement is the similarities

15  across the multiple transactions. *See* Opp. at 36 ("Defendants' agreement to conspire with another

16  and their knowledge of the scheme is highlighted by the fact that they engaged in essentially *the*

17  *same course of fraudulent conduct* over a substantial period of time." (emphasis in original)). The

18  M&M Brokers, however, were each involved in only one or a few transactions, which does not

19  support an inference of knowledge or agreement on their part. Moreover, in *Twombly*, the Supreme

20  Court found allegations of an agreement between the defendants implausible because it was based

21  solely on the factual allegations of parallel conduct–conduct which the Court found was "consistent

22  with conspiracy, but just as much in line with a wide swath of rational and competitive business

23  strategy unilaterally prompted by common perceptions of the market." *See Bell Atlantic Corp. v.*

24  *Twombly*, 550 U.S. 544, 554, 564-69 (2007). Similarly, the M&M Brokers here are simply alleged

25  to have performed their typical business roles of acting as brokers of properties. Plaintiffs do allege

26  that the M&M Brokers made numerous misrepresentations about the financial situation of the

27  Morabito and/or Waelti entities and gave plaintiffs unjustified reassurances about the safety and

28  security of their investments. However, while these allegations may support claims arising out of

ORDER GRANTING MOTIONS TO DISMISS—No. C-09-00511 RMW
MEC/LJP                                                    23

those specific transactions, they do not plausibly suggest that the M&M Brokers were aware of any overarching scheme, much less that they agreed to act in furtherance of that scheme.

### C.    State Law Claims

Having concluded that the RICO claim must be dismissed, the court declines to exercise supplemental jurisdiction over the state law claims. *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The court notes that, although plaintiffs have failed to sufficiently allege a fraudulent scheme in the context of a RICO claim, plaintiffs allege a general series of misrepresentations and omissions in the course of each transaction that may support state law claims against some defendants. The court does not express an opinion on whether those misrepresentations are pled with sufficient particularity, but does not believe the claims are foreclosed solely based on the court's conclusions with respect to the RICO claim.

### D.    Leave to Amend

Plaintiffs were previously given an opportunity to amend their complaint, which resulted in the addition of nearly sixty pages of allegations. Notwithstanding the complaint's increasingly unmanageable length, plaintiffs' RICO claim continues to suffer from fundamental pleading defects, as discussed above. The court recognizes that its previous order did not provide much detail in analyzing some of the complaint's deficiencies. However, plaintiffs have given no indication that they would be able to amend to state a valid claim. Notably, plaintiffs in their previous attempt to amend did not add any factual allegations as to many of the defendants, even when apprised of the court's concerns. For example, the court noted that the original complaint failed to adequately allege that each defendant engaged in a pattern of racketeering activity, "in particular lacking facts for the individual broker defendants who are alleged to have been involved in only one transaction, or a couple of transactions within a relatively short amount of time." Dkt. No. 253 at 5. But the FAC does not contain allegations of any additional conduct by the M&M Brokers, and plaintiffs simply repeated much of their original opposition in opposing the new motion to dismiss. Thus, plaintiffs have not demonstrated an ability to allege additional conduct or details that would support defendants' liability. Nor have plaintiffs requested leave to amend.

In addition, as discussed above, the flaw in plaintiffs' RICO claim is not so much lack of particularity as lack of plausibility. That is not necessarily fixed by additional facts; indeed, it is the factual details in the complaint that render plaintiffs' theory implausible. It does not appear to the court that plaintiffs could plead around these facts so as to formulate a viable RICO claim against defendants. Thus, the court finds that it is appropriate to dismiss the complaint without further leave to amend. *See Mir v. Fosburg*, 646 F.2d 342, 347 (9th Cir. 1980) ("[A] district court has broad discretion to grant or deny leave to amend, particularly where the court has already given a plaintiff one or more opportunities to amend his complaint to allege federal claims."); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1097 (9th Cir. 2002) ("Leave to amend need not be granted when an amendment would be futile.").

### ORDER

Defendants' motions to dismiss are granted. Count I, alleging a violation of RICO, is dismissed with prejudice. The court declines to assert supplemental jurisdiction over the remaining claims, and, therefore, they are dismissed without prejudice. The motion to strike plaintiffs' jury demand is moot.

DATED:     March 5, 2012

RONALD M. WHYTE
United States District Judge

**United States District Court**
For the Northern District of California